IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| INTERNATIONAL PAPER COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| BEAZLEY INSURANCE COMPANY, ) | JURY TRIAL DEMANDED |
| INC. and ZURICH AMERICAN ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff, International Paper Company ("International Paper" or "IP"), by and through its undersigned attorneys, files this Complaint alleging as follows:

## NATURE OF THE ACTION

1. This is an insurance coverage action arising out of a theft that was committed against International Paper by one of its employees, Sitaraman Jagannath, who spent years stealing money from International Paper through a scheme designed to abuse the company's diversity supplier program in order to illegally funnel tens of millions of dollars to entities controlled by Mr. Jagannath and/or his half-brother (the "Employee Theft Scheme").

2. The Defendant insurance companies, Beazley Insurance Company Inc. ("Beazley") and Zurich American Insurance Company ("Zurich") (collectively, the "Insurers") issued their respective commercial crime insurance policies to International Paper that provide coverage for Mr. Jagganath's Employee Theft Scheme. However, the Insurers have failed to honor their contractual obligations to provide coverage.

3. International Paper seeks monetary damages from the Insurers for the breach of their contractual obligations under their commercial crime policies, as further described herein.

## PARTIES

4. Plaintiff, International Paper, is a corporation organized under the laws of New York, with its principal place of business in Memphis, Tennessee.

5. Beazley Insurance Company, Inc. ("Beazley") is a corporation organized under the laws of Connecticut, with its principal place of business in Farmington, Connecticut.

6. Zurich American Insurance Company ("Zurich") is a corporation organized under the laws of Illinois, with its principal place of business in Schaumburg, Illinois.

## JURISDICTION

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court has personal jurisdiction over the Insurers pursuant to Rule 4 of the Federal Rules of Civil Procedure and Tenn. Code Ann. § 20-2-223 because the Insurers are transacting business in Tennessee, contracting to supply services in Tennessee, and contracting to insure persons, property or risks located within Tennessee.

9. Venue of this action is proper in this District under 28 U.S.C. § 1391 and in its Western division under 28 U.S.C. §123 because the Insurers issued the insurance policies at issue in this action to International Paper in Shelby County, Tennessee, and a substantial part of the events giving rise to International Paper's coverage claim took place in Shelby County.

## FACTUAL BACKGROUND

A. **The International Paper Crime Policies**

10. The Insurers each issued a commercial crime insurance policy to International Paper with a policy period from July 1, 2019 through July 1, 2020.

11. These two policies, defined further herein, are referred to collectively as the "Crime Policies." International Paper reserves the right to claim coverage under additional insurance policies not identified in this Complaint.

12. International Paper paid all premiums due to the Insurers in consideration for the Crime Policies.

13. International Paper gave timely notice to the Insurers of its claim for coverage under the Crime Policies, and all conditions precedent to recovery under the Crime Policies are satisfied, waived or otherwise inapplicable.

### 1. *The Beazley Commercial Crime Policy*

14. Beazley issued to International Paper Company the Beazley Commercial Crime Policy no. V27C90190101, with a policy period of July 1, 2019 through July 1, 2020 (the "Beazley Crime Policy").

15. The Beazley Crime Policy provides $15 million in coverage, subject to a $1 million deductible, for "Employee Dishonesty," which is defined as including "Loss resulting directly from Employee Theft or Employee Forgery."

16. "Employee Theft," in turn, is defined as "the unlawful taking of Money, Securities, or Property to the deprivation of an Insured by an Employee, whether identified or not, acting alone or in collusion with others to obtain financial benefit for the Employee[.]"

17. "Loss" is defined to mean "direct financial loss."

### 2. *The Zurich Crime Insurance Excess Policy*

18. For the same July 1, 2019 through July 1, 2020 policy period, Zurich issued to International Paper the Crime Insurance Excess Policy, No. FID 0198398-03 (the "Zurich Crime Excess Policy").

19. The Zurich Crime Excess Policy provided International Paper with an additional $15 million of coverage, immediately excess of the limits of the Beazley Crime Policy.

20. Specifically, the Zurich Crime Excess Policy states that it "shall provide the Insureds with insurance coverage during the Policy Period excess of the Underlying Insurance."

21. The "Insured" is International Paper and the "Underlying Insurance" is Beazley Insurance Company, Policy Number: V27C90190101.

22. The Zurich Crime Excess Policy states that "in the event of the reduction or exhaustion of the Limit(s) of Liability of the Underlying Insurance solely as the result of actual payment of loss covered thereunder, this policy shall: (i) in the event of reduction, pay excess of the reduced Limit(s) of Liability of the Underlying Insurance, and (ii) in the event of exhaustion, continue in force as primary insurance excess of the retention applicable in the Primary Policy[.]"

### B. International Paper and Mr. Jagannath's Employment

23. International Paper is one of the world's leading producers of fiber-based packaging, pulp and paper.

24. Mr. Jagannath was employed by International Paper for approximately 30 years, from July 1987 to December 2019.

25. Beginning in October 2009, Mr. Jagannath was a manager in International Paper's raw materials buying group.

26. From April 2013 until his separation from International Paper on December 1, 2019, Mr. Jagannath served as International Paper's Sourcing Manager for Global Specialty Chemicals.

27. As the Sourcing Manager for Global Specialty Chemicals, Mr. Jagannath was in charge of implementing and supervising the purchase of certain specialty chemicals for International Paper's various paper mills and operations.

28. On an annual basis, Mr. Jagannath was responsible for tens of millions of dollars in purchases by International Paper.

29. International Paper has long had a commitment to improving communities in which it operates and in which its employees live. Part of International Paper's commitment to positive community impact is its supplier diversity program.

30. Dating back more than a decade, International Paper has taken steps to increase its percentage of its purchases from minority and women owned businesses. As a result, purchasing and procurement personnel within International Paper have been encouraged to do business with diverse suppliers such as veteran, minority and women-owned businesses, subject to internal procurement approvals and processes, and subject to the requirement that diverse suppliers provide market-rate prices for goods and/or services rendered.

31. Among his duties, Mr. Jagannath was tasked with identifying and developing diverse suppliers of specialty chemicals that were available and capable of adding value in a purchase transaction.

32. While performing his job as Sourcing Manager for Global Specialty Chemicals, Mr. Jagannath was also subject to, and was required to abide by, all of International Paper's

internal policies and procedures including, but not limited to, International Paper's Conflict of Interest Policy.

33. International Paper's Conflict of Interest Policy prohibits employees from entering into financial dealings with persons or companies with which the employee has a personal or financial interest, including but not limited to dealings with family members, without disclosing such interests and obtaining appropriate management approvals.

34. While performing his job as Sourcing Manager for Global Specialty Chemicals, Mr. Jagannath was also obligated to act for the best interests of International Paper and its shareholders and not to engage in business activities to benefit himself or his family members.

C. **Mr. Jaggannath's Employee Theft Scheme**

35. The universe of suppliers of specialty chemicals used by International Paper is relatively limited to a handful of companies, all of which in 2005, were majority owned – i.e., they were not diverse suppliers.

36. Prior to 2005, the Global Sourcing Specialty Chemicals area within International Paper did not procure specialty chemicals from diverse suppliers because none had yet been identified as being capable of meeting company needs.

37. In August 2005, Diversified Global Sourcing, Inc. ("DGS") was created, and Mr. Jagannath's half-brother, Shiv Kumar Seetharaman ("Shiv Kumar"), was the head of the company.

38. DGS is a Tennessee corporation, with a principal place of business in Memphis, Tennessee.

39. Without disclosing his relationship to DGS or that Shiv Kumar was his half-brother, Mr. Jagannath arranged to have DGS register as a diverse supplier with International

Paper, and Mr. Jagganath began directing International Paper to do business with DGS sometime between 2005 and 2010.

40. Specifically, DGS became a diverse supplier for International Paper, entering into relationships directly with International Paper and with several majority suppliers that contracted with International Paper for the sale of specialty chemicals.

41. In the instances where DGS was engaged by Mr. Jagannath as a diverse supplier, Mr. Jagannath would intentionally displace the incumbent majority supplier for DGS. DGS would then enter into a corresponding contract and/or business relationship with the displaced majority supplier such that the majority supplier would sell specialty chemicals to DGS, which in turn would sell those same chemicals to International Paper.

42. DGS was operated as a pure pass-through from the majority suppliers to International Paper, but DGS marked up the price International Paper would otherwise have paid the majority supplier directly for specialty chemicals, operating as a sham "middleman" entity to funnel money from International Paper to DGS, which was controlled by Mr. Jagannath's half-brother, Shiv Kumar.

43. Records from 2011 and 2012 show that International Paper made invoice payments to DGS for specialty chemicals procured totaling approximately $3.6 million.

44. Upon information and belief, DGS was the only diverse supplier for International Paper's specialty chemicals purchases during that period.

45. Beginning in 2012 and through early 2020, International Paper has records of specific amounts paid to DGS for specialty chemicals.

46. Those records show that in 2013, International Paper paid DGS in excess of $11 million.

47. In 2014, International Paper paid DGS in excess of $11 million.

48. In 2015, International Paper paid DGS in excess of $16 million.

49. In 2016, International Paper paid DGS in excess of $20 million.

50. In 2017, International Paper paid DGS in excess of $25 million.

51. Upon information and belief, due to one of the majority supplier's objection to conducting business with DGS, Mr. Jagannath and Shiv Kumar created a second diverse supplier to act as a pass-through entity to continue to funnel money to themselves in transactions involving that particular supplier. Specifically, Mid South Diversity Group, Inc. ("Mid-South") – ostensibly located in the Dallas-Ft. Worth area – was formed in 2015, and the Employee Theft Scheme continued in the same manner with Mid-South as with DGS.

52. In 2018, International Paper paid DGS and Mid-South collectively in excess of $29 million.

53. In 2019, International Paper paid DGS and Mid-South collectively in excess of $33 million.

54. In the aggregate, between 2013 and 2020, International Paper paid DGS and Mid-South collectively in excess of $148 million, of which tens of millions of dollars had been retained by DGS and Mid-South before paying the remainder over to the majority suppliers that were actually providing all of the goods and services that International Paper had purchased.

55. DGS and Mid-South were essentially "shell" companies, with little or no operating assets and employees and, on information and belief, these companies were created for the purpose of carrying out Mr. Jagganath's Employee Theft Scheme.

56. DGS and Mid-South would mark up invoices and pass along the goods and services from the majority suppliers to International Paper without providing any value-added services to International Paper in exchange for the mark-up they were charging.

57. Mr. Jagganath's Employee Theft Scheme was not discovered prior to the latter part of 2019 because Mr. Jagannath took efforts to disguise and hide his scheme from International Paper and from others.

58. In 2019, Mr. Jagannath announced his impending retirement.

59. As Mr. Jagannath was transitioning to retirement in the latter part of 2019 and being replaced with a new Sourcing Manager for Global Specialty Chemicals, questions about the relationship between Mr. Jagannath, DGS and Mid South were raised within International Paper, and an investigation commenced. After continued questioning, Mr. Jagannath eventually admitted that Shiv Kumar was his half-brother.  At that point, Mr. Jagannath's Employee Theft Scheme began to be uncovered by International Paper.

60. As a result of Mr. Jagannath's course of conduct in funneling money to his own pockets through payments to DGS and Mid-South, International Paper estimates that it overpaid for specialty chemicals in an amount in excess of $34 million during the period between 2013 and 2020, which amounts were siphoned off by DGS and Mid-South for the personal benefit of Mr. Jagganath and Shiv Kumar.

61. In late 2019, International Paper advised the U.S. Attorneys' Office, the Federal Bureau of Investigation, and the International Revenue Service of Mr. Jagganath's Employee Theft Scheme.

62. These federal agencies investigated the scheme, and the U.S. Attorneys' Office for the Western District of Tennessee filed a criminal complaint against Mr. Jagannath on December 16, 2019.

63. On October 5, 2020, International Paper filed a civil suit against Mr. Jagannath, Shiv Kumar, DGS, Mid South and other related companies seeking compensatory damages in the amount of more than $30 million.

64. On September 24, 2022, the parties reached a settlement agreement of the civil suit (the "Settlement Agreement"), under which International Paper has recovered a portion of the amounts Mr. Jagannath had stolen from International Paper through the Employee Theft Scheme perpetrated over the years.

65. In the Settlement Agreement, Mr. Jagannath acknowledged that DGS and Mid-South had received funds from International Paper pursuant to their contracts with IP and its suppliers, and that some of those funds were transferred to accounts controlled by Mr. Jagannath.

66. Although International Paper recovered a portion of the stolen funds by virtue of the Settlement Agreement, the remaining portion of the funds stolen – totaling in the many millions of dollars – have not been recovered, and those unrecovered funds are the subject of International Paper's coverage demand to the Insurers.

**D.      Communications Between International Paper and the Insurers**

67. International Paper provided timely notice of the Employee Theft Scheme to the Insurers after it was discovered.

68. Since notice was provided, in response to the Insurers' requests for information about the nature of the Employee Theft Scheme and the losses relating thereto, International

Paper has produced thousands of documents to the insurers and responded to countless written questions regarding the details of the scheme.

69. Moreover, on April 8, 2022, and August 31, 2022, an examination under oath of the individual who replaced Mr. Jaggannath as International Paper's Manager for Global Specialty Chemicals was conducted, and he responded to the Insurers' questions regarding details of the Employee Theft Scheme.

70. Notwithstanding that International Paper has provided the Insurers with the information necessary for the Insurers to acknowledge and accept coverage under their Crime Policies for this Loss, the Insurers have not accepted coverage and have given no indication that they will do so within any particular time period. Thus, by their actions, the Insurers have effectively denied International Paper the coverage they purchased under the Insurers' Crime Policies.

## COUNT I
## BREACH OF CONTRACT

71. International Paper repeats and re-alleges all of the allegations set forth previously in this Complaint as if set forth fully herein.

72. Defendants have breached their contracts of insurance affording coverage to International Paper by refusing or failing to acknowledge their duty to provide coverage to International Paper for the Employee Theft Scheme.

73. All conditions precedent to recovery under the Crime Policies have been satisfied or waived.

74. As a direct result of Defendants' breaches of their contracts of insurance, International Paper has been deprived of the benefit of the insurance coverage for which substantial premiums were paid. International Paper has incurred actual damages because it has

suffered many millions of dollars of financial losses and has incurred substantial sums in investigating these losses and pursuing recovery from Mr. Jagganath, with no coverage for those losses and expenses from the Insurers.

75.     As a direct result of the Defendants' breaches of their contracts of insurance, International Paper has been forced to incur, and will continue to incur, additional consequential damages, including without limitation, the costs of attorneys' fees and other expenses in order to prosecute this action.

## PRAYER FOR RELIEF

WHEREFORE, International Paper requests that the Court enter judgment against the Insurers, jointly and severally, and award International Paper:

a.  Actual money damages for an amount in excess of $75,000;

b.  Reasonable attorneys' fees and expenses, costs of this suit, pre-judgment and post-judgment interest; and

c.  Such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

International Paper demands a trial by jury on all issues so triable.

| | |
|---|---|
| Dated: November 11, 2022 | *s/ Jason W. Callen* <br> Jason W. Callen <br> TN Bar #015076 <br> K&L Gates LLP <br> 222 Second Avenue S <br> Suite 1700 <br> Nashville, TN 37201 <br> (615) 780-6729 <br><br> *Of Counsel:* <br> John M. Sylvester (*pro hac vice* forthcoming) <br> Laura K. Veith (*pro hac vice* forthcoming) <br> K&L Gates Center <br> 210 Sixth Avenue <br> Pittsburgh, Pennsylvania 15222 <br> (412)-355-6500 <br><br> *Counsel for Plaintiff International Paper Company* |