# **Exhibit 20**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| INTERNATIONAL PAPER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-02789- TLP-CGC |
| v. | ) | |
| | ) | |
| BEAZLEY INSURANCE COMPANY, INC., | ) | |
| and ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANT BEAZLEY INSURANCE COMPANY'S
### SUPPLEMENTAL RESPONSES TO PLAINTIFF'S
### FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Beazley

Insurance Company ("Beazley"), by its attorneys, hereby submits its supplemental responses to

Plaintiff's First Set of Interrogatories (the "Interrogatories") as follows:

### GENERAL OBJECTIONS

1.     In responding to the Interrogatories, Beazley does not waive, but instead expressly

reserves, all defenses and objections to each of the claims alleged in the Complaint filed by

Plaintiff on November 11, 2022.

2.     Beazley provides this response to the Interrogatories without waiver or prejudice to

its rights, at any later time, to raise objections to (a) any further demand or discovery involving or

relating to the matters raised in the Interrogatories, or (b) the authenticity, relevance, materiality,

or admissibility of (i) the Interrogatories or any part thereof or (ii) statements made in these

responses to the Interrogatories or any part thereof.

26289330-v3

3.     Beazley objects to the Interrogatories to the extent they assume facts and/or legal conclusions, or call for, or call upon it to reveal, legal conclusions to Plaintiff.  The responses below shall not be deemed to constitute admissions (i) that any particular document or thing exists, is relevant, or admissible in evidence, or (ii) that any statement or characterization in the Interrogatories is accurate or complete.  Beazley further objects to any implications and to any explicit or implicit characterization of the facts, events, circumstances, or issues in the Interrogatories.  Any response is not intended to indicate that Beazley agrees with any such implications or characterizations, or that such implications or characterizations are relevant to this litigation.

4.     Beazley objects to the Interrogatories to the extent they purport to require it to search through an unduly large quantity of data or to search for information that is not accessible, available or locatable without imposing an undue burden upon it. Beazley objects to the Interrogatories to the extent that they are unduly burdensome to the extent they seek information that is available, in a way that would be less burdensome or less expensive, from either a public source or some other source available to Plaintiff, or for which the burden of deriving or ascertaining the answer is substantially the same for Beazley as for Plaintiff.

5.     Beazley undertakes to respond to the Interrogatories only to the extent called for by Federal Rules of Civil Procedure 26 and 33, the Local Rules, and the orders of this Court.  Beazley objects to the Interrogatories to the extent that they call for it to undertake to respond or to provide information in any manner inconsistent with or beyond the terms of those Rules and any orders of this Court.

6.     Any specific responses are based on information now available to Beazley after having made a diligent inquiry.

7.  Beazley objects to the Interrogatories to the extent they call for the disclosure of communications protected by the attorney-client privilege, the common interest privilege, the work product doctrine, and/or any other applicable privilege.  In the event that any privileged or otherwise protected communication is disclosed, the disclosure is inadvertent and does not constitute a waiver of any privilege or protection.

8.  These General Objections are hereby incorporated by reference into each separate response.  Except as otherwise noted, Beazley objects to the production of any information encompassed within one of the General Objections set forth above.  In the event any information submitted falls within any objection, its production does not constitute waiver of the objection. The inclusion of any specific objection to an interrogatory in any response below is neither intended as, nor shall in any way be deemed, a waiver of any General Objection or of any other specific objection made herein or that may be asserted at a later date.  In addition, the failure to include at this time any objection to an interrogatory is neither intended as, nor shall in any way be deemed, a waiver of Beazley's rights to assert that or any other objection at a later date.

9.  Beazley objects to these contention interrogatories as premature.  Discovery is in its early stages and Plaintiff has refused to produce documents necessary for Beazley to respond to these contention interrogatories.  Beazley reserves the right to modify these responses and objections.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.  Beazley objects to Definition 7, which defines the terms "You," "Your," "Yours," "Defendant" and "Beazley," because it is (i) overly broad, (ii) unduly burdensome, (iii) seeks information from other parties and third parties not under Beazley's control, and  (iv) seeks information or documents that are not relevant to Plaintiff's Complaint against Beazley or not

proportional to the needs of the case insofar as it includes parties other than Beazley. For purposes of these responses to the Requests, the terms "You" and "Your" shall be interpreted to refer to Beazley.

2.        Beazley objects to Instruction Nos. 2 and 4 insofar as they purport to impose obligations beyond those permitted by the Federal Rules of Civil Procedure.

<u>**RESPONSES AND SPECIFIC OBJECTIONS**</u>

**INTERROGATORY 1**:

Identify all Persons who participated in preparing the answers to this set of Interrogatories.

**<u>Response</u>**:  Beazley objects to this Interrogatory to the extent that it calls for disclosure of information protected by the attorney-client privilege, the work product doctrine, the joint defense privilege and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that counsel for Beazley assisted in preparing answers to these Interrogatories and the answers were reviewed by Pia Ellis of Beazley, who can be contacted through counsel.

**<u>INTERROGATORY 2</u>**:

Identify all facts supporting Your denial of any of the allegations set forth in the Complaint.

**<u>Response</u>**:  Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information

-4-

prepared in anticipation of litigation, and any other applicable privilege or other protection. Beazley objects to the extent that this Interrogatory asks it to provide the factual basis for every denial of allegations set forth in the 75-Paragraph Complaint, ECF No. 1 (the "Complaint"). Beazley also objects to this Interrogatory to the extent that it seeks information regarding any of Beazley's "denials" in the Complaint based on the fact that Beazley "lack[ed] knowledge or information sufficient to form a belief as to the truth of the [subject] allegations."

Subject to and without waiving the foregoing general and specific objections, Beazley identifies the following facts that support its affirmative denials of the substantive allegations in the Complaint:

Beazley issued Beazley Commercial Crime Policy No. V27C90190101 to International Paper Company for the July 1, 2019 to July 1, 2020 policy period (the "Policy").[1] The Policy included coverage for Employee Dishonesty, up to a $15,000,000, each loss, limit of liability and a $1,000,000, each loss, deductible. The Policy's coverage for Employee Dishonesty provides, in relevant part, that Beazley "will indemnify the **Insured** for . . . **Loss** resulting directly from **Employee Theft**[.]" The Policy defines Employee Theft as "the unlawful taking of **Money**, **Securities** or **Property** to the deprivation of an **Insured** by an **Employee**, whether identified or not, acting alone or in collusion with others to obtain financial benefit for the Employee[.] Financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commission, fees, bonuses, promotions, awards, profit sharing or pensions."

---

[1] While certain Policy provisions are reflected here for convenience, pursuant to Rule 33(d), Beazley further refers Plaintiff to the complete terms and conditions of the Policy, reserving its right to rely on and language not expressly included here.

The Discovery provision in the Policy states that "th[e] Policy only applies to **Loss** which is **Discovered** during the **Policy Period**." Further, "[a]s a condition precedent to coverage hereunder that, upon **Discovery** of **Loss** or an occurrence," Plaintiff shall "not take any action which in any way increases [Beazley's] exposure under this Policy."

The Policy's Subrogation provision provides:

> In the event of any payment under this Policy, [Beazley] shall be subrogated to the extent of such payment to the **Insured's** rights of recovery and the **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable [Beazley] effectively to bring suit in the name of the **Insured**.

In relevant part, Loss is defined under the Policy as "direct financial loss." The term Employee is defined to mean:

1. a natural person:

    (i) while in the regular service of the **Insured** in the ordinary course of its business or for sixty (60) days after termination of service;

    (ii) whom the **Insured** has the right to direct and control while performing labor or service for the **Insured** whether such labor or service is on a part-time, temporary, seasonal or full-time basis; and

    (iii) who is compensated directly by the **Insured** through salary, wages or commissions;

2. a natural person who is a volunteer or leased **Employee** directed and controlled by the **Insured** while performing labor or service for the **Insured** pursuant to a lease or other written contract to which the **Insured** is a party;

3. a natural person who is a director, trustee, officer, administrator, manager or partner of the **Insured**, when performing acts coming within the scope of the usual duties of an **Employee**, whether or not they are compensated;

4. a natural person who is a trustee, officer, employee, administrator, fiduciary or manager of any **ERISA Plan** or any other natural person who is required to be bonded by Title 1 of the Employee Retirement Income Security Act of 1974, as amended;

5. a natural person who is a former or retired **Employee** who is retained as a consultant, but solely while such individuals are performing acts within the scope of the usual duties of an **Employee** for or on behalf of the **Insured**, and while under the supervision, direction and control of the **Insured**.

6. members of any committee duly authorized by the Insured, but solely while such individuals are performing services within the scope of the usual duties of an **Employee** for or on behalf of the **Insured**.

7. students and/or interns gaining work experience;

8. employees on leave of absence or military leave of absence;

but solely while such individuals are performing acts within the scope of the usual duties of an employee for or on behalf of the Insured, and while under the supervision, direction and control of the Insured.

The term Employee does not include any agent, broker or commission merchant of the Insured.

Under the Policy, Discovery or Discovered is defined as follows:

The moment when any member of the **Control Group** of the **Insured** first becomes aware of facts which would cause a reasonable person to believe that **Loss** covered by this Policy has been or will be incurred, even though the exact amount or details of **Loss** may not then be known. This includes **Loss**:

1. sustained prior to the coverage inception date shown under the Policy Information in the Declarations; or

2. which does not exceed the Deductible shown under the Coverage Schedule in the Declarations.

**Discovery** or **Discovered** also includes the **Insured**'s receipt of notice of an actual or potential claim against the **Insured** alleging facts that if true would constitute a covered **Loss** under this Policy.

Plaintiff is a global pulp, paper, and packaging company that both manufactures and distributes its products through the use of approximately 29 paper mills throughout the United States. On or about December 6, 2019, Plaintiff provided notice to Beazley of a claim resulting from potential "employee theft," identified by Beazley as claim number BEAZL100005026833

(the "Claim"). Prior to providing notice to Beazley, Plaintiff retained Butler Snow, LLP to investigate the background of the Claim. As presented, the Claim related to Plaintiff's Global Sourcing Manager for Specialty Chemicals, Sitaraman Jagannath ("Jagannath"), who worked for Plaintiff since 1987. Jagannath was responsible for implementing and supervising the purchase of certain specialty chemicals and other chemicals for Plaintiff's paper mills and operations. Plaintiff claims that Jagannath advised he would be retiring on November 30, 2019, and, as his successor, Douglas Dowdell began to transition into the role. Plaintiff claims that Dowdell discovered certain alleged "irregularities" with respect to Plaintiff's dealings with two diversity specialty chemical suppliers: 1) Diversified Global Sourcing ("DGS"); and 2) Mid-South Diversity Group ("Mid-South").

Jagannath was an employee of IP from 1987 to 2019. From 2013 to 2019, Jagannath was the Sourcing Manager for IP's Specialty Chemicals Group. He worked in IP's Global Sourcing department, which was responsible for the procurement of all business-significant resources at IP.

IP's Specialty Chemicals Group provided chemicals to the IP mills to both operate the mills and provide certain attributes to the products manufactured by the mills. The chemicals used by the Specialty Chemicals Group required certain intellectual property and expertise to produce that only exist in a small number of companies, none of which are minority-owned. Thus, it was impossible for IP to contract with diverse companies to manufacture the chemicals required by the Specialty Chemicals Group. As a result, IP entered into other arrangements with diverse or minority-owned business to meet the goals of its Diversity Supplier Program and the requirements of its customers.

As part of its operations, Plaintiff utilized diverse or minority-owned businesses. Plaintiff's Supplier Diversity Program was established in 1985. According to Plaintiff's Global

Sourcing Policy and Procedures Manual, effective March 1, 2019, "[t]he purpose of International Paper's Supplier Diversity Program is to promote the growth and development of diverse businesses. The Company will source its goods and services requirements on a competitive basis to attain the greatest value in terms of quality, cost and service." The manual stated the expectation that those involved in the procurement process would "adhere to this policy by integrating supplier diversity into their business strategies, making good faith efforts to include diverse suppliers in sourcing events where applicable, and continually striving to improve our spend with diverse suppliers." *Id.* Plaintiff defined its doing business with diverse or minority-owned businesses as a business strategy that encourages the use of companies owned, operated, and controlled by minorities, women, and veterans, as well as small businesses.

IP received significant benefits from doing business with diverse or minority-owned businesses, including DGS and Mid-South, regardless of the goods or services provided by those companies. IP viewed the diversity program as a "business strategy" and recognized that investment in supplier diversity programs improved its bottom line. Supplier Diversity Presentation ("On average, supplier diversity programs add $3.6 million to the bottom line for every $1 million in procurement operation costs.") [JAG.INS.00143193].[2] On information and belief, IP obtained tax benefits as a result of doing business with diverse or minority-owned businesses. The business case for the Supplier Diversity Program included, among other reasons: "[m]eet[ing] customer scorecard requirements" and "[d]riv[ing] cost reduction by increasing competition." *Id.* [JAG.INS.00143197]. IP's customers required the use of diverse companies in the supply chain to achieve various goals:

---

[2] The identification of any documents in this response is by way of example only and not intended to be exhaustive. Beazley is not required to provide an exhaustive list of documents in response to interrogatories. Beazley reserves the right to rely on any documents in support of its positions and defenses.

- Increased business with diverse supplier to help them meet their annual supplier diversity targets (Tier I);

- Creative solutions that allow them to channel more spend towards their diversity goals (strategic alliances, Tier II Direct, joint ventures); and

- Compliance with contractual agreements re: supplier diversity targets set.

*Id*. (JAG.INS.00143200].  IP "has customers totaling approx. $5 Billion in revenue that require [IP] to report our diversity spend annually."  At least some IP customers included in their contracts with IP requirements regarding the use of diverse or minority-owned business.  One example of this type of contractual requirement is: "SELLER will use its best commercial efforts to ensure that the use of such minority and women-owned vendors will reach or exceed 1% of BUYER'S annual spend with SELLER at those locations in the United States of America on a cost-neutral basis.  SELLER will report to BUYER the amount of such minority and women-owned vendor spending quarterly."  Specialty Chemicals Sodium Hypoclorite RFP, May 2019 [JAG.INS.168360].

Each department within IP was required to meet supplier diversity goals.  Supplier Diversity Presentation [JAG.INS.00143202].  IP encouraged placing value on the use of diverse or minority-owned business when evaluating bids and responses to RFPs.  *Id*. [JAG.INS.00143205].  IP in turn closely tracked its use of diverse or minority-owned business.  IP tracked its spend on diverse or minority-owned business in its business software (SAP).  *Id*. [JAG.INS.00143204].  IP's Supplier Diversity Team also closely tracked the company's spend on diverse or minority-owned business.  Portals were maintained for majority suppliers to report, and IP actively pursued its majority suppliers to report, their diversity spend through the company's "Tier 2 portal."  *See, e.g.*, August 7, 2018 Email from Melissa Evans to Raw Materials Team.

Moreover, Jagannath reported diversity spend directly to the head of IP's Supplier Diversity Program, including millions of dollars of spend with the companies at issue in this claim. *See, e.g.*, March 4, 2019 Email from Jagannath to Debra Voss.

IP set diversity spend targets for the Global Sourcing division. In 2011, IP had a diversity spend target of approximately $350 million in "Tier 1" purchases with a "stretch goal" of $400 million. In 2015, IP had a diversity spend target of approximately $367 million (and a stretch goal of $385 million). In 2016, IP had a diversity spend target of approximately $402 million (and a stretch goal of $420 million).

The Specialty Chemicals Group did business with diverse or minority-owned business in two ways, referred to as Tier 1 and Tier 2 arrangements. A Tier 1 diversity supplier purchased chemicals from the majority-owned chemical manufacturers and sold those chemicals to IP. The Tier 1 supplier acted as a middleman in the transaction. The Tier 1 supplier paid the chemical manufacturer at a price negotiated between the chemical manufacturer and the Tier 1 supplier. The Tier 1 supplier then marked up the price and re-sold the chemicals to IP. The invoices, purchase orders, and other transaction data maintained by IP and the manufacturer identified quantities and types of chemicals to be delivered but typically did not identify any service provided by the Tier 1 supplier other than serving as a pass through to IP. All or most of the contracts, invoices and other transaction data relating to Tier 1 suppliers did not reflect any value-added services in exchange for this markup. Where a Tier 1 supplier did provide some form of additional service, *e.g.*, transport, process improvements, packaging, inventory management, bulk purchases, or distribution, the value of those services did not approach the amount of the price markup it charged to IP.

-11-

In a Tier 2 diversity supplier arrangement, the chemical manufacturer contracted with, and sold the product directly to, IP. The manufacturer paid a commission or rebate to the diverse or minority-owned business. Tier 2 commissions are paid to the diverse or minority-owned business by the chemical manufacturers, not IP. In connection with these arrangements, in many instances, Jagannath negotiated with the chemical manufacturer to include a Tier 2 diversity supplier as part of a comprehensive arrangement that benefitted IP in multiple ways. Along with the purchase price for the chemicals, Jagannath sought to obtain added value from the manufacturer, such as equipment, spare parts, labor and applications expertise, included in the contract. *See* Email dated June 28, 2019 from Richard Verbrugge of Solenis to Jagannath. In addition, IP benefitted from the "diversity spend credit" it received from utilizing a diverse or minority-owned business in the Tier 2 arrangement. *Id.*

DGS and Mid-South qualified as diverse or minority-owned business under IP's Supplier Diversity Program. DGS and Mid-South provided value to IP through both goods and services and their participation in IP's Supplier Diversity Program. These entities entered into Tier 1 and Tier 2 arrangements similar to many other IP diverse or minority-owned business. All relevant agreements with DGS and Mid-South were approved through IP's corporate channels and not by Jagannath acting alone. Like other diverse or minority-owned business in the Specialty Chemicals Group, DGS and Mid-South did not have the ability to produce the chemicals used by IP, which was known to IP.

IP made payments to DGS and/or Mid-South between 2011 and 2020. During this period, DGS and Mid-South provided chemicals and services to various of IP's mills. All of IP's contracts with DGS and Mid-South were entered into in the ordinary course of business and were known to employees in the Global Sourcing department, the Diversity Supplier Program, and IP's mills.

26289330-v3

Various of the DGS and Mid-South contracts provided for these companies to deliver various services, including inventory management, evaluation of new products, and tank monitoring. *See* Specialty Chemical Contract Extension Amendment (JAG.INS.00168404); JAG.INS.00149126-27; Aug. 27, 2015 Presentation from DGS to IP (presentation outlining services provided by DGS); August 13, 2019 email from Jagannath to R. Kuenzinger (discussing various value-add services provided by DGS); May 30, 2019 email from Jagannath to M. Donaldson and M. Houser (retaining DGS due to "lowest cost," in addition to "technical service and telemetry"). Moreover, DGS's services were often the lowest cost to IP. *See, e.g.*, Summary of Supplier Terms (evaluation of three mill bids from suppliers, showing DGS as frequent low bid). These services were no different that the purported services offered by other diverse or minority-owned business, such as Chou Chemical. *See, e.g.,* Chou Chemical Value Add (purporting to identify "value-add" services from Chou that do not substantially differ from those offered by DGS/Mid-South). As described above, no diverse or minority-owned business in IP's Specialty Chemicals Group manufactured the chemicals, and DGS and Mid-South were not IP's only diverse or minority-owned business in the Specialty Chemicals Group. IP understood that these diverse or minority-owned business were obtaining the chemicals from the chemical manufacturers and marking up the price without contributing to the manufacturing process. Thus, neither DGS and Mid-South nor any other diverse or minority-owned business in the Specialty Chemicals Group satisfied IP's Competitive Bidding Policy or Supplier Diversity Policy. IP, however, received the chemicals it ordered, and received the benefit of having diverse or minority-owned business in the supply chain to satisfy customer requirements and obtain the other benefits associated with using diverse or minority-owned business.

-13-

DGS and Mid-South provided services and/or goods to IP. DGS and Mid-South provided over $100 million in specialty chemicals to IP between 2013 and 2019 through an arrangement formally recognized by IP and utilized by numerous other diverse and non-diverse partners of IP. The DGS and Mid-South contracts specifically provide for value-added services. IP negotiated with its majority suppliers and used diverse or minority-owned business such as DGS and Mid-South as part of an overall strategy to extract value for IP. *See, e.g*., Specialty Chemical Contract Extension Amendment (JAG.INS.00168404); Email dated June 28, 2019 from Richard Verbrugge of Solenis to Jagannath; Aug. 27, 2015 Presentation from DGS to IP (presentation noting expertise/services offered by DGS); August 13, 2019 email from Jagannath to R. Kuenzinger (noting value-add services provided by DGS).

IP received value from its transactions with DGS and Mid-South. IP benefitted from these arrangements by allowing it to claim these amounts as part of its diversity program. IP benefitted with its customers by showing that their products resulted from a diverse supply chain. In addition, IP received benefits from using diverse or minority-owned business. DGS and Mid-South rendered services to IP.

Jagannath did not conceal the fact that he was negotiating arms-length contracts with DGS and Mid-South similar to other diverse or minority-owned businesses. In addition, Jagannath advised the chemical manufacturers that they were free to use any diverse or minority-owned business they chose. *See*, *e.g.*, August 14, 2017 Jagannath Email to Plasmine ("IP is fine with Plasmine running its diversity participation through any diversity supplier. IP has no preference as long as the supplier is approved by our Diversity Enterprise Council.").

IP did not follow its competitive bidding guidelines when it came to diverse or minority-owned businesses. *See* Global Sourcing Chou Chemical Vendor Audit Internal Audit Report, July

-14-

28, 2021 at 6 ("IA noted differing opinions throughout G/S in regards to diversity vendors; where higher prices are acceptable to grow IP's diversity spending or in certain instances pricing should be competitive."). Contracts with other diversity suppliers other than DGS and Mid-South were not competitively bid. *See id.* (based on a review of 57,000 transactions for all caustic soda vendors from 2017 through Q1 2021, "Internal Audit observed Chou Chemical pricing was significantly higher than all other suppliers resulting in excess costs of $7.4MM to $9.9MM to IP from January 2017 through March 2021."). IP also concluded that no or inadequate value was provided by diverse or minority-owned business other than DGS or Mid-South. Global Sourcing Chou Chemical Vendor Audit Internal Audit Report, July 28, 2021, at 7 ("not one contract for direct shipments with Chou Chemical outlined the services provided, mills supported, or expectations of International Paper in regards to those services. Additionally, the AOBs [Awards of Business] for the direct shipment business do not mention a service component."). Chou Chemical had eight employees. KBG had two employees.

IP's Global Sourcing department routinely failed to properly document the transactions into which it entered. The key documentation for these transactions included Outline Agreements (OAs), which memorialize vendor pricing, and Commitment Authorizations (CAs), which document the maximum permitted spend with a vendor. As to OAs, 1,700 OAs in IP's system had an expiration date of 12/31/1999. There was no CA for a vendor with spend totaling $3.1 million in 2018 and $6.8 million in 2019. Another vendor with a CA of $25 million from 2017 to 2020 had an actual spend of $56.1 million. *Id.* at 11-12.

IP has not provided any evidence as to what, if any, payments or other financial benefits that Jagannath received as a result of the work performed by DGS and Mid-South for or on behalf of IP.

-15-

Prior to the inception of the Policy, Plaintiff's employees periodically made complaints about the services DGS and Mid-South provided, which were reported to the Plaintiff. Notwithstanding those complaints, Plaintiff continued to conduct business with DGS and Mid-South for nearly a decade. The nature of these complaints suggests that, at any given time, DGS and/or Mid-South were providing some services to Plaintiff—arranging for shipping and dealing with Plaintiff's employees. All of the contracts, agreements and/or payments to DGS and/or Mid-South appear to have been conducted in the ordinary course of business and, as noted, continued for a number of years. Indeed, Plaintiff appears to have received the chemicals it ordered, and Plaintiff was able to identify DGS or Mid-South as minority-owned businesses that it utilized.

IP was aware of the scope of work performed by DGS and Mid-South. Prior to inception of the Policy, IP knew that there was substantial markup associated with the DGS and Mid-South work and characterized DGS as a middleman. *See, e.g.* February 11, 2019 M. Brown Email to Jagannath (IP is aware that "DGS . . . is basically a middle man for the chemical between [IP] and Nalco]") [JAG.INS.00131925].

After receiving notice from Plaintiff, Beazley promptly began to investigate the Claim. As part of its investigation and as provided for in the Policy, Beazley made requests for information to Plaintiff, asked that Plaintiff provide a sworn proof of loss, and conducted an examination under oath. On December 7, 2020, Plaintiff submitted a proof of loss to Beazley, dated December 4, 2020, including an addendum with additional documentation, alleging a loss in the estimated amount of $31,148,445. Beazley continued to request information from Plaintiff and to investigate the potential for coverage under the Policy.

Beazley has not been provided with adequate information and documents to assess whether Jagannath directly profited from the alleged course of conduct, whether the alleged conduct was

in fact "unlawful" or merely unethical and whether the alleged conduct constituted the "unlawful taking of **Money**, . . . to the deprivation of [Plaintiff] by [Jagannath]."  In addition, Beazley has not been provided with adequate information and documents to assess at what point in time Plaintiff had sufficient knowledge of the Claim, which may bar coverage in whole or in part.  Even if some part of the Claim did constitute a covered cause of loss, the Policy's exclusionary language may apply.  Lastly, Plaintiff's conduct, including but not limited to settling with certain parties without Beazley's consent, may have violated certain Policy provisions which would either preclude coverage in whole or in part for the Claim.

On October 5, 2020, Plaintiff filed a civil action against Jag, Shiv, DGS, Mid South, Senecura and Pingala in the Chancery Court of Shelby County, Tennessee styled as *International Paper Company v. Sitaraman Jagannath, Shiv Kumar Seetharaman, Diversified Global Sourcing, Inc., Mid South Diversity Group, Inc., Senecura and Pingala Group, Inc.*, Case No. CH-20-1233 (the "Recovery Action").  On information and belief, the subject matter of the Recovery Action was the same subject matter as the Claim.  Plaintiff settled the Recovery Action for $15,000,000— an amount that was less than the alleged loss incurred as a result of Jagannath's actions and significantly less than the funds and assets that the federal government had frozen during its investigation of the attendant facts relating to the Claim.  As part of the settlement, Plaintiff executed a complete release of the parties accused of misconduct as part of the Claim.  Beazley did not authorize the settlement and reserved its rights.

A criminal complaint was filed against Jagannath in the United States District Court for the Western District of Tennessee on December 16, 2019, case number 2:19-cr-20356-1, alleging one count of wire fraud under 18 U.S.C. § 1343 and 18 U.S.C. § 2.  On September 8, 2022, the criminal complaint against Jagannath was dismissed, with the government determining that, with

the settlement of the Recovery Action, "criminal prosecution is unwarranted." Neither Jagannath nor Seetharaman were convicted of any criminal activity for the conduct that comprises the Claim.

Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**<u>INTERROGATORY 3</u>**:

Identify the factual and legal basis supporting Your second Affirmative Defense that "Plaintiff's claims are barred in whole or in part by the terms and conditions of the Beazley Policy."

**<u>Response</u>**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley incorporates its response to Interrogatory Nos. 2, 4-5, and 8-12 as if set forth fully herein. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**<u>INTERROGATORY 4</u>**:

Identify the factual and legal basis supporting Your third Affirmative Defense that "Plaintiff's claims are barred in whole or in part to the extent that the Indirect or Consequential Exclusion in the Beazley Policy applies."

**Response**:  Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages.  Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory.  Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues.  Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that the Policy includes an Indirect or Consequential exclusion, which provides that:

> [Beazley] shall not be liable for **Loss** or **Expenses** arising out of indirect or consequential loss of any kind except for covered **Expenses** under the Expense Coverage insuring agreement.

Beazley further states that DGS and Mid-South entered into various Tier II arrangements with majority suppliers.  Plaintiff was not a party to these arrangements and had no obligation to pay any amounts under those arrangements.  Plaintiff contends that it made payments to majority suppliers to compensate them with respect to certain Tier II arrangements those majority suppliers had with DGS and Mid-South.

Beazley incorporates its response to Interrogatory No. 2 as if set forth fully herein.  Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

-19-

**INTERROGATORY 5**:

Identify the factual and legal basis supporting Your fourth Affirmative Defense that "Plaintiff's claims are barred in whole or in part to the extent that the Voluntary Exchange or Purchase Exclusion in the Beazley Policy applies."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that The Policy includes an exclusion for Voluntary Exchange or Purchase, providing that coverage is excluded as follows:

> [Beazley] shall not be liable for **Loss** or **Expenses** arising out of the **Insured** knowingly having given or surrendered **Money, Securities** or **Property** in any exchange or purchase with a **Third Party,** not in collusion with an **Employee;** provided that this exclusion shall not apply to loss under the Money Orders and Counterfeit Paper Currency Fraud insuring agreement.

Beazley further states that the money that Plaintiff contends constitutes its Loss under the Policy was voluntarily paid to DGS and Mid-South as part of a legitimate, arms-length business transaction. DGS and Mid-South were qualified by Plaintiff as minority-owned or diverse businesses. All of IP's contracts with DGS and Mid-South were entered into in the ordinary course of business and were known to employees in the Global Sourcing department, the Diversity Supplier Program, and IP's mills. Various of the DGS and Mid-South contracts provided for these

-20-

companies to deliver various services, including inventory management, evaluation of new products, and tank monitoring. *See* Specialty Chemical Contract Extension Amendment (JAG.INS.00168404); JAG.INS.00149126-27; Aug. 27, 2015 Presentation from DGS to IP (presentation outlining services provided by DGS); August 13, 2019 email from Jagannath to R. Kuenzinger (discussing various value-add services provided by DGS); May 30, 2019 email from Jagannath to M. Donaldson and M. Houser (retaining DGS due to "lowest cost," in addition to "technical service and telemetry"). There was no material difference between the contracts that Plaintiff entered into with DGS and Mid-South and those entered into with other minority-owned or diverse businesses. Plaintiff has provided no evidence of collusion between Jagannath and DGS or Mid-South. DGS and Mid-South were approved by Plaintiff as minority-owned or diverse businesses. Jagannath's managers, co-workers and Plaintiff's plant personnel were aware of DGS and Mid-South's retention by and work with Plaintiff. DGS and Mid-South business relationships were reported to Plaintiff's Supplier Diversity Program.

Beazley incorporates its response to Interrogatory No. 2 as if set forth fully herein. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**<u>INTERROGATORY 6</u>**:

Identify the factual and legal basis supporting Your fifth Affirmative Defense that "Plaintiff's claims are barred in whole or in part to the extent that the Fraudulent, Dishonest or Criminal Exclusion in the Beazley Policy applies."

**<u>Response</u>**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley

further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that its Fifth Affirmative Defense states that Plaintiff's claim is barred in whole or in part "to the extent" this exclusion applies. Beazley is conducting discovery to obtain facts to determine if the exclusion applies and will supplement this response, as necessary, once discovery is complete.

**INTERROGATORY 7**:

Identify the factual and legal basis supporting Your sixth Affirmative Defense that "Plaintiff's claims are barred in whole or in part to the extent that the Potential Income Exclusion in the Beazley Policy applies."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that its Sixth Affirmative Defense states that Plaintiff's claim is barred in whole or in part "to the extent" this exclusion applies. Beazley is conducting discovery to obtain facts to determine if the exclusion applies and will supplement this response, as necessary, once discovery is complete.

**INTERROGATORY 8**:

Identify the factual and legal basis supporting Your seventh Affirmative Defense that the Legal Fees, Costs or Expenses Exclusion in the Policy applies.

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that the Policy excludes certain Legal Fees, Costs or Expenses, providing that:

> [Beazley] shall not be liable for **Loss** or **Expenses** incurred or paid by an **Insured** in defending or prosecuting any legal proceeding or claim, provided that this Exclusion shall not apply to the coverage provided under the Expense Coverage insuring agreement.

Beazley further states that Plaintiff seeks to recover, as part of its claim, legal fees, costs and expenses and other amounts incurred in defending or prosecuting a legal proceeding or claim, including but not limited to the criminal prosecution of Jagannath and the civil lawsuit brought by

Plaintiff against Jagannath and others. The amount of legal fees, costs and expenses claimed by Plaintiff exceeds $500,000, the Expense Coverage sublimit.

Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**INTERROGATORY 9**:

Identify the factual and legal basis supporting Your eighth Affirmative Defense that "Plaintiff's claims are barred in whole or in part to the extent that the Affiliates and Prior Employees Exclusion in the Beazley Policy applies."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that the Policy's Affiliates and Prior Employees exclusion provides as follows:

> [Beazley] shall not be liable under the Employee Dishonesty, Client Property Coverage or Expense Coverage insuring agreements for loss or damage sustained by any **Insured** caused by:
>
> 1. any agent, broker, factor, commission merchant, consignee, contractor, independent contractor, subcontractor, or similar person or entity; or
>
> 2. any **Employee** acting alone or in collusion with any other employee more than 30 days following the termination of such **Employee**.

-24-

Beazley further states that DGS and Mid-South are a contractor, independent contractor, subcontractor, or similar person or entity with respect to Plaintiff. Plaintiff contends that it suffered loss or damage because DGS and Mid-South provided no value or services in exchange for the amounts paid to them by Plaintiff. Some or all of the funds that IP contends are part of the alleged theft were retained by DGS and Mid-South.

Beazley incorporates its response to Interrogatory No. 2 as if set forth fully herein. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**INTERROGATORY 10**:

Identify the factual and legal basis supporting Your ninth Affirmative Defense that "Plaintiff's claims are barred to the extent they were discovered prior to the policy period for the Beazley Policy."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that its Ninth Affirmative Defense states that Plaintiff's claim is barred in whole or in part

"to the extent" this exclusion applies. Beazley is conducting discovery to obtain facts to determine if the exclusion applies and will supplement this response, as necessary, once discovery is complete. Beazley further states that Plaintiff's claim is premised on the contentions that DGS and Mid-South (1) were paid a higher price under Tier I arrangements than the majority suppliers manufacturing the chemicals and (2) were not providing any value or services in return for those payments. To the extent those contentions constitute Employee Theft under the Policy, Plaintiff was aware of these facts prior to the inception of the Policy. *See, e.g.* February 11, 2019 Matthew Brown Email to Jagannath (IP is aware that "DGS . . . is basically a middle man for the chemical between [IP] and Nalco]" and noting "substantial" markup associated with same) [JAG.INS.00131925].

**INTERROGATORY 11**:

Identify the factual and legal basis supporting Your tenth Affirmative Defense that "Plaintiff's claims are barred in whole or in part to the extent that Plaintiff did not provide Beazley with written notice as required by the Notices provision in the Beazley Policy. The Beazley Policy terminated, and Plaintiff's claims are barred in whole or in part, to the extent and as soon as Plaintiff acquired knowledge of any unlawful taking of money or other fraudulent or dishonest act committed by Sitaraman Jagannath during the term of his employment with Plaintiff."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure

by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that its Tenth Affirmative Defense states that Plaintiff's claim is barred in whole or in part "to the extent" this exclusion applies. Beazley is conducting discovery to obtain facts to determine if the exclusion applies and will supplement this response, as necessary, once discovery is complete. Beazley further states that Plaintiff's claim is premised on the contentions that DGS and Mid-South (1) were paid a higher price under Tier I arrangements than the majority suppliers manufacturing the chemicals and (2) were not providing any value or services in return for those payments. To the extent those contentions constitute Employee Theft under the Policy, Plaintiff was aware of these facts prior to the inception of the Policy.

**INTERROGATORY 12**:

Identify the factual and legal basis supporting Your eleventh Affirmative Defense that the Recoveries provision in the Policy applies.

**Response**: Beazley objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that the Policy's Recoveries provision reads:

> Recoveries, whether effected by [Beazley] or by the **Insured,** less the cost of recovery, shall be distributed as follows:
>
> 1. first, to the **Insured** for the amount of **Loss** otherwise covered but in excess of the Limits of Liability;

-27-

2. second, to [Beazley] for the amount paid to the **Insured** for covered **Loss**;

3. third, to the **Insured** for the Deductible; and

4. fourth, to the **Insured** for **Loss** specifically excluded hereunder.

Recovery from reinsurance or indemnity of [Beazley] shall not be deemed a recovery hereunder.

Beazley further states that Plaintiff has recovered at least $15,000,000 from various persons and entities under a settlement agreement that included Jagannath, DGS and Mid-South. Any Loss under the Policy is reduced by this recovery. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**INTERROGATORY 13**:

Identify the factual and legal basis supporting Your twelfth Affirmative Defense that "Plaintiff's claims are barred to the extent Plaintiff has breached any condition precedent to coverage under the Beazley Policy."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

-28-

Subject to and without waiving the foregoing general and specific objections, Beazley incorporates its response to Interrogatory Nos. 2, 4-5, and 8-12 as if set forth fully herein. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**INTERROGATORY 14**:

Identify the factual and legal basis supporting Your thirteenth Affirmative Defense that "Plaintiff's claims are barred to the extent Plaintiff has failed to mitigate any damages."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that Plaintiff has recovered at least $15,000,000 from various persons and entities under a settlement agreement that included Jagannath, DGS and Mid-South. Plaintiff retained Kroll to evaluate the assets of Jagannath and others. Kroll's report identified significant assets, including but not limited to real property, held by Jagannath and others. Beazley further states on information and belief that Plaintiff did not pursue these assets as part of its settlement with Jagannath and others. Beazley further states that, after the date on which Plaintiff claims that it

discovered the alleged theft, it continued to make payments to DGS and Mid-South. Also following the date on which it claims that it discovered the alleged theft, Plaintiff made payments to its majority suppliers with respect to Tier II arrangements that those majority suppliers had with DGS and Mid-South.

Beazley incorporates its response to Interrogatory No. 2 as if set forth fully herein. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**INTERROGATORY 15**:

Identify the factual and legal basis supporting Your fourteenth Affirmative Defense that "Plaintiff's claims are barred in whole or in part by the equitable doctrines of waiver, estoppel, unclean hands and laches."

**Response**: Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages. Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory. Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues. Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley incorporates its response to Interrogatory Nos. 2, 4-5, 8-12, and 14 as if set forth fully herein. Beazley reserves the right to supplement and/or amend this Response, if necessary, as discovery

proceeds in accordance with the Court's anticipated Scheduling Order, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

**INTERROGATORY 16**:

Identify the factual and legal basis supporting Your fifteenth Affirmative Defense that "Plaintiff's claims are barred in whole or in part by the applicable statute of limitations."

**Response**:  Beazley objects to this Interrogatory as premature in that it seeks information that is still being collected and developed through discovery, which is still in its early stages.  Beazley further objects that Plaintiff has refused to produce documents necessary for Beazley to respond to this contention interrogatory.  Beazley further objects that this Interrogatory requires Beazley to render a legal conclusion regarding contested factual or legal issues.  Beazley further objects to this Interrogatory to the extent that it calls for disclosure of information protected from disclosure by the attorney-client privilege, the work product doctrine, the joint defense privilege, information prepared in anticipation of litigation, and any other applicable privilege or other protection.

Subject to and without waiving the foregoing general and specific objections, Beazley states that its Fifteenth Affirmative Defense states that Plaintiff's claim is barred in whole or in part "to the extent" this exclusion applies.  Beazley is conducting discovery to obtain facts to determine if the exclusion applies and will supplement this response, as necessary, once discovery is complete.

**BEAZLEY INSURANCE COMPANY, INC.**

*/s/ Matthew M. Burke*
_____
Bradford D. Box (TN Bar # 16596)
**Rainey Kizer Reviere & Bell PLC**
209 East Main Street
Jackson, TN  38301
(731) 426-8142
bbox@raineykizer.com

Matthew M. Burke (admitted *Pro Hac Vice*)
Wm Maxwell Daley (admitted *Pro Hac Vice*)
**ROBINSON & COLE LLP**
One Boston Place, 25th Floor
Boston, MA  02108
(617) 557-5996
mburke@rc.com
wdaley@rc.com

*Attorneys for Beazley Insurance Company, Inc.*

26289330-v3

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2023, a true and correct copy of the foregoing

document was served via e-mail on all counsel of record.

*/s/ Matthew M. Burke*
Matthew M. Burke

26289330-v3

## <u>VERIFICATION</u>

Pia Ellis declares the following under penalties of perjury:

I am employed by Beazley Insurance Company, Inc. ("Beazley"). The facts and matters stated in these Supplemental Responses to Plaintiff's First Set of Interrogatories are not necessarily within my personal knowledge, or the personal knowledge any one specific individual, but the facts stated in these Responses have been assembled on behalf of Beazley by authorized individuals. On behalf of Beazley, I declare that the facts and matters stated herein are true to the best of my knowledge, information and belief.

Dated: November 29, 2023

_____
Pia Ellis
Claims Manager | Executive Risk Claims
Fidelity & Crime
45 Rockefeller Plaza, 16th Floor
New York 10111