# **Exhibit 27**

1  UNITED STATES DISTRICT COURT

2  _____

3  International Paper Company,      )

4            Plaintiff,              )

5  v.                                )Civil Action No.

6  Beazley Insurance Company, Inc.,)2:22-cv-02789-MSN-CGC

   and Zurich American Insurance    )

7  Company,                          )

                                     )

8            Defendants.             )

   _____

9

            DEPOSITION OF JYOTIKA BALSARA

10  _____

11               10:00 a.m.

             December 21, 2023

12          Foster City, California

13

14

15

16

17

18

19

20               File #6359128

21

22

23

24

25      Reported By:  Judy Robinson, CCR #2171

1                    A P P E A R A N C E S
2     ATTORNEY FOR THE PLAINTIFF, INTERNATIONAL PAPER:
3     NATHAN TOWNSEND
      K&L GATES
4     210 6th Avenue, Suite #1900
      Pittsburgh, Pennsylvania 15222
5     412.355.6368
      nathan.townsend@klgates.com
6
7     ATTORNEY FOR THE DEFENDANT, BEAZLEY INSURANCE COMPANY,
      INC.:
8
      EUGENE P. MURPHY
9     ROBINSON & COLE, LLP
      One Boston Place, 25th Floor
10    Boston, Massachusetts 02108
      617.557.5996
11    emurphy@rc.com
12
      Also Present:  Peter Yaroschuk, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    I N D E X

2    WITNESS                EXAMINATION              PAGES

3    JYOTIKA BALSARA

4

5                          BY MR. MURPHY ......... 6-47

6

7

8

9

10                      E X H I B I T S

11

12   NO.   PAGE         DESCRIPTION

13

14   Exhibit 1      10    Deposition Notice

15

16   Exhibit 2      32    Presentation to Georgetown Mill

17

18

19

20

21

22

23

24

25

1       BE IT REMEMBERED that the deposition upon oral

2   examination of JYOTIKA BALSARA was taken on December 21,

3   2023, at 10:00 a.m., at 125 South 309th Street, Federal

4   Way, Washington, 98003, before Judith A. Robinson, CCR,

5   Notary Public in and for the State of Washington, residing

6   at Federal Way, Washington.

7       Whereupon, the following proceedings were had,

8   to-wit:

9                   VIDEOGRAPHER:  Good morning.  We are

10  going on the record at 10:06 a.m. on December 21st, 2023.

11          Please note that the microphones are sensitive and

12  may pick up whispering, private conversations, and cellular

13  interference.

14          Please turn off all cell phones and place them

15  away, as they can interfere with the deposition audio.

16          Audio and video recording will continue to unless

17  all participants agree to go off the record.

18          This is Media No. 1 of the video-recorded

19  deposition of Jyotika Balsara, taken by counsel for

20  defendant, in the matter of International Paper Company, v.

21  Beazley Insurance Company, Incorporated, et al., filed in

22  the United States for the Western District of Tennessee,

23  Case Number 2:22-cv-02789-MSN-CGC.

24          This deposition is being held on a Zoom

25  videoconference.

1       My name is Peter Yaroschuk from the firm Veritext.

2   I am the videographer.  The court reporter is Judy Robinson

3   from the firm Veritext.  I am not related to any party in

4   this action, nor am I financially interested in the

5   outcome.

6       Counsel and all present, and everyone attending

7   remotely, please now state your appearances and

8   affiliations for the record.

9       If there are any objections to proceeding, please

10  state them at the time of your appearance, beginning with

11  the noticing attorney.

12                  MR. MURPHY:  Thank you.  Eugene Murphy,

13  with the law firm of Robinson Cole, on behalf of the

14  defendants, Beazley Insurance Company.

15                  MR. TOWNSEND:  Nathan Townsend, from K&L

16  Gates, representing International Paper.

17                  VIDEOGRAPHER:  Thank you.

18      Would the court reporter please swear in the

19  witness.

20                  REPORTER:  Yeah, okay.

21      And good morning, Counsel.

22      Before we proceed with the deposition, I just want

23  to make you aware I'm a licensed reporter of 24 years in

24  the State of Washington and will need a joint agreement and

25  stipulation from all parties in order to swear in the

1   witness under the Federal rules.

2          Can I please get your verbal agreement?

3                   WITNESS:  Yes.

4                   MR. MURPHY:  Agreed for the defendant.

5                   MR. TOWNSEND:  Agreed, International

6   Paper.

7                   * * * * * *

8                   JYOTIKA BALSARA

9             having been first duly sworn

10                on oath was examined

11             and testified as follows:

12                E X A M I N A T I O N

13  BY MR. MURPHY:

14     Q.   Okay thank you.

15          Good morning, again, Ms. Balsara.  Again, my name's

16  Gene Murphy.  I represent the insurance company in this

17  insurance coverage action that's now pending, and I'll be

18  asking you questions here today.

19          Let me just ask you to state your full name and

20  address for the record.

21     A.   Jyotika Balsara, 351 Seahorse Court, Foster City,

22  California.

23                   (Reporter Clarification.)

24  BY MR. MURPHY:

25     Q.   Okay, Ms. Balsara, have you ever been deposed

1    before?

2        A.    Sorry, to where?

3        Q.    Have you ever been deposed before?  Have you ever

4    been asked questions under oath in a context such as this?

5        A.    No, I'm -- I'm -- sorry, no, I'm not.  I'm not even

6    sure why I'm here today, honestly.

7        Q.    Okay, fair enough.  I'm going to explain to you the

8    procedure, and, you know, we'll provide you with a little

9    bit more detail, but the main purpose would be for us to

10    ask you questions in connection with this pending

11    litigation.

12            Let me -- let me explain some of the ground rules,

13    and, you know, we'll get to the point where we're going to

14    start with the first question.  But -- and there are

15    questions to the ground rules, but let me just go through

16    it.

17            Again, if anything comes up that's unusual or you

18    don't understand, just stop me and let me know.  That's

19    fine.  I understand it's your first deposition.

20            So, the way the procedure works is, I pose

21    questions, and I'd ask that you respond to those questions

22    to the best of your ability.

23            Not to get into the substance at this point, but

24    the questions today are going to relate to your work with

25    BGS in the context of various contracts with International

1    Paper.

2              With that said, there will also be an opportunity

3    for International Paper's Counsel, Nathan Townsend, who's

4    here on the screen as well, to ask questions after I ask

5    questions as well.  So we'd ask that you respond, to the

6    best of your ability, to both Counsels' questions.

7              As we proceed, different things come up.  You know,

8    we're doing this via video, via Zoom.

9              Please let me finish my questions before you

10   respond.  Sometimes people in normal conversations speak

11   over each other.  It's not, you know, intentional or meant

12   to be offensive, but the problem is we have Judy

13   transcribing the record, and she can only transcribe one

14   person at a time.

15             Secondly, when we proceed -- as we proceed here,

16   the questions have to be verbal, the responses have to be

17   verbal.  So please give us verbal responses.  Gestures and

18   nods of the head, which may seem appropriate because we

19   have you on video, are also a challenge to transcribe, so

20   we need verbal responses as well.

21             If, at any time, as I said earlier, either Counsel

22   asks you questions that you don't understand, you think

23   they're confusing, or whatever the reasons are, please just

24   let us know, and I'm sure both Counsel will attempt to

25   clarify.

1           Is that all acceptable in terms of the basic ground

2    rules?

3        A.   Yes.

4        Q.   Okay.  And let me ask you a couple other

5    preliminary questions that are not meant to offend you in

6    any way.  I ask every witness these questions before we

7    start.

8           Number 1, have you ever been convicted of a crime?

9        A.   No.

10       Q.   Okay.  Are you taking any medication that would

11   affect your ability to understand my questions here today?

12       A.   No.

13       Q.   Okay.  And your date of birth, please?

14       A.   June 28, 1972.

15       Q.   All right.  And you asked -- you -- you said you

16   don't know why you're here today.  The purpose is an

17   insurance coverage dispute between International Paper and

18   my client, Beazley Insurance Company.  So that's basically

19   a dispute over whether or not insurance proceeds should be

20   paid to International Paper, in connection with, I'll just

21   say this very generally, DGS activities and Mid South

22   activities.  So those are what the questions are going to

23   involve.

24           Does that help you understand why you're here

25   today?

1    A.    Yes.  I wanted to just make a note that it's been

2   -- I stopped working with DGS or Mid South January of 2020.

3   So I may not be able to recap everything in detail, just to

4   put that on record.  It's been a few years.

5    Q.    We understand.  That's fine.  We have some exhibits

6   that we can share with you on the screen, so you'll be able

7   to see that as well, okay?

8    A.    Uh-huh.

9                    MR. TOWNSEND:  Gene, do we want to walk

10  through Exhibit Share and make sure that's in working order

11  for everyone?

12                   MR. MURPHY:  Yeah, that's a good idea.

13                   (Exhibit No. 1 was marked.)

14  BY MR. MURPHY:

15   Q.    Now, the exhibits are in a software called

16  Exhibit Share.  So I've already introduced Exhibit No. 1.

17          Can you open up that exhibit?  Can you see that

18  exhibit right now?

19                   (Discussion between counsel and witness.)

20                   VIDEOGRAPHER:  We are off the record at

21  10:16 a.m.

22              (Off the record.)

23                   VIDEOGRAPHER:  We are back on the record

24  at 10:19 a.m.

25                   MR. MURPHY:  Okay, thank you.

1      BY MR. MURPHY:

2            Ms. Balsara, we're going to continue with the

3      deposition.

4            Thank you for identifying yourself and your

5      address.  Let me just ask you, you know, have you worked

6      for DGS?  And do you know what DGS stands for?

7         A.    Diversified Global Sourcing, and yes, I did work

8      for them.

9                        (Reporter clarification.)

10     BY MR. MURPHY:

11        Q.    Okay.  And just to clarify, I -- I appreciate the

12     response.  Just to be more precise, DGS actually refers to

13     Diversified Global Sourcing, Inc.; isn't that correct,

14     Ms. Balsara?

15        A.    Yes, that is correct.

16        Q.    Okay.  As we go forward with the deposition here

17     today, there are a couple of different names that I'll be

18     using, or -- or references to entities that we have some

19     short versions or acronyms for.  I want to go through those

20     just to make sure that you're familiar with them.

21            Is that okay?

22        A.    Sure.

23        Q.    Okay.  First, in addition to DGS, there's another

24     company known as Mid South Diversity Group, Inc.

25            Are you familiar with that company?

1       A.   Yes, I am.

2       Q.   Okay.  And if I refer to it as Mid South during the

3   deposition today, you'll understand that to mean Mid South

4   Diversity Group, Inc.; is that right?

5       A.   That's correct.

6       Q.   And also, There's a gentleman by the name of

7   Sitaraman Jagannarth who is sometimes referred to as Jag.

8            In the future if I refer to Jag, do you know who

9   that is?

10      A.   Yes.

11      Q.   Okay.  And for the record, could you just identify

12  who you understand Jag to be?

13      A.   He was, I believe, the head of Global Sourcing at

14  International Paper.

15      Q.   Approximately when?

16      A.   Well, when I started working at Diversified, which

17  was probably about eight or nine years prior to 2019, is

18  when he was head of Global Sourcing.

19      Q.   And there's another gentleman you -- you come to

20  refer to as Shiv.  Do you know who Shiv is?

21      A.   He was my boss.

22      Q.   Okay.  Could you, for the record, provide us with

23  his full name?

24      A.   Shiv Kumar Seetharman.

25      Q.   Okay.

1           MR. MURPHY:  During a break, Judy, I'll

2       give you some of the spellings, if that's acceptable.

3           REPORTER:  Thank you.

4           MR. MURPHY:  Okay.

5       BY MR. MURPHY:

6           Q.    Okay, great.  And sometimes I may slip into calling

7       International Paper IP.  You're familiar with International

8       Paper, correct?

9           A.    Yes.  Yes.

10          Q.    And -- and what's the basis for your familiarity

11      with International Paper?

12          A.    Well, I work for Diversity, DGS, and we had

13      contracts with International Paper, where we were providing

14      chemicals to them.

15          Q.    Do you work for Mid South?

16          A.    I work for Diversified Global Sourcing.

17          Q.    Okay.  Did you have -- did you ever provide any

18      services for Mid South?

19          A.    I did, yes.

20          Q.    That was as a DGS employee; is that right?

21          A.    Yes.

22          Q.    Okay.  And you were a -- a W-2 employee of DGS; is

23      that right?

24          A.    That is -- it's actually, 1099.

25          Q.    Okay.  So you were not actually an employee or an

1    independent contractor; is that right?

2        A.    Yes.

3        Q.    Okay.  All right.  I wanted to get through some of

4    those names and acronyms.  Let me just go back, step back

5    for a moment more generally.  Could you share with us your

6    educational background?

7        A.    High school.

8        Q.    Okay.  Where did you attend high school?

9        A.    I'm actually from South Africa, so I attended high

10   school in South Africa.

11       Q.    Okay.  And when did you graduate?

12       A.    Oh, wow.  1983.

13       Q.    1983?

14       A.    Yeah, I think so.  Sorry.  It's just been too long

15   now.

16       Q.    I understand.  That's fine.

17             Any other schooling?  College?  University?

18   Post-graduate work?  Anything like that?

19       A.    I did do -- I have -- I'm a real estate agent.  I

20   did travel and tourism.  So I have certification for that

21   when I came into this country through Canada College.

22       Q.    You have a real estate license?

23       A.    That's correct.

24       Q.    With the State of California?

25       A.    That is correct.

1     Q.    Okay.  Any other professional licenses?

2     A.    No.

3     Q.    Okay.  I want to start out generally.  I'm -- my --

4    the next couple questions are just about your employment

5    background.

6          Could you tell us, you know, generally, what kind

7    of work you pursued after graduating from high school?

8     A.    I worked at a bank.  I worked at a credit union.  I

9    worked for Providian Financial.  I worked at a call center.

10   So a lot of financial background.  A worked for a company

11   for a few years before I joined DGS as an office manager.

12    Q.    And just generally over the years, where were you

13   located with regards to those -- those jobs?

14    A.    When I worked in a bank in -- I was in South

15   Africa; I worked at the credit union in the U.S.; I worked

16   as an office manager in the U.S.

17    Q.    Could you be a little bit more specific as to where

18   in the U.S.?

19    A.    California.

20    Q.    Okay.

21    A.    San Mateo, California.

22    Q.    Okay.  Do you have -- have you worked, prior to any

23   involvement with DGS or Mid South, have you had any work in

24   the chemical manufacturing industry?

25    A.    No.

1    Q.    Okay.  Do you have any particular training in

2    connection with chemical manufacturing?

3    A.    No, I do not.

4    Q.    What was your specific job prior to joining DGS?

5    A.    I worked as a real estate agent.  And I worked to

6    -- I worked as an office manager.

7    Q.    And that was in California?

8    A.    That is right.

9    Q.    How did you come to be employed with DGS?

10    A.    Shiv Kumar is a common friend and he asked me if I

11    could do admin assistant, office management for his company

12    that he's starting.  And that's how I joined him.

13    Q.    When you say, "a common friend," do you know him

14    through relatives or what's the connection?

15    A.    Friends.  I know him through friends.

16    Q.    Okay.

17    A.    Our children went to school together.

18    Q.    And your children went to school in California?

19    A.    That is correct.

20    Q.    At some point did you move to Tennessee?

21    A.    No.

22    Q.    So, in connection with your work with DGS, you were

23    always based in California?

24    A.    That is correct.

25    Q.    I know you stated it before, but just so I'm clear,

1    the city you were working out of in California while you
2    were with DGS was which city?
3        A.    Foster City.
4        Q.    Okay.  How did the -- you said that Shiv asked you
5    if you could assist in that office manager capacity.
6            How did he describe the job to you, what the duties
7    would be to you as that agent?
8        A.    It would be more accounts receive -- well, I was
9    the first employee to start at DGS.
10           So I would be doing account receivable, payable.  I
11   would review contracts.  I would be placing orders that we
12   would receive.  I would be the contact person between
13   International Paper and our vendors, and basically
14   receiving money and in making payments.
15       Q.    And that was how it was described to you.
16           I wanted to get to what you actually did shortly,
17   but that was how the job was described to you?
18       A.    Yes.
19       Q.    Okay.  And I know from looking at the documents you
20   started working there.  So you came to an agreement.  You
21   agreed to some terms with Shiv in that regard, correct?
22       A.    Yes, that was going to be my role.
23       Q.    Okay.  So you earlier testified you were a 1099 DGS
24   person.  So what was the nature of the agreement that you
25   had as a complication with DGS?

1       A.      You want to know my pay?  Is that what you're

2    asking.

3       Q.      Well, how did you get paid?  How often?  And then

4    --

5       A.      Oh, monthly.

6       Q.      -- like, how --

7       A.      Monthly paid.

8       Q.      Monthly, all right.  And what was the annual

9    salary?

10      A.      So I ended with 90K.  I think I started at maybe 35

11   or 40.

12      Q.      Okay.  In terms of being the first employee at DGS,

13   was there any kind of training that was performed by Shiv

14   or anybody else, to, you know, get you to know the systems

15   and the -- the procedures that were going to be established

16   at DGS?

17      A.      Yes, Shiv would be the person that guided me on

18   what we need to have in place.  Since I worked as an office

19   manager for about four years prior with another company, I

20   -- my experience helped him bring, you know, an accountant

21   or to use QuickBooks.  How to make things a little bit

22   easier as far as accounting, and, you know, the -- the

23   general office management stuff.

24      Q.      So when did you start at DGS?

25      A.      I believe it was 2010 or 2011.  In that timeframe.

1      Q.   Oh.  I'm going to be able to show you some exhibits

2    later.  But I have one exhibit that's dated June of 2011

3    that you drafted while with DGS.  Does that sound about

4    right?

5      A.   That's -- that probably sounds right.

6      Q.   Okay.  When you first started with DGS, tell me

7    what you did on your first day if you remember.

8           I'm just trying to get an appreciation for what you

9    were introduced to and what services you were, you know,

10   they had you perform for DGS.

11     A.   When we initially started, it was trying to get --

12   trying to get a website going, trying to learn a little bit

13   about the chemical business, trying to figure out insurance

14   for the company, try to find out an accountant for the

15   company.

16     Q.   Were you shortly thereafter, once you started,

17   introduced to certain IP contacts?

18     A.   I was introduced to International Paper because

19   they were the company we were going to be supplying

20   chemicals to.

21     Q.   Do you remember who your initial contact were with

22   International Paper?

23     A.   I'm sorry.  I do not.

24     Q.   Did you speak with those contacts over the phone?

25     A.   Yes, I always had spoke with them over the phone.

1    Q.    Okay.  Did you ever have email communications with
2    them?
3    A.    Yes.
4    Q.    Okay.  Did your job -- so what was your actual
5    title then?  I know you described some of your duties.
6    What was your actual title?
7    A.    So I was admin assistant, or ops manager.  You
8    know, I -- I played a lot of roles.  I did the HR stuff and
9    we started hiring folks as well.
10        So this -- in the beginning it was playing a lot of
11   hands.
12   Q.    And when you were performing the HR stuff and
13   hiring people, were they being hired at employees, 1099s,
14   W-2 employees?  How were they --
15   A.    W-two.  They were W-2.
16   Q.    Okay.  Did you ever become a W-2 employee?
17   A.    No, I did not.
18   Q.    Once you started working in approximately 2011 for
19   DGS, what were the nature of the services that DGS was
20   providing to its customers?
21   A.    They were --
22                    MR. TOWNSEND:  Objection to form.
23   BY MR. MURPHY:
24   Q.    You can answer.  Sometimes there will be objections
25   by counsel, and unless there's something more specific, you

1    should go ahead and answer the question, to the best of

2    your ability.

3         A.    We were purchasing chemicals and providing to

4    International Paper.

5         Q.    Did DGS have any other customers other than

6    International Paper?

7         A.    No.

8         Q.    And you mentioned suppliers earlier.  What

9    suppliers did DGS work with?

10        A.    We worked with Georgia Pacific, GP.  We worked with

11   Nalco.  We worked with Kemira.

12                         (Reporter clarification.)

13   BY MR.

14        Q.    Before she asked for the spelling, were there any

15   others?

16        A.    There were.  I'm sorry.  I don't know the names.

17        Q.    Okay.  Without understanding that you can't

18   retrieve all the names off the top of your head,

19   approximately how many suppliers did DGS have business

20   relations with?

21        A.    I would say about six, seven, maybe over the

22   timeframe.  Some came and went, and, you know, we changed

23   vendors.

24        Q.    Okay.  Why would you change vendors?

25        A.    Because of pricing.

1      Q.    So throughout the time that you were with GDS --

2                       MR. TOWNSEND:  DGS.

3      BY MR. MURPHY:

4      Q.    -- DGS, excuse me, was Shiv always your immediate

5      superior?

6      A.    Yes, he was.

7      Q.    Okay.  And that was the person that you were always

8      reporting to?

9      A.    That's correct.

10     Q.    Did there come a time, you know, during the hiring

11     of employees, that that you reported to anybody else?

12     A.    No, I did not.

13     Q.    Did anybody report to you?

14     A.    We had another employee, and they would report to

15     me, or -- in parallel to Shiv as well.  If they had

16     questions they would come directly to me first, and I would

17     either take them to Shiv, or they'd go to him directly.  We

18     were a very small company of maybe, like, four or five

19     employees.  And so they would come to me for direct

20     questions, you know, whether it's regarding pay or ordering

21     something with vendors.  If there was a conflict or

22     delivery problem they would come to me for assistance, and

23     if it's something I could not handle, it would go to Shiv.

24     Q.    When you say, "ordering with vendors," are you

25     referring to the suppliers you mentioned?

1      A.   That is correct.

2      Q.   Again, I know it's been a while, but can you, to

3    the best of your memory, identify these DGS employees?

4      A.   There was one lady called Heather, and I do not

5    remember her last name.  And the other employee that worked

6    a long time with us was -- sorry, I just don't remember his

7    name anymore, but he was there for quite sometime, quite a

8    few years.

9      Q.   Do you know a gentleman by the name of Mark Allen?

10     A.   Mark Allen, that's right.

11     Q.   And -- and what was his role at DGS?

12     A.   It became an overload for me to do the ordering

13   from vendor and delivery of, plus the -- the other stuff

14   going around the accounts receivable and payable.  And so

15   we got Mark Allen involved to take care of ordering and

16   making sure that the deliveries took place.

17     Q.   What was Mark Allen's background, if you know?

18     A.   I think Mark worked at -- in Kenny Grove for

19   sometime, but he did many other jobs as well.  He was

20   actually a retired cook.  And he could do this from home,

21   so it worked out well for him.

22     Q.   Where he was based?

23     A.   He was based in Charlotte.

24     Q.   North Carolina?

25     A.   Uh-huh.

1    Q.    All right.  Where was Heather based?

2    A.    I don't remember, but somewhere in the East Coast.

3    I did not have too much communication with Heather.  It was

4    mostly with Mark.  When Mark was traveling, then Heather

5    took over the ordering, so we had her as a backup for a

6    short time.

7    Q.    I mentioned the four or five employees and you

8    mentioned Heather and Mark.  Any other names you can

9    remember?

10    A.    We had one more gentleman.  I do not his name.  He

11    worked a short time for us.  And we -- we wanted him to do

12    more sales, but he didn't work out well.

13    Q.    Where was Shiv based during the time that you were

14    working at DGS?

15    A.    He was both in Tennessee and in California.

16    Q.    Did your job as the office manager require any

17    traveling?

18    A.    I did travel.  I did go to Georgetown.  I went to a

19    couple of mills.  I remember Georgetown was the first one

20    when we were we were trying to get our first contract.  I

21    did travel with Shiv to Georgetown.

22    Q.    And generally speaking, what was the nature of that

23    -- that travel, that business travel?  What was the purpose

24    from a DGS perspective?

25    A.    We were doing the presentation.

1      Q.    (Coughing)  I'm sorry.  That was me.  I coughed.

2   Say that again.

3      A.    We were doing a presentation to let the mill know

4   that the product that we were going to be providing them.

5   And I do not remember which product it was at the time.

6            And it is basically a presentation to say who we

7   were, and we can provide this product, pricing, and what we

8   can do for International Paper.

9      Q.    All right.  I'm going to have something I can show

10  you shortly.  It's a PowerPoint presentation, and it's --

11  it actually says, "Presentation of International Paper

12  Georgetown, South Carolina."

13           Does that sound familiar to you?

14     A.    That's correct.

15     Q.    Is that something you put together, or Shiv, or do

16  you know?

17     A.    We would have both put it together.

18     Q.    Okay.  So it's fair to say, I know we didn't have

19  exact dates, but I know you worked with DGS for

20  approximately nine years?

21     A.    About that.  That's correct.

22     Q.    Did your -- you've described your various duties

23  and the things that you did.  Did that change much over the

24  years?  Did you just get more active?  Tell me how your

25  role expanded or changed, if at all, during that nine-year

1   period.

2       A.    What I've told you is pretty much what I did at

3   DGS.  I would review contracts with Shiv when he received

4   contracts from International Paper, just as a second read.

5       Q.    Right.

6       A.    Making sure we're not missing out on something or

7   signing off on something.  So I would -- I would read

8   contracts.

9       Q.    Okay.  When you -- when you travel for these

10  different meetings to the mills, would Shiv accompany you?

11      A.    The first one, yes, to Georgetown.  Like I said,

12  that was our first presentation and we both went together.

13  It was also a learning for me to see how the company was

14  going to work.  And like I said, and I was the only

15  employee at the time.  At that, I think it was that trip

16  when I looked -- was looking for Mark Allen -- it's when I

17  found Mark Allen.

18      Q.    Uh-huh.

19      A.    And, yeah, I think we got him on board.

20      Q.    So in -- in future, you know, business trips,

21  Mark Allen would accompany you, is that right?

22      A.    No, Mark did not.  I did another -- I don't

23  remember which city I went to.  I did go once.  It was more

24  like a little sales pitch or just to introduce where we

25  are.  If they needed anything, you know, they could always

1    come to us.  If they needed other chemicals they could come

2    to us, and we could outsource it for them, or we could

3    source it for them.

4        Q.    Okay.  So can you share with us, by way of an

5    approximation, how many times you personally traveled to IP

6    mills during your nine years with DGS?

7        A.    For sure two times.  It could be three.  But

8    definitely I went to Georgetown and I went to another mill.

9    I don't remember which one.  I was dealing with many mills

10   with International Paper.

11       Q.    And when you say, "too many," approximately how

12   many?

13       A.    Oh, I would say 10, 12 mills, if not more.

14       Q.    In different states throughout the country?

15       A.    That is correct.

16       Q.    Any work outside the country?

17       A.    No.

18       Q.    All right.  In terms of the work DGS was performing

19   during your nine-year period, how did that work go?  Were

20   you achieving the goals within DGS?  Were you keeping the

21   IP happy?  What -- describe first the -- the success or

22   efforts of DGS.

23                    MR. TOWNSEND:  Objection, vague.

24   BY MR. MURPHY:

25       Q.    You can answer if you understand the question.

1      A.    So my understanding is we -- we were keeping in

2    happy with providing them the chemicals they wanted.  We

3    were always providing on-time service.  We were very good

4    at that, especially when they were in a -- a in a holiday

5    season or bad weather.  We'd get our vendors.  Even if we

6    got a different vendor in to provide the chemical, we'd --

7    we'd do whatever it takes our -- to get our trucks in there

8    to drop off the chemicals, because they always needed the

9    chemical to -- to produce.

10      Q.    Right.  So that was a service and connection with

11    shipping in the chemicals to the various mills; is that

12    right?

13      A.    That's correct.

14      Q.    Okay.  And I did see some references to -- I'm

15    forgetting the name now.  We'll see it, but a hurricane

16    that, you know, certainly impacted the schedules, the

17    shipping schedules; is that right?

18      A.    That is correct.

19                    MR. TOWNSEND:  Objection --

20      A.    -- yes.

21                    MR. TOWNSEND: -- lacks foundation.

22                    (Reporter clarification.)

23                    (Requested testimony was read.)

24    BY MR. MURPHY:

25      Q.    And to the extent that you had weather event like

1    that, what was it you would actually do to address the

2    shipping schedules?

3        A.    We would -- if International Paper reached out to

4    us because they needed a certain chemical to go on

5    producing, we would see with our vendors if they could send

6    out a truck or two to provide a -- provide the chemical out

7    there to their mill.

8        Q.    Okay.  And were you generally successful in that

9    regard?

10       A.    Yes, we were.

11       Q.    Okay.  And if for some reason your supplier could

12   not supply the chemical, what action did DGS takes?

13       A.    We were unable to do it at this time.

14       Q.    Okay.  Did you ever find alternate sources?

15       A.    Yes.  Like I mentioned before we would try other

16   vendors.

17       Q.    Okay.

18       A.    Not necessarily the vendor that's already providing

19   it, but another vendor that would have the similar

20   chemical, we would try to help him out by getting that

21   product in there.

22       Q.    Okay.  At some point in time you testified earlier

23   you left DGS?

24       A.    Sorry, the question again?

25       Q.    Sure.  At some point in time you left DGS; is that

1   right?

2       A.   2020 is when we stopped DGS -- providing inter --

3   well, I think it was 2019, the end of 2019, in December, we

4   stopped providing any chemicals to International Paper.

5   And then Jan, 2020, I was no longer working with them.

6       Q.   Okay.  And what's your understanding as to why DGS

7   stopped supplying chemicals to International Paper?

8       A.   Actually, I didn't understand at the point why it

9   all stopped.  And then in January, I'd gone on a holiday

10  and I knew I didn't have a job anymore with DGS, and we

11  were going to stop -- we were going to stop supplying

12  International Paper, and we were not going to continue with

13  the company.  We were going to shut down for now, unless I

14  know that there were a lot of pending payments, so I tried

15  had a for a month and International Paper did not pay.  And

16  so at that point I had no job.

17      Q.   Okay.  Did you make any payments to suppliers

18  during that time?

19      A.   When we stopped receiving payments we stopped

20  making payments as well.

21      Q.   Okay.  So when the money stopped coming in from

22  International Paper, DGS stopped paying suppliers; is that

23  right?

24      A.   That is correct.

25      Q.   Did Shiv give you any explanation as to why DGS was

1    no longer supplying IP?

2       A.   He told me there was some kind of lawsuit.  I

3    didn't go into too much of detail because it was not -- it

4    didn't have anything to do with me.

5       Q.   Did anyone share with you, or did you learn of any,

6    you know, allegations of misconduct by DGS?

7       A.   When I was contacted by the FBI that's when I came

8    to know.

9       Q.   And when were you contacted by the FBI?

10      A.   2020 sometime, I believe.

11      Q.   And I presume you generally shared with them what

12   you did at the business; is that right?

13      A.   That's correct.

14      Q.   And what type of work did you pursue after you left

15   DGS?

16      A.   I didn't work for a few months because it was the

17   Covid time.  It was difficult to find a job working from

18   home especially.  Now I have my own catering business.

19      Q.   Okay.  And that's what your -- your work is today

20   is a catering business?

21      A.   That is correct.

22      Q.   Okay.  I'm going to go ahead, I don't know if I'm

23   going to jump to it right away.  But first let me just ask

24   you, did that other exhibit fully download?  Can you see

25   it?

1    A.    Let me check.  No.  It's going to in a second.

2    Q.    Okay.  Let me see if I --

3    A.    We do -- it's just showing the first page.  It's

4    yellow.

5    Q.    Right.  Can you scroll to the next page or is there

6    some kind of city icon?

7    A.    No, it's not moving beyond page 1.  It's 135 pages.

8              (Exhibit No. 2 was marked.)

9    BY MR. MURPHY:

10   Q.    Right, okay.

11   A.    Yeah.

12   Q.    Excuse me.  I'm introducing another exhibit.  Let

13   me know if you can see that exhibit.  It's Exhibit

14   Number 2.

15   A.    Now, where do I find this second exhibit?

16              MR. TOWNSEND:  Sorry to interrupt.

17   Jyotika, if you press refresh --

18              WITNESS:  Yeah.

19              MR. TOWNSEND: -- it might pop up.

20              WITNESS:  Yeah, I'm trying to see if it

21   opens now.  I just -- I'm trying to go back.  Still just

22   turning around.

23              (Exhibit No. 2 was marked.)

24   BY MR. MURPHY:

25   Q.    All right.  Let me try something else here.  I'm

1    going to try to share my screen so that you can see the

2    exhibit.

3        A.    Actually, Exhibit 2 has come up.

4        Q.    Oh, okay, great.  Okay.  So what I'd like you to do

5    is just flip through it for a moment.  I don't expect you

6    to read every word.  That's not the point.  I -- my

7    question is simply:  Do you recognize Exhibit Number 2?

8        A.    Yes, I do.

9        Q.    Okay.  What is it?

10       A.    This was basically a presentation to Georgetown

11   Mill to introduce ourselves of who we are at DGS and what

12   we -- what we do.

13       Q.    Okay.  So this presentation went through the

14   services that DGS provides to its customers?

15       A.    That's correct.

16       Q.    Okay.  And as I understand it, the sole customer

17   was International Paper; is that right?

18       A.    Yes.

19       Q.    Okay.  And I see the date on that first page is

20   May 24th, 2011.  Is that -- does that sound accurate to

21   you, based upon having been there?

22       A.    Yes.  Yes, that's probably around the time I went

23   there.

24       Q.    Okay.  So you -- you flew in from California for

25   this presentation?

1     A.   That's right.

2     Q.   And it was actually conducted at the Georgetown

3  Mill itself; is that right?

4     A.   Yes.

5     Q.   In -- in a conference room there on the plant

6  property?

7     A.   Yes, on the -- in a conference room.

8     Q.   Okay.  And who attended?

9     A.   There were, I believe, about three people from

10  International Paper up there.

11     Q.   Okay.

12     A.   I'm not going to remember names.  I'm000 sorry.

13     Q.   That's fine.  So three people from International

14  Paper, yourself, and Shiv.  Anybody else?

15     A.   No.  It was mostly a presentation to International

16  Paper.  May have been people from there.  The product that

17  we were providing.  I believe the product we were

18  providing, the lead person in that group will handle that

19  product.

20     Q.   Okay.  Does --

21     A.   Probably, I -- I -- Alyssia, I think her name was,

22  but too many people.

23                 (Reporter clarification.)

24     A.   I think her name was Alyssia.  And it may be wrong

25  too.  I'm sorry.

1    BY MR. MURPHY:

2        Q.   I want to make sure I understand your response.

3             Were you saying Alyssia was an IP person or

4    somebody with a prior supplier?

5        A.   No, no, no.  It was only International Paper.  We

6    were presenting to them.

7        Q.   Okay, great.  All right.  If you get through the

8    presentation, page 2 talks about, you know, the

9    introductions and so forth.  Let me ask you:  Was this a

10   joint presentation by yourself and Shiv or did one of you

11   do it?

12       A.   It was joint.

13       Q.   Okay.  Were you responsible for any particular or

14   was it joint across the board?

15       A.   We -- oh, we both spoke about, you know, similar

16   stuff.  I think Shiv presented most of the items.  I can't

17   remember which part I -- but it was, you know, Q and A.  I

18   was happy to answer questions if I knew whether Shiv would

19   -- would come in.  Like I said, this was first customer, or

20   first mill, and it was new for me too.  I was trying to

21   learn the business.

22       Q.   Okay.  If you turn to the third slide, which is

23   entitled "Introductions"; do you see that?

24       A.   Yes.

25       Q.   Okay.  I see both Shiv and yourself.  I see you're

1    listed as a sales director.  Was that one of your titles,

2    or was that, you know, synonymous with office director, or

3    office manager, excuse me?

4        A.    It was all the same.  Like I said, I was the only

5    person at this time in the company, so I played many hats.

6        Q.    Okay.  So the third gentleman that's listed there,

7    who was that?

8        A.    I do not know.  These were all Shiv's contacts.

9    People that he knew.

10       Q.    Okay.  They --

11       A.    I did not have to deal with them.

12       Q.    All right.  They were not International Paper

13   people, correct?

14       A.    No, no.

15       Q.    Okay.  Were they -- were they -- I -- I'm getting

16   -- I'm thinking that they were at the presentation as part

17   of the introduction, or am I mistaken in that regard?

18       A.    No, they were not at the presentation.  They were

19   people he introduced that he had worked with and would be

20   affiliated with our -- with our company.

21       Q.    Okay.  Did you ever have any contact with either of

22   those people in connection with your duties --

23       A.    No, I --

24       Q.    -- in that regard?

25       A.    -- did not.  I did not.

1    Q.    Okay.  I'd like you to flip in a few pages to --

2    there's a -- a map.  I don't have the exact page number,

3    but it says, "DGS Current Presence"; do you see that?

4    A.    Yes.

5    Q.    Okay.  Are you familiar with any, you know,

6    manufacturing alliances or distribution centers that are

7    outside the U.S.?

8    A.    I am not aware of any.

9    Q.    Okay.  All right.  Let's go to the next slide.

10   Tell me the significance of what that slide was.  It's

11   entitled, "Wet Strengths" in your presentation.

12   A.    Okay.  So what do you want to know about this?

13   Q.    What's the purpose of this slide as part of your

14   presentation to the IP Mill?

15   A.    It's what -- what DGS would be, which is to provide

16   service to International Paper.

17   Q.    Okay.  Is that list of chemicals?  What is that a

18   list of?

19   A.    Rosin was a chemical.  Westrin (phonetic) is a

20   chemical.  It was all --

21                    (Reporter clarification.)

22   A.    So all of them I believe, no, not all chemicals,

23   because we have shredded tires, which was different from

24   chemicals, but was something we could provide the mill if

25   they needed it.  Valves and pumps is something we could

1   also provide, because that comes from Shiv's background.

2   From the company he worked to previously, he would be able

3   to have suppliers for that.  Cables, if they needed that.

4   Who's -- these were basically things we could provide

5   International Paper above and beyond just chemicals.

6   BY MR. MURPHY:

7       Q.   Okay.  And so I don't forget, do you know where

8   Shiv is located today?

9       A.   Today, no, I don't know.

10      Q.   Okay.  So, as you pointed out, and as the first

11  page of the exhibit says, this was a presentation to the IP

12  Georgetown, South Carolina Mill.

13           Did you, as a result of this presentation, enter

14  into a contract with IP to provide any of these chemicals

15  to the Georgetown Mill?

16      A.   That is correct.

17                    MR. TOWNSEND:  Objection, vague.

18                    WITNESS:  Oh.

19  BY MR. MURPHY:

20      Q.   You can answer.

21      A.   We provided them with wet strength.

22      Q.   What is "wet strength"?

23           Okay.  Have you finished your response?

24      A.   Yes.

25      Q.   Other than wet strength, did DGS supply the

1    Georgetown Mill with any other chemicals?

2        A.    In the future, yes.  And I don't remember which

3    chemical it was.  But at that time, it was only wet

4    strength.

5        Q.    All right.  And these other chemicals that are

6    listed on this slide, were they provided to other IP mills?

7        A.    Some of them, yes.

8        Q.    Okay.  If you would, just identify the chemicals

9    that DGS supplied to IP mills during your nine-year period

10   with DGS.

11       A.    We provided Rosin.  We provided sodium

12   hydrochloride.

13       Q.    Any other chemicals?

14       A.    Yes.  We did have other chemicals as well.  Sodium

15   bisulfite.  I'm sorry.  It's -- we -- we did provide more

16   chemicals than that.

17       Q.    You just can't retrieve the names?

18       A.    Yes.  I'm sorry.

19       Q.    Fair enough.  That's fine.  I understand.

20             I'd like you to flip through a little bit further.

21   There's a -- a slide about DGS operational pet source.

22   There's a reference to focus on Six Sigma implementation.

23             Did you have any involvement with that?

24       A.    No.

25       Q.    Okay.  Keep -- keep scrolling through.  There's a

1    slide entitled "Georgetown Mill Value Proposition."

2        A.    Yes.

3        Q.    Okay.  What was the purpose of this slide in your

4    presentation to the mill?

5        A.    The purpose of the slide is to let -- let the men

6    know that we -- we can understand that you cannot run out

7    of product at any time, because they cannot keep

8    manufacturing of any kind of paper.  And so, that we will

9    ensure that they're always supplied with the chemicals they

10   require.

11       Q.    They supply your work with DGS.  Were there times

12   where IP had concerns about running out of product?

13       A.    Running out of product or having it delivered on

14   time.

15       Q.    Okay.  So there were two concerns?

16       A.    They were concern -- well, that -- that was our

17   presentation to them was that we'll always have it to you

18   on time.

19       Q.    Okay.  Did you follow -- did DGS follow through

20   with their actions with regards to that presentation?

21       A.    Yes, we always provided on time.  From my

22   understanding, we never had the products -- they did not

23   have to shut down or switch a chemical, sorry, switch a

24   product because they didn't have one of our chemicals.

25       Q.    Over the nine years you worked with DGS, were there

1    times when IP praised your work, or times when, on the

2    other side, there were complaints made regarding DGS's

3    work?

4        A.    As far as I know, we did not have any complaints.

5    They were happy because we used to do a monitoring system

6    which Mark used to take care of.  He would know.  I believe

7    IP has an -- I may get this incorrect.  I believe what IP

8    has is a monitoring system where they can tell when it's

9    chemical comes to a certain level, we're ready to order.

10   And Mark would monitor that with the mills, so we always

11   have a truckload in within a few days, so they do not run

12   short of chemicals.

13       Q.    Did anyone ever complain personally with regard to

14   your services from IP to Shiv?  Anything like that?

15       A.    Not that I'm aware of.

16       Q.    Shift to the next slide that just says, "Georgetown

17   Mill's DGS offered solutions."  That first bullet talks

18   about DGS providing a dedicated account manager.

19             Who was the dedicated account manager that you and

20   Shiv were speaking of in connection with his presentation?

21       A.    It would either be me or Mark Allen.  It ended up

22   being more Mark, who would be dealing with the mills,

23   because he would be monitoring the mills' products.  And I

24   just explained.  And he would be taking the orders.

25       Q.    Can you give me -- I'm looking at that second

1    bullet.  Why don't you read that to yourself for a second?

2        A.    (Complies)  Okay.

3        Q.    Can you explain to me what you mean by that?  What

4    is -- give me an example of that.

5        A.    About the supply chain to provide the right amount

6    of product in a timely manner?

7        Q.    Yes.

8        A.    Yeah.

9        Q.    I would like to have -- if you have an

10   International Paper specific example of how you perform

11   that service?

12       A.    As I just explained, Mark -- we had a monitoring

13   system in place with International Paper.  When the product

14   came to a certain level we would provide -- we would make

15   our order from our vendor to have the chemical provided

16   within the next few days.

17       Q.    Okay, thank you.  I have no further questions with

18   regard to that exhibit.

19           Ms. Balsara -- I apologize if I'm mispronouncing

20   your name.  "Balsara," is that correct?

21       A.    That is correct.

22       Q.    Close enough?

23       A.    Yes.

24       Q.    I -- I want you to know, just in terms of this

25   procedure today, if at any time that you need a break, you

1    can definitely let me know, and we can do that.  The only

2    request that I have is that if I have a pending question,

3    that, you know, that you answer the question before we do

4    that.

5         We've been going for about an hour now.  That said,

6    I'm still, you know, prepared to go forward.  I think the

7    videographer and the court reporter are good.

8         Do you need to take a break right now or can we

9    keep going for another half an hour?

10   A.   Yeah, I wanted to find out how long, because I had

11   no idea how long has going to take, so...

12   Q.   Well, I can't speak for Mr. Townsend.  I'm

13   thinking, you know, somewhere -- you can't hold me to this,

14   but somewhere around 2-1/2 hours for me.  And then, you

15   know, certainly, Mr. Townsend is entitled to, you know, ask

16   questions as well.  So you -- you know, based upon your

17   clock, you could be, you know, looking at you know 2, 3,

18   4:00 o'clock, somewhere in that range.  Obviously, we can

19   stop for lunch.

20   A.   Yeah, I'm sorry.  I did not plan for that, knowing

21   that it's going to take that long.

22   Q.   Okay.

23   A.   I do have a business that I run, and I need to get

24   back to, because I have customers waiting for me as well.

25        Is it possible to do the second part of questions

1     another day and we can have a timeframe?

2                MR. MURPHY:  Nathan, I'll let you chime

3     in here for a moment.

4                MR. TOWNSEND:  Well, let's -- let's see.

5         Ms. Balsara, what would be a -- A good end time for

6     you today?

7                WITNESS:  Sorry?  What time would be good

8     to end today?

9                MR. TOWNSEND:  Yes.  Is there something

10    -- is there a time period where you can't be answering

11    questions anymore?  Another commitment you have to attend

12    to today at a certain time period?

13               WITNESS:  Well, I can do it for the next

14    45 minutes.  I really didn't plan -- I thought this would

15    be half an hour.  I did not think it was going to be that

16    long.  I was not given a timeframe, so...

17               MR. TOWNSEND:  So, 45 minutes.  But is

18    there anything today?  Do you have, like, a meeting with a,

19    as I understand you run a catering business.  Is there a

20    customer you need to meet today?  Or is there any prior

21    commitment that you really can't cancel today?  Or are you

22    just generally planning that you'd be attending to your

23    business this afternoon?

24               WITNESS:  I need to -- I need to prep and

25    prepare for my customers who were going to be picking up

1    food from me in the next few hours.

2                    MR. TOWNSEND:  Okay.  I -- I understand

3    your -- your dilemma, Ms. Balsara.  45 minutes is

4    definitely not enough time.  And we can look at calendars.

5         I don't know, maybe we want to pause and go off the

6    record, Gene.  Would that make sense?

7                    MR. MURPHY:  Yeah, that's -- that's fine.

8         Judy, and the videographer, can we suspend the

9    transcript for a moment?

10                   REPORTER:  You bet.

11                   MR. TOWNSEND:  Okay.

12                   VIDEOGRAPHER:  Do you want to go off the

13   record, Counsel?

14                   MR. TOWNSEND:  Yes, please.

15                   VIDEOGRAPHER:  We are -- this marks the

16   end of Media No. 1 in the deposition of Jyotika Balsara.

17   The time is 11:13 a.m.  We're off the record.

18               (Off the record.)

19                   VIDEOGRAPHER:  This marks the beginning

20   of Media Number 2 in the deposition of Jyotika Balsara.

21   The time is 11:20 a.m.  We're on the record.

22                   MR. MURPHY:  Okay.  The -- the parties

23   realized that Ms. Balsara has a business conflict in a --

24   in short order, so she's not able to complete the

25   deposition today.

1          We have agreed to complete her deposition on

2     January 8th, starting at 7:00 a.m., California time, and

3     the goal of the parties is to complete that deposition in

4     four hours or less.

5          I think both parties reserve their rights, in case

6     anything extraordinary comes up in the testimony, but we

7     will do our best to get everything done during that

8     four-hour timeframe.

9          Mr. Townsend, anything else?

10               MR. TOWNSEND:  Nothing from me.  I agree

11    with you, Mr. Murphy.  Thank you.

12               MR. MURPHY:  Okay.  And Ms. Balsara,

13    unless you've got anything else to say, thank you for, you

14    know, being here on time today.  And we will send out --

15    the court reporter will send out a Zoom link, and we'll

16    reconvene on January 8th, 7:00 o'clock, your time.

17               WITNESS:  Thank you so much.

18               MR. MURPHY:  Okay, thank you.  Happy

19    holidays.

20               REPORTER:  Just one second, Peter.

21          Mr. Murphy, would you like to order?

22               MR. MURPHY:  You know, eventually I'll

23    want to order.  Although, I guess, let me say it this way:

24    I would like to see a dirty transcript, if you have it.  If

25    I have to record it now, that's fine.

1                    REPORTER:  You got it.

2                    MR. MURPHY:  Okay.

3                    REPORTER:  And same thing for you,

4      Mr. Townsend?

5                    MR. TOWNSEND:  Yes, thank you.

6                    REPORTER:  Go right ahead, Peter.

7                    VIDEOGRAPHER:  Counsel, do you want a

8      video order as well?

9                    MR. TOWNSEND:  Yes, please, in standard

10     format.  Whatever that is.

11                    VIDEOGRAPHER:  Good.  Thank you.

12          And I'll conclude.

13          This concludes today's deposition of Jyotika

14     Balsara.  The number of media used was two.  The time is

15     11:22.  We're off the record.

16                    (The deposition of Jyotika Balsara,

17     Volume 1, was concluded at 11:22 a.m.)

18                    (Signature was reserved.)

19

20

21

22

23

24

25

1   STATE OF WASHINGTON )

2                       ) SS.

3   COUNTY OF KING      )

4

5           I, the undersigned, declare under penalty of

6   perjury that I have read the foregoing transcript, and

7   I have made any corrections, additions, or deletions,

8   that I was desirous of making; that the foregoing is a

9   true and correct transcript of my testimony contained

10  therein.

11

12          EXECUTED this _____ day of _____ 2024 at

13  _____, _____.

14

15

16                      _____

17

18                      JYOTIKA BALSARA

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF WASHINGTON )
                    )SS.
COUNTY OF KING      )

        I, Judith A. Robinson, Certified Court Reporter and an
officer of the Court under my commission as a Notary
Public, in and for the State of Washington, do hereby
certify that the foregoing deposition was transcribed under
my direction; that the transcript of the deposition is a
full, true and correct transcript to the best of my
ability; that I am neither attorney for, nor a relative or
employee of any of the parties to the action or any
attorney or Counsel employed by the parties hereto, nor
financially interested in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal this 31st day of December 2023.

                        Judy Robinson

                        Judith A. Robinson, Notary Public
                        in and for the State of Washington
                        residing at Seattle.
                        My Commission expires November 4,
                        2024.
                        CCR License #2171

1                          **ERRATA SHEET**
                   **VERITEXT/NEW YORK REPORTING, LLC**
2

    CASE NAME: International Paper Co v. Beazley Insurance Co
3   DATE OF DEPOSITION: 12/21/2023
    WITNESSES' NAME: Jyotika Balsara
4
5    **PAGE    LINE (S)        CHANGE                REASON**
     ____|_____|_____|_____
6
     ____|_____|_____|_____
7
     ____|_____|_____|_____
8
     ____|_____|_____|_____
9
     ____|_____|_____|_____
10
     ____|_____|_____|_____
11
     ____|_____|_____|_____
12
     ____|_____|_____|_____
13
     ____|_____|_____|_____
14
     ____|_____|_____|_____
15
     ____|_____|_____|_____
16
     ____|_____|_____|_____
17
     ____|_____|_____|_____
18
     ____|_____|_____|_____
19
     ____|_____|_____|_____
20
21                                    _____
                                      Jyotika Balsara
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS _____ DAY OF _____, 20__.
23
24
     _____          _____
25   (NOTARY PUBLIC)               MY COMMISSION EXPIRES:

1           UNITED STATES DISTRICT COURT

2

3   International Paper Company,      )

4              Plaintiff,            )

5   v.                              )Civil Action No.

6   Beazley Insurance Company, Inc.,)2:22-cv-02789-MSN-CGC

    and Zurich American Insurance    )

7   Company,                        )

                                    )

8              Defendants.          )

    _____

9

             DEPOSITION OF JYOTIKA BALSARA

10                    VOLUME 2

11

                      7:00 a.m.

12               January 8, 2024

             Foster City, California

13

14

15

16

17

18

19

20

21

22

23

24

25        Reported By:  Judy Robinson, CCR #2171

1               A P P E A R A N C E S

2    ATTORNEY FOR THE PLAINTIFF, INTERNATIONAL PAPER:

3    NATHAN TOWNSEND

     K&L GATES

4    210 6th Avenue, Suite #1900

     Pittsburgh, Pennsylvania 15222

5    412.355.6368

     nathan.townsend@klgates.com

6

7    ATTORNEY FOR THE DEFENDANT, BEAZLEY INSURANCE COMPANY, INC.:

8    EUGENE P. MURPHY

     ROBINSON & COLE, LLP

9    One Boston Place, 25th Floor

     Boston, Massachusetts 02108

10   emurphy@rc.com

11

     Also Present:  Terrance Weiss, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2    WITNESS              EXAMINATION              PAGES

3    JYOTIKA BALSARA

4

5                     BY MR. MURPHY ............ 56-103

6                     BY MR. TOWNSEND ......... 103-179

7

8                      E X H I B I T S

9    NO.          PAGE          DESCRIPTION

10

11   Exhibit 1      72           Procurement Contract

12   Exhibit 2      85           May 24, 2011 PowerPoint

13   Exhibit 3      56           1/1/2018 Contract

14   Exhibit 4     106           August 25, 2018 Email

15   Exhibit 5     111           Job Description Document

16   Exhibit 6     118           10/17/2018 Email

17   Exhibit 7     123           8/27/2015 Email

18   Exhibit 8     131           11/4/2019 PowerPoint

19   Exhibit 9     148           8/31/2017 Email

20   Exhibit 10    159           11/15/2013 Letter

21   Exhibit 11    159           Email Attachment to Exhibit 10

22   Exhibit 12    165           4/9/2013 Email

23   Exhibit 13    165           Email Attachment to Exhibit 12,

24                               Excel Spreadsheet

25   Exhibit 14    171           2012 Tax Return

1        BE IT REMEMBERED that the deposition upon oral examination

2    of JYOTIKA BALSARA, Volume 2, was taken on January 8, 2024, at

3    7:00 a.m., at 125 South 309th Street, Federal Way, Washington,

4    98003, before Judith A. Robinson, CCR, Notary Public in and for

5    the State of Washington, residing at Federal Way, Washington.

6            Whereupon, the following proceedings were had, to-wit:

7                VIDEOGRAPHER:  Good morning.  We're on the record

8        at 7:06 a.m. on January 8th, 2024.

9                Please note that this deposition is being conducted

10       virtually, and the quality of the recording depends on the

11       quality of the camera and the inter -- internet connection

12       of the participants.

13               What is seen from the witness and heard on the

14       screen is what will be recorded.  Audio and video recording

15       will continue to take place unless all parties agree to go

16       off the record.

17               And we have a Mary Jane Palmer coming in; is that

18       okay?

19               MR. TOWNSEND:  Yes.  She's a client for

20       International Paper.

21               VIDEOGRAPHER:  Okay.  This is Media Unit 1 of the

22       video -- video-recorded deposition of Volume 2 of Jyotika

23       Balsara in the matter of International Paper Company versus

24       Beazley Insurance Company et al., filed in the United States

25       District Court for the Western District of Tennessee, Case

1    Number 2:22-cv-02789.  The location of this deposition is

2    via Zoom remote meeting.

3         My name is Terrance Weiss, representing Veritext

4    Legal Solutions, and I'm your videographer.  Our court

5    reporter today is, Judy Robinson, from the firm Veritext

6    Legal Solutions.

7         I am not related to any party in this action, nor

8    am I financially interested in the outcome.

9         Counsel and everyone attending remotely will now

10   state their appearances and affiliations for the record.

11        If there are any objections to proceeding, please

12   state them at the time of your appearance, beginning with

13   the noticing attorney.

14        MR. MURPHY:  Gene Murphy, noticing attorney, on

15   behalf of the defendant insurance company, Beazley Insurance

16   Company, with the law firm of Robinson & Cole.

17        MR. TOWNSEND:  Good morning.  This is

18   Nathan Townsend from K&L Gates.  I'm representing

19   International Paper in this matter.  I also have my client,

20   Mary Jane Palmer from International Paper logging in.  Thank

21   you.

22        VIDEOGRAPHER:  Would the court reporter please

23   swear in the witness.

24             WITNESS:  Sorry.  Could you say that

25   again?

1                     * * * * * *

2                  JYOTIKA BALSARA

3              having been first duly sworn

4                 on oath was examined

5                and testified as follows:

6              E X A M I N A T I O N

7    BY MR. MURPHY:

8        Q    Great.  Good morning, Ms. Balsara.  Thank you for, you

9    know, continuing the deposition here with us this morning.  I

10   realize it's much earlier there.  You -- we appreciate your

11   working with that in terms of the scheduling.

12           What I'd like to do in terms of moving on to the next

13   exhibit is have you actually go ahead and look at Exhibit Share

14   with regard to Exhibit No. 3.

15                (Exhibit No. 3 was marked.)

16   BY MR. MURPHY:

17   Can you go ahead and open up Exhibit No. 3, which you'll --

18   you'll see is a procurement contract.

19       A    Okay.  I have to find that now.

20       Q    Okay.  Take -- take -- take your time.

21       A    So it's saying no account found to actually view the

22   exhibit.

23                MR. TOWNSEND:  Gene, it looks like you have

24       Exhibit 3 uploaded in a folder for December 21st, 2023.

25       It's possible Ms. Balsara has a link for January 8th, 2024.

1    That could be our technical issue.  I do see Exhibit 3.

2    It's in the December 18th folder.

3              MR. MURPHY:  Okay.

4              WITNESS:  I'm unable to actually get into the

5    exhibits itself.

6              MR. MURPHY:  Okay.  So can you -- I guess -- can

7    you see Exhibit 3 or not?  The answer is no; is that right,

8    Ms. Balsara?

9              WITNESS:  No.  No.  I'm not even able to get into

10   the -- any exhibits.

11             MR. MURPHY:  Okay.  Hold on.

12             WITNESS:  It says no account found.

13             MR. MURPHY:  No account found.

14             MR. TOWNSEND:  Ms. Balsara, is it possible when you

15   go to the web page, there's a button to access it as a

16   guest.  It -- would you be able to click on that instead and

17   see if you can get in?

18             WITNESS:  Yeah, I got in and it said this folder is

19   empty.

20             MR. TOWNSEND:  Okay.

21             MR. MURPHY:  Okay.  All right.  I'm going to see if

22   I can reintroduce it and focusing on today's date.  Hold on

23   one second.

24             Okay.  I've introduced it.  Are you seeing anything

25   new?  I guess that goes out to Nathan as well.

1          WITNESS:  Yes.

2          MR. TOWNSEND:  I see it.  Thank you.

3          MR. MURPHY:  Okay.

4     BY MR. MURPHY:

5          Q    All right.  It's marked as Exhibit 3 in terms of what

6     you're looking at, Ms. Balsara.

7          A    It's still coming up.  It's going to take some time.

8          Q    Okay.  It shouldn't be that bad.  It's about a -- a

9     20-page document.  Since you -- that composite exhibit from last

10    time, I'm going to go ahead and introduce it now.  We don't need

11    it right now, but if it takes time to download, I want to make

12    sure it's doing that while we're addressing this exhibit.

13         A    Okay.  So where -- what page are we looking at?

14         Q    What I'd like you to do is just take a -- just look at

15    the entire exhibit for a moment.  Scroll through it.

16              My first question is simply going to be, do you

17    recognize the document?

18         A    Yes, I do.

19         Q    Okay.  Just give me one second.  I want to introduce

20    that other document so it's ready for later.

21              Okay.  Great.  Thank you.  Tell us what this document

22    is based upon your personal knowledge and as someone who worked

23    at DGS.

24         A    It's a contract between DGS and IP.

25         Q    Okay.  And what's the date of this particular document?

1    A    Jan. 1st, 2018.

2    Q    Okay.

3    A    It's a five-year contract.

4    Q    Okay.  So I'm sorry.  It's a what contract?

5    A    Five-year contract.

6    Q    Thank you.  And do you see the -- the signatures on

7    behalf of International Paper and DGS in the contract?

8    A    Oh, let me look.  Yes, I do.

9    Q    Okay.  And I see, if you look at the fifth page of the

10   document, is that where you see the signatures?

11   A    What page?  Page 6?

12   Q    It actually says page 5 at the bottom.

13   A    Yes.

14   Q    Okay.  And so you see a signature there for

15   International Paper, correct?

16   A    That's correct.

17   Q    And the printed name under the signature is Metrick

18   Houser.  Do you see that?

19   A    That's correct.

20   Q    During your time with DGS, did you have occasion to

21   communicate with Metrick Houser, whether it be by phone or

22   email, whatever the -- the form --

23   A    No.

24   Q    -- application?

25   A    No.

1          Q     Okay.  Do you know who Metrick Houser is?

2          A     No.

3          Q     Okay.  And I see the other signature over the printed

4     name, Shiv Kumar.  Do you see that as well?

5          A     That's correct.

6          Q     Okay.  And do you recognize that as Mr. Kumar's

7     signature?

8          A     Yes.

9          Q     And throughout this document -- you'll see it on that

10    page as well -- there's a stamp.  Do you recognize that stamp?

11         A     That's -- yes, I do.

12         Q     And what's the significance of that stamp?

13         A     It's just a DGS stamp --

14         Q     Okay.

15         A     -- that we used to put in for all official documents.

16         Q     Is that something that you personally would apply?

17         A     We purposely apply?

18         Q     No.  Did you personally -- I mean, did you literally

19    have the stamp on your desk?  Did you apply it in the course of

20    your work?

21         A     Yes.

22         Q     Okay.  And under what circumstances did you apply the

23    stamp with respect to contracts with International Paper?

24         A     We just wanted a stamp with our name on it.  We did

25    that for any contracts.

1          Q     Okay.  Other than procurement contracts, did you use

2     that stamp with regard to other correspondence or -- or

3     contracts with International Paper?

4          A     I don't remember.

5          Q     Okay.  And -- okay.  Now, this contract, do you

6     recognize this form?

7          A     Yes.

8          Q     Were there other contracts during your tenure -- tenure

9     that were executed between DGS and International Paper?

10         A     Yes.  Every time something -- a new product is

11    introduced, we would try to put it in contract, and so we would

12    have this type of contract going on with DGS -- with

13    International Paper.

14         Q     Okay.  And when you say a "new product," are you

15    talking about a chemical that was being supplied?

16         A     A new chemical, something -- if we were trying to bid

17    on a product, and then if we did win the bid, then we'd create a

18    contract with International Paper and DGS.

19         Q     Okay.  And just as a reminder, just so Judy, the court

20    reporter, doesn't get mad at any one of us, please let me finish

21    my questions before you respond.  I know sometimes we anticipate

22    knowing where the question's going, but she's going to have to

23    transcribe one person at a time, okay?

24         A     Uh-huh.

25         Q     Thank you.  Okay.  You see that this contract has

1    various exhibits that are referred to in the contract.  Do you

2    see the first one on page 6, Exhibit A.  Do you see that?

3         A    Exhibit A?

4         Q    Correct.  It says Exhibit A Terms and Conditions at the

5    top of the page.

6         A    Yes.

7         Q    Okay.  And I mean, I don't want to limit it to

8    Exhibit A.  Earlier in your testimony you talked that you would

9    do a second read with regard to these various contracts between

10   DGS and -- and IP.

11        In case -- is this a contract that you did a second

12   read on?

13        A    Possibly, yes.

14        Q    Okay.  Let me -- let me broaden that.  Is this the type

15   of contract that you would do second reads on in connection with

16   your work at DGS?

17        A    Yes.

18        Q    Okay.  What type of changes or edits did you make in

19   the past while you were doing these second reviews?

20        A    You know, Kumar would -- would review the contracts,

21   and he asked to just see if there's something that shows out

22   that we suppose we were going to do a five-year contract,

23   suppose it showed three years, you know, it just those kind of

24   changes to see that everything is okay, that he's retained the

25   information the right.

1        Just a second read just to see that nothing blanks out

2    to me as far as maybe a rule and regulation with International

3    Paper that we need to make sure that we haven't missed out or we

4    signed up for something that we're not aware of or comes in as a

5    surprise to us.  I mean, like any contract, with any -- with any

6    customer, right?

7        Q    Okay.  Thank you.  As you scroll through this contract,

8    do you see an identification in the -- in the main contract or

9    the, you know, various attachments that identifies the chemicals

10   that DGS is supplying in accordance with the contract?

11       A    Yes.

12       Q    Can you direct us to that page, please, or pages?

13       A    Okay.  That's page 14.

14       Q    Okay.  Page 14, when I look at it at the top, it says

15   Attachment A Products, Prices, Program Specifications and

16   Expectation Documents; are we on the same page?

17       A    Yes.

18       Q    And there's a Bates number to the bottom right that

19   says DGS0001129; is that right?

20       A    Yes.

21       Q    Okay.  So tell me what this -- this Attachment A

22   represents based upon your experience at DGS.

23       A    It -- the mill is a mill that we're going to be

24   delivering the product to.  The product are the product names

25   that we will be delivering to those particular mills.  The

1   pricing we are offering to International Paper in the third

2   column, and the fourth one is a delivered price to International

3   Paper.

4       Q    Okay.  Can you be more specific?  What do you mean by

5   "delivered price"?  And the reason I'm asking you is, is this

6   something that's added later?  I mean, how do you know it's

7   delivered at the time you sign the contract?  Or maybe I'm

8   reading it the wrong way.

9       A    Delivered price means that we're going to -- we -- the

10  price of delivery is incorporated in this pricing.

11  International Paper will not be paying a separate delivery fee.

12      Q    I see.  Okay.  I see.  Based upon your earlier

13  deposition, I see reference, you know, right there at the very

14  top to sodium hypochlorite, which is one of the chemicals that

15  you had shared with us that DGS supplied to International Paper.

16  That's consistent with your past testimony, correct?

17      A    Yes.

18      Q    Okay.  And now -- and you had identified some others.

19  I'm just -- generally, I have notes here.  You spoke about rosin

20  size.  You spoke about wet strength resins.  When you look at

21  this list, do any of those chemicals -- are those listed here as

22  well in addition to the sodium hypochloride?

23      A    So I'm not sure.  Trust me.  It's been many years, so

24  whether the sosperse is a wet strength, I'm not sure.

25                  REPORTER:  Hold on.  Sosperse?

1          WITNESS:  Yes.  S-O-S-P-E-R-S-E.

2          REPORTER:  Thank you.

3     BY MR. MURPHY:

4        Q    Okay.  I -- I should point out -- and I apologize for

5     interrupting, but the third page does have a specific reference

6     to wet strength, so you know.

7        A    Oh, yes, I -- I did see -- okay.  I see that.  They do

8     have wet strength.  They have wet strength resin.  So they do

9     have resin.  They have ASA.  They have rosin in Valliant.  So we

10    do have some of the products I mentioned.

11       Q    Okay.  And part of the reason I was asking a question

12    is, you know, maybe some of these names, you know, fall into the

13    category of, you know, what you had previously identified.  I

14    don't know, but let me withdraw that and just simply say these

15    -- this -- this sosperse that I'm looking at, the first page,

16    going to the Mansfield Mill.  Is it your understanding that --

17    that DGS supplied that chemical to the Mansfield Mill?

18       A    If it's -- if it's on the contract, and we won the

19    contract, then -- oh, well, this was an agreement, and yes, we

20    supplied it.

21       Q    Okay.  So it's your general understanding that each of

22    the products identified on this Attachment A, which is a

23    three-page document, were supplied to International Paper; is

24    that right?

25       A    That is correct.

1      Q    Okay.  And looking at the -- if you look at the page

2  15, Bates stamped at the bottom right of DGS1130, there's

3  reference to nitric acid going to the Eastover Mill.  Do you see

4  that?

5      A    Yes.

6      Q    And I -- I've seen some other correspondence relating

7  to nitric acid.  Is that one of the chemicals that, you know,

8  you have experience with supplying to International Paper?

9      A    I believe so, yes.

10     Q    Okay.  And obviously, there are multiple plants

11  identified on this Attachment A, but your understanding is that

12  these particular products were supplied to those particular IP

13  mills; is that right?

14     A    Yes, it was.

15     Q    Okay.  And on page 2 there's a reference to Georgetown.

16  That's the facility -- the -- the mill that you personally

17  visited; correct?

18     A    That's correct.

19     Q    When you look at this list of mills, does that refresh

20  your memory as to other mills that you visited?  You said that

21  there were at least two, but you weren't sure about other name.

22     A    I think it was Mansfield.

23     Q    Okay.  What was the purpose of the Mansfield visit, if

24  you recall?

25     A    Oh, that was a long time back.  It was probably to

1    introduce ourselves and show who we are, and you know, there are

2    people that exist from DGS because it would normally be

3    telephone conversations, and if there are any -- to let them

4    know that if we -- more like a sales pitch, that if they had any

5    other products they wanted to outsource with DGS, then you know,

6    we're out there to help them.

7        Q    Okay.  And where was -- what state was Mansfield

8    located in?

9        A    Oh, I don't know.  I don't remember that.

10       Q    Okay.  Fair enough.  Valliant seems to come up quite a

11   bit in the correspondence.  Are you familiar with that mill?

12       A    Yes, I am.

13           REPORTER:  Reporter clarification, Valliant?

14           MR. MURPHY:  Valliant is V-A-L-L-I-A-N-T.

15           REPORTER:  Okay.  Thanks.

16   BY MR. MURPHY:

17       Q    Did you have -- if you scroll through to page 17, you

18   see there's an exhibit sheet, consignment agreement?

19       A    Page 17?  Yep.

20       Q    The Bates No. Is DGS1132 in the bottom right-hand

21   corner.

22       A    Yes.

23       Q    My question simply is:  Did you have any particular

24   involvement in the implementation or services in the connection

25   with this consignment agreement?

1          MR. TOWNSEND:  Objection to form.

2   BY MR. MURPHY:

3      Q    Let me withdraw and just say it this way, Ms. Balsara:

4   What did you do in connection with the consignment agreement

5   while you were at GDS [sic]?

6      A    You know, we had someone else who actually made sure

7   that the deliveries took place.  I was doing more the accounting

8   side at this point.

9      Q    Okay.

10     A    It was accounts receivable and payable.

11     Q    Right.  And when you say "at this point," you're

12  talking about 2018 which is the date of this contract?

13     A    Correct.

14     Q    Okay.  And that's the gentleman Mark Allen that you

15  identified earlier?

16     A    Yes.

17     Q    Okay.  Turn to the last page of this Exhibit No. 3.

18  Can you identify what that document represents?

19     A    So we're talking about page number 20?

20     Q    No.  It's the page after that.  It's the bottom

21  right-hand corner is Bates No. DGS0001136.

22     A    Right.  So this would be similar to what we have in the

23  previous exhibit.  It's showing the mills.  The -- I believe it

24  was maybe the product numbers and the pricing.

25     Q    Did you generate this document?

1      A     If I remember correctly, we got this from International

2    Paper, but I -- I -- I would have reviewed it, but I don't --

3    and added onto it, maybe some other product numbers.

4      Q     Uh-huh.

5      A     But whether I actually generated it, I don't remember

6    that.

7      Q     All right.  Do you see there's column to the right?

8    It's actually the third column from the right.  It's entitled,

9    Contract Length, Comments, Mini SE is one with three.  I think

10   it says Qualified Bidders, but I'm focused on the column.  Do

11   you see that column?  It says Mini SE in yellow bar there.

12     A     Okay.

13     Q     And as you scroll down, there's a number of references

14   to the annual review.  Can you tell us what the annual review

15   was?

16     A     I'm assuming that it would be reviewed annually for

17   that particular product.

18     Q     Okay.

19     A     I'm assuming that.  I -- I'm not sure.

20     Q     All right.  And that's why we -- we don't want you to

21   guess.  So if you don't know --

22     A     I don't know.

23     Q     -- is a fair answer.  Okay.

24     A     I don't know.

25     Q     If you scroll down that same column, there's a

1    reference to a trial chemical.

2        A    Uh-huh.

3        Q    It's in the same row as this chemical identified as

4    neuroz N850P bulk.  For the court reporter, neuroz is spelled

5    N-E-U-R-O-Z.  Do you see --

6        A    Neuroz, uh-huh.

7        Q    Can you tell us what that means, the reference to trial

8    chemical in connection with the entry for neuroz?

9        A    So it was a product that we asked International Paper

10   to try out, and if it works out, then we could be a provider --

11       Q    Okay.

12       A    -- for that chemical.

13       Q    Do you know -- again, I know it's been a while --

14   whether or not that particular chemical worked out for IP and

15   that --

16       A    I do not.

17       Q    Okay.  Fair enough.  Did you -- and I -- I appreciate

18   your letting us know about, you know, where this particular

19   document came from based upon your testimony.

20            With regard to the rest of the contract and its

21   attachments, was that generated by DGS or you, or was that

22   provided by International Paper, if you know?

23       A    It was generated to the ones especially in the Word

24   document and the pricing we previously went through, I generated

25   those.

1          REPORTER:  Reporter clarification.  In the what --

2          WITNESS:  Attachment A.

3          REPORTER:  Hold on.  In the wood document or the

4     where document you just said?

5          WITNESS:  So Attachment A --

6          REPORTER:  Hold you.  You just said the wood

7     document --

8          WITNESS:  Word document.

9          REPORTER:  Word document.  Okay.  Excuse me.  Go

10    ahead.

11    A    Yes, Attachment A is what I generated.

12 BY MR. MURPHY:

13    Q    Okay.  And just so we're clear, that's the Attachment A

14    that you testified about earlier which is on page 14, Bates No.

15    DGS0001129, correct?

16    A    Yes.

17    Q    Okay.  And in this exhibit, that's a three-page

18    document.  It goes from page 14 to page 16, correct?

19    A    Correct.

20    Q    Okay.  And where did you get the information that

21    permitted you to generate these -- this three-page chart in

22    Attachment A?

23    A    I was in charge of the accounts receivable and payable,

24    and so I had pricing, and so I would just generate the document

25    from the pricing we had or what we're going to be offering.

1    Mr. Kumar would -- would provide me with a price, and I would

2    just put it in to the document.

3        Q    Okay.  And did you -- for example, did you have actual

4    invoices or purchase orders, some kind of other documentation to

5    support what you generated here?

6        A    We had everything on QuickBooks.

7        Q    Have you ever had an experience where a mill called up

8    and say, Hey, we've contracted for this chemical.  We haven't

9    gotten it.  When are you going to deliver it?  Did that ever

10   take place?

11       A    No.  Never have I had that experience.

12       Q    Okay.  Thank you.  No further questions with regard to

13   that document.

14                (Exhibit No. 1 was marked.)

15   BY MR. MURPHY:

16   Take a look now and see if you can see Exhibit 1.

17       A    (Complies.)

18       Q    I should point out that that is a composite exhibit.

19   It's approximately 135 pages.  Obviously, I'm not going to be

20   asking you to read every page.

21           But the first question is simply can -- well, can you

22   see it on Exhibit Share?

23       A    Not yet.

24       Q    Hm.  All right.  Bear with me one minute.  I'm going to

25   maybe try something else.  Bear with me.

1          A      Uh-huh.

2          Q      Okay.  I'm going to screen share Exhibit No. 1 with

3     you.  So first just let me know if you can see a document on the

4     screen right now.

5          A      Yes.

6          Q      Okay.  Can you read it, or should I blow it up?

7          A      No, it's good.

8          Q      Okay.

9                 MR. MURPHY:  Can everybody else see it?

10                MR. TOWNSEND:  Yes.

11                MR. MURPHY:  Okay.  All right.  For the record, the

12          questions that I'm addressing now are with respect to

13          Exhibit No. 3, which appears to be in the process of

14          downloading to Exhibit Share.

15                It's 135-page composite exhibit, and it's a

16          collection of various emails and correspondence involving

17          Ms. Balsara and others.  And just in terms of timeframe,

18          there are emails as early as -- this one that we see on the

19          screen, June 13th, 2011, and they go up to December of 2019.

20          That's just by way of identification for the record.

21     BY MR. MURPHY:

22          Q      Ms. Balsara, my first question -- you had earlier

23     testified about, you know, when you had started.  Clearly based

24     upon this exhibit, you were working with DGS as of June 13th,

25     2011, correct?

1          A     Yes.

2          Q     Any idea if you were working there a couple of months

3     beforehand, having seen this document?  And again, don't

4     speculate.  I just want to ask to see if this refreshes your

5     memory in any way.

6          A     Actually, it does not.

7          Q     Okay.  So this particular email is from yourself to

8     Shiv Kumar, correct?

9          A     Yes.

10         Q     And what is it regarding?

11         A     I'm going to assume this; I'm not 100 percent sure.  He

12    had asked me to make inquiries about the product from suppliers,

13    and maybe this is the feedback from what I received.

14         Q     Okay.  Specifically the subject line says "Sodium

15    Bisulfite."  Do you see that?

16         A     Yes.

17         Q     Is it your understanding that DGS provided sodium

18    bisulfite to International -- excuse me -- yes, to International

19    Paper?

20         A     Yes, we did.

21         Q     Okay.  To multiple mills or to one in particular?

22         A     I know to Courtland Mill.  It could have been multiple.

23    I'm not sure.

24         Q     And I see this email has an O, that should be

25    Courtland.

1          A      Yeah, Courtland.  Yeah.

2          Q      Okay.  Which is located in Alabama; is that right?

3          A      Right.

4          Q      What's the significance of the question about whether

5     or not the product can be provided in a liquid form?

6          A      Or in a -- in a powder form and then the mill has to

7     mix it themselves.

8          Q      Okay.  So did certain mills require it in a liquid

9     form?  What -- what was the normal experience there in terms of

10    making sure you supplied the mill properly?

11         A      As far as I know, we -- we did supply everything in the

12    liquid form.

13         Q      And it's your understanding that that would eliminated

14    the need for the mill to do the mixing themselves?

15         A      Correct.

16         Q      Were there times when suppliers offered you the option

17    of a powdered form, you know, as maybe a -- a pricing advantage?

18    Anything of that nature?

19         A      I do not remember that.

20         Q      Okay.  I'm going to scroll forward.

21                Do you recognize this email?

22         A      I mean, I wrote it, but I don't know the details of it.

23         Q      Okay.  Can you just tell us what an MSDS sheet is?

24         A      An MSDS is a sheet that actually tells you what the

25    product is all about.  I mean, what -- what it contains in the

1    product.

2         Q    Okay.

3         A    What type of chemicals are in there; how it's made.

4         Q    Okay.  Is that an acronym for -- well, I take it back.

5    I thought I remembered it.  I want to say material safety data

6    sheet, but I'm not sure.  Do you know what the acronym stands

7    for?

8         A    Yeah, I think it is material safety data sheet.

9              REPORTER:  I'm sorry, what?

10             WITNESS:  Safety date sheet.

11   BY MR. MURPHY:

12        Q    And the subject here is "DGS MSDS-Echo Clean."  Can you

13   tell me what the significance of Echo Clean is in that email?

14        A    Echo Clean was, I believe, one of the mills.  This was

15   to provide eco-friendly material to cleanup some of the

16   machinery because the -- the mills would do an annual -- what do

17   you call this?  Annual cleaning of their -- of their machinery,

18   and so it's something that we would provide an eco-friendly

19   material before they clean it.

20        Q    Okay.  So that was something separate and apart from

21   the chemicals themselves that you supplied to the IP mill; is

22   that right?

23        A    That's correct.

24        Q    Did you do that for more than one mill?

25        A    I know we did it for one mill, and it could have been

1    Franklin Mill, but I'm not sure whether we did it for other

2    mills as well.

3         Q    I see your emails is to Emmett Parker at International

4    Paper.  Do you associate him with a particular mill?

5         A    No.  I -- I don't.  I don't even remember who he is.

6         Q    Okay.  Fair enough.  I've moved on to what's Bates

7    stamped DGS0002320.  Do you see that?

8         A    Uh-huh.

9         Q    And as you can see at the top, it's an email from

10   Fred McGee on January 24th, 2013, to yourself; do you see that?

11        A    Yes.

12        Q    Can you tell me who Fred McGee is?

13        A    I don't know.

14        Q    How about -- there's a cc to Amy Richardson; do you

15   know who that is?

16        A    Amy Richardson?  No.  All I see here is Fred is saying

17   he was a purchasing manager, and that's probably who he was.

18        Q    Okay.  You're referring to Fred McGee?

19        A    Yes.

20        Q    Okay.  And by that you're -- you're looking at his

21   signature block in the email that he sent?

22        A    That's correct.  Yes.

23        Q    Okay.  It says Courtland Mill after that; do you see

24   that?

25        A    Courtland Mill, yes.

1    Q    Okay.  Did -- based upon your experience, did DGS

2    supply ASA and hypochlorite to the Courtland mill?

3    A    Yes, we did.

4             REPORTER:  I'm sorry.  Is that "hydrochloride" or

5        "hypochloride"?

6             WITNESS:  "Hypo."

7             MR. MURPHY:  "Hypo."

8             REPORTER:  Thank you.

9    BY MR. MURPHY:

10   Q    And ASA is a chemical different from hypochlorite,

11   correct?

12   A    Two different chemicals.

13   Q    Okay.  Did you provide hypochlorite to mills other

14   than -- strike that.

15          Did DGS, based upon your experience, provide

16   hypochlorite to other mills other than the Courtland mill?

17   A    Yes, we did.

18   Q    Approximately how many mills did you supply IP with

19   hypochlorite?

20   A    I have no idea, but the Exhibit A that we've seen

21   previously would probably give you a good idea.

22   Q    Okay.  So if I refer --

23   A    It was a popular product, though.

24   Q    It was a popular product?

25   A    Yes.

1       Q       Okay.  So, for example, I'm seeing references to sodium

2    hypochlorite going to various mills:  Orange, Rome, Franklin,

3    Riverdale, Campti, Mansfield, Vicksburg.  Does that sound

4    accurate to you?

5       A       That sounds right.

6       Q       Okay.  What about ASA?  Was that provided to other IP

7    mills other than the Courtland mill?

8       A       Yes.

9       Q       Approximately how many?

10      A       Same thing.  The Exhibit A would say it.  I don't know

11   what -- many mills.  It was also another popular product.

12      Q       Okay.  So at this point in time, we're talking January

13   of 2013, you've been with DGS for about a year and a half, two

14   years; is that right?

15      A       Yes.

16      Q       Let's go to the next correspondence.

17              So we're clear for the record, we're looking at Bates

18   No. DGS0006178.

19              Do you recognize this email, Ms. Balsara?

20      A       Let me read it.  I'm not sure.  I mean, I'm not -- it's

21   been a long time, but this is probably when we were taking over

22   the product.

23      Q       Okay.  Let me ask you, you know, apart from the email

24   itself, just based upon your experience, did DGS, you know,

25   handle bleach business, bleach supply delivery activities to IP?

1        A     Yes, we did.

2        Q     Okay.  And here it's specific to Courtland and Selma,

3    Riverdale; is that consistent with your memory?

4        A     Yes.

5        Q     Were there other mills that DGS provided or supplied

6    bleach to various IP mills?

7        A     We provided to many mills.  I do not remember the names

8    of them.

9        Q     This says from Tom Rice.  Let me just ask you do you --

10   do you recognized that name?  Do you remember Tom Rice?

11       A     I remember the name Tom Rice, but yes, it's from Olin.

12             REPORTER:  I'm sorry.  From where?

13             WITNESS:  Olin.

14             MR. MURPHY:  O-L-I-N.

15   BY MR. MURPHY:

16       Q     Can you tell us, you know, who Olin was in the context

17   of the supply operations that DGS was involved with for IP?

18       A     Olin was one of our suppliers.

19       Q     Okay.  Meaning, one of DGS's suppliers?

20       A     Yes.  That's correct.

21       Q     Did they supply other chemicals other than bleach?

22       A     No.  I believe it was just bleach, but not 100 percent

23   sure.

24       Q     Did DGS obtain bleach from any competitor suppliers as

25   well?

1       A     We could have.  We would look at the radius of a mill,

2   and if we had a supplier nearby -- like Olin may have had

3   facilities nearby, then that's where we would have that product

4   delivered to that particular mill.

5       If, of course, Olin was not spread all over, we'd find

6   other vendors to provide the products to International Paper.

7       Q     Stepping away from this particular document for a

8   moment, I'm looking at some other correspondence, and I'm trying

9   to expedite this a little bit by not showing you everything, but

10  if you have questions, we can go through it.

11      Were there times when, you know, you had an opportunity

12  to correct invoices in connection with either review from

13  suppliers or invoices that were provided to IP?  Was that part

14  of your job?

15      A     If there was a mistake on pricing?  Is that what you're

16  asking?

17      Q     Yes.

18      A     Yes, I would -- I would let either mill know or my

19  supplier know that there was incorrect pricing.  This would

20  generally happen when there was a switch in pricing.

21      Q     So part of your job was to monitor the pricing to make

22  sure that it was corrected both on the supply side and the IP

23  side?

24      A     That's correct.  I mean, that's part of accounts

25  receivable and payable.

1    Q    And that would include, for example, if there was a tax

2    added that shouldn't have been added, that's something you can

3    correct?

4    A    Yes.

5    Q    I'm talking about, for example, a sales tax that might

6    not have been appropriate?

7    A    Correct.

8    Q    Okay.  There's correspondence about processing

9    nondisclosure agreements.  In particular, this one refers to a

10   Nalco NDA.  Did you have involvement with that?

11                REPORTER:  Clarification.  Nalco?

12                MR. MURPHY:  Oh, it's Nalco, which is N-A-L-C-O.

13   A    Yes.  I would review like the second part of the

14   contract that would be going out to either supplier or to

15   International Paper.

16   BY MR. MURPHY:

17   Q    Okay.  And for the record -- I don't know if I

18   confirmed this with you earlier.

19        Can you just identify Nalco, what Nalco was in

20   connection with the DGS business?

21   A    They were one of our suppliers.

22   Q    Were they a significant supplier in terms of volume?

23   A    Yes.

24   Q    And what do you mean by that?

25   A    I mean they provided products in different mills for

1    us.

2         Q    Okay.  More than ten mills?

3         A    Oh, I don't know.

4         Q    Okay.  Did they provide multiple chemicals as well?

5         A    I believe they did.

6         Q    Based upon your experience, can you identify any of the

7    chemicals that Nalco provided to DGS as part of the supply chain

8    operation to International Paper?

9         A    No, I don't remember.

10        Q    Okay.  Is there somebody that -- at IP named Bob that

11   you had work with in connection with nondisclosure agreements?

12        A    I do not remember.

13        Q    Okay.  Okay.  Let me scroll forward.  I'm sharing with

14   you a document which I can't see the Bates No.  There it is.

15   DGS002148.

16             My first question is:  Do you recognize this document?

17        A    No.

18        Q    Okay.  Let's just go through the -- the details at the

19   top for a moment.  This is from Gunars J. Dzenis from gapac.com.

20   Or I should say gapac.com.  Do you know what that email address,

21   meaning the domain represents, what company that is?

22        A    I believe that should be Georgia Pacific.

23        Q    Okay.  Do you know or you're not sure?

24        A    Georgia Pacific.

25        Q    Okay.  Did you ever -- understanding you may not

1    remember the document, did you -- do you remember having contact

2    with this particular individual at Georgia Pacific?

3        A    Yes, the name sounds familiar.

4        Q    Okay.  The subject line here is "Delay this shipment."

5    You know, having read this document -- and if you need more

6    time, that's fine -- you know, what -- how did DGS participate

7    or assist in connection with any shipment delays as part of the

8    supply chain operations?

9        A    So if the mill needed a product to be delayed, right,

10   they did not -- one of the reasons -- I think the only reason

11   they want it delayed is because they still -- they did not have

12   enough space in their tanker to -- in their tanker to put it in,

13   to fill up, then they'll ask for a delay for a few days.

14       Q    Okay.

15       A    Which means we need to contact our supplier and ask for

16   a -- as for a delay.

17       Q    Does that activity fold in with your previous testimony

18   about some of the monitoring services that DGS provide --

19   provided IP?

20       A    So as I mentioned, our previous call in December, this

21   was the beginning, and I would -- we were still very small with

22   International Paper, and I would be taking -- playing in

23   different roles.

24       Q    So --

25       A    Especially in that 2013 time.  2018 was more accounts

1   receivable and payable and making sure because we had a lot more

2   products.  But at this time I was playing different roles.

3       Q    Okay.  So this monitoring role, ensuring that, you

4   know, the right amount of chemical was available for the mill

5   when needed, was taken over by Mark Allen at some point in time;

6   is that right.

7       A    That's correct.

8            MR. TOWNSEND:  Object to form.  Foundation -- lacks

9       foundation.  Sorry to interrupt.

10           (Exhibit No. 2 was marked.)

11  BY MR. MURPHY:

12      Q    Go ahead.  You can finish your response.

13      A    Yeah.  I was mostly cc'd on a lot of these -- these

14  emails.

15      Q    Uh-huh.

16      A    Because when it started off, it was with correspondence

17  between either Shiv and myself or the mill or the suppliers till

18  Mark Allen got used to -- or familiar with the products and how

19  to do things.  I was cc'd on a lot of emails, but not

20  necessarily I had involvement in them.

21      Q    Okay.  On this particular one, you weren't cc'd.  It

22  was directed to you and Shiv together, correct?

23      A    Well, he's -- he's got it to everyone, right?  There's

24  no cc, so...

25      Q    Who's Mallen?

1      A      Sorry?

2      Q      What -- the -- the other email at the end there of the

3      "to" line is Mallen@diversifiedglobalsourcing.com --

4      A      That's Mark Allen.

5      Q      That's Mark Allen.  So Mark was already on board as of

6      April 2013; is that right?

7      A      Correct.

8      Q      Okay.  Do you remember Dawn Wheeler from the Texarkana

9      Mill?

10     A      No.

11     Q      I have up on the screen a three-page email chain.  It

12     starts out at DGS15902, then it goes to 15904?

13            Does this -- take a moment and tell me when you need me

14     to scroll to that last page.  Does this refresh your memory at

15     all as to who Dawn Wheeler was?

16     A      Well, looking at the title, it was someone that would

17     be in charge of new products or child parts.

18     Q      Okay.

19     A      That's the only recollection I have.

20     Q      All right.  And then let me -- let me pull you away

21     from the document and just ask you, was there a particular

22     person that you, on behalf of DGS, dealt with in connection with

23     any trial chemicals that you were proposing to IP?

24     A      Shiv Kumar would deal with that.

25     Q      Okay.  I see here, certainly a particular part of the

1    email where Dawn is asking you for the specific gravity of a

2    chemical; is that something that you would typically respond to?

3        A    I would, especially in the beginning, like I said,

4    2013.  And I'm looking at this.  It was a new product we were

5    trying to introduce, and then we'd -- I would go back to a

6    supplier and ask them these questions.

7        Q    And this particular chemical that's the subject of this

8    email chain is sulfamic acid.

9             For the court reporter, that's S-U-L-F-A-M-I-C.

10            Is that right?

11       A    Yes.

12       Q    My question -- and you -- you may not remember.  If

13   not, that's just -- that's fine.

14            Did DGS ultimately supply IP with sulfamic acid?

15       A    I don't think so.

16       Q    Okay.

17       A    But not 100 percent.

18       Q    Last time we went through a PowerPoint presentation

19   related to the Georgetown Mill.  Here there's reference to

20   another PowerPoint at the Valliant mill, right?

21            I have two questions.  The first is, does this refresh

22   your memory at all as to another mill that you may have visited?

23       A    I don't think so.  I -- I don't remember.  I'm sorry.

24       Q    That's fine.  Did you prepare this particular

25   PowerPoint that's referred to in this email?

1    A    I -- I would have helped in the process.  I mean, it

2    was -- it was pretty generic PowerPoint, and we just made

3    changes here and there depending on the mill and the product.

4    Q    Right.  And I -- I know you can refer me to the -- in

5    the Exhibit 3 and the -- the chemical listing attachment, but

6    from your personal experience and what you can tap into for your

7    memory, can you tell us what chemicals DGS supplied the Valliant

8    mill with?

9    A    Probably hypochlorite.  I know there were a few other

10   products.  I'm sorry.  I do not remember.

11   Q    Fair enough.  Okay.  Take a moment to take -- to review

12   this document.  This is DGS0003567.  And tell me when you're

13   ready to proceed.

14        Okay.  This is another example where you're working

15   with the mill and the supplier to monitor the delivery times; is

16   that right?

17   A    Yes.

18   Q    And specifically this email reference to delivery to

19   the Campti IP mill; is that right?

20   A    To the Campti, yes.

21   Q    For the court reporter, that's C-A-M-P-T-I.

22             REPORTER:  Thank you.

23   BY MR. MURPHY:

24   Q    And I see this email is to you and others.  It's really

25   to you and Shiv with some other copies.  But it's from Ray

1    Boudreaux, if I'm pronouncing that correctly.  Can you help me

2    understand who Brenntag.com is, that company?

3         A    Our supplier.

4         Q    Okay.  And obviously, they supply bleach, correct?

5         A    Correct.

6         Q    Any other chemicals?

7         A    They could have, but I don't remember which one.

8         Q    Do you remember Ray Boudreaux?

9         A    So I remember, yes, speaking to him or corresponding

10   with him.

11        Q    Is he -- as you read through this email, I'm focused on

12   the third paragraph, in particular.  I'll just read it into the

13   record for a moment.  It says:  "Also, if we ship a full load to

14   Campti, it would be helpful if the (inaudible) cannot take the

15   full load, the balance can be used at the other locations in the

16   mill.  This will prevent any extra" --

17        A    Freight charges.

18        Q    It says "FTT."  The witness has clarified that's

19   freight charges for returning material.

20             What was the benefit there?  What were -- what were you

21   and Ray Boudreaux trying to accomplish?

22        A    That when the mill required a product, when we sent in

23   a full tanker truck, that it will -- they will be able to

24   offload the entire truck at the mill.

25             Sometimes a mill may not need a full truck for a

1    particular tanker, but they -- we were asking that they could --

2    he was asking if they do use it at a -- at another location in

3    the mill just so that it avoids sending half a trank -- half a

4    truck back or a quarter truck back, and that's when these

5    freight charges to return some of the product.

6         Q    Right.  So if I understand your testimony, if they

7    don't drop off the full load, then that may necessitate another

8    truck coming out for an additional trip; is that right?

9         A    That truck that they just dropped off would be

10   returning with part of product.  If they did not take the full

11   load, there will be a freight damage to return because the

12   freight company is going to charge again for return.

13        Q    Okay.  IP -- let me just ask you, if the truck drops

14   off half the load, does IP get charged for the whole load or

15   just the half that was dropped off?

16        A    In my knowledge, it was never half a load.  It was

17   always when they needed a full truck.

18        Q    Okay.  And under this circumstance in this email, it

19   looks like it -- you know, did that not the full load, that it

20   couldn't -- it didn't have the capacity to take it at that

21   particular location of mill; is that right?

22             MR. TOWNSEND:  Objection.  Calls for speculation.

23   BY MR. MURPHY:

24        Q    You can answer, Ms. Balsara.

25        A    Yeah, I think that's more speculation.  It's just

1    trying to -- it's -- it's not to say that we don't -- that we're

2    providing -- they wanted just half the load.  It's just saying

3    that if they have a problem with taking the entire truck at one

4    time, they could try to put it into other areas of the mill.

5        Q    Okay.  And what's the benefit putting it into those

6    other areas?

7        A    So that there's no freight charges and return charges,

8    or returning of the product in the few days leading to the same

9    you need more of the same product.

10       Q    Okay.  Thank you.  I'm looking at one email, Soto

11   product prices.  That's S-O-T-O.  Do you know what Soto product

12   prices are?

13       A    Soto was one of our suppliers.

14       Q    Okay.  And generally what products did they supply?

15       A    Maybe sosperse.

16               REPORTER:  I'm sorry.  Say it again.

17               WITNESS:  Sosperse.  S-O-S-P-E-R-S-E, I think.

18   BY MR. MURPHY:

19       Q    Take a look at this email in connection with Soto

20   product prices.  My main question is:  Do you remember

21   Jim Rettinger?

22       A    Jim, yes.

23       Q    Okay.  And you said that Soto was one of your

24   suppliers.  Is it more specific to say Kemira was one of your

25   suppliers?

1      A     Yes.  So, I believe, Soto was taken over by Kemira.

2      Q     Okay.  So prior to -- was DGS supplying Soto products

3   to IP prior to the Kemira takeover?

4      A     I do not know that.

5             REPORTER:  And clarification, Kemira?

6             WITNESS:  K-E-M-I-R-A.

7   BY MR. MURPHY:

8      Q     Okay.  The next email, DGS17226, that's an email from

9   Clare Neatherway from IP paper.  From -- it says ipaper.com to

10  various parties on December 22, 2015.  Do you recognize this

11  email, Ms. Balsara?

12     A     No.

13     Q     Okay.  Was there a particular software or payment

14  processing system that DGS worked with?

15     A     I'm sorry.  Let me just read this and see.

16           I'm not sure whether this was the time when

17  International Paper had started a new software system where we

18  needed to -- I thought it was SAP.  When we needed to upload our

19  invoices there directly.

20     Q     Okay.  As part of your many hats address, you know,

21  accounts receivable, accounts payable, you would have

22  coordinated this effort with IP?

23     A     Yes, because it was -- it was about accounts payable.

24     Q     Okay.

25     A     When they introduced a new software to -- where we need

1    to start providing our invoices to International Paper.

2         Q    Did that happen on occasion that IP said we're going

3    to, you know, start using a different software --

4         A    Yes.

5         Q    -- so update your systems accordingly?

6         A    Yes.  They started a new system where we needed to

7    upload our invoices in -- I think it was SAP.  And then they

8    switched to something else again, I believe.  And so we had to

9    just go with the flow.  It was not mailing the invoices anymore,

10   but uploading them in a particular system.

11        Q    Got it.  I've got a new document up on the screen.

12   This is part of Exhibit 1, the composite exhibit.  This is Bates

13   stamped DGS16724 through 16725.

14             The second page, there's not that much on it.  I'm just

15   going to show you that, the end, the reference to Nalco and

16   Ecobad Company.

17             My first question is more general.  Did -- you don't

18   even need to see this email.  What was your understanding of

19   International Paper's diversity supplier program?

20        A    As far as I knew, that they would be getting a tax

21   credit when they worked with minorities, minority companies.

22        Q    Okay.  And what's the source of your information on

23   that?

24        A    That was Shiv Kumar.

25        Q    Okay.  Did you have any other understanding as to what

1    benefits IP would gain by involving diversity suppliers?

2        A    Well, any information I got was through Shiv when it

3    came to -- when it comes to diversity program.  He had mentioned

4    that IP would benefit through the government for tax credits if

5    they work with minorities, and we were a minority company.

6        Q    And what's your understanding as to why it was DGS

7    qualified as a minority company?

8        A    It was, I believe -- it was, I believe, it was

9    ethnicity.

10       Q    Okay.  And what specific ethnic group are you referring

11   to?

12       A    Shiv Kumar.

13       Q    Can you be more specific?

14       A    Him being an Indian.

15       Q    What about Mid South?  Did Mid South qualify for the

16   IP's diverse supplier program?

17       A    Yes, they did.

18       Q    And what was the basis for that qualification?

19       A    It's the same diversity program.  Shiv Kumar is the

20   owner, so...

21       Q    Looking at this exhibit that I just shared on the

22   screen, I see you're sending a minority certification.

23            Is that something that you prepared?

24       A    I don't prepare the minority certification.  This comes

25   from the minority certification of -- that we needed to update

1    every two years, I believe, and so we always applied for it, and

2    that's when we got it.  You know, companies like Nalco would ask

3    for our certification to make sure we still certified as a

4    minority company, and we would provide the certification.

5        Q    So when you say you applied for it, where did DGS

6    submit its application for a minority certification?

7        A    Oh, it may have been the state of Tennessee.  I can't

8    remember.  I mean, I have to go through a lot of emails to see

9    those things.  I'm sorry.

10       Q    No, that's fine.  Was that something that you

11   specifically applied for on behalf of DGS?

12       A    Yes.

13       Q    Did you do the same thing for Mid South?

14       A    I don't remember doing it for Mid South.  I can't

15   remember that.  I didn't have to much involvement with Mid

16   South.  Very little.

17       Q    Okay.  You weren't sure if it was Tennessee.  Let me

18   just ask, was it -- was it a governmental website that you

19   processed these --

20       A    Yes.  Governmental --

21       Q    Application.

22       A    Governmental site.

23            REPORTER:  Hold on.  Didn't get your question.  Can

24   you please repeat your question?  That you processed these?

25            WITNESS:  He asked if it was a governmental site.

1    BY MR. MURPHY:

2         Q    All right.  Thank you, both.  And I'm sometimes guilty

3    of that as well.  Let me just put the question on the record so

4    it's clear.  Ms. Balsara, you can answer again.

5              Was it a governmental website that you processed the

6    minority certification application with?

7         A    Yes, it was.

8         Q    Thank you.  Joshua Harden with Premier, do you know

9    that name?

10        A    Yes.

11        Q    Did you correspond with Joshua in connection with DGS's

12   supplying IP with various chemicals?

13        A    Yes.

14        Q    Would it surprise you to know that Joshua sent you an

15   email at one point saying, quote, "We need to build a little

16   inventory so that we don't run out -- run them out of the

17   product."  Is that a common request?

18        A    Not common because we -- we always -- since we had the

19   monitoring system Mark would monitor, we always have products

20   there on time.

21        Q    Okay.  Just take a moment to look at this email.  We're

22   looking at Bates stamp No. DGS2922.

23        A    Okay.

24        Q    Okay.  Were you -- would you agree with me that this

25   email is part of the DGS effort to, you know, monitor the level

1  of chemicals that are at the various mills?

2     A    Yes.

3     Q    Again, I'm trying to speed this up a little bit.  Let

4  me just do a stop share for a moment, and what I'm going to do

5  consistent with the videographer's request, I'm going to take a

6  break here at about 11:30.  That's seven minutes away.  Does

7  that work for you, Ms. Balsara?

8     A    Yes.

9     Q    Okay.

10    A    Are you almost rounding up with your questions because

11  did say hour and a half for yourself.

12    Q    Yeah.  I think I said an hour and a half or so, but

13  yes, I'm trying to -- that's why I'm not showing you some other

14  exhibits right now.  So I'm going to, you know, finish up

15  shortly.  But I'm going to need probably another 15 minutes

16  after the break, and then I'm going to defer to Mr. Townsend.

17         Were there times when DGS was involved with the change

18  of specifications for particular chemicals?

19    A    I don't remember that.  That would be more of a Shiv

20  Kumar involvement.  Like I say, I'm not someone that understands

21  the chemical to what the MSDS would say.  I may be included in

22  some of the correspondence, but I don't know the actual chemical

23  as far as what goes into it.

24    Q    Ms. Balsara, take a moment to look at this document

25  which is part of Exhibit No. 1; DGS17445 is the Bates No.

1          What's the purpose of this email?

2     A    I'm assuming the mill needed a product and -- but they

3     did not need an entire tanker truck.

4     Q    Okay.  How would you assist in responding to an email

5     like this, which is being sent to you by the supplier?

6     A    Well, I -- first thing, would go to Shiv because -- and

7     then our supplier.  It's how he guided me, and to go to the

8     supplier and ask what the mill needed just half a truck, which

9     means they're still taking an entire full truck and going to

10    deliver, but just half a truck would be dropped off.  It would

11    be a discrepancy of pricing, so...

12    Q    Were you involved in efforts to, you know, reduce the

13    pricing for chemicals that were being charged to IP?

14    A    I don't understand.  What do you mean by I would be

15    involved?

16    Q    I mean do you help process price reductions through DGS

17    or for the benefit of IP?

18    A    Shiv Kumar would be the one who discussed pricing, not

19    me.

20    Q    Okay.

21    A    I may be included in correspondence, but I'm not the

22    one making the decision what price goes out.

23    Q    Okay.  In terms of your experience in being included in

24    the correspondence, did you see examples where DGS reduced

25    pricing for the benefit of International Paper?

1    A    Yes.  So they're giving us a price drop here, and so we

2    would pass on -- and it's really whatever Kumar says would --

3    would go.

4    Q    Okay.  And I -- you know, let's -- you know, and I'm

5    not really focusing on the document itself.  It's more of a

6    general question, and I understand you're saying that Shiv would

7    make those decisions, but I'm saying, given the many hats that

8    you wore, the emails that you were included on, did you see

9    examples during the approximate nine years that you were at DGS

10   where DGS facilitated price reductions for the benefit of

11   International Paper?

12   A    Yes, we did.

13   Q    Did that happen with some regularity?  Was it once

14   every two years?  Did it happen a couple of times a year.  Help

15   me understand the nature of that.

16   A    It just -- it just depends.  If, you know, product

17   prices dropped, it could be during the year, and we would reduce

18   the price.

19            MR. MURPHY:  Okay.  It's 11:28.  Why don't we take

20       a -- I'm going to jump back on at 11:35.  So we're talking

21       about seven minutes.  And what I will do during this break,

22       Ms. Balsara, is I'm going to go through my exhibits and --

23       and limit the rest of my questions to about 15 minutes, and

24       then I'll turn to over to Internation Paper's counsel, okay?

25       Let's take that read off.

1              Go ahead.  You have a question?

2              WITNESS:  Yeah.  With regard to International

3      Paper, can you -- you know, I do have limited time.  I mean,

4      I cannot go on for another four hours and three hours.  So

5      please with due respect, I have a family to take care of and

6      a business as well.

7              MR. TOWNSEND:  Yeah.  We'll -- we'll be as quick as

8      possible, and you know, we'll respond when we get on.  But,

9      yeah, we'll -- we'll make every effort to be -- make this

10     short.  Thanks.

11             WITNESS:  Thank you so much.

12             VIDEOGRAPHER:  This ends Media 1.  We're now going

13     off the record.  The time is 8:29.

14             (Off the record.)

15             VIDEOGRAPHER:  This begins Media 2.  We're now back

16     on the record.  The time is 8:36.

17     BY MR. MURPHY:

18     Q    Were there times, Ms. Balsara, where you would send out

19     questionnaires to the suppliers?

20     A    Possibly.  I'm not sure what kind of questionnaires.  I

21     don't remember that.

22     Q    Okay.  I'm having trouble finding my exhibit right now,

23     but were there times where weather events impacted the supply

24     efforts by DGS to IP?

25     A    The supply efforts?

1     Q    Right.  For example, would you adjust the delivery

2    schedule if there was an incoming hurricane coming?  There's

3    some reference in the emails to Hurricane Harvey, and what was

4    done there in connection with a Kemira delivery.

5    A    Yes, we would --

6             MR. TOWNSEND:  Objection to form.

7             Go ahead.

8    A    We would make the adjustments.

9    BY MR. MURPHY:

10    Q    Okay.  And -- all right.  Let me -- because we had the

11    objection to form, let me rephrase it.

12             Did you, on behalf of DGS, make adjustments to chemical

13    deliveries to IP mills during significant weather events such as

14    Hurricane Harvey?

15    A    Yes, we did.

16    Q    And DGS would coordinate that between the supplier and

17    the mill; is that right?

18    A    Yes.

19    Q    Okay.  All right.  Give me one second to find this

20    exhibit.  I'm trying to speed things up, and I'm kind of going

21    out of order.  Let me just ask it this way without showing you

22    the exhibit.  Are you familiar with a company called Water

23    Guard, sales manager Adam Belcher?

24    A    I don't remember.  Just...

25    Q    Okay.  Fair enough.

1      A    I don't know what Water Guard does.

2      Q    All right.  Let me share one last document with you.

3  Can you see my screen?

4      A    Yes.

5      Q    Okay.  This is actually a -- a three-page document.  As

6  you can see the Bates No. at the bottom is DGS1051, and it goes

7  to DGS1053.  My question on this one is:  I see at the bottom

8  there where you're telling Josh that, you know, you spoke with

9  the mill this morning asking them to check the dilute tank, and

10  this is in 2019, correct?

11      A    Okay.

12      Q    So that's you coordinating to make sure that they have

13  sufficient chemicals, is it not?

14      A    Yes.

15      Q    And you're ensuring to make sure that a delivery of

16  nitric acid can get out to them in a timely fashion; is that

17  right?

18      A    That's correct.

19      Q    Okay.  I'm done with exhibits.  One last one or two

20  questions.

21           Are you familiar with a consultant large firm by the

22  name of Ernst & Young?

23      A    Yes.

24      Q    Were there occasions where you communicated with Ernst

25  & Young in connection with International Paper Imports?

1    A    I don't remember what it would be related to, but

2    maybe.

3    Q    Well, for example, did they ever ask you for, you know,

4    particular financial data in connection with any work that they

5    were doing for International Paper as one of their suppliers?

6    A    Possibly, yes.

7    Q    Okay.

8         MR. MURPHY:  Okay.  Ms. Balsara, thank you very

9         much for fielding my questions, both for the previous day

10        and this morning.  I have no further questions at this time.

11        MR. TOWNSEND:  Thank you, Mr. Murphy.

12        Ms. Balsara, as a reminder my name is Nathan

13        Townsend, and I represent International Paper in this

14        matter.

15              E X A M I N A T I O N

16    BY MR. TOWNSEND:

17    Q    I would remind you that you are under oath, and my

18    first question is:  Are you represented by counsel at this time?

19    A    Nope.

20    Q    Okay.  You met -- testified previously that you

21    provided services to Mid South.  Can you tell me what those

22    services were?

23    A    It was just the account receivable and payable.

24    Q    What -- did you have an Mid South email address?

25    A    Mid South email address?  I don't even remember.  It's

1   been so long.

2        Q    Did you -- are you familiar with someone named Jasmine

3   Manish?

4        A    Yeah.  I mean, Shiv just gave me that name to use for

5   -- for Mid South, use that as an email address, so I did that.

6        Q    So your testimony is that Shiv gave you the name

7   Jasmine Manish to use for Mid South?

8        A    Right.

9        Q    Is that the email address you used when you worked for

10  Mid South?

11       A    Yes.

12       Q    Did Shiv tell you why you should use Jasmine Manish

13  instead of your real name?

14       A    No.  He said just use this email address.  I went ahead

15  with that.

16       Q    Are you familiar with --

17       A    It's just --

18       Q    Oh, please go ahead.

19       A    Yeah.  It was mostly accounts receivable/payable.  He

20  gave -- I had nothing to do with setting up all the business or

21  any of that.

22       Q    Can you tell me what Mid South did for International

23  Paper?

24       A    Like DGS, they provided chemicals.

25       Q    Did Mid South have anyone who would monitor inventory

1    in the same way that Mark Allen would monitor inventory?

2        A    I don't believe so.

3        Q    Are you familiar with someone named Parasuraman Sekur?

4        A    I've heard that name.  I have heard that name, yes.

5        Q    And for the court reporter, Parasuraman is spelled

6    P-A-R-A-S-U-R-A-M-A-N, and Sekur is spelled S-E-K-A-R.

7        A    I believe he was running Mid South.  He was supposedly

8    involved in Mid South.  Parasuraman.

9        Q    You may have testified to this earlier, but for

10   clarification, who owned Mid South?

11       A    As far as I know, it was -- this gentleman and -- and

12   Shiv Kumar.

13       Q    Do you know what percentage?

14       A    No.  I don't know all that.  I don't get -- I mean,

15   that's their business.  I'm just an admin person, right?

16       Q    Did Shiv ever go by just the term Kumar?

17       A    So, like I mentioned in the first conversation, I know

18   him as Kumar, right?  Because my kids went to school together,

19   so I know him as Kumar.

20       Q    So you would address him sometimes just as Kumar and

21   not Shiv?

22       A    I always -- I always address him as Kumar.

23       Q    Okay.  Did Shiv have a Mid South email address?

24       A    I don't know, actually.

25       Q    Did Shiv use Mr. Sekur's email address?

1       A     Oh, I don't know that.

2       Q     Ms. Balsara, if you could turn to Exhibit Share.

3       A     Okay.

4       Q     I'm going to attempt to upload one.  I know sometimes

5    this is tricky, so we'll see how it goes.

6       A     Okay.  So which is your Exhibit 15?  Is that what it

7    is?

8                   (Exhibit No. 4 was marked.)

9    BY MR. TOWNSEND:

10      Q     Yes, ma'am.  It looks like it went straight in.

11                And before we do that, I'm actually going to take a

12   moment to stamp it for our purposes as Exhibit 4 so we're not

13   all confused as to where we stand.  So if you could refresh.

14      A     Ah, now, yes, I do.  So as far as monitoring services

15   go, we -- we had a gentleman by the name of Shreyans Jain who

16   did the monitoring for Mid South.

17                   REPORTER:  I'm sorry.  Repeat the name.

18                   WITNESS:  I'm going to spell it for you.  It's

19      S-H-R-E-Y-A-N-S, and the last name J-A-I-N.

20                   REPORTER:  Thank you.

21   BY MR. TOWNSEND:

22      Q     Thank you, Ms. Balsara.  So your testimony is that --

23   well, first, let me strike that.

24                Is Shreyans Jain, is -- is that a man or a woman?

25      A     It's a man.

1    Q    Did Mr. Jain -- so you're testimony is that Mr. Jain

2    monitored the inventory in the same way as Mr. Allen?

3    A    That is correct.

4    Q    Where is Mr. Jain located?

5    A    He's in -- I believe he's in Dallas.

6    Q    Is -- do you know where Mid South's mailing address was

7    located?

8    A    I don't remember that.

9    Q    Did you ever visit Mid South's office?

10   A    No, I did not.

11   Q    Did DGS have office space?

12   A    We did.  We had in Tennessee, and I did visit that.

13   Q    And where was it located in Tennessee?

14   A    It was located in a building.  I don't remember the --

15   the address offhand, but I went there.  I know I've set up the

16   office, and we had an office space there, so when Shiv traveled

17   to Tennessee, he would work out of that office.

18   Q    And is that office in Memphis?

19   A    In Memphis, Tennessee, yes.

20   Q    How many times did you visit that office, if you

21   recall?

22   A    Twice.

23   Q    Do you recall the dates of those two visits?

24   A    I'm sorry, I do not.  You know, you folks are asking me

25   things from ten years ago.  I don't, I'm sorry.

1      Q     Of course, I totally understand.

2            Well, can you tell me how often Shiv would work from

3      that office?

4      A     I don't know because I would not ask him whether he was

5      in California or he was in Tennessee.  We just have

6      correspondence either by text or by phone or by email, so I

7      wasn't keeping track of where he would be at a particular time.

8      Q     When Shiv worked from California, was that from his

9      home?

10     A     Yes.

11     Q     DGS didn't have any office space other than its space

12     in Memphis; is that right?

13     A     That's correct.

14     Q     And did you work from your home?

15     A     I worked from my home.  We all did.

16     Q     And so Mark Allen did as well?

17     A     Yes.  And that was the advantage of the job -- job

18     because we could work from home and take care of our families as

19     well.

20     Q     Understood.  And the last person I'm curious about is

21     Ms. Heather Darnell, and she worked from home as well?

22     A     Yes.  Yes.

23     Q     Did DGS own any buildings?

24     A     Own any buildings?  No, not that I'm aware of.

25     Q     Did DGS -- aside from the office space in Memphis, did

1    DGS lease any buildings?

2        A    Did they lease any other buildings?

3        Q    Correct.

4        A    Not that I'm aware of.

5        Q    Did DGS own any real estate outside of the United

6    States?

7        A    I don't know.

8        Q    Did DGS own any patents that you're aware of?

9        A    I am not aware of that.

10        Q    Did DGS own any rail cars?

11        A    No.

12        Q    Did DGS lease any rail cars?

13        A    I don't know that.

14        Q    Did DGS own any vehicles?

15            MR. MURPHY:  Objection to form.

16        A    Vehicles?

17            WITNESS:  Sorry.

18            MR. MURPHY:  Objection as to form.

19            You can answer.

20        A    I'm not aware of that.

21    BY MR. TOWNSEND:

22        Q    And did DGS lease any vehicles?

23            MR. MURPHY:  Objection as to form.

24        A    If he -- Kumar did, that was all on him -- on him.

25    What, you know, him leasing.  I believe he had leased vehicles

1    in that, yes.

2    BY MR. TOWNSEND:

3        Q    Did Shiv travel to any IP mills?

4        A    Yes, he did.

5        Q    Do you know how many mills he traveled to?

6        A    I know -- well, I know the first trip was Georgetown

7    who we had approached.  After that, I'm not sure to which other

8    mills.

9        Q    Would -- would you know if he traveled to more than

10   just Georgetown?

11       A    I am -- I do not remember.

12       Q    Did he ever mention that he was traveling to any IP

13   mills besides Georgetown?

14       A    He may have been gone, I mean, for presentations, but I

15   -- I don't -- I don't remember which mills and when he did that.

16       Q    Did Shiv ever visit International Paper's corporate

17   headquarters in Memphis?

18       A    Oh, I have no idea.

19       Q    Did you ever visit IP's corporate headquarters?

20       A    No, I did not.

21       Q    Did Mark Allen ever come out to Shiv's personal address

22   in California?

23       A    No.

24       Q    Did DGS have any vendors located out the -- outside of

25   the United States?

1     A     No.  Our suppliers were all from the United States.

2     Q     Did DGS have any customers outside of the United

3     States?

4     A     I am not aware of that.

5     Q     Did DGS -- so is your testimony that DGS only had one

6     customer and that was International Paper?

7     A     Well, the one I was dealing with was International

8     Paper.

9     Q     Do you know of any other customers?

10     A     I do not know.

11     Q     Did Shiv ever mention that there was more than one

12     customer for DGS?

13     A     No, he did not mention that to me.  I just needed to

14     know anything about International Paper because that's whom I

15     was deal with and the vendors that supplied International Paper,

16     and they were all local in the U.S.

17     Q     Ms. Balsara, I'm going to load up another exhibit for

18     you.  Apologies everyone.  I'm just having a slight computer

19     malfunction.

20           Okay.  Ms. Balsara, I'm going to be introducing this as

21     Exhibit 5.

22                (Exhibit No. 5 was marked.)

23     BY MR. TOWNSEND:

24     Q     Do you see Exhibit 5 introduced on your screen?

25     A     Not yet.

1     Q    Do you mind refreshing?

2     A    Yep.  Okay.

3     Q    So you see -- it should be Exhibit -- there's going to

4  be three zeros and a five.

5     A    It'll just take time to open.

6     Q    Sure.  And just let me know when you have that up.

7     A    Yep, I have it up.

8     Q    Okay.  If you could take a second to review that

9  document and just let me know when you're done, please.

10    A    Okay.

11    Q    Do you recognize this document?

12    A    No.  I don't know who drafted that.  Not me.  I don't

13  believe that's me.

14    Q    The salary column on the right-hand -- on the

15  right-hand side, is that within the range of the salary that you

16  received from DGS on a (inaudible) basis?

17    A    Possibly, yes.

18    Q    What about for Mark Allen at 2500?

19    A    Yes.

20    Q    Do you know how much -- how much Mark Allen started out

21  making with DGS?

22    A    I don't remember.  I'm sorry.  That was like ten years

23  ago.

24    Q    Do you remember how much he finished making?

25    A    No, I don't.

1      Q    Was it more than $30,000?

2      A    Possibly, but I'm not sure because Kumar was the one

3    that handled salaries, and it went automatic into the bank

4    accounts, and I did not have -- it was separate salary account,

5    so he had access to that, not me.

6      Q    Okay.  Thank you.  And just for clarification, do you

7    know how much Ms. Darnell made on an annual basis?

8      A    I'm sorry.  How much who made?

9      Q    Heather Darnell.

10     A    No.  I mean, I'm just looking at this, and maybe that's

11   right.  I -- I don't know.

12     Q    Okay.  If you review the job description on this column

13   on this document for yourself, and my question to you will be,

14   is that an accurate description of your work for DGS?

15     A    That seems accurate, yep.

16     Q    And what about for Mark Allen?

17     A    Yeah, that's correct.  And Heather's is correct as

18   well.

19     Q    Okay.  Thanks.  That speeds things up.

20          Previously you -- you testified about DGS handling

21   deliveries of -- of chemicals to International Paper.  Do you

22   recall discussing that with Mr. Murphy?

23     A    Yes.  Handling deliveries, yes.

24     Q    Would DGS contract with a delivery company to have

25   chemicals supplied to International Paper?

1      A     Not with -- not a delivery company.  We did it with our

2  vendors.  Our vendors would arrange the delivery.

3      Q     So the vendors were responsible for delivering the

4  product to International Paper?

5      A     Correct.

6                MR. MURPHY:  Objection as to form.

7  BY MR. TOWNSEND:

8      Q     And when DGS handles deliveries, that definition would

9  mean you would tell the vendor to -- to deliver product to a

10  mill; is that right?

11                MR. MURPHY:  Objection as to form.

12      A     Yes.

13  BY MR. TOWNSEND:

14      Q     Would you do anything else regarding deliveries?

15      A     As far as delivery goes, we just wanted to ensure

16  between our vendor and International Paper that they would --

17  they received it on time.

18      Q     And how would you ensure that International Paper

19  received a chemical on time?

20      A     With the monitoring system that we had in place that

21  Mark Allen handled, we always -- Mark would know if the

22  chemicals came to a certain point or percentage in the tank that

23  we are ready to order.  The next delivery he would then contact

24  that -- like the product manager or whoever he needed to contact

25  at the mill to inquire if they're ready for the next delivery,

1    and if they agreed, then I believe he would place that order.

2    So we make sure they don't run short of it.

3        Q    Aside from your testimony regarding Mr. Allen's

4    monitoring of inventory, would DGS do anything else to ensure

5    that International Paper received its chemicals on time?

6              MR. MURPHY:  Objection as to form.

7        A    So am I supposed to answer or not?  I don't know.

8    BY MR. TOWNSEND:

9        Q    Oh, yes, you can.

10             MR. MURPHY:  Yes.

11       A    Okay.  I'm not sure.  That's something that Mark

12   handled.

13   BY MR. TOWNSEND:

14       Q    What did you do to ensure that Internation Paper

15   received its chemicals on time?

16       A    So I was not -- I was more the -- in the last many

17   years, I was more the accounts receivable payable.  I would just

18   have to be an occasional, maybe once a year, or twice year

19   backup if -- if Mark was on holiday or Heather was not available

20   to place an order.

21             But that was, like I say, very occasional if Mark was

22   traveling internationally.  But I was not involved in the

23   day-to-day handling of -- of the delivery.  I had to focus more

24   on the accounts receivable and payable because we did have a

25   substantial amount of business from International Paper, and we

1    had many different suppliers, so getting in money was always a

2    challenge to getting paid on time and to ensure that we paid out

3    on time.  So that was my job.

4         Q    Thanks.  What did Shiv -- what services did Shiv

5    provide to International Paper?

6         A    He did a lot of the sales.

7         Q    Aside from -- well, can you tell me what Shiv doing a

8    lot of the sales means?

9         A    Well, he would, you know, work on what we could provide

10   at different mills, what different products.

11             Now, how he did his sales, I don't know.  Like I said,

12   we were not all working in the same office together.  We worked

13   out of our homes, so what he did as an individual is really on

14   -- on him.  I don't know that part.

15             But he would let us know or he would find out what

16   other mills required, and he would try to find a supplier for

17   that.

18        Q    And when Shiv handled sales, was he purchasing or

19   arranging for the purchase of chemicals from a supplier and then

20   ultimately reselling those chemicals to International Paper?

21        A    Yes.

22             MR. MURPHY:  Note my objection as to form.

23   BY MR. TOWNSEND:

24        Q    Would Shiv do anything else for International Paper

25   besides sales?

1          MR. MURPHY:  Objection as to form.

2          You can answer.

3     A    I don't know.

4     BY MR. TOWNSEND:

5     Q    Did Shiv have a Ph.D. in chemical engineering?

6     A    Yes, he did.  He does.

7     Q    Do you know where that degree was obtained from?

8     A    I have no idea.

9     Q    Why would International Paper not simply purchase its

10    chemicals directly from the chemical suppliers instead of from

11    DGS?

12         MR. TOWNSEND:  Objection as to form.

13    A    My assumption is because we were a minority company,

14    and International Paper needed that minority discount.

15    BY MR. TOWNSEND:

16    Q    And what is the majority discount that you understand

17    to exist?

18    A    Oh, I believe it was a tax savings for International

19    Paper from the government.  That's --

20    Q    What?  Oh, I'm sorry.

21    A    -- my understanding.  Yeah.  That's my understanding.

22    Q    Sorry to cut you off.

23    A    That's fine.

24    Q    Aside from this tax savings that you understand

25    existed, did International Paper benefit from DGS in any other

1    way?

2              MR. TOWNSEND:  Objection as to form.

3        A    The way International Paper -- some of my understanding

4    in listening to Mark and to Kumar, on occasion, some of the

5    suppliers were not providing delivery on time, and they would --

6    this were not set up with the monitoring system, and so when we

7    came in there, we worked with the mills on the monitoring system

8    which really helped get delivery on time.

9    BY MR. TOWNSEND:

10       Q    Can you tell me which suppliers were not delivering on

11   time?

12       A    I --

13       Q    Do you recall?

14       A    I don't know.

15       Q    Okay.

16       A    Yeah.

17       Q    Ms. Balsara, if my computer cooperates with me, I'm

18   going to attempt to upload another exhibit here, and I'll be

19   marking this as Exhibit 6.

20              (Exhibit No. 6 was marked.)

21   BY MR. TOWNSEND:

22       Q    If you refresh, it should be there now.

23       A    It's still coming up.

24       Q    Okay.  Can you tell me when you have it up?

25       A    Okay.  It's come up now.

1      Q      Okay.  Great.  If you could take a moment to review

2      this, and just for the sake of time, I'll let you know that

3      we're really only going to be reviewing the first two pages,

4      although you are free to read the entire thing if you wish.

5      A      Okay.  So --

6      Q      And -- okay.

7      A      Okay.  So question?

8      Q      Sure.  So the first question is:  Do you recall this

9      email chain?

10     A      I -- I don't.

11     Q      Do you recall the individual with the last name of

12     Versaney from Ernst & Young?

13     A      E-Y -- yes, I remember correspondence with them.

14     Q      Do you remember why you were corresponding with Ernst &

15     Young?

16     A      I think it was in auditing.

17     Q      So your testimony is that Ernst & Young was auditing

18     DGS?

19     A      Possibly.  I -- I really don't know.  I mean, we went

20     for a few months back and forth on -- on questions, answers and,

21     you know, probably those kind of forms, but I'm sorry.  It's --

22     it's been sometime.  I...

23     Q      No problem.  Do you see there in the second email from

24     October 17th, 2018, there's some orange text; do you see that?

25     A      Yes.

1    Q    Okay.  And the top email from you, it says:  "See notes
2    below."  Do you see that?
3    A    Okay.
4    Q    So are you the one writing this orange or yellow
5    text --
6    A    Probably.
7    Q    -- in the second email?  Oh, I'm sorry.  I should have
8    let you finish there.
9    A    Yeah, probably me.
10    Q    Okay.  If you could scroll down to -- it's the second
11    question of that second email.  It says:  "Does DGS repack or
12    rebrand any goods purchased from its vendors?"  Do you see that?
13    A    Right.
14    Q    And the orange text says:  "No repackaging.  Some
15    products are rebranded under DGS name, e.g. DGS sodium
16    hypochlorite."  Is that right?
17    A    Right.
18    Q    Is that an accurate statement that DGS did not
19    repackage products from its vendors?
20    A    We did not repackage them.
21    Q    The third question says:  "Does DGS manufacture any
22    products or outsource manufacturing to a third party?"  Do you
23    see that?
24    A    Yes.
25    Q    Did DGS manufacture any products or outsource

1    manufacturing to a third party?

2        A    No.

3        Q    Did DGS manufacture any production outside of the

4    United States?

5        A    No.  Not that we -- not any of the products that we

6    provided International Paper, we did not get anything outside of

7    the United States.

8        Q    And DGS didn't own any manufacturing.  How -- I believe

9    your testimony previously was that DGS was a small company with

10   four to five employees; is that right?

11       A    Correct.

12       Q    And all of those employees were located in the United

13   States?

14       A    Yes.

15       Q    So how would you not know if DGS had manufacturing

16   facilities outside of the United States if all of its employees

17   were located in the United States?

18              MR. MURPHY:  Objection as to form.

19              You can answer.

20       A    So I don't understand.  We -- we were providing

21   everything in the United States, right?  I'm -- I'm saying that.

22   Our employees were in the United States.  If they did anything

23   outside, and whether he did business outside of the United

24   States, I'm saying I'm not aware of that.

25   BY MR. TOWNSEND:

1      Q    And when you say "he," you're referring to Shiv?

2      A    Shiv, yeah.

3      Q    And if Shiv did business outside of the United States,

4  was that through DGS, or was that through another company?

5               MR. MURPHY:  Objection as to form, foundation.

6      A    I don't know.

7  BY MR. TOWNSEND:

8      Q    So your testimony is --

9      A    I don't know of anything that happened in the United

10 States.

11     Q    Okay.  And so your testimony is you're not aware of any

12 manufacturing facilities that DGS owned outside of the United

13 States?

14     A    I'm not aware of anything.  Shiv may know, but that's

15 on him.  I just know what was happened in the United States.

16     Q    Okay.  The fifth question on this email says:  "Does

17 DGS handle any material from the time it procures goods from its

18 vendors and sells them to its customer?"

19          Do you see that question?

20     A    Yes.

21     Q    Okay.  Did DGS handle any material from the time it

22 procured the goods from its vendors to the time it sold it to

23 IP?

24     A    No.

25     Q    Did DGS have any distribution facilities?

1        A     No.

2        Q     Okay.  Ms. Balsara, thank you.  That's all of our

3   questions on that exhibit.  And I'm going to be uploading

4   another one shortly.  And to warn you, this is a tad smaller.

5                  MR. MURPHY:  I'm thinking you meant a tad larger.

6                  MR. TOWNSEND:  If I said smaller, I was incorrect.

7        That's why we need you objecting, Gene.

8                  MR. MURPHY:  That's -- that's definitely not an

9        objection.

10                 MR. TOWNSEND:  Everyone just sit tight.  I'm going

11       to try that again, and if it is not working for me, I will

12       just share my screen.

13                 (Exhibit No. 7 was marked.)

14  BY MR. TOWNSEND:

15       Q     That is Exhibit 7, Ms. Balsara.  It may take a moment

16  to download.  It took me a while to upload, so if you could

17  start that process, I would appreciate it.

18       A     Okay.

19       Q     Has it uploaded for you yet?

20       A     No.

21       Q     Or is it still taking its time?

22       A     It's taking time.

23       Q     Well, to speed things along because I -- I know you

24  have a short amount of time today, while we wait for this

25  exhibit, I'll ask you a couple of other questions.

1          You mentioned DGS provided an eco-friendly product to

2    International Paper.  Do you recall that testimony?

3      A    Correct.

4      Q    Was DGS purchasing that product from another company

5    and selling it to International Paper?

6      A    We were purchasing it from a company, and we had person

7    from that company actually do the cleaning.

8      Q    Do you recall who that person was?

9      A    Oh, I'm sorry.  I don't remember the name.

10     Q    Any chance it was a man by the name of Preston Tynes?

11     A    Yep.  Preston.

12     Q    Okay.  And Preston, did he work for DGS, or did he have

13   his own company?

14     A    He did work for us for sometime, and he did have his

15   own company as well.

16     Q    Okay.  And so would Preston, through his company, sell

17   his product to DGS?

18     A    Sorry, say that again.  Did Preston?

19     Q    Would Preston sell his product to DGS?

20     A    He sold -- he had sold the product to us which we then

21   provided to International Paper.

22     Q    Would DGS increase the price to International Paper

23   from what it cost it to purchase it from Preston's company?

24     A    Yes.  I believe that's how business works, right?

25     Q    So DGS would -- would mark up the price?

1        A    Yes.

2        Q    What was DGS providing to International Paper for that

3    markup for Preston's product?

4        A    Are you asking me what price?

5        Q    What -- what value was DGS providing for the markup it

6    charged?

7        A    So what we're providing was a service.  I don't believe

8    International Paper had someone.  We introduced that we would

9    have someone do an eco-friendly cleanup, and I believe Kumar had

10   actually approached some of the mills, and he was able to -- we

11   had Preston do a presentation with the mill, and they agreed to

12   tryout the product and the cleaning.

13       Q    You testified just now that DGS provided a service to

14   International Paper; is that right?

15       A    Right.  The cleaning, right, isn't that a service?

16       Q    Why would International Paper not just go straight to

17   Preston's company?

18            MR. MURPHY:  Objection as to form.

19       A    I don't know.  We introduced Preston, and we were a

20   minority business.  International Paper needed the minority

21   business for their tax break, and so they -- they went through

22   us.

23   BY MR. TOWNSEND:

24       Q    Okay.  Do you mind checking to see if Exhibit 7 has

25   downloaded for you?

1    A   It came up, of course.  Uh-huh.

2    Q   What's that?

3    A   It came up.

4    Q   Okay.  Great.  It is -- it is a long PowerPoint.  But I

5 guess my first question, just based on the first slide, do you

6 recognize this PowerPoint?

7    A   This is probably -- probably our presentation.

8    Q   Do you remember preparing any portion of this

9 PowerPoint?

10   A   I think a lot of it was done by Kumar.  And I would

11 have added in some slides.  It's also some of the slides from

12 previous presentation possibly.

13   Q   And do you remember who presented this PowerPoint?

14   A   Possibly Kumar, not me.

15   Q   Any chance you know who Kumar presented this PowerPoint

16 to?

17   A   I'm sorry.  I have no idea.

18   Q   Okay.  Understand.  If you would please scroll down,

19 it's going to be slide four and the title is "About

20 DGS-Nanjing."

21         REPORTER:  How is Nanjing spelled?

22         MR. TOWNSEND:  Nanjing is spelled N-A-N-J-I-N-G.

23         REPORTER:  Thank you.

24   A   Okay.  Yes.

25 BY MR. TOWNSEND:

1      Q     Did DGS own a facility at Nanjing, China?

2      A     Like I said, what happened outside of the United

3   States, I am not aware.

4      Q     Did you know if DGS owned 41 Chinese national patents,

5   and one international patent?

6      A     I have no idea.

7      Q     Did Shiv ever mention to you a DGS facility in Nanjing,

8   China?

9      A     I -- no, not that I'm aware of.  I don't know.

10     Q     If you could scroll down to the next slide, it's also

11   titled "About DGS-Nanjing."

12     A     Uh-huh.

13     Q     Do see the third bullet point, it says:  "R&D and QC

14   center with 30 full-time scientists."  Do you see that?

15     A     Yes.

16     Q     Did DGS have 30 full-time scientists as employees?

17     A     Like I say, anything out of the U.S., I am not aware

18   of.

19     Q     But this is a presentation from DGS to International

20   Paper in the U.S.; is that right?

21     A     That is correct.  I did not do this presentation.

22     Q     But it is a presentation to DGS's sole customer,

23   International Paper; is that right?

24     A     It looks like a presentation to International Paper.

25     Q     So Shiv is representing to International Paper that DGS

1    has 30 full-time scientists; is that right?

2              MR. MURPHY:  Objection as to form.

3       A    I don't know.  I mean, if it's here, then that's what

4    he's saying, I did not create this presentation, and neither do

5    I remember seeing it before.

6    BY MR. TOWNSEND:

7       Q    It may take a little while, but if you could scroll

8    town to slide 35, and the title of that is "Logistics and

9    Supply:  Local Supply Chain/Warehouse," and do you see that

10   slide?

11      A    Let me get there.

12      Q    Did DGS have a warehouse in Portland, Oregon?

13      A    No.

14      Q    Why would this slide say that DGS have -- why -- why

15   would this slide have a sentence that implies that DGS has a

16   warehouse in Portland, Oregon?

17      A    I did not -- I did not create this slide, so I am not

18   aware of it.

19      Q    Did DGS have a warehouse in Franklin, Virginia?

20      A    They did not have centers in any of these places.  I

21   did not create this slide, and I do not know about it.

22      Q    Was Shiv lying when he said that DGS has warehouses in

23   Springfield, Franklin, Augusta, and Valliant?

24              MR. MURPHY:  Objection as to form.

25      A    I can't say what he did.  Whether he created this and

1    he presented it or somebody else did it, I don't know.  But I'm

2    -- what I'm aware of is that we did not have warehouses in any

3    -- in any of these places.  So I cannot answer for what he's

4    done or he had someone else do.

5    BY MR. TOWNSEND:

6        Q    Okay.  I appreciate that, Ms. Balsara.  And we'll be

7    done with that exhibit, and I'm going to take a big risk here

8    and try to do two things at once to keep things moving.  I'm

9    going to simultaneously try to upload our next exhibit and I'll

10   be asking you questions so that we can move as quickly as

11   possible.

12            Ms. Balsara, do you recall a DGS presentation to

13   International Paper taking place on November 4th, 2019?

14       A    November 4th, 2019?  No.

15       Q    Do you recall --

16       A    To tell you the truth, I was traveling.  I was out of

17   the country at that time.

18       Q    Okay.  Do you recall dialing in to a presentation given

19   by individuals represent -- representing themselves as DGS

20   personnel to International Paper?

21       A    I can't remember because I was out of the country.  I

22   was visiting my parents.  2019 -- I don't remember.  I may have.

23   I may have not.  I believe I was travelling.  That was the

24   advantage of working from home.  Even if I was traveling, I

25   could -- I could still do my work.

1    Q    Okay.

2    A    Okay.

3    Q    I think you previously testified that DGS's

4    relationship with International Paper ended around December of

5    2019; is that right?

6    A    Correct.

7    Q    And I might mess this up, so can you just tell me again

8    your understanding of why International Paper terminated its

9    relationship with DGS?

10   A    I really did not know what was happening.  All I know,

11   when I was calling in for payments, International Paper, they

12   wouldn't pay, and we weren't getting any calls in for supplies.

13   Q    Did International -- did anyone at -- at International

14   Paper tell you why the relationship?

15   A    No.

16   Q    Okay.

17   A    Because International Paper wouldn't answer our calls

18   if we -- I was calling in for payments.  I needed help knowing

19   when our payments were coming through.  We had a substantial

20   amount due from International Paper, and my job as account

21   receivable payroll was to make sure that we were getting paid on

22   time.  We weren't getting paid, and so I got no response.

23   Q    Okay.  Did -- and I -- again, do you mind just telling

24   me again what Shiv said to you regarding the termination between

25   International Paper and DGS?

1      A    He told me that they're -- they're frozen our --

2    they're frozen business to us at this point.  We'll have to wait

3    and see.

4      Q    And did he say why International Paper had frozen

5    business?

6      A    I -- I do not know.

7      Q    Did you ever ask him?

8      A    I did ask him because, you know, at that point he -- I

9    think by December he had been terminated, and since we no longer

10   were going to be doing business with International Paper.

11     Q    And did -- did he answer your question when you asked

12   him?

13     A    When I asked him, he says, you know, our business has

14   stopped.  International Paper doesn't want to use us as a

15   service anymore, and that's the way it ended.

16               (Exhibit No. 8 was marked.)

17   BY MR. TOWNSEND:

18     Q    Okay.  If you could try to pull up Exhibit 8.  If you

19   refresh and start downloading.  This is a large file, so it may

20   take a little while.

21     A    Okay.

22     Q    In the meantime, Ms. Balsara, you mentioned in your

23   testimony in December that the FBI interviewed you at some point

24   in 2020; do you recall that?

25     A    Correct.

1          Q     Do you recall what the FBI asked you?

2          A     Well, they already know I was travelling in November.

3     That's like a recap, but that, you know, I was -- I was out of

4     the country.  And I don't recall the questions all that they

5     asked me.  Basic, you know, did I work with DGS, and I -- I

6     don't remember this -- I know this was sometime in 2020, early

7     2020 maybe they contacted me.

8          Q     Okay.

9          A     It was a telephone conversation.

10         Q     It was a how much conversation?

11         A     It was a telephone conversation.

12         Q     Okay.  Do you recall maybe how long they spoke to you?

13         A     A few minutes.

14         Q     Any chance you remember who the individual was who

15     spoke to you?

16         A     Oh, no, I don't.

17         Q     Did they tell you anything regarding their

18     investigation?

19         A     They are trying to -- they told me that it was some

20     kind of fraud is what they told me.  That's when I got to know a

21     little bit more, but then they wouldn't disclose too much.  It's

22     the FBI.

23         Q     Okay.

24         A     So, yeah.

25         Q     Do you remember what you told them that day, what

1    information you shared?

2        A    Well, whatever they asked me, I answered that, but that

3    was it.  You know, it was supposed to be a private conversation,

4    not to let anyone know about it, that kind of stuff.

5        Q    Okay.  Did you know that Shiv Kumar is a half brother

6    of Sitaraman Jagannath?

7        A    I did not know that until the FBI told me that.

8        Q    Okay.  So Shiv never mentioned that to you?

9        A    No.

10       Q    Okay.  Just as an update, has that Exhibit 8 downloaded

11   for you?

12       A    It just did.  It just did.

13       Q    Oh, perfect timing.  Okay.  This first slide here, do

14   you recall seeing this before?

15       A    So this is what we had seen before in this first slide

16   is what we created before for Georgia Pacific initially, and

17   then when Shiv presented to other mills for other products, we

18   would update the slide as we started getting in more products.

19   So yes, this slide is familiar to me.

20       Q    Okay.  Can you tell me what this PowerPoint was meant

21   to do, if you recall?

22       A    It was a -- basically a sales presentation is what I

23   understand.

24       Q    A sales presentation?

25       A    It's --

1      Q    I'm sorry.

2      A    It's trying to say who we were as DGS, as a team,

3  products that we could provide.  This was -- I think this was

4  not just a sales thing.  This seems to be -- because they talk

5  about Ariba, SAP Ariba which is trying to say what we as DGS

6  did -- provided to International Paper.

7      Q    Okay.  So it was a sales presentation and introduction

8  to International Paper; is that right?

9      A    No.  It seems a little different.  The beginning

10  slide's -- sorry, the beginning slides seemed like what we were

11  presenting to most of our mills for -- as a sales pitch.  But

12  then I see slide 7, or page 7, where it shows what we have done

13  for International Paper, like migrating to the Ariba and then to

14  City Bank because International Paper made changes in the

15  accounting system, and we were the first to get on to it because

16  International Paper wanted all the vendors to get on or their

17  suppliers to get on, and we were one of the first people to

18  implement it because that's what they -- they requested.

19      Q    Okay.  But it was a presentation to International

20  Paper, right?

21      A    It was, yeah, probably a presentation to International

22  Paper of what we as DGS are providing to International Paper or

23  can provide.

24      Q    Okay.  If you go to slide 4, the heading says "Team."

25      A    Okay.

1      Q    And if you can review that for me and then can you tell

2   me who Scott Minter is?

3      A    I do not know him.

4      Q    Okay.  Can you tell me who Joe Arnold is?

5      A    I believe he -- Kumar was talking to him.  He was more

6   trying to transition to sales, but that's on Kumar.  I -- I

7   don't know them.

8      Q    Okay.

9      A    I don't personally know them, but he speaks to a lot of

10  people.  I don't necessarily know everyone.

11     Q    Okay.  And then there's Preston Tynes, correct?

12     A    Uh-huh.

13     Q    But Preston Tynes didn't work for DGS, right?  He had

14  his own company?

15     A    He had his own company, and he was consulting for us as

16  well.

17     Q    Okay.  So he was consulting for DGS?

18     A    Yes.

19     Q    Why would this slide include Scott Minter, if Scott

20  Minter was not part of DGS?

21                  MR. MURPHY:  Objection as to form.

22                  You can answer.

23     A    I did not create this slide, so I do not know.

24  BY MR. TOWNSEND:

25     Q    Okay.  Why would this slide with the heading of "Team"

1    include Joe Arnold, if Joe Arnold did not work for DGS?

2        A    I did not create the slide.  I do not know.

3        Q    If you could scroll down to the next slide, it's slide

4    number 5, the title "Current Presence, Distribution and

5    Manufacturing Centers."

6        A    Okay.  The map?

7        Q    Did -- thank you.  Did DGS have a distribution or

8    manufacturing center in Burlingame, California?

9        A    We did not have a distribution center, no.

10       Q    What about a manufacturing center?

11       A    No.  We did not manufacture our own products.

12       Q    Okay.  Why would this slide state that DGS has a

13   distribution and manufacturing center in Burlingame, California

14   if DGS did not manufacture its own products?

15       A    I did not --

16            MR. MURPHY:  Objection as to form.

17       A    I did not create the slide, so I do not know.

18   BY MR. TOWNSEND:

19       Q    Did DGS have a manufacturing or distribution center

20   Chennai, India?

21       A    I have no idea.

22       Q    What about South Carolina?

23       A    I am not aware of it.

24       Q    What about Louisiana?

25       A    I am not aware of it.

1      Q     When you joined DGS, did you have to undergo any safety

2      training?

3      A     I did go through some safety training with

4      International Paper, yes.

5      Q     So that was provided by International Paper?

6      A     Correct.

7      Q     Did DGS ever provide safety training?

8      A     I did not need it because I was -- I was basically

9      doing more the accounting part, and it was all by phone.  When I

10     needed to visit a mill, I did a safety training for

11     International Paper, and I completed that.

12            So I did not need to do one for DGS because I was not

13     -- you know, we didn't have any manufacturing going on at the

14     time I started.

15     Q     Okay.  Do you know if DGS provided safety training to

16     anyone else besides yourself?

17     A     I am not aware of it.

18     Q     Okay.  Could you scroll down to slide 12, which says

19     "Safety Initiatives," please?

20     A     Slide number what?

21     Q     12.

22     A     12, okay.

23     Q     The first bullet point says:  "Mandatory safety

24     orientation for now employees," right?

25     A     Uh-huh.

1    Q    Did DGS provide a safety orientation for new employees?

2    A    I believe we did.  We may have for Mark Allen because

3    he was going to visit the mills, and Mark was already -- he --

4    he worked in this kind of environment before, so he was already

5    aware of a lot of these trainings as well.  He had done some

6    trainings is what I understood.

7    Q    Did Shiv provide that?

8    A    It was a long time ago.

9         I'm not sure.

10   Q    Sorry, we may have messed up our record just a bit.  I

11   apologize for cutting you off.

12        The question was:  Did Shiv provide any safety

13   orientation training to Mark Allen?

14   A    I am not sure of that.

15   Q    How do you know that Mark Allen received safety

16   orientation training from DGS?

17   A    I remember a conversation with Mark because he said

18   that he -- he may have been a very old retired employee of

19   International Paper at some point, and so he had done safety

20   trainings as well.

21   Q    But those were not safety trainings from DGS, right?

22   A    Not what Mark had told me.  But now whether Shiv

23   provided or not, I am not aware of that.

24   Q    Okay.  So you don't know if Mark Allen received safety

25   orientation training from DGS?

1      A    I do not know.

2      Q    If you don't know if Mark Allen received safety

3  orientation training and you did not receive safety orientation

4  training, did anyone at DGS receive safety orientation training?

5      A    I do not know because Heather never visited any of the

6  mills.  She was just a backup for Mark.  And I just know what --

7  I mean, I did not.  I did do the safety trainings for

8  International Paper when I needed to visit the mill.

9      Q    Okay.  This slide also mentions ten hours of OSHA

10  training for managers; do you see that?

11      A    Yes.

12      Q    What managers of DGS received ten hours of OSHA

13  training?

14      A    I don't know.  We really -- there's -- there's no

15  managers really, right?  Kumar is the manager.  He's -- he's the

16  CEO.

17      Q    Did Shiv receive ten hours of OSHA training?

18      A    I have no idea.

19      Q    Do you believe that it is accurate for this slide to

20  state that DGS employees received a mandatory safety

21  orientation?

22      A    Sorry, repeat the question.  Is it mandatory?

23      Q    Do you believe this slide is accurate when it says that

24  DGS provided mandatory safety orientation for new employees?

25      A    I did not receive it.  I do not know about the others,

1    so I can't answer for anybody else, but I did not receive it,

2    but because I was more HR admin, in the beginning some sales,

3    but you know, it was mostly Kumar who did the sales.

4         Q    Okay.  If you could scroll down to the next slide.

5    Apologies, actually, it's the slide after that, slide 14.

6              It says "DGS defoamer team."

7         A    Uh-huh.

8              REPORTER:  I'm sorry, DGS what team?

9              MR. TOWNSEND:  Defoamer.  That's D-E-F-O-A-M-E-R.

10             REPORTER:  Thank you.

11   BY MR. TOWNSEND:

12        Q    Do you see there, it says -- the last piece of text

13   there's an email address for Joe Arnold at

14   diversifiedglobalsourcing.com?

15        A    Right.

16        Q    And your testimony previously was that Joe Arnold did

17   not work for DGS, right?

18        A    So I am not aware of it, but if that's something

19   between Kumar and Joe, I'm not aware of that.

20        Q    Okay.

21        A    I was not handling payroll, so I don't know, you know,

22   whether he got paid from DGS or not.  Whether he and Kumar were

23   having correspondence, I don't know.  If I did not -- the

24   involvement was with me was between Heather, Mark Allen, myself,

25   Kumar.  Anyone else, it would be, you know, Shiv handling them.

1      Q    Okay.  Do you know when DGS was created?

2      A    I believe in 2007, '8, or '9, something like that.

3      Q    Okay.  Can you scroll down to slide 16 for me?  It

4 says, "About DGS-Nanjing."

5      A    Okay.

6      Q    The top left-hand corner, it says "Established in

7 1992"; do you see that?

8      A    Yes.

9      Q    If you believe that DGS was established in the late

10 2000s, why would this slide say it was established in 1992?

11             MR. TOWNSEND:  Objection as to form.

12             Go ahead.

13      A    Like I said before, I have nothing to do with what

14 happened outside of the U.S.  So I have no idea.  I did not

15 create the slides.  I did not create the presentation.  I have

16 no idea.

17 BY MR. TOWNSEND:

18      Q    But this slide presentation was provided to

19 International Paper, right?

20      A    I have no idea.  I've -- this is the first time I'm

21 seeing it.

22      Q    Could you scroll down to the next slide, slide 17?  It

23 says "About DGS-Nanjing."

24      A    Okay.

25      Q    The bottom text says:  "2000 customers worldwide."  Do

1   you see that?

2       A    Yes.

3       Q    Did DGS have 2000 customers worldwide?

4       A    I have no idea.  I just know about the customers in --

5   out here in the U.S.

6       Q    And that was only one customer in the United States,

7   right?

8       A    That was International Paper is who I was working with.

9   Beyond that, I don't know what Kumar had.

10      Q    So Kumar never mentioned any other customer out of the

11  2000 to you?

12      A    No.  I -- I was just focused on International Paper,

13  and that kept me busy, so I did not discuss anything else beyond

14  that.

15      Q    So the reporting relationship went from you to Shiv,

16  right?

17      A    I'm sorry, the question?

18      Q    Yeah.  You reported directly to Shiv, correct?

19      A    I did.  I did.

20      Q    And he was the CEO and owner of DGS?

21      A    Correct.

22      Q    And your testimony is that you only handled the

23  accounts payable and accounts receivable for one customer,

24  right?

25      A    For International Paper and that was it for me and Mark

1    Allen and Heather.

2        Q    Okay.  So the CEO of a company with 2000 customers

3    would work directly with the accountant for just one of those

4    customers under -- in DGS; is that right?

5                MR. MURPHY:  Objection as to form.

6        A    So if that's something that he worked with the

7    accountant, I don't know.  I just worked on International Paper

8    and the vendors that supplied International Paper.

9    BY MR. TOWNSEND:

10       Q    Okay.

11       A    Our vendors that supplied International Paper.

12       Q    I understood.  Thanks.  But my question is -- maybe I'm

13   not asking it clearly enough.

14            The CEO of a -- of DGS, Shiv, who has 2000 customers

15   worldwide, is working directly with you, the accountant, for a

16   single customer in the United States; is that right?

17       A    Yeah, I was not --

18                MR. MURPHY:  Objection as to form.

19       A    I was not the accountant.  I was the admin account

20   receivable/payable person for the company.  I was not the

21   accountant.  We had a different accounting firm.

22       Q    Okay.  But Shiv was working directly with you who was

23   handling administrative tasks, right?

24       A    Yes.

25       Q    Okay.

1             MR. TOWNSEND:  I think it would be a good time to

2         take a break.  I don't have a lot more questions, maybe

3         30 minutes.  So maybe we can go to like 1:00, take a

4         slightly longer break and come back at -- at 1:00 Eastern,

5         10:00 Pacific.  Would that work for you, Ms. Balsara?

6             WITNESS:  Okay.  So nine-minute break is what

7         you're saying?

8             MR. TOWNSEND:  Yes, that's right if that works for

9         everyone else.

10            VIDEOGRAPHER:  This ends Media 2.  We're now going

11        off the record.  The time is 9:51.

12            (Off the record.)

13            VIDEOGRAPHER:  This begins Media 3.  We're now back

14        on the record.  The time is 10:03.

15    BY MR. TOWNSEND:

16        Q   Ms. Balsara, you testified previously that Shiv would

17    travel to DGS's office space in Memphis; do you recall that?

18        A   Correct, yes.

19        Q   Do you know where Shiv would stay when he travelled to

20    Memphis?

21        A   No idea.

22        Q   Would you ever book a hotel room for him there?

23        A   No.  He did his -- all of his bookings, international,

24    domestic, all on his own.

25        Q   Did Shiv own any property in Memphis that you know of?

1    A    No.  I'm not aware of it.

2    Q    Okay.  We already actually have it inside of Exhibit

3    Share.  It was, I believe, the first exhibit that I showed you.

4    Maybe that's not quite right.

5    A    So we're not looking at Exhibit 8 now?

6    Q    We are -- we are done with Exhibit 8.

7    A    Okay.

8    Q    If we could go back, I have a follow-up question on an

9    exhibit.  This one is Exhibit 4.

10   A    Okay.

11   Q    We looked at previously.

12   A    Let me open that.

13   Q    Okay.  And just let me know when you have it up.

14   A    Okay.

15   Q    Okay.  So on this email coming from Mr. Jain, on August

16   25th, 2018, is he addressing you in this email when it says

17   "Jasmine"?

18   A    Yes.

19   Q    Okay.  And it also says that he's addressing Shiv; is

20   that right?

21   A    Yes.

22   Q    And the email addresses that he's sending this email to

23   are the Jasmine Manish address; is that right?

24   A    Yes.

25   Q    And it's also the P. Sekur address; is that right?

1      A    It looks like, yes.

2      Q    So was Mr. Jain emailing Shiv in this instance?

3      A    I don't know whether he did a BCC or -- and he's

4    addressing him as well.  It -- he's addressing Shiv and Jasmine,

5    and that's what I know of from looking at this email.

6      Q    Did you ever meet Mr. Sekur?

7      A    Did I meet Mr. -- no, I did not.

8      Q    Did you ever speak to him over the phone?

9      A    I don't remember if I did.

10      Q    Is Shiv using the alias of Mr. Sekur in this instance,

11    do you know?

12      A    Not that I'm aware of.  I believe there was a Mr. Sekur

13    that existed, but I do not know whether he's using him as an

14    alias here.

15      Q    Do you know if Shiv ever used this P. Sekur email

16    address for Mid South?

17      A    I don't know.  I don't know.

18      Q    Okay.  You mentioned that Mr. Jain performed inventory

19    monitoring for International Paper; is that right?

20      A    Correct.

21      Q    Okay.  Do you recall what mills Mr. Jain monitored

22    inventory for?

23      A    I'm sorry, I do not.  I don't remember which mills were

24    provided for at this time.

25      Q    Okay.  Do you remember what chemicals Mid South

1    provided to International Paper?

2         A    Oh, no, I do not.

3         Q    Okay.  Do you know why Mid South was formed?

4         A    No.  I mentioned earlier I was no involved in the

5    formation of Mid South, so I do not know.

6         Q    Okay.  Did -- what did Shiv tell you about you

7    providing services to Mid South?

8         A    He told me to just -- I never got paid from Mid South.

9    He told me, you know, just to use his email address and just do

10   accounts receivable and payable.  That's it.  I said, sure, I'll

11   go ahead and help you with that.

12        Q    Okay.

13        A    None -- nothing that I got paid for or any of that.

14        Q    And this is not meant to pry into your life,

15   Ms. Balsara, but is your daughter's name Jasmine, and your

16   husband's name Anish; is that right?

17        A    Yes, it is.

18        Q    Was there any reason why Shiv selected the names of

19   your daughter and husband as your email address?

20        A    I have absolutely no idea.

21        Q    Okay.

22        A    Absolutely no idea.

23        Q    Okay.

24        A    Makes me think too why.  I don't know.

25        Q    What's that?

1     A    Makes me think why too.

2     Q    We're done with that exhibit.  Ms. Balsara, I tried to

3    get ahead of things a bit, and I's loaded it already.  It's

4    Exhibit 9.

5           (Exhibit No. 9 was marked.)

6    BY MR. TOWNSEND:

7     Q    It is an email, so it shouldn't take very long to

8    download, but if you could access that, please.

9     A    Okay.  It's still coming up.  Okay.

10    Q    Okay.  If you could review it, and once you're done,

11   could you let me know if you recall seeing this email chain

12   before?

13          MR. MURPHY:  Nathan?

14          MR. TOWNSEND:  Yes?

15          MR. MURPHY:  I lost track.  Which exhibit are we

16     looking at?

17          MR. TOWNSEND:  We are in Exhibit 9; the first page

18     of the Bates label is DGS003 -- or 0003008.

19          MR. MURPHY:  I've got it.  Great.  Thank you.

20          MR. TOWNSEND:  Yeah.

21   BY MR. TOWNSEND:

22    Q    Ms. Balsara, do you recognize this document?

23    A    I don't, but my name's there, so I've probably written

24   it.

25    Q    Okay.

1      A     Provided totes to International Paper.

2      Q     Okay.  And it looks like Mr. Greg Brown from Brenntag

3   is offering a price of $1.65 gallon delivered; is that right?

4      A     Correct.

5      Q     Okay.  And then in a second -- in the next email, Shiv

6   emails you and says:  "Please mark off $2 a gallon and quote

7   Valliant."  Is that right?

8      A     Yes.

9              REPORTER:  I'm sorry. $2 a gallon, and the last

10        three words were what?

11             MR. TOWNSEND:  And quote Valliant.

12             REPORTER:  Okay.  Thank you.  Excuse me.

13             MR. TOWNSEND:  Thanks.

14             REPORTER:  Yep.

15   BY MR. TOWNSEND:

16      Q     So in this instance, DGS had a markup of 35 cents on

17   the price, right?

18      A     Correct.

19      Q     What value was DGS offering International Paper for

20   that markup of 35 cents?

21             MR. MURPHY:  Objection as to form.

22      A     Well, as far as I know, we're providing a product that

23   they required.  The markup was probably little or too much.  I

24   don't know.  That's not on me to judge, but we were providing or

25   requesting to provide a product that they wanted in the mill.

1        And then one time when International Paper was not able

2   to get a product on time, especially if it's totes and needed

3   extra or something that they did not have the facility to keep a

4   truckload, and they just wanted totes because they had space to

5   just keep totes, and so we were able to provide that.  So we

6   were trying to provide whatever they wanted.

7        International Paper also called us because we were

8   providing a good service to them, on time service, and they

9   would call us and ask us if we had any resources to -- to get a

10  particular product.  I don't know which products, but you know,

11  they -- they would contact us.

12  BY MR. TOWNSEND:

13      Q    Could International Paper have contacted Brenntag for

14  the sodium hypochlorite that it's requesting in this email

15  chain?

16      A    I mean, they could have.

17      Q    And they could have obtained -- sorry, go ahead.

18      A    Yeah, they could have.  I -- you know, whether they did

19  it directly or not, I don't know.  But they probably already had

20  a relationship with DGS, and I know our on-time service with

21  them, and we had built a relationship with International Paper

22  and lot of the folks at the mills as well, and so they would

23  call us when they were in need of something.

24      Q    And you mentioned this on-time service.  I think we've

25  gone over this a bit, but just as a reminder, can you tell me

1   what this on-time service was that DGS provided?

2       A    So we had heard from some of the International Paper --

3   Mark would relate this to me that some of the staff would say,

4   oh, you know, they're either running low or they did not -- some

5   of the supplies did not provide on time, and so we tried to ask

6   the mill what kind of products those were and if we can

7   outsource them ourselves.

8           We -- we were already to help and hop on there to

9   International Paper and say we were trying to find a vendor and

10  provide that on time to them, the product on time.  You know, it

11  was always in the good faith that International Paper does not

12  run out of products, and that was always a service we wanted to

13  provide to them, that they never run out of it or too low.  But

14  they always had it, and that's where we came in and wanted to

15  ensure that we were able to do it.

16          People like Brenntag or Nalco, they were big companies,

17  and as much as they did have stuff come around -- but what I

18  heard that sometimes they do slip through the crack.  I can --

19  you know, they -- they may not have a product there on time.

20  But we were -- we were a smaller company, and so we were able to

21  focus on -- on giving them this -- you know, going that extra

22  mile to make sure that International Paper was satisfied.

23      Q    And work for ensuring that a product arrive on time

24  from DGS came from Mark Allen; is that right?

25      A    Correct.

1     Q   Did it come from anyone else besides Mark Allen?

2     A   No.  I -- I -- as far as I understood, it came from

3  Mark Allen because he was on top of it, making sure that the

4  mills had the products that they needed, the ones that we were

5  supplying by ordering it on time or running short, or he would

6  -- he would -- he was pretty good at saying he had -- apart from

7  the monitoring service that we had at some of the mills, but he

8  was good to even say, oh, it's been two weeks or 10 days, and

9  this product should be consumed by now.  Are we ready to order?

10  He would call the mill.

11        He'd ask those managers or -- or the people that are

12  actually using the product.  Are you ready to order your next

13  shipment?  So he'd get onto it on his own by actually calling up

14  the mills and finding out whether that's something they needed

15  before the mill can call us.

16        He did that very often in many of the mills to make

17  sure, hey, I think it's going to be about time because you

18  should be running out of that particular product.  Are you ready

19  to get the next supply?

20     Q   And did DGS provide Mark Allen's services for all of

21  the chemicals it sold to International Paper?

22     A   For most of them, yes.  I believe there was some

23  from -- maybe sosperse.  No.  I don't remember whether he did

24  sosperse, but he did all the other products.

25     Q   But DGS did provide sosperse to International Paper at

1    a markup, right?

2        A    Yes.

3        Q    So what was the value to International Paper for the

4    sosperse markup?

5                 MR. MURPHY:  Objection as to form.

6        A    I mean, I clearly don't understand what you mean by

7    "what is the value?"  We're -- we are outsourcing.  If we put in

8    a bid for a product, if we won the bid due to pricing because we

9    are getting better pricing than someone else, then isn't that

10   value itself?

11   BY MR. TOWNSEND:

12       Q    So your value would be if you can offer a lower price

13   than another company?  Is that a value you believe DGS provided?

14                 MR. MURPHY:  Objection as to form.

15       A    I believe --

16                 MR. MURPHY:  Go ahead.

17       A    I believe, yes.  I mean, that's for anyone, right?  We

18   go out shopping, and someone gave you a better price than the

19   next person, you're going to go with what's the better price,

20   right?  That's what business is about.

21   BY MR. TOWNSEND:

22       Q    In the instance we're looking at here, the price to you

23   for $1.65 from Brenntag, and you sold it to International Paper

24   for $2.00, right?

25       A    Correct.

1      Q    So isn't the better price to International Paper $1.65?

2      A    Yeah, but International Paper did not go directly to

3   Brenntag.  They came to us, correct?

4      Q    What if International Paper had gone directly to

5   Brenntag instead of coming to you?

6           MR. MURPHY:  Objection as to form, calls for

7      speculation.

8      A    Then that's up to -- you know, in between International

9   Paper and Brenntag.

10  BY MR. TOWNSEND:

11     Q    Do you know who at International Paper was purchasing

12  these chemicals?

13     A    No.  I don't have no idea.

14     Q    Can you tell me --

15     A    I mean, the mills -- the mills were purchasing, right?

16  The mills were purchasing its products.

17     Q    What was the role of Sitaraman Jagannath?

18     A    He was a manager.  What was he a procurement manager,

19  or he was a manager there at International Paper.

20     Q    Was Sitaraman Jagannath purchasing these products for

21  them?

22     A    That I don't know.

23     Q    So your testimony is that the mills -- personnel at the

24  mills were purchasing chemicals from DGS?

25     A    Right.  Because we were dealing directly with the

1    mills.  Now, if Shiv was dealing with someone else, then we are

2    not aware of that, but we were dealing directly with the mills.

3         Q    If Sitaraman Jagannath purchased chemicals from DGS, a

4    company owned by his brother, would that be a conflict of

5    interest?

6              MR. MURPHY:  Objection as to form.

7              You can answer.

8         A    Well, it depends how you look at it, right?  If -- if

9    we're providing a good price, then would it be, you know,

10   conflict if we're providing a good price to International Paper?

11   I don't think so.

12   BY MR. TOWNSEND:

13        Q    What if International Paper could have obtained this

14   product from Brenntag at $1 -- $1.65, but instead, it purchased

15   the product at $2.00 from DGS?

16              MR. MURPHY:  Same --

17   BY MR. TOWNSEND:

18        Q    Is that a good price?

19              MR. MURPHY:  Same objection.

20        A    Okay.  So a lot of the times with companies -- I'm not

21   going to go after every vendor out there and, you know, ask for

22   pricing, right?  When we do this -- when we do -- my

23   understanding -- okay, and I'm not some big professional on

24   this, it's what I've learned over the 9, 10 years with DGS.

25              If you go and, you know, we present ourselves like --

1    there were many companies that we were working with.  We present

2    pricing and products and our services.  If we win some of the

3    bids, then it's our product, right?  It's -- it's our business

4    to keep.  And we also lost business to other companies that were

5    providing better pricing for certain products.  So I don't see

6    where the conflict is there when we're providing a good price

7    and providing the service.

8            Now, with them being, you know, half brothers -- and

9    that I was not aware at all of that -- and whether that's a

10   conflict of interest, I -- I -- it truly doesn't matter to me.

11   You know, that's just all new to me.  So I'm just looking on the

12   business side of us providing product at a good pricing.

13   BY MR. TOWNSEND:

14      Q    So your testimony is that you somehow know that the

15   folks at International Paper didn't shop around for its

16   chemicals; is that right?

17      A    At that -- I don't know whether they did or not.  I'm

18   just saying, in general, big companies.  I'm not saying they did

19   not.  I'm sure they did, right?  To what extent?  I don't know.

20   I don't know what they did on their back end.

21      Q    So you're just speculating right now?

22      A    Sorry?  It's just a speculation.

23      Q    Just a speculation.

24      A    Yes.

25      Q    Okay.

1    A    Right?  It's not hard core.  I don't know what

2    International Paper did.  I don't know anyone personally out

3    there to -- to say this is what they did or did not do.  This is

4    just my speculation in big companies.  You know, in companies

5    people will have a (inaudible) and has a good pricing or, you

6    know, a good service, then probably that's who they're going to

7    choose.  How they make that judgment and who to choose, that's

8    really on the company's side.  I don't have no involvement in

9    that.

10    Q    Did Shiv ever explain to you how DGS would calculate

11    its markup?

12    A    No, no.  He did all of that.

13    Q    Okay.

14    A    That's got nothing to do with me.  I mean, I --

15    whatever pricing he told me, that's what I put down on paper.

16    That's it.

17    Q    Okay.  So in this example, we're looking at Brenntag

18    where Shiv tells you to mark up the price of $2 a gallon, he

19    never explained why it should go down from $1.65 to $2?

20    A    No.  I mean, no.  He's a sales person.  It's his

21    company; it's his thing.  I'm someone who's doing, like I said,

22    the admin account receivable and payable.  Who am I to say what

23    pricing should be?

24    Q    Okay.  Did Shiv ever instruct you to put DGS letterhead

25    on a material safety data sheet from another company?

1          A     Material safety -- yes, he did.

2          Q     Did he explain why he wanted you to put DGS letterhead

3    on a material safety data sheet?

4          A     Because that's what we're going to be providing to

5    International Paper.

6          Q     Was it DGS's product that was being provided?

7          A     It was our vendors' or our suppliers' product that we

8    would be providing.

9          Q     So why you would put DGS's letterhead on a material

10   safety data sheet for another company's product?

11         A     My understanding was because that's what we're going to

12   be providing now.  When it -- I mean, I just did what I was

13   told.  I'm not one to question that kind of stuff because it's

14   not -- it's not me, right?  That's -- I don't even understand

15   the product.  I'm not a chemist or, you know, an engineer to

16   understand that stuff.  If you asked me to, you know, change it

17   to DGS letterhead, yes, then I did that.

18         Q     Okay.  I'm going to pull up -- it's going to be two

19   exhibits.  But one is an email and one is an attachment so we'll

20   tack them in together.

21         A     So we're done with Number 9?

22         Q     Yes, we are.  Thank you.  Thank you for reminding me to

23   close out of that.

24               I've introduced the Exhibit 10.  Actually it's an

25   email, and I'm in the process of getting up Exhibit 11.

1           (Exhibit Nos. 10 and 11 were marked.)

2    BY MR. TOWNSEND:

3        Q    Okay.  And Exhibit 11 is also up.  Do you see those two

4    exhibits, Ms. Balsara?

5        A    I see Exhibit 10.

6        Q    Okay.

7        A    I believe I can only open one exhibit at a time.

8        Q    Yeah, that's fine.  We'll start with Exhibit 10 if you

9    could open that.

10       A    I've done that.

11       Q    Okay.  Do you remember seeing this email before?

12       A    I wrote it, so probably, yes.  It's a long time ago.

13       Q    Right, and you are emailing Mr. Jagannath in this

14   instance; is that right?

15       A    Correct.

16       Q    And you tell him:  "Please find a signed copy of IP

17   code of conduct"; is that right?

18       A    Yes.

19       Q    Okay.  And just so we keep our record a little clear

20   here, this is Bates labeled DGS0016 through 08.

21            Ms. Balsara, we'll now leave this exhibit and go look

22   at Exhibit 11, which is the attachment to that email.  Do you

23   have that up?

24       A    It's coming up.

25       Q    Okay.

1      A    Okay.

2      Q    Okay.  I'm going to teach you a little trick about

3  Exhibit Share right now.  If you scroll down to the second page,

4  it probably is -- the letters are on the side.  If you up to

5  Exhibit Share's icons, there's a print icon, and next to it is

6  an icon that is labeled "view controls" if you hover over it.

7      A    I just see the one where it's the plus/minus.

8      Q    Okay.  Slightly to the left.  It's like a -- I don't

9  know what you would call it.  Like a piece of paper with a

10  little tool in side of it, I guess.

11      A    Yeah, off this page, right?  Of the screen?  But I

12  don't see anything on my screen.

13      Q    Okay.  That's -- that's okay.  You know what?  I think

14  we'll do for this one just so that you can read it without

15  having to strain your neck, how about I just share this one

16  through screen share --

17      A    Sure.

18      Q    -- so we can all -- all just be on the same page.

19      A    Yes.

20           MR. TOWNSEND:  All right.  Can everyone see my

21      screen?

22           WITNESS:  Yes.

23           MR. MURPHY:  Yes.

24  BY MR. TOWNSEND:

25      Q    So, Ms. Balsara, this is that attachment from the email

1    we just looked at.  I am going to scroll down to the second

2    page, and I'm going to rotate it so that you can read it both

3    this page and the next one.  So just let me know when you've had

4    a chance to review this, and I'll scroll town to the next one.

5         A    (Complies.)  Okay.

6         Q    Okay.

7         A    Okay.

8         Q    All right.  And I'm going to scroll to our top page

9    here.

10             Ms. Balsara, do you remember this document?

11        A    I don't.  Really long time ago.  I don't.  I'm sorry, I

12   don't.

13        Q    No problem.  Is that your signature on the first page?

14        A    Yes, it is.

15        Q    Okay.  And on the second page, is this your signature

16   on the side here below the corporate seal?

17        A    Yes.

18        Q    Okay.  And on our third page, is this your signature

19   down here at the bottom right-hand corner?

20        A    Yes.

21        Q    Okay.  And the third paragraph, page 3, it says:

22   "Suppliers shall disclose to IP any potential conflict of

23   interest such as when one of their employees or someone close to

24   the employee has a relationship with an employee who can make

25   decisions that will affect supplier's business or when an IP

1    employee has any kind of interest in the supplier's business."

2           Did I read that right?

3    A    Correct.

4    Q    Did DGS as a supplier disclose to IP that Shiv Kumar

5    was a half brother of Sitaraman Jagannath who was an IP

6    employee?

7                MR. MURPHY:  Objection as to form.

8                You can answer.

9    A    So I do not know that.  I only became aware of this

10   when the FBI told me, so...

11   BY MR. TOWNSEND:

12   Q    Okay.  But Shiv --

13   A    And I find this, it was not a conflict that I was aware

14   of.

15   Q    I understand.  And I appreciate that.

16          But did Shiv Kumar disclose that he was the half

17   brother of Sitaraman Jagannath to IP?

18   A    I have no idea.  I mean -- he would -- he had not

19   disclosed it to me, so whether he disclosed it to International

20   Paper, I have no idea.

21   Q    If you recall -- I'm happy to pull back up, but if you

22   recall our previous exhibit, it had Shiv carbon copied.  Do you

23   remember that?

24   A    Probably.

25   Q    Okay.  So it's Shiv was on the email that you sent to

1    Mr. Jagannath disclosing this document, correct?

2        A    Yes.

3        Q    So he permitted you to send this document to his half

4    brother indicating that DGS would disclose any potential

5    conflicts of interest; is that right?

6        A    Yes.

7        Q    And he never said anything to you?

8        A    No.

9        Q    Okay.  He was letting you send this document and sign

10   it without disclosing any conflict of interest, right?

11       A    To me.  Like I mentioned, I only found out in 2020 when

12   the FBI told me that.

13       Q    But it's not just to you, right?  It was also to

14   International Paper because you were emailing International

15   Paper, right?

16       A    I was emailing to International Paper.  So whether he

17   disclosed that to them or not, I have no idea.

18       Q    On this first page, it says:  "Diversified Global

19   Sourcing Inc agrees to comply with and require its employees,

20   subcontractors, and agents to comply with International

21   Paper's -- International Paper Company's supplier code of

22   conduct."  Is that right?

23       A    Yes.

24       Q    And that code of conduct that we just looked at

25   requires DGS to disclose conflict of interests, right?

1      A    Yes.

2      Q    So DGS was not complying with the supplier code of

3   conduct when you sent your email to Mr. Jagannath, right?

4               MR. MURPHY:  Objection as to form.

5      A    I -- I'm not aware of that because I don't know whether

6   he had that conversation with International Paper or not.  I'm

7   not aware of it.  Like I said, I only found out in 2020, but

8   whether he had this conversation with International Paper, I am

9   not aware of it.

10              I was just following what I knew or what I was told to

11  do, to sign it and send it and review it.  And for me, there was

12  no conflict of interest because I was not aware of the

13  relationship.

14  BY MR. TOWNSEND:

15     Q    Okay.  I'm going to stop sharing now.  We're done with

16  Exhibit 11.

17              Ms. Balsara, did you help prepare DGS's tax returns?

18     A    Tax returns?  I would just provide the login and

19  password to the -- for whatever I had in QuickBooks is what the

20  software we're using to the accountant, and they would prepare

21  the tax return, not me.

22     Q    Okay.  Did you ever provide, if you recall, income and

23  expense financial information from DGS to DGS's accountants?

24     A    Yes, but they had access to that anyway on QuickBooks.

25     Q    Okay.  We're going to take a look at two exhibits

1    again, sort of like what we just did.  The first is going to be

2    an email, and then we'll take a look at its attachment.

3                    (Exhibit Nos. 12 and 13 were marked.)

4    BY MR. TOWNSEND:

5         Q    Okay.  I have it -- Exhibit 12 up for you.  So we'll go

6    there first.  If you could open that, please.

7         A    Yes.  To Krishnan.

8         Q    Yes.  Do you recall writing this email to Krishnan?

9         A    Yes, I did.  This was -- this was like right in the

10   beginning, before we -- let's see.  Before we hired our more

11   experienced or bigger accounting firm.

12        Q    Okay.  And are you sending to Krishnan DGS's 2012

13   expense -- expenses and income for filing?

14        A    Yes, I did.

15        Q    Okay.  And so the expenses that you were sending over,

16   these were deductions from DGS as a corporate entity; is that

17   right?

18        A    As far as I know, yes.

19        Q    Okay.  Let's see if we have Exhibit 13.  I believe

20   Exhibit 13 is ready.  If you can look at that, it's an Excel

21   spreadsheet.  It's the attachment to the email we just looked

22   at.

23        A    (Complies.)

24        Q    Ms. Balsara, do you see --

25        A    Not yet.

1      Q    Not yet?

2      A    Still loading.

3      Q    Okay.  We'll just give it a second.  Just let me know,

4  Ms. Balsara -- what's that?

5      A    Nothing yet.

6      Q    Nothing yet.  Okay.  Let's give it a couple of more

7  minutes.  If it is not loading, to keep things moving, I'll do

8  an Exhibit Share again from my computer.  We'll just sit tight

9  for just a little while longer.

10     A    You may want to do the screen share.  It's not coming

11  up.

12     Q    Okay.  Okay.  We'll -- we'll do that.  Let me just pull

13  it up on my end.

14          Okay, everyone.

15          Ms. Balsara, do you see this Excel sheet I have pulled

16  up?

17     A    Yes.

18     Q    Okay.  Do you recall this Excel sheet from your time at

19  DGS?

20     A    I mean, it's probably something I created.  Do I recall

21  it?  No.  It's a long time ago.

22     Q    Okay.  Do you see here at the top of column B it says

23  "Expensed"?

24     A    Yes.

25     Q    And then in column C it says "Debit," and column D it

1    says "Credit"; is that right?

2          A    Right.

3          Q    Okay.  So in cell D1 -- D2, actually, under "Credit"

4    there's an amount, and in the "Expense" column, it says "IV

5    payment"; is that right?

6          A    Right.

7          Q    Okay.  So is this reflecting revenue to DGS from IP

8    here?

9          A    Correct.

10         Q    Okay.  And in this column C with debit, are these

11   expenses?

12         A    They are expenses.

13         Q    They're expenses?  Okay.

14              Do you know how these expenses were booked?

15         A    Credit card.

16         Q    Okay.

17         A    I'd only have gotten it out of credit card; that's it.

18         Q    So you would take expense items from a credit card, and

19   you would book them as an expense for DGS?

20         A    Yes, because he -- he had a business credit card.

21         Q    Okay.  If you look down to row 14, the expense item

22   says Denny's; do you see that?

23         A    Yes.

24         Q    What was the business reason that DGS was taking a

25   charge for Denny's?

1          MR. MURPHY:  Objection as to form.

2     A    I really don't know.  I mean, he went to eat at

3     Denny's.  Did he meet someone?  I don't know, but I just took

4     the expenses from the credit card, and I put it on the Excel

5     sheet.

6     BY MR. TOWNSEND:

7     Q    Okay.

8     A    Everyone has meal expenses for -- for their business.

9     They go out.  If you go out for lunch today, it's going to have

10    a meal expense.

11    Q    Okay.  Let's go down to row 35.  It says "Peninsula

12    Endoscopy for $748.71."  What's the business reason for an

13    endoscopy for DGS?

14    A    Well, all I did was plug in into this form the expenses

15    from the credit card.  The accountant would be the one who would

16    -- who would actually probably evaluate what was a business

17    expense and what was not.

18    Q    Okay.  But my question to you is:  Is this -- does this

19    have a business reason for DGS?

20    A    No, it does not.

21    Q    Okay.  So your testimony is that the accountant would

22    back out some of these items from this Excel spreadsheet under

23    the tax return; is that right?

24    A    That's correct.  I just plugged in whatever was there

25    on the credit card.

1      Q    Okay.

2      A    On the Excel sheet.

3      Q    I want to go -- go down to row 109.  It says "Super

4    Duck tours for $71"; do you see that?

5      A    Yes.

6      Q    Do you know what a duck tour is?

7      A    I have no idea.

8      Q    Do you know if this was a business expense for DGS?

9      A    Absolutely no idea.  I just plugged in from the credit

10   card into the expenses there and sent to the accountant.

11     Q    We're going to scroll for a little while here.  Row

12   565.  It says, "24-Hour Fitness"; is that right?

13     A    Correct.

14     Q    Do you know what a 24-Hour Fitness is?

15     A    It's a gym membership.

16     Q    Okay.  And this amount is for $49?

17     A    Correct.

18     Q    Okay.  And what about banana Republic for $463.95?

19     A    Correct.

20     Q    What's the business reason for this expense for DGS?

21     A    No.  I have no idea about that.  All I know, as I said,

22   I'm plotting whatever is on the credit card and put it on the

23   Excel sheet.  The accountant will eliminate what he does not

24   need and keep what he does require.

25     Q    Okay.  So your testimony here is that this Banana

1    Republic expense would be something that the accountant would

2    eliminate from DGS's tax return; is that right?

3        A    That's my understanding, yes.

4        Q    Did you ever have a conversation with the accountant

5    about what to back out?

6        A    It's not -- it's not me to do that.  The accountant

7    would know what to back out, and that's between the accountant

8    and Shiv Kumar.  I just plug in the information from the credit

9    card bills onto the Excel sheet.

10       Q    Okay.

11       A    Final review is if Shiv Kumar on the taxes and tax

12   return, the expenses.  It's not me.

13       Q    Okay.  I'm going to scroll over to column N, Excel N --

14   I'm sorry.  Messing all of that up.  Scrolling over to column N,

15   the row is 567, and the cell is N567; do you see that?

16       A    Okay.

17       Q    And that's the same amount for Banana Republic that we

18   just discussed at 463.95; is that right?

19       A    Correct.

20       Q    Okay.  I'm going to scroll up to the top again.

21            Do you see the very top of column N where it says

22   M-I-S-C?

23       A    Uh-huh.  Yes.

24       Q    And does that stand for miscellaneous?

25       A    Yes.

1      Q    Okay.  Bear with me.  All right.  Scroll down to row

2    865, column N.  Do you see where my placeholder is now?

3      A    Yes, on 30,000.

4      Q    Okay.  So it's $30,842.72, right?

5      A    Correct.

6      Q    And that would -- that encompasses, according to the

7    Excel formula, cells N2 -- what's that?

8      A    Anything in row N.

9      Q    Okay.  So that would include the Banana Republic

10   expense, right?

11     A    Correct.

12          (Exhibit No. 14 was marked.)

13   BY MR. TOWNSEND:

14     Q    Okay.  I'm going to stop sharing my screen.  We're

15   going to look at another exhibit.

16          I've uploaded the next exhibit.  My screen sharing

17   might have brought some confusion.  It says Exhibit 14, and if

18   you could open that, Ms. Balsara, I would appreciate it.

19     A    Waiting on it to open.  11/20 is the return.

20     Q    That's correct.  And just our record's clear, the first

21   page is DGS0005633.  Do you have this out, Ms. Balsara?

22     A    It's still coming up.

23     Q    Okay.  Is this the tax return for the 2012 tax year?

24     A    Yes, it is.  Looks like it.

25     Q    Okay.  And is that Shiv Kumar's signatures on the "sign

1    here" block towards the bottom?

2        A    Yes.

3        Q    Okay.  Let's scroll to the last page if you can.

4        A    Okay.

5        Q    And if you review the "Other deductions" section,

6    you'll see a row for misc or miscellaneous.

7        A    Yes.

8        Q    And the amount is for $30,843, right?

9        A    Correct.

10       Q    And that's the same amount we just saw in column N on

11   the previous exhibit, right?

12       A    Correct.

13       Q    So DGS took as a business expense $463 from Banana

14   Republic, right?

15       A    Maybe.  Was that not in miscellaneous?

16       Q    Your previous testimony was that Banana Republic

17   expense wouldn't be a business expense, and now you're changing

18   that; is that correct?

19       A    Well, I'm not changing anything.  I'm just asking ws

20   that in miscellaneous?  I don't know.  You know, like I said, I

21   can't judge what the accountant did.  All I did was plug from

22   the credit card and put it in the Excel sheet.

23           Now, this is a question really for the accountant and

24   how he distributed the expenses.  It's not on me to say where it

25   goes.  I'm not an accountant by profession.

1      Q      Did you handle DGS's QuickBooks, though?

2      A      I did handle the QuickBooks, yes.  And this --

3      Q      And you did download expenses?

4      A      At this point I don't believe -- this was 2012, 2013.

5      I don't believe we had -- in 2012 I don't believe we had

6      QuickBooks.  We were a very small store as a company.  So it was

7      all on Excel sheet, and that's why you're seeing everything on

8      Excel.

9      Q      So are you telling me that a company with 2000

10     customers just was using Excel sheets?  Is that what you just

11     testified to?

12     A      I --  I was working --

13             MR. MURPHY:  Objection as to form.

14     A      No.  I was working -- and I repeated this many times --

15     for International Paper only.  I don't know about his other

16     customers.

17     BY MR. TOWNSEND:

18     Q      So your testimony is that Shiv used Excel sheets for a

19     single customer in the United States; is that right?

20     A      No.  I'm saying that I used this for International

21     Paper because it was just the beginning of when we started

22     business with International Paper, okay?  And then I said -- I

23     told him that we're, as a company, growing.  We should move to a

24     platform that's easier for the accountants to understand.  We

25     did change to a larger company for accountant as the business

1    grew.

2        And so I started off with -- with just the Excel sheet.

3    That was easy to just go ahead and send out to the accountant.

4    That's how I started it off.  I did not know when I started with

5    the company, you know, how much it's going to grow, but when we

6    started growing, I said, I think we need a more professional

7    platform, just an Excel sheet would not work.

8        Q    Okay.  What --

9        A    I'm not an accountant to judge this, I'm sorry to say.

10   That's the accountant or the one that needs to distribute.

11   That's the accountant's job to do it.  All I did was plug in

12   information from a credit card onto an Excel sheet.

13       Q    I understand that, Ms. Balsara.

14       As far as you know in your personal capacity, though,

15   what expense was DGS incurring at Banana Republic for $463?  Can

16   you tell me, if you know?

17       A    I don't know.

18       Q    Was Shiv --

19       A    I don't know.

20       Q    What's that?

21       A    I don't know.

22       Q    Do you think that was a proper business for DGS to be

23   taking and reporting to the IRS?

24            MR. MURPHY:  Objection as to form.

25       A    I'm sorry, but that's not for me to judge.  I'm just

1  plugging in information from -- from a statement into the Excel.

2  That's not for me is judge what's correct and not.  Right?

3  That's between the accountant and Shiv.

4  BY MR. TOWNSEND:

5      Q    If we were to go through all the entries for that

6  $30,843, would we find justifications to those items as a

7  business expense?

8              MR. MURPHY:  Objection as to form.

9      A    I'm sorry.  That's not -- that's not for me to judge

10  that.  I don't have justification for anything that happens.  I

11  just follow through; I plug in the information.  It's the

12  accountant's job to decide what needs to be eliminated and what

13  needs to be kept on.  That's not me; I'm not the accountant.

14  BY MR. TOWNSEND:

15      Q    Ms. Balsara, are you aware that Sitaraman Jagannath was

16  arrested at the airport in December 2019 trying to leave the

17  country?

18      A    No.

19      Q    Are you aware that his bank accounts were frozen as

20  part of the FBI's investigation?

21      A    No.

22      Q    Are you aware that Shiv's bank accounts were frozen as

23  part of FBI's investigation?

24      A    No, I did not.

25      Q    Are you aware that Shiv considered testifying against

1    Sitar -- Sitaraman Jagannath at his trial?

2        A    Sorry, say that again.  Against him?

3        Q    Are you aware that Shiv Kumar considered testifying

4    against Sitaraman Jagannath at Sitaraman Jagannath's trial?

5        A    No.

6        Q    Are you aware that Shiv and Jag agreed to provide $15

7    million to International Paper in exchange for International

8    Paper dropping their civil suit against them?

9        A    No, I'm not.

10        Q    Are you aware that Sitaraman Jagannath admitted that he

11    received funds from DGS and Mid South that were transferred to

12    bank accounts controlled by him?

13        A    No, I'm not.

14                MR. MURPHY:  Objection as to form.

15    BY MR. TOWNSEND:

16        Q    Okay.  Ms. Balsara, when was the last time you spoke to

17    Shiv?

18        A    I met him on New Year's Eve at a -- at a New Year's Eve

19    party with common friends, but not talking about work.  It's a

20    social event.

21        Q    What do you mean New Year's Eve?  That's New Year's

22    Even in 2023?

23        A    Yes.

24        Q    So eight days ago?

25        A    Yes.

1     Q     And you did not bring up the fact that you were going

2     to testify in this matter with Mr. Kumar that night?

3     A     No, it was a social event with families and I did not.

4     But I did tell him that I was called to testify.  I did call him

5     and told him that.  I told him that in December.

6     Q     Okay.  That was my next question.

7           Do you recall exactly when in December you told

8     Mr. Kumar?

9     A     I told him when I received the letter, why am I getting

10    called to testify?  I don't work for either of these companies.

11    I've worked for DGS.  I haven't worked for them for three years

12    now, and I don't see why I need to be pulled into all of this,

13    and why it should be taking up my time.

14          So to tell you the truth, to go on record, I'm

15    frustrated that it's taking up more than six hours of my time.

16    This is really frustrating for me.  I have nothing to do with

17    the insurance company or International Paper.  This is just my

18    time that you folks are taking up.  I really don't appreciate it

19    because I have nothing to do with any of this.

20    Q     What do you mean you have nothing --

21    A     I don't -- I don't work for IP.  I don't work for the

22    insurance company, right?  I worked for DGS.  That was three

23    years ago.  What they did and the things you just asked me

24    questions about, I was never aware of it.  I mean, it's got

25    nothing to do with me.

1          I was like an admin or HR person or, you know, the

2    person that did accounts receivable and payable.  I just

3    followed instructions.  If you have a secretary, she follows

4    instructions.  She's going to do what ask her to do, right?

5    Beyond that she cannot be responsible for what you're doing.

6          Q    When you say "I had nothing to do with this," what is

7    "this"?

8          A    Whatever they as brothers -- now you're saying they're

9    brothers or half brothers, whatever they are, whatever they have

10   been doing, or they're being in business together.  I have

11   nothing to do with any of that, right?

12         How the -- how Shiv ran the business, I have nothing to

13   do with it.  I was just following instructions like any admin

14   person would do.

15         Q    Okay.

16              MR. TOWNSEND:  Ms. Balsara, we're about done.  We

17         just want to take a five-minute break.  I'm going to review

18         my notes, then we can come back on the record.  I expect I

19         might have maximum of one or two questions.  But we're about

20         there, so maybe we'll take a break for five and come back at

21         2:05 Eastern and whatever that is on the Pacific time.

22              VIDEOGRAPHER:  This ends Media 3.  We now are going

23         off the record.  The time is 11:00.

24              (Off the record.)

25              VIDEOGRAPHER:  This begins Media 4.  We're now back

1           on the record.  The time is 11:06.

2       BY MR. TOWNSEND:

3           Q    Ms. Balsara, I have one last question for you.

4                When you spoke to Shiv Kumar in December, when you

5       called him, did he tell you to say anything in your deposition

6       testimony?

7           A    Be honest is what he told me.

8           Q    Okay.

9                MR. TOWNSEND:  I have no further questions.  Thank

10      you.

11               MR. MURPHY:  I have no follow up.  Thank you very

12      much, Ms. Balsara.

13               WITNESS:  Thank you.

14               REPORTER:  Okay.  Go ahead, Nathan.  I'm sorry.

15               MR. TOWNSEND:  Well, Judy, I was about to ask you,

16      is Ms. Balsara free to go?  I'm happy to help with spellings

17      and anything else you might need.

18               REPORTER:  Okay.  I'm just going to get orders on

19      the record, and then Terry can read us off, and then get a

20      few of the spellings.

21               MR. TOWNSEND:  Thank you.  Great.

22               MR. MURPHY:  Thank you.

23               REPORTER:  Okay, and Mr. Murphy, do you want to

24      order?

25               MR. MURPHY:  Yes.

1                REPORTER:  Yep.  And then, Nathan, you want to

2        order?

3                MR. TOWNSEND:  I would like to.  And, Judy, do you

4        mind giving a timeframe of when you think a standard order

5        would -- if we did it by standard, like when it would

6        arrive, roughly?

7                REPORTER:  Yeah.  Today's Monday -- a week from

8        Friday.

9                MR. TOWNSEND:  Okay.  Yeah.  That -- that should be

10       okay.  So, yeah, standard order for me as well.

11               VIDEOGRAPHER:  Mr. Townsend, would you -- would you

12       like a copy of the video?

13               MR. TOWNSEND:  That would be great and whatever the

14       standard format is, Terry.  Whatever we usually do.

15               VIDEOGRAPHER:  You have a standing order.

16               MR. TOWNSEND:  Oh, we do.

17               VIDEOGRAPHER:  I mean, no, I was asking.  Do you

18       have a standing order?

19               MR. TOWNSEND:  Oh, I don't know.  So whatever

20       people usually ask for.

21               VIDEOGRAPHER:  Well, video sync is what seems to be

22       the popular thing now.

23               MR. TOWNSEND:  Okay.  Let's do it then.

24               VIDEOGRAPHER:  Okay.  I guess we'll close out.

25               REPORTER:  Okay.  Hold on.  Just one second.

1              Mr. -- yeah.  Mr. Murphy, do you want a -- I can

2        send you rough draft, and then the final and you'll get it a

3        week from Friday.  Would you like a rough draft?

4              MR. MURPHY:  Yeah, that'd be great.  Thank you.

5              REPORTER:  Okay.  Same with you?

6              MR. TOWNSEND:  I'd like one too.

7              REPORTER:  You got it.  All right.

8              VIDEOGRAPHER:  Okay.  We are off the record at

9        11:48 a.m., and this concludes today's testimony given by

10       Jyotika Balsara.  The total number of media used was four

11       and will be retained by Veritext Legal Solutions.

12              (The deposition of Jyotika Balsara, Volume 2, was

13       concluded at 11:08 a.m.)

14              (Signature was reserved.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON )

                         )SS.

4    COUNTY OF KING      )

5

6        I, Judith A. Robinson, Certified Court Reporter and an

7    officer of the Court under my commission as a Notary Public, in

8    and for the State of Washington, do hereby certify that the

9    foregoing deposition was transcribed under my direction; that

10   the transcript of the deposition is a full, true and correct

11   transcript to the best of my ability; that I am neither attorney

12   for, nor a relative or employee of any of the parties to the

13   action or any attorney or Counsel employed by the parties

14   hereto, nor financially interested in its outcome.

15       IN WITNESS WHEREOF, I have hereunto set my hand and affixed

     my official seal this 17th day of January, 2024.

16

17                    *Judy Robinson*

18                         Judith A. Robinson, Notary Public

                           in and for the State of Washington

19                         residing at Seattle.

                           My Commission expires November 4,

20                         2024.

                           CCR License #2171

21

22

23

24

25

```
 1    Nathan Townsend, Esq.

 2    nathan.townsend@klgates.com

 3                        January 17, 2024

 4    International Paper Company v. Beazley Insurance Co., et al.

 5         1/8/2024, Jyotika Balsara (#6382840)

 6         The above-referenced transcript is available for

 7    review.

 8         Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com.

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25
```

1    International Paper Company v. Beazley Insurance Co., et al.

2    Jyotika Balsara (#6382840)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Jyotika Balsara                              Date

25

1    International Paper Company v. Beazley Insurance Co., et al.

2    Jyotika Balsara (#6382840)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Jyotika Balsara, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Jyotika Balsara                          Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

## &

**&** 52:8 55:16
  102:22,25
  119:12,14,17

## 0

**0003008** 148:18
**02108** 52:9
**02789** 51:6
  55:1
**08** 159:20

## 1

**1** 53:11 54:21
  72:14,16 73:2
  93:12 97:25
  100:12 155:14
**1.65** 149:3
  153:23 154:1
  155:14 157:19
**1/1/2018** 53:13
**1/8/2024** 183:5
**10** 53:20,21
  152:8 155:24
  158:24 159:1,5
  159:8
**10/17/2018**
  53:16
**100** 74:11
  80:22 87:17
**103-179** 53:6
**106** 53:14
**109** 169:3
**10:00** 144:5
**10:03** 144:14

**11** 53:21
  158:25 159:1,3
  159:22 164:16
**11/15/2013**
  53:20
**11/20** 171:19
**11/4/2019**
  53:18
**111** 53:15
**118** 53:16
**11:00** 178:23
**11:06** 179:1
**11:08** 181:13
**11:28** 99:19
**11:30** 97:6
**11:35** 99:20
**11:48** 181:9
**12** 53:22,23
  137:18,21,22
  165:3,5
**123** 53:17
**125** 54:3
**13** 53:23 165:3
  165:19,20
**131** 53:18
**135** 72:19
  73:15
**13th** 73:19,24
**14** 53:25 63:13
  63:14 71:14,18
  140:5 167:21
  171:12,17
**148** 53:19
**15** 66:2 97:15
  99:23 106:6

  176:6
**15222** 52:4
**159** 53:20,21
**15904** 86:12
**16** 71:18 141:3
**165** 53:22,23
**16725** 93:13
**17** 67:17,19
  141:22 183:3
**171** 53:25
**17662** 182:17
**17th** 119:24
  182:15
**18th** 57:2
**1900** 52:4
**1992** 141:7,10
**1:00** 144:3,4
**1st** 59:1

## 2

**2** 51:10 53:12
  54:2,22 66:15
  85:10 100:15
  144:10 149:6,9
  157:18,19
  181:12
**2.00** 153:24
  155:15
**20** 58:9 68:19
  185:15
**2000** 141:25
  142:3,11 143:2
  143:14 173:9
**2000s** 141:10
**2007** 141:2

**2011** 53:12
  73:19,25
**2012** 53:25
  165:12 171:23
  173:4,5
**2013** 77:10
  79:13 84:25
  86:6 87:4
  173:4
**2015** 92:10
**2018** 53:14
  59:1 68:12
  84:25 119:24
  145:16
**2019** 73:19
  102:10 129:13
  129:14,22
  130:5 175:16
**2020** 131:24
  132:6,7 163:11
  164:7
**2023** 56:24
  176:22
**2024** 51:12
  54:2,8 56:25
  182:15,20
  183:3
**210** 52:4
**2171** 51:25
  182:20
**21st** 56:24
**22** 92:10
**24** 53:12
  169:12,14

| 24th 77:10 | 412.355.6368 | 8 | access 57:15 |
|---|---|---|---|

**24th** 77:10
**25** 53:14
**2500** 112:18
**25th** 52:9
 145:16
**2:05** 178:21
**2:22** 51:6 55:1

**3**

**3** 53:13 56:14
 56:15,17,24
 57:1,7 58:5
 68:17 73:13
 88:5 144:13
 161:21 178:22
**30** 127:14,16
 128:1 144:3
 183:17
**30,000** 113:1
 171:3
**30,842.72** 171:4
**30,843** 172:8
 175:6
**309th** 54:3
**35** 128:8
 149:16,20
 168:11

**4**

**4** 53:14 106:8
 106:12 134:24
 145:9 178:25
 182:19
**4/9/2013** 53:22
**41** 127:4

**412.355.6368**
 52:5
**463** 172:13
 174:15
**463.95** 169:18
 170:18
**49** 169:16
**4th** 129:13,14

**5**

**5** 53:15 59:12
 111:21,22,24
 136:4
**56** 53:13
**56-103** 53:5
**565** 169:12
**567** 170:15

**6**

**6** 53:16 59:11
 62:2 118:19,20
**6382840** 183:5
 184:2 185:2
**6th** 52:4

**7**

**7** 53:17 123:13
 123:15 125:24
 134:12,12
**71** 169:4
**72** 53:11
**748.71.** 168:12
**7:00** 51:11 54:3
**7:06** 54:8

**8**

**8** 51:12 53:18
 54:2 131:16,18
 133:10 141:2
 145:5,6
**8/27/2015**
 53:17
**8/31/2017**
 53:19
**85** 53:12
**865** 171:2
**8:29** 100:13
**8:36** 100:16
**8th** 54:8 56:25

**9**

**9** 53:19 141:2
 148:4,5,17
 155:24 158:21
**98003** 54:4
**9:51** 144:11

**a**

**a.m.** 51:11 54:3
 54:8 181:9,13
**ability** 182:11
**able** 57:9,16
 89:23 125:10
 150:1,5 151:15
 151:20
**above** 183:6
 185:7
**absolutely**
 147:20,22
 169:9

**access** 57:15
 113:5 148:8
 164:24
**accomplish**
 89:21
**accordance**
 63:10
**account** 56:21
 57:12,13
 103:23 113:4
 130:20 143:19
 157:22
**accountant**
 143:3,7,15,19
 143:21 164:20
 168:15,21
 169:10,23
 170:1,4,6,7
 172:21,23,25
 173:25 174:3,9
 174:10 175:3
 175:13
**accountant's**
 174:11 175:12
**accountants**
 164:23 173:24
**accounting**
 68:7 134:15
 137:9 143:21
 165:11
**accounts** 68:10
 71:23 81:24
 84:25 92:21,21
 92:23 104:19
 113:4 115:17

115:24 142:23
142:23 147:10
175:19,22
176:12 178:2
**accuracy** 183:9
**accurate** 79:4
113:14,15
120:18 139:19
139:23
**acid** 66:3,7
87:8,14 102:16
**acknowledge...**
185:3
**acknowledg...**
183:12
**acronym** 76:4,6
**action** 51:5
55:7 182:13
**activities** 79:25
**activity** 84:17
**actual** 72:3
97:22
**actually** 56:13
56:21 57:4
59:12 68:6
69:5,8 74:6
75:24 102:5
105:24 106:11
124:7 125:10
140:5 145:2
152:12,13
158:24 167:3
168:16
**adam** 101:23

**added** 64:6
69:3 82:2,2
126:11
**addition** 64:22
**additional** 90:8
**additions** 185:6
**address** 83:20
92:20 103:24
103:25 104:5,9
104:14 105:20
105:22,23,25
107:6,15
110:21 140:13
145:23,25
146:16 147:9
147:19
**addresses**
145:22
**addressing**
58:12 73:12
145:16,19
146:4,4
**adjust** 101:1
**adjustments**
101:8,12
**admin** 105:15
140:2 143:19
157:22 178:1
178:13
**administrative**
143:23
**admitted**
176:10
**advantage**
75:17 108:17

129:24
**affect** 161:25
**affiliations**
55:10
**affixed** 182:15
**agents** 163:20
**ago** 107:25
112:23 138:8
159:12 161:11
166:21 176:24
177:23
**agree** 54:15
96:24
**agreed** 115:1
125:11 176:6
**agreement**
65:19 67:18,25
68:4
**agreements**
82:9 83:11
**agrees** 163:19
**ah** 106:14
**ahead** 56:13,17
58:10 71:10
85:12 100:1
101:7 104:14
104:18 141:12
147:11 148:3
150:17 153:16
174:3 179:14
**airport** 175:16
**al** 54:24 183:4
184:1 185:1
**alabama** 75:2

**alias** 146:10,14
**allen** 68:14
85:5,18 86:4,5
105:1 107:2
108:16 110:21
112:18,20
113:16 114:21
138:2,13,15,24
139:2 140:24
143:1 151:24
152:1,3
**allen's** 115:3
152:20
**allotted** 183:20
**american** 51:6
**amount** 85:4
115:25 123:24
130:20 167:4
169:16 170:17
172:8,10
**amy** 77:14,16
**anish** 147:16
**annual** 69:14
69:14 76:16,17
113:7
**annually** 69:16
**answer** 57:7
69:23 90:24
96:4 109:19
115:7 117:2
121:19 129:3
130:17 131:11
135:22 140:1
155:7 162:8

| | | | |
|---|---|---|---|
| **answered** 133:2 | 177:18 | **asking** 64:5 | **auditing** 119:16,17 |

answered
  133:2
answers  119:20
anticipate
  61:21
anybody  140:1
anymore  93:9
  131:15
anyway  164:24
apart  76:20
  79:23 152:6
apologies
  111:18 140:5
apologize  65:4
  138:11
appearance
  55:12
appearances
  55:10
appears  73:13
appended
  185:7
applicable
  183:8
application
  59:24 95:6,21
  96:6
applied  95:1,5
  95:11
apply  60:16,17
  60:19,22
appreciate
  56:10 70:17
  123:17 129:6
  162:15 171:18

177:18
approached
  110:7 125:10
appropriate
  82:6
approximate
  99:9
approximately
  72:19 78:18
  79:9
april  86:6
areas  91:4,6
ariba  134:5,5
  134:13
arnold  135:4
  136:1,1 140:13
  140:16
arrange  114:2
arranging
  116:19
arrested
  175:16
arrive  151:23
  180:6
asa  65:9 78:2
  78:10 79:6
aside  108:25
  115:3 116:7
  117:24
asked  62:21
  70:9 74:12
  95:25 131:11
  131:13 132:1,5
  133:2 158:16
  177:23

asking  64:5
  65:11 72:20
  81:16 87:1
  90:1,2 102:9
  107:24 125:4
  129:10 143:13
  172:19 180:17
assist  84:7 98:4
associate  77:4
assume  74:11
assuming  69:16
  69:19 98:2
assumption
  117:13
attached
  183:11
attachment
  53:21,23 63:15
  63:21 65:22
  66:11 71:2,5
  71:11,13,22
  88:5 158:19
  159:22 160:25
  165:2,21
attachments
  63:9 70:21
attempt  106:4
  118:18
attending  55:9
attorney  52:2,7
  55:13,14
  182:11,13
  183:13
audio  54:14

auditing
  119:16,17
august  53:14
  145:15
augusta  128:23
automatic
  113:3
available  85:4
  115:19 183:6
avenue  52:4
avoids  90:3
aware  63:4
  108:24 109:4,8
  109:9,20 111:4
  121:24 122:11
  122:14 127:3,9
  127:17 128:18
  129:2 136:23
  136:25 137:17
  138:5,23
  140:18,19
  145:1 146:12
  155:2 156:9
  162:9,13 164:5
  164:7,9,12
  175:15,19,22
  175:25 176:3,6
  176:10 177:24

**b**

b  53:8 166:22
back  66:25
  76:4 87:5 90:4
  90:4 99:20
  100:15 119:20
  144:4,13 145:8

156:20 162:21
168:22 170:5,7
178:18,20,25
**backup** 115:19
139:6
**bad** 58:8
**balance** 89:15
**balsara** 51:9
53:3 54:2,23
56:2,8,25 57:8
57:14 58:6
68:3 73:17,22
79:19 90:24
92:11 96:4
97:7,24 99:22
100:18 103:8
103:12 106:2
106:22 111:17
111:20 118:17
123:2,15 129:6
129:12 131:22
144:5,16
147:15 148:2
148:22 159:4
159:21 160:25
161:10 164:17
165:24 166:4
166:15 171:18
171:21 174:13
175:15 176:16
178:16 179:3
179:12,16
181:10,12
183:5 184:2,24
185:2,4,12

**banana** 169:18
169:25 170:17
171:9 172:13
172:16 174:15
**bank** 113:3
134:14 175:19
175:22 176:12
**bar** 69:11
**based** 58:22
63:22 64:12
70:19 73:23
78:1,15 79:24
83:6 126:5
**basic** 132:5
**basically**
133:22 137:8
**basis** 94:18
112:16 113:7
**bates** 63:18
66:2 67:20
68:21 71:14
77:6 79:17
83:14 93:12
96:22 97:25
102:6 148:18
159:20
**bcc** 146:3
**bear** 72:24,25
171:1
**beazley** 51:6
52:7 54:24
55:15 183:4
184:1 185:1
**beginning**
55:12 84:21

87:3 134:9,10
140:2 165:10
173:21
**begins** 100:15
144:13 178:25
**behalf** 55:15
59:7 86:22
95:11 101:12
**belcher** 101:23
**believe** 66:9
68:23 76:14
80:22 83:5,22
92:1 93:8 94:8
94:8 95:1
105:2,7 107:5
109:25 112:13
115:1 117:18
121:8 124:24
125:7,9 129:23
135:5 138:2
139:19,23
141:2,9 145:3
146:12 152:22
153:13,15,17
159:7 165:19
173:4,5,5
**benefit** 89:20
91:5 94:4
98:17,25 99:10
117:25
**benefits** 94:1
**best** 182:11
**better** 153:9,18
153:19 154:1
156:5

**beyond** 142:9
142:13 178:5
**bid** 61:16,17
153:8,8
**bidders** 69:10
**bids** 156:3
**big** 129:7
151:16 155:23
156:18 157:4
**bigger** 165:11
**bills** 170:9
**bisulfite** 74:15
74:18
**bit** 67:11 81:9
97:3 132:21
138:10 148:3
150:25
**blanks** 63:1
**bleach** 79:25,25
80:6,21,22,24
89:4
**block** 77:21
172:1
**blow** 73:6
**board** 86:5
**bob** 83:10
**book** 144:22
167:19
**booked** 167:14
**bookings**
144:23
**boston** 52:9,9
**bottom** 59:12
63:18 66:2
67:20 68:20

102:6,7 141:25
161:19 172:1
**boudreaux**
89:1,8,21
**break** 97:6,16
99:21 125:21
144:2,4,6
178:17,20
**brenntag** 149:2
150:13 151:16
153:23 154:3,5
154:9 155:14
157:17
**brenntag.com**
89:2
**bring** 177:1
**broaden** 62:14
**brother** 133:5
155:4 162:5,17
163:4
**brothers** 156:8
178:8,9,9
**brought** 171:17
**brown** 149:2
**build** 96:15
**building**
107:14
**buildings**
108:23,24
109:1,2
**built** 150:21
**bulk** 70:4
**bullet** 127:13
137:23

**burlingame**
136:8,13
**business** 79:25
82:20 100:6
104:20 105:15
115:25 121:23
122:3 124:24
125:20,21
131:2,5,10,13
153:20 156:3,4
156:12 161:25
162:1 167:20
167:24 168:8
168:12,16,19
169:8,20
172:13,17
173:22,25
174:22 175:7
178:10,12
**busy** 142:13
**button** 57:15

**c**

**c** 52:1 82:12
87:9 88:21
166:25 167:10
170:22 182:1,1
**calculate**
157:10
**california**
51:12 108:5,8
110:22 136:8
136:13
**call** 76:17
84:20 150:9,23
152:10,15

160:9 177:4
**called** 72:7
101:22 150:7
177:4,10 179:5
**calling** 130:11
130:18 152:13
**calls** 90:22
130:12,17
154:6
**camera** 54:11
**campti** 79:3
88:19,20 89:14
**capacity** 90:20
174:14
**carbon** 162:22
**card** 167:15,17
167:18,20
168:4,15,25
169:10,22
170:9 172:22
174:12
**care** 100:5
108:18
**carolina** 136:22
**cars** 109:10,12
**case** 54:25
62:11
**category** 65:13
**cc** 77:14 85:24
**cc'd** 85:13,19
85:21
**ccr** 51:25 54:4
182:20
**cell** 167:3
170:15

**cells** 171:7
**center** 127:14
136:8,9,10,13
136:19
**centers** 128:20
136:5
**cents** 149:16,20
**ceo** 139:16
142:20 143:2
143:14
**certain** 75:8
114:22 156:5
**certainly** 86:25
**certification**
94:22,24,25
95:3,4,6 96:6
**certified** 95:3
182:6
**certify** 182:8
**cgc** 51:6
**chain** 83:7 84:8
86:11 87:8
119:9 128:9
148:11 150:15
**challenge** 116:2
**chance** 124:10
126:15 132:14
161:4
**change** 97:17
158:16 173:25
184:4,7,10,13
184:16,19
**changes** 62:18
62:24 88:3
134:14 183:10

185:6
**changing**
172:17,19
**charge** 71:23
86:17 90:12
167:25
**charged** 90:14
98:13 125:6
**charges** 89:17
89:19 90:5
91:7,7
**chart** 71:21
**check** 102:9
**checking**
125:24
**chemical** 61:15
61:16 65:17
70:1,3,8,12,14
72:8 78:10
85:4 87:2,7
88:5 97:21,22
101:12 114:19
117:5,10
**chemicals** 63:9
64:14,21 66:7
76:3,21 78:12
80:21 83:4,7
86:23 88:7
89:6 96:12
97:1,18 98:13
102:13 104:24
113:21,25
114:22 115:5
115:15 116:19
116:20 117:10

146:25 152:21
154:12,24
155:3 156:16
**chemist** 158:15
**chennai** 136:20
**child** 86:17
**china** 127:1,8
**chinese** 127:4
**choose** 157:7,7
**circumstance**
90:18
**circumstances**
60:22
**city** 51:12
134:14
**civil** 51:5 176:8
**clare** 92:9
**clarification**
67:13 71:1
82:11 92:5
105:10 113:6
**clarified** 89:18
**clean** 76:12,13
76:14,19
**cleaning** 76:17
124:7 125:12
125:15
**cleanup** 76:15
125:9
**clear** 71:13
79:17 96:4
159:19 171:20
**clearly** 73:23
143:13 153:6

**click** 57:16
**client** 54:19
55:19
**close** 158:23
161:23 180:24
**code** 159:17
163:21,24
164:2
**cole** 52:8 55:16
**collection**
73:16
**column** 64:2
69:7,8,10,11,25
112:14 113:12
166:22,25,25
167:4,10
170:13,14,21
171:2 172:10
**come** 67:10
110:21 118:25
144:4 151:17
152:1 178:18
178:20
**comes** 63:4
94:3,24
**coming** 54:17
58:7 90:8
101:2 118:23
130:19 145:15
148:9 154:5
159:24 166:10
171:22
**comments** 69:9
**commission**
182:7,19

**common** 96:17
96:18 176:19
**communicate**
59:21
**communicated**
102:24
**companies**
93:21 95:2
151:16 155:20
156:1,4,18
157:4,4 177:10
**company** 51:3
51:6,7 52:7
54:23,24 55:15
55:16 83:21
89:2 90:12
93:16 94:5,7
95:4 101:22
113:24 114:1
117:13 121:9
122:4 124:4,6
124:7,13,15,16
124:23 125:17
135:14,15
143:2,20
151:20 153:13
155:4 157:21
157:25 173:6,9
173:23,25
174:5 177:17
177:22 183:4
184:1 185:1
**company's**
157:8 158:10
163:21

**competitor**
  80:24
**complete** 185:8
**completed**
  137:11 183:17
**complies** 72:17
  161:5 165:23
**comply** 163:19
  163:20
**complying**
  164:2
**composite** 58:9
  72:18 73:15
  93:12
**computer**
  111:18 118:17
  166:8
**concluded**
  181:13
**concludes**
  181:9
**conditions** 62:4
**conduct** 159:17
  163:22,24
  164:3
**conducted** 54:9
**confirmed**
  82:18
**conflict** 155:4
  155:10 156:6
  156:10 161:22
  162:13 163:10
  163:25 164:12
**conflicts** 163:5

**confused**
  106:13
**confusion**
  171:17
**connection**
  54:11 62:15
  67:24 68:4
  70:8 81:12
  82:20 83:11
  84:7 86:22
  91:19 96:11
  101:4 102:25
  103:4
**considered**
  175:25 176:3
**consignment**
  67:18,25 68:4
**consistent**
  64:16 80:3
  97:5
**consultant**
  102:21
**consulting**
  135:15,17
**consumed**
  152:9
**contact** 84:1,15
  114:23,24
  150:11
**contacted**
  132:7 150:13
**contains** 75:25
**context** 80:16
**continue** 54:15

**continuing**
  56:9
**contract** 53:11
  53:13 56:18
  58:24 59:3,4,5
  59:7 61:5,11
  61:12,18,25
  62:1,11,15,22
  63:5,7,8,10
  64:7 65:18,19
  68:12 69:9
  70:20 82:14
  113:24
**contracted**
  72:8
**contracts** 60:23
  60:25 61:1,3,8
  62:9,20
**controlled**
  176:12
**controls** 160:6
**conversation**
  105:17 132:9
  132:10,11
  133:3 138:17
  164:6,8 170:4
**conversations**
  67:3
**cooperates**
  118:17
**coordinate**
  101:16
**coordinated**
  92:22

**coordinating**
  102:12
**copied** 162:22
**copies** 88:25
  183:14
**copy** 159:16
  180:12
**core** 157:1
**corner** 67:21
  68:21 141:6
  161:19
**corporate**
  110:16,19
  161:16 165:16
**correct** 59:15
  59:16,19 60:5
  62:4 64:16
  65:25 66:17,18
  68:13 71:15,18
  71:19 73:25
  74:8 75:15
  76:23 77:22
  78:11 80:20
  81:12,24 82:3
  82:7 85:7,22
  86:7 89:4,5
  102:10,18
  107:3 108:13
  109:3 113:17
  113:17 114:5
  121:11 124:3
  127:21 130:6
  131:25 135:11
  137:6 142:18
  142:21 144:18

146:20 149:4
149:18 151:25
153:25 154:3
159:15 162:3
163:1 167:9
168:24 169:13
169:17,19
170:19 171:5
171:11,20
172:9,12,18
175:2 182:10
185:8
**corrected** 81:22
**corrections**
185:6
**correctly** 69:1
89:1
**correspond**
96:11
**corresponden...**
61:2 66:6
67:11 73:16
79:16 81:8
82:8 85:16
97:22 98:21,24
108:6 119:13
140:23
**corresponding**
89:9 119:14
**cost** 124:23
**counsel** 55:9
99:24 103:18
182:13 183:14
**country** 129:17
129:21 132:4

175:17
**county** 182:4
**couple** 74:2
99:14 123:25
166:6
**course** 60:19
81:5 108:1
126:1
**court** 51:1
54:25 55:4,22
61:19 70:4
87:9 88:21
105:5 182:6,7
**courtland**
74:22,25 75:1
77:23,25 78:2
78:16 79:7
80:2
**crack** 151:18
**create** 61:17
128:4,17,21
135:23 136:2
136:17 141:15
141:15
**created** 128:25
133:16 141:1
166:20
**credit** 93:21
167:1,3,15,17
167:18,20
168:4,15,25
169:9,22 170:8
172:22 174:12
**credits** 94:4

**cs** 183:15
**curious** 108:20
**current** 136:4
**customer** 63:6
111:6,12
122:18 127:22
142:6,10,23
143:16 173:19
**customers**
111:2,9 141:25
142:3,4 143:2
143:4,14
173:10,16
**cut** 117:22
**cutting** 138:11
**cv** 51:6 55:1

**d**

**d** 53:1 140:9
166:25
**d1** 167:3
**d2** 167:3
**dallas** 107:5
**damage** 90:11
**darnell** 108:21
113:7,9
**data** 76:5,8
103:4 157:25
158:3,10
**date** 57:22
58:25 68:12
76:10 184:24
185:12
**dates** 107:23
**daughter**
147:19

**daughter's**
147:15
**dawn** 86:8,15
87:1
**day** 103:9
115:23,23
132:25 182:15
185:15
**days** 84:13 91:8
152:8 176:24
183:17
**deal** 86:24
111:15
**dealing** 111:7
154:25 155:1,2
**dealt** 86:22
**debit** 166:25
167:10
**december**
56:24 57:2
73:19 84:20
92:10 130:4
131:9,23
175:16 177:5,7
179:4
**decide** 175:12
**decision** 98:22
**decisions** 99:7
161:25
**declare** 185:4
**deductions**
165:16 172:5
**deemed** 185:6
**defendant** 52:7
55:15

**defendants**
  51:8
**defer**  97:16
**definitely**  123:8
**definition**
  114:8
**defoamer**  140:6
  140:9
**degree**  117:7
**delay**  84:4,13
  84:16
**delayed**  84:9,11
**delays**  84:7
**deliver**  72:9
  98:10 114:9
**delivered**  64:2
  64:5,7,9 81:4
  149:3
**deliveries**  68:7
  101:13 113:21
  113:23 114:8
  114:14
**delivering**
  63:24,25 114:3
  118:10
**delivery**  64:10
  64:11 79:25
  88:15,18 101:1
  101:4 102:15
  113:24 114:1,2
  114:15,23,25
  115:23 118:5,8
**denny's**  167:22
  167:25 168:3

**depending**  88:3
**depends**  54:10
  99:16 155:8
**deponent**
  183:13 185:3
**deposing**
  183:13
**deposition**  51:9
  54:1,9,22 55:1
  56:9 64:13
  179:5 181:12
  182:9,10
**description**
  53:9,15 113:12
  113:14
**desk**  60:19
**details**  75:22
  83:18
**dgs**  58:23,24
  59:7,20 60:13
  61:9,12,18
  62:10,16 63:10
  63:22 64:15
  65:17 67:2,5
  70:21 73:24
  74:17 76:12
  78:1,15 79:13
  79:24 80:5,17
  80:24 82:20
  83:7 84:6,18
  86:22 87:14
  88:7 92:2,14
  94:6 95:5,11
  96:25 97:17
  98:16,24 99:9

99:10 100:24
101:12,16
104:24 107:11
108:11,23,25
109:1,5,8,10,12
109:14,22
110:24 111:2,5
111:5,12
112:16,21
113:14,20,24
114:8 115:4
117:11,25
119:18 120:11
120:15,15,18
120:21,25
121:3,8,9,15
122:4,12,17,21
122:25 124:1,4
124:12,17,19
124:22,25
125:2,5,13
126:20 127:1,4
127:7,11,16,19
127:25 128:12
128:14,15,19
128:22 129:12
129:19 130:9
130:25 132:5
134:2,5,22
135:13,17,20
136:1,7,12,14
136:19 137:1,7
137:12,15
138:1,16,21,25
139:4,12,20,24

140:6,8,17,22
141:1,4,9,23
142:3,20 143:4
143:14 149:16
149:19 150:20
151:1,24
152:20,25
153:13 154:24
155:3,15,24
157:10,24
158:2,17 162:4
163:4,25 164:2
164:23 165:16
166:19 167:7
167:19,24
168:13,19
169:8,20
172:13 174:15
174:22 176:11
177:11,22
**dgs's**  80:19
  96:11 127:22
  130:3 144:17
  158:6,9 164:17
  164:23 165:12
  170:2 173:1
**dgs0001129**
  63:19 71:15
**dgs0001136**
  68:21
**dgs0002320**
  77:7
**dgs0003567**
  88:12

dgs0005633
 171:21
dgs0006178
 79:18
dgs0016 159:20
dgs002148
 83:15
dgs003 148:18
dgs1051 102:6
dgs1053 102:7
dgs1130 66:2
dgs1132 67:20
dgs15902 86:12
dgs16724 93:13
dgs17226 92:8
dgs17445 97:25
dgs2922 96:22
dialing 129:18
different 78:10
 78:12 82:25
 84:23 85:2
 93:3 116:1,10
 116:10 134:9
 143:21
dilute 102:9
direct 63:12
directed 85:22
direction 182:9
directly 92:19
 117:10 142:18
 143:3,15,22
 150:19 154:2,4
 154:25 155:2
disclose 132:21
 161:22 162:4

162:16 163:4
 163:25
disclosed
 162:19,19
 163:17
disclosing
 163:1,10
discount
 117:14,16
discrepancy
 98:11
discuss 142:13
discussed 98:18
 170:18
discussing
 113:22
distribute
 174:10
distributed
 172:24
distribution
 122:25 136:4,7
 136:9,13,19
district 51:1
 54:25,25
diverse 94:16
diversified
 163:18
diversifiedgl...
 86:3 140:14
diversity 93:19
 94:1,3,19
document
 53:15 58:9,17
 58:20,21,25

59:10 60:9
 65:23 68:18,25
 70:19,24 71:3
 71:4,7,8,9,18
 71:24 72:2,13
 73:3 74:3 81:7
 83:14,16 84:1
 84:5 86:21
 88:12 93:11
 97:24 99:5
 102:2,5 112:9
 112:11 113:13
 148:22 161:10
 163:1,3,9
documentation
 72:4
documents
 60:15 63:16
doing 58:12
 62:19 68:7
 95:14 103:5
 116:7 131:10
 137:9 157:21
 178:5,10
domain 83:21
domestic
 144:24
download
 58:11 123:16
 148:8 173:3
downloaded
 125:25 133:10
downloading
 73:14 131:19

draft 181:2,3
drafted 112:12
drop 90:7 99:1
dropped 90:9
 90:15 98:10
 99:17
dropping 176:8
drops 90:13
duck 169:4,6
due 100:5
 130:20 153:8
duly 56:3
dzenis 83:19

**e**

e 52:1,1 53:1,8
 56:6 65:1,1
 70:5 91:17,17
 92:6 103:15
 105:6 106:19
 119:13 140:9,9
 182:1,1 184:3
 184:3,3
e.g. 120:15
earlier 56:10
 62:8 64:12
 68:15 71:14
 73:22 82:18
 105:9 147:4
early 73:18
 132:6
easier 173:24
eastern 144:4
 178:21
eastover 66:3

easy 174:3
eat 168:2
echo 76:12,13
  76:14
eco 76:15,18
  124:1 125:9
ecobad 93:16
edits 62:18
effort 92:22
  96:25 100:9
efforts 98:12
  100:24,25
eight 176:24
either 81:12,18
  82:14 85:17
  108:6 151:4
  177:10
eliminate
  169:23 170:2
eliminated
  75:13 175:12
email 53:14,16
  53:17,19,21,22
  53:23 59:22
  74:7,24 75:21
  76:13 77:9,21
  79:19,23 83:20
  86:2,11 87:1,8
  87:25 88:18,24
  89:11 90:18
  91:10,19 92:8
  92:8,11 93:18
  96:15,21,25
  98:1,4 103:24
  103:25 104:5,9

104:14 105:23
105:25 108:6
119:9,23 120:1
120:7,11
122:16 140:13
145:15,16,22
145:22 146:5
146:15 147:9
147:19 148:7
148:11 149:5
150:14 158:19
158:25 159:11
159:22 160:25
162:25 164:3
165:2,8,21
emailing 146:2
159:13 163:14
163:16
emails 73:16,18
77:3 85:14,19
95:8 99:8
101:3 149:6
emmett 77:3
employed
182:13
employee
138:18 161:24
161:24 162:1,6
182:12
employees
121:10,12,16
121:22 127:16
137:24 138:1
139:20,24
161:23 163:19

empty 57:19
emurphy 52:10
encompasses
171:6
ended 130:4
131:15
endoscopy
168:12,13
ends 100:12
144:10 178:22
engineer
158:15
engineering
117:5
ensure 114:15
114:18 115:4
115:14 116:2
151:15
ensuring 85:3
102:15 151:23
entire 58:15
89:24 91:3
98:3,9 119:4
entitled 69:8
entity 165:16
entries 175:5
entry 70:8
environment
138:4
ernst 102:22,24
119:12,14,17
errata 183:11
183:13,17
especially
70:23 84:25

87:3 150:2
esq 183:1
established
141:6,9,10
estate 109:5
et 54:24 183:4
184:1 185:1
ethnic 94:10
ethnicity 94:9
eugene 52:8
evaluate
168:16
eve 176:18,18
176:21
event 176:20
177:3
events 100:23
101:13
everybody 73:9
exactly 177:7
examination
53:2 54:1
examined 56:4
example 72:3
79:1 82:1,5
88:14 101:1
103:3 157:17
examples 98:24
99:9
excel 53:24
165:20 166:15
166:18 168:4
168:22 169:2
169:23 170:9
170:13 171:7

172:22 173:7,8
173:10,18
174:2,7,12
175:1
**exchange** 176:7
**excuse** 71:9
74:18 149:12
**executed** 61:9
**exhibit** 53:11
53:12,13,14,15
53:16,17,18,19
53:20,21,21,22
53:23,23,25
56:13,13,14,15
56:17,22,24
57:1,7 58:5,9
58:12,15 62:2
62:3,4,8 67:18
68:17,23 71:17
72:14,16,18,22
73:2,13,14,15
73:24 78:20
79:10 85:10
88:5 93:12,12
94:21 97:25
100:22 101:20
101:22 106:2,6
106:8,12
111:17,21,22
111:24 112:3
118:18,19,20
123:3,13,15,25
125:24 129:7,9
131:16,18
133:10 145:2,3

145:5,6,9,9
148:2,4,5,15,17
158:24,25
159:1,3,5,7,8
159:21,22
160:3,5 162:22
164:16 165:3,5
165:19,20
166:8 171:12
171:15,16,17
172:11
**exhibits** 57:5
57:10 62:1
97:14 99:22
102:19 158:19
159:4 164:25
**exist** 67:2
117:17
**existed** 117:25
146:13
**expect** 178:18
**expectation**
63:16
**expedite** 81:9
**expense** 164:23
165:13 167:4
167:18,19,21
168:10,17
169:8,20 170:1
171:10 172:13
172:17,17
174:15 175:7
**expensed**
166:23

**expenses**
165:13,15
167:11,12,13
167:14 168:4,8
168:14 169:10
170:12 172:24
173:3
**experience**
63:22 66:8
72:7,11 75:9
78:1,15 79:24
83:6 88:6
98:23
**experienced**
165:11
**expires** 182:19
**explain** 157:10
158:2
**explained**
157:19
**extent** 156:19
**extra** 89:16
150:3 151:21

**f**

**f** 87:9 140:9
182:1
**facilitated**
99:10
**facilities** 81:3
121:16 122:12
122:25
**facility** 66:16
127:1,7 150:3
**fact** 177:1

**fails** 183:19
**fair** 67:10
69:23 70:17
77:6 88:11
101:25
**faith** 151:11
**fall** 65:12
**familiar** 67:11
84:3 85:18
101:22 102:21
104:2,16 105:3
133:19
**families** 108:18
177:3
**family** 100:5
**far** 63:2 75:11
93:20 97:23
105:11 106:14
114:15 149:22
152:2 165:18
174:14
**fashion** 102:16
**fbi** 131:23
132:1,22 133:7
162:10 163:12
**fbi's** 175:20,23
**federal** 54:3,5
**fee** 64:11
**feedback** 74:13
**fielding** 103:9
**fifth** 59:9
122:16
**file** 131:19
**filed** 54:24

filing 165:13
fill 84:13
final 170:11
  181:2
financial 103:4
  164:23
financially 55:8
  182:14
find 56:19 81:5
  101:19 116:15
  116:16 151:9
  159:16 162:13
  175:6
finding 100:22
  152:14
fine 84:6 87:13
  87:24 95:10
  117:23 159:8
finish 61:20
  85:12 97:14
  120:8
finished 112:24
firm 55:5,16
  102:21 143:21
  165:11
first 56:3 58:16
  62:2 65:15
  72:21 73:3,22
  83:16 87:21
  93:17 98:6
  103:18 105:17
  106:23 110:6
  119:3,8 126:5
  126:5 133:13
  133:15 134:15

134:17 137:23
141:20 145:3
148:17 161:13
163:18 165:1,6
171:20
fitness 169:12
  169:14
five 59:3,5
  62:22 112:4
  121:10 178:17
  178:20
floor 52:9
flow 93:9
focus 115:23
  151:21
focused 69:10
  89:11 142:12
focusing 57:22
  99:5
fold 84:17
folder 56:24
  57:2,18
folks 107:24
  150:22 156:15
  177:18
follow 145:8
  175:11 179:11
followed 178:3
following 54:6
  164:10 178:13
follows 56:5
  178:3
foregoing
  182:9 185:5

form 59:22
  61:6 68:1 75:5
  75:6,9,12,17
  85:8 101:6,11
  109:15,18,23
  114:6,11 115:6
  116:22 117:1
  117:12 118:2
  121:18 122:5
  125:18 128:2
  128:24 135:21
  136:16 141:11
  143:5,18
  149:21 153:5
  153:14 154:6
  155:6 162:7
  164:4 168:1,14
  173:13 174:24
  175:8 176:14
format 180:14
formation
  147:5
formed 147:3
forms 119:21
formula 171:7
forth 119:20
forward 75:20
  83:13
foster 51:12
found 56:21
  57:12,13
  163:11 164:7
foundation
  85:8,9 122:5

four 100:4
  121:10 126:19
  181:10
fourth 64:2
franklin 77:1
  79:2 128:19,23
fraud 132:20
fred 77:10,12
  77:16,18
free 119:4
  179:16
freight 89:17
  89:19 90:5,11
  90:12 91:7
friday 180:8
  181:3
friendly 76:15
  76:18 124:1
  125:9
friends 176:19
frozen 131:1,2
  131:4 175:19
  175:22
frustrated
  177:15
frustrating
  177:16
ftt 89:18
full 89:13,15,23
  89:25 90:7,10
  90:17,19 98:9
  127:14,16
  128:1 182:10
funds 176:11

**further** 72:12
103:10 179:9

**g**

**g** 126:22
**gain** 94:1
**gallon** 149:3,6
149:9 157:18
**gapac.com.**
83:19,20
**gates** 52:3
55:18
**gds** 68:5
**gene** 55:14
56:23 123:7
**general** 65:21
93:17 99:6
156:18
**generally** 64:19
81:20 91:14
**generate** 68:25
71:21,24
**generated** 69:5
70:21,23,24
71:11 72:5
**generic** 88:2
**gentleman**
68:14 105:11
106:15
**georgetown**
66:15 87:19
110:6,10,13
**georgia** 83:22
83:24 84:2
133:16

**getting** 93:20
116:1,2 130:12
130:21,22
133:18 153:9
158:25 177:9
**give** 58:19
78:21 101:19
166:3,6
**given** 99:7
129:18 181:9
185:9
**giving** 99:1
151:21 180:4
**global** 163:18
**go** 54:15 56:13
56:17 57:15
58:10 71:9
73:19 79:16
81:10 83:18
85:12 87:5
93:9 95:8 98:6
98:7 99:3,22
100:1,4 101:7
104:18 105:16
106:15 125:16
134:24 137:3
141:12 144:3
145:8 147:11
150:17 153:16
153:18,19
154:2 155:21
155:25 157:19
159:21 165:5
168:9,9,11
169:3,3 174:3

175:5 177:14
179:14,16
**goes** 57:25
71:18 86:12
97:23 98:22
102:6 106:5
114:15 172:25
**going** 57:21
58:7,10,16
61:12,22,22
62:22 63:23
64:9 65:16
66:3 71:25
72:9,19,24
73:2 74:11
75:20 79:2
82:14 90:12
93:2,15 97:4,5
97:14,15,16
98:9 99:20,22
100:12 101:20
106:4,11,18
111:17,20
112:3 118:18
119:3 123:3,10
126:19 129:7,9
131:10 137:13
138:3 144:10
151:21 152:17
153:19 155:21
157:6 158:4,11
158:18,18
160:2 161:1,2
161:8 164:15
164:25 165:1

168:9 169:11
170:13,20
171:14,15
174:5 177:1
178:4,17,22
179:18
**good** 54:7
55:17 56:8
73:7 78:21
144:1 150:8
151:11 152:6,8
155:9,10,18
156:6,12 157:5
157:6
**goods** 120:12
122:17,22
**gotten** 72:9
167:17
**government**
94:4 117:19
**governmental**
95:18,20,22,25
96:5
**gravity** 87:1
**great** 56:8
58:21 119:1
126:4 148:19
179:21 180:13
181:4
**greg** 149:2
**grew** 174:1
**group** 94:10
**grow** 174:5
**growing** 173:23
174:6

**guard** 101:23 102:1
**guess** 57:6,25 69:21 126:5 160:10 180:24
**guest** 57:16
**guided** 98:7
**guilty** 96:2
**gunars** 83:19
**gym** 169:15

**h**

**h** 53:8 106:19 184:3
**half** 79:13 90:3 90:3,14,15,16 91:2 97:11,12 98:8,10 133:5 156:8 162:5,16 163:3 178:9
**hand** 67:20 68:21 112:14 112:15 141:6 161:19 182:15
**handle** 79:25 122:17,21 173:1,2
**handled** 113:3 114:21 115:12 116:18 142:22
**handles** 114:8
**handling** 113:20,23 115:23 140:21 140:25 143:23

**happen** 81:20 93:2 99:13,14
**happened** 122:9,15 127:2 141:14
**happening** 130:10
**happens** 175:10
**happy** 162:21 179:16
**hard** 157:1
**harden** 96:8
**harvey** 101:3 101:14
**hats** 92:20 99:7
**heading** 134:24 135:25
**headquarters** 110:17,19
**heard** 54:13 105:4,4 151:2 151:18
**heather** 108:21 113:9 115:19 139:5 140:24 143:1
**heather's** 113:17
**help** 67:6 89:1 98:16 99:14 130:18 147:11 151:8 164:17 179:16

**helped** 88:1 118:8
**helpful** 89:14
**hereto** 182:14 185:7
**hereunto** 182:15
**hey** 72:8 152:17
**hired** 165:10
**hm** 72:24
**hold** 57:11,22 64:25 71:3,6 95:23 180:25
**holiday** 115:19
**home** 108:9,14 108:15,18,21 129:24
**homes** 116:13
**honest** 179:7
**hop** 151:8
**hotel** 144:22
**hour** 97:11,12 169:12,14
**hours** 100:4,4 139:9,12,17 177:15
**houser** 59:18 59:21 60:1
**hover** 160:6
**hr** 140:2 178:1
**huh** 61:24 69:4 70:2,6 73:1 77:8 85:15 126:1 127:12

135:12 137:25 140:7 170:23
**hurricane** 101:2,3,14
**husband** 147:19
**husband's** 147:16
**hydrochloride** 78:4
**hypo** 78:6,7
**hypochloride** 64:22 78:5
**hypochlorite** 64:14 78:2,10 78:13,16,19 79:2 88:9 120:16 150:14

**i**

**icon** 160:5,6
**icons** 160:5
**idea** 74:2 78:20 78:21 110:18 117:8 126:17 127:6 136:21 139:18 141:14 141:16,20 142:4 144:21 147:20,22 154:13 162:18 162:20 163:17 169:7,9,21
**identification** 63:8 73:20

**identified**
64:18 65:13,22
66:11 68:15
70:3
**identifies** 63:9
**identify** 68:18
82:19 83:6
**impacted**
100:23
**implement**
134:18
**implementati...**
67:24
**implies** 128:15
**imports** 102:25
**inaudible** 89:14
112:16 157:5
**include** 82:1
135:19 136:1
171:9
**included** 97:21
98:21,23 99:8
**income** 164:22
165:13
**incoming** 101:2
**incorporated**
64:10
**incorrect** 81:19
123:6
**increase** 124:22
**incurring**
174:15
**india** 136:20
**indian** 94:14

**indicating**
163:4
**individual** 84:2
116:13 119:11
132:14
**individuals**
129:19
**information**
62:25 71:20
93:22 94:2
133:1 164:23
170:8 174:12
175:1,11
**initially** 133:16
**initiatives**
137:19
**inquire** 114:25
**inquiries** 74:12
**inside** 145:2
**instance** 146:2
146:10 149:16
153:22 159:14
**instruct** 157:24
**instructions**
178:3,4,13
**insurance** 51:6
51:6 52:7
54:24 55:15,15
177:17,22
183:4 184:1
185:1
**inter** 54:11
**interest** 155:5
156:10 161:23
162:1 163:5,10

164:12
**interested** 55:8
182:14
**interests**
163:25
**internation**
99:24 115:14
**international**
51:3 52:2
54:20,23 55:19
55:20 59:7,15
60:23 61:3,9
61:13,18 63:2
64:1,2,11,15
65:23 66:8
69:1 70:9,22
74:18,18 77:3
81:6 82:15
83:8 84:22
92:17 93:1,19
98:25 99:11
100:2 102:25
103:5,13
104:22 110:16
111:6,7,14,15
113:21,25
114:4,16,18
115:5,25 116:5
116:20,24
117:9,14,18,25
118:3 121:6
124:2,5,21,22
125:2,8,14,16
125:20 127:5
127:19,23,24

127:25 129:13
129:20 130:4,8
130:11,13,13
130:17,20,25
131:4,10,14
134:6,8,13,14
134:16,19,21
134:22 137:4,5
137:11 138:19
139:8 141:19
142:8,12,25
143:7,8,11
144:23 146:19
147:1 149:1,19
150:1,7,13,21
151:2,9,11,22
152:21,25
153:3,23 154:1
154:2,4,8,11,19
155:10,13
156:15 157:2
158:5 162:19
163:14,14,16
163:20,21
164:6,8 173:15
173:20,22
176:7,7 177:17
183:4 184:1
185:1
**internationally**
115:22
**internet** 54:11
**interrupt** 85:9
**interrupting**
65:5

**interviewed**
131:23
**introduce**
58:10,19 67:1
87:5
**introduced**
57:24 61:11
92:25 111:24
125:8,19
158:24
**introducing**
111:20
**introduction**
134:7
**inventory**
96:16 104:25
105:1 107:2
115:4 146:18
146:22
**investigation**
132:18 175:20
175:23
**invoices** 72:4
81:12,13 92:19
93:1,7,9
**involved** 80:17
97:17 98:12,15
105:8 115:22
147:4
**involvement**
67:24 82:10
85:20 95:15
97:20 140:24
157:8

**involving** 73:16
94:1
**ip** 58:24 62:10
66:12 70:14
76:21 78:18
79:6,25 80:6
80:17 81:13,22
83:10 84:19
86:23 87:14
88:19 90:13,14
92:3,9,22 93:2
94:1,4 96:12
98:13,17
100:24 101:13
110:3,12
122:23 159:16
161:22,25
162:4,5,17
167:7 177:21
**ip's** 94:16
110:19
**ipaper.com**
92:9
**irs** 174:23
**issue** 57:1
**it'll** 112:5
**item** 167:21
**items** 167:18
168:22 175:6
**iv** 167:4

**j**

**j** 83:19 106:19
126:22
**jag** 176:6

**jagannath**
133:6 154:17
154:20 155:3
159:13 162:5
162:17 163:1
164:3 175:15
176:1,4,10
**jagannath's**
176:4
**jain** 106:15,24
107:1,1,4
145:15 146:2
146:18,21
**jan** 59:1
**jane** 54:17
55:20
**january** 51:12
54:2,8 56:25
77:10 79:12
182:15 183:3
**jasmine** 104:2
104:7,12
145:17,23
146:4 147:15
**jim** 91:21,22
**job** 53:15 81:14
81:21 108:17
108:17 113:12
116:3 130:20
174:11 175:12
**joe** 135:4 136:1
136:1 140:13
140:16,19
**joined** 137:1

**josh** 102:8
**joshua** 96:8,11
96:14
**judge** 149:24
172:21 174:9
174:25 175:2,9
**judgment**
157:7
**judith** 54:4
182:6,18
**judy** 51:25 55:5
61:19 179:15
180:3
**jump** 99:20
**june** 73:19,24
**justification**
175:10
**justifications**
175:6
**jyotika** 51:9
53:3 54:2,22
56:2 181:10,12
183:5 184:2,24
185:2,4,12

**k**

**k** 92:6 105:6
**k&l** 52:3 55:18
**keep** 129:8
150:3,5 156:4
159:19 166:7
169:24
**keeping** 108:7
**kemira** 91:24
92:1,3,5 101:4

kept 142:13
175:13
kids 105:18
kind 62:23 72:4
100:20 101:20
119:21 132:20
133:4 138:4
151:6 158:13
162:1
king 182:4
klgates.com
52:5 183:2
knew 93:20
164:10
know 56:9 60:1
61:21 62:20,23
63:9 64:6,13
65:6,12,12,13
65:14 66:7
67:1,4,5,9 68:6
69:21,22,24
70:13,13,18,18
70:22 73:3,23
74:22 75:11,17
75:22 76:6,25
77:13,15 79:10
79:23,24 80:16
81:11,18,19
82:17 83:3,20
83:23 84:5,6
85:4 88:4,9
90:19 91:11
92:4,20 93:3
95:2 96:8,14
96:25 97:14,22

98:12 99:4,4
99:16 100:3,8
102:1,8 103:3
105:11,13,14
105:17,19,24
106:1,4 107:6
107:15,24
108:4 109:7,13
109:25 110:5,6
110:6,9 111:9
111:10,14
112:6,9,12,20
113:7,11
114:21 115:7
116:9,11,14,15
117:3,7 118:14
119:2,19,21
121:15 122:6,9
122:14,15
123:23 125:19
126:15 127:4,9
128:3,21 129:1
130:10,10
131:6,8,13
132:2,3,5,6,20
133:3,4,5,7
135:3,7,9,10,23
136:2,17
137:13,15
138:15,24
139:1,2,5,6,14
139:25 140:3
140:21,21,23
140:25 141:1
142:4,9 143:7

144:19,25
145:13 146:3,5
146:11,13,15
146:17,17
147:3,5,9,24
148:11 149:22
149:24 150:10
150:10,18,19
150:20 151:4
151:10,19,21
154:8,11,22
155:9,21,25
156:8,11,14,17
156:19,20
157:1,2,4,6
158:15,16
160:9,13 161:3
162:9 164:5
165:18 166:3
167:14 168:2,3
169:6,8,14,21
170:7 172:20
172:20 173:15
174:4,5,14,16
174:17,19,21
178:1 180:19
knowing 61:22
130:18
knowledge
58:22 90:16
krishnan 165:7
165:8,12
kumar 60:4
62:20 72:1
74:8 86:24

93:24 94:12,19
97:20 98:18
99:2 105:12,16
105:18,19,20
105:22 109:24
113:2 118:4
125:9 126:10
126:14,15
133:5 135:5,6
139:15 140:3
140:19,22,25
142:9,10 162:4
162:16 170:8
170:11 176:3
177:2,8 179:4
kumar's 60:6
171:25

**l**

l 67:14,14
80:14 82:12
87:9
label 148:18
labeled 159:20
160:6
lacks 85:8
large 102:21
131:19
larger 123:5
173:25
late 141:9
law 55:16
leading 91:8
learned 155:24
lease 109:1,2
109:12,22

**leased** 109:25
**leasing** 109:25
**leave** 159:21
  175:16
**left** 141:6 160:8
**legal** 55:4,6
  181:11 183:23
**length** 69:9
**letter** 53:20
  177:9
**letterhead**
  157:24 158:2,9
  158:17
**letters** 160:4
**letting** 70:18
  163:9
**level** 96:25
**license** 182:20
**life** 147:14
**limit** 62:7 99:23
**limited** 100:3
**line** 74:14 84:4
  86:3 184:4,7
  184:10,13,16
  184:19
**link** 56:25
**liquid** 75:5,8,12
**list** 64:21 66:19
**listed** 64:21
**listening** 118:4
**listing** 88:5
**literally** 60:18
**little** 81:9 95:16
  96:15 97:3
  128:7 131:20

132:21 134:9
149:23 159:19
160:2,10 166:9
169:11
**llp** 52:8
**load** 89:13,15
  90:7,11,14,14
  90:16,19 91:2
  111:17
**loaded** 148:3
**loading** 166:2,7
**local** 111:16
  128:9
**located** 67:8
  75:2 107:4,7
  107:13,14
  110:24 121:12
  121:17
**location** 55:1
  90:2,21
**locations** 89:15
**logging** 55:20
**login** 164:18
**logistics** 128:8
**long** 66:25
  79:21 104:1
  126:4 132:12
  138:8 148:7
  159:12 161:11
  166:21
**longer** 131:9
  144:4 166:9
**look** 56:13
  58:14 59:8,9
  63:14 64:20

66:1,19 72:16
81:1 91:19
96:21 97:24
155:8 159:21
164:25 165:2
165:20 167:21
171:15
**looked** 145:11
  161:1 163:24
  165:21
**looking** 58:6,13
  65:15 66:1
  77:20 79:17
  81:8 86:16
  87:4 91:10
  94:21 96:22
  113:10 145:5
  146:5 148:16
  153:22 156:11
  157:17
**looks** 56:23
  90:19 106:10
  127:24 146:1
  149:2 171:24
**lost** 148:15
  156:4
**lot** 85:1,13,19
  95:8 116:6,8
  126:10 135:9
  138:5 144:2
  150:22 155:20
**louisiana**
  136:24
**low** 151:4,13

**lower** 153:12
**lunch** 168:9
**lying** 128:22

**m**

**m** 56:6 87:9
  88:21 92:6
  103:15 105:6
  140:9 170:22
**ma'am** 106:10
**machinery**
  76:16,17
**mad** 61:20
**made** 68:6 76:3
  88:2 113:7,8
  134:14 185:5
**mailing** 93:9
  107:6
**main** 63:8
  91:20
**majority**
  117:16
**make** 58:11
  62:18 63:3
  74:12 81:21
  95:3 99:7
  100:9,9 101:8
  101:12 102:12
  102:15 115:2
  130:21 151:22
  152:16 157:7
  161:24
**makes** 147:24
  148:1
**making** 75:10
  85:1 98:22

112:21,24
152:3
**malfunction**
111:19
**mallen** 85:25
86:3
**man** 106:24,25
124:10
**manager** 77:17
101:23 114:24
139:15 154:18
154:18,19
**managers**
139:10,12,15
152:11
**mandatory**
137:23 139:20
139:22,24
**manish** 104:3,7
104:12 145:23
**mansfield**
65:16,17 66:22
66:23 67:7
79:3
**manufacture**
120:21,25
121:3 136:11
136:14
**manufacturing**
120:22 121:1,8
121:15 122:12
136:5,8,10,13
136:19 137:13
**map** 136:6

**mark** 68:14
85:5,18 86:4,5
86:5 96:19
105:1 108:16
110:21 112:18
112:20 113:16
114:21,21
115:11,19,21
118:4 124:25
138:2,3,13,15
138:17,22,24
139:2,6 140:24
142:25 149:6
151:3,24 152:1
152:3,20
157:18
**marked** 56:15
58:5 72:14
85:10 106:8
111:22 118:20
123:13 131:16
148:5 159:1
165:3 171:12
**marking**
118:19
**markup** 125:3
125:5 149:16
149:20,23
153:1,4 157:11
**mary** 54:17
55:20
**massachusetts**
52:9
**material** 76:5,8
76:15,19 89:19

122:17,21
157:25 158:1,3
158:9
**matter** 54:23
55:19 103:14
156:10 177:2
**maximum**
178:19
**mcgee** 77:10,12
77:18
**meal** 168:8,10
**mean** 60:18
62:7 63:5 64:4
64:6 75:22,25
79:20 81:24
82:24,25 88:1
95:8 98:14,16
100:3 104:4
105:14 110:14
113:10 114:9
119:19 128:3
139:7 150:16
153:6,6,17
154:15 157:14
157:20 158:12
162:18 166:20
168:2 176:21
177:20,24
180:17
**meaning** 80:19
83:21
**means** 64:9
70:7 84:15
98:9 116:8

**meant** 123:5
133:20 147:14
**media** 54:21
100:12,15
144:10,13
178:22,25
181:10
**meet** 146:6,7
168:3
**meeting** 55:2
**membership**
169:15
**memory** 66:20
74:5 80:3
86:14 87:22
88:7
**memphis**
107:18,19
108:12,25
110:17 144:17
144:20,25
**mention** 110:12
111:11,13
127:7
**mentioned**
65:10 84:20
94:3 105:17
124:1 131:22
133:8 142:10
146:18 147:4
150:24 163:11
**mentions** 139:9
**mess** 130:7
**messed** 138:10

**messing** 170:14
**met** 103:20
  176:18
**metrick** 59:17
  59:21 60:1
**mid** 94:15,15
  95:13,14,15
  103:21,24,25
  104:5,7,10,22
  104:25 105:7,8
  105:10,23
  106:16 107:6,9
  146:16,25
  147:3,5,7,8
  176:11
**migrating**
  134:13
**mile** 151:22
**mill** 63:23,23
  65:16,17 66:3
  66:16 67:11
  72:7 74:22
  75:6,10,14
  76:21,24,25
  77:1,4,23,25
  78:2,16 79:7
  81:1,4,18 84:9
  85:4,17 86:9
  87:19,20,22
  88:3,8,15,19
  89:16,22,24,25
  90:3,21 91:4
  98:2,8 101:17
  102:9 114:10
  114:25 125:11

  137:10 139:8
  149:25 151:6
  152:10,15
**million** 176:7
**mills** 63:25
  66:13,19,20
  68:23 74:21
  75:8 76:14,16
  77:2 78:13,16
  78:18 79:2,7
  79:11 80:5,6,7
  82:25 83:2
  97:1 101:13
  110:3,5,8,13,15
  116:10,16
  118:7 125:10
  133:17 134:11
  138:3 139:6
  146:21,23
  150:22 152:4,7
  152:14,16
  154:15,15,16
  154:23,24
  155:1,2
**mind** 112:1
  125:24 130:23
  180:4
**mini** 69:9,11
**minorities**
  93:21 94:5
**minority** 93:21
  94:5,7,22,24,25
  95:4,6 96:6
  117:13,14
  125:20,20

**minter** 135:2
  135:19,20
**minus** 160:7
**minute** 72:24
  144:6 178:17
**minutes** 97:6
  97:15 99:21,23
  132:13 144:3
  166:7
**misc** 172:6
**miscellaneous**
  170:24 172:6
  172:15,20
**missed** 63:3
**mistake** 81:15
**mix** 75:7
**mixing** 75:14
**moment** 58:15
  81:8 83:19
  86:13 88:11
  89:13 96:21
  97:4,24 106:12
  119:1 123:15
**monday** 180:7
**money** 116:1
**monitor** 81:21
  88:15 96:19,25
  104:25 105:1
**monitored**
  107:2 146:21
**monitoring**
  84:18 85:3
  96:19 106:14
  106:16 114:20
  115:4 118:6,7

  146:19 152:7
**months** 74:2
  119:20
**morning** 54:7
  55:17 56:8,9
  102:9 103:10
**move** 129:10
  173:23
**moved** 77:6
**moving** 56:12
  129:8 166:7
**msds** 75:23,24
  76:12 97:21
**msn** 51:6
**multiple** 66:10
  74:21,22 83:4
**murphy** 52:8
  53:5 55:14,14
  56:7,16 57:3,6
  57:11,13,21
  58:3,4 65:3
  67:14,16 68:2
  71:12 72:15
  73:9,11,21
  76:11 78:7,9
  80:14,15 82:12
  82:16 85:11
  88:23 90:23
  91:18 92:7
  96:1 99:19
  100:17 101:9
  103:8,11
  109:15,18,23
  113:22 114:6
  114:11 115:6

115:10 116:22
117:1 121:18
122:5 123:5,8
125:18 128:2
128:24 135:21
136:16 143:5
143:18 148:13
148:15,19
149:21 153:5
153:14,16
154:6 155:6,16
155:19 160:23
162:7 164:4
168:1 173:13
174:24 175:8
176:14 179:11
179:22,23,25
181:1,4

**n**

**n** 52:1 53:1
56:6,6 67:14
70:5 80:14
82:12 103:15
103:15 105:6
106:19,19
126:22,22,22
170:13,13,14
170:21 171:2,8
172:10
**n2** 171:7
**n567** 170:15
**n850p** 70:4
**nalco** 82:10,11
82:12,19,19
83:7 93:15

95:2 151:16
**name** 55:3
59:17 60:4,24
66:21 80:10,11
84:3 96:9
102:22 103:12
104:4,6,13
105:4,4 106:15
106:17,19
119:11 120:15
124:9,10
147:15,16
**name's** 148:23
**named** 83:10
104:2 105:3
**names** 63:24
65:12 80:7
147:18
**nanjing** 126:20
126:21,22
127:1,7,11
141:4,23
**nathan** 52:3
55:18 57:25
103:12 148:13
179:14 180:1
183:1
**nathan.towns...**
52:5 183:2
**national** 127:4
**nature** 75:18
99:15
**nda** 82:10
**nearby** 81:2,3

**neatherway** 92:9
**necessarily** 85:20 135:10
**necessary** 185:6
**necessitate** 90:7
**neck** 160:15
**need** 58:10 63:3
75:14 84:5,15
86:13 89:25
91:9 92:25
93:18 96:15
97:15 98:3
123:7 137:8,12
150:23 169:24
174:6 177:12
179:17
**needed** 84:9
85:5 90:17
92:18,18 93:6
94:25 98:2,8
111:13 114:24
117:14 125:20
130:18 137:10
139:8 150:2
152:4,14
**needs** 174:10
175:12,13
**neither** 128:4
182:11
**neuroz** 70:4,4,6
70:8

**never** 72:11
90:16 133:8
139:5 142:10
147:8 151:13
157:19 163:7
177:24
**new** 57:25
61:10,14,16
86:17 87:4
92:17,25 93:6
93:11 138:1
139:24 156:11
176:18,18,21
176:21
**night** 177:2
**nine** 99:9 144:6
**nitric** 66:3,7
102:16
**nondisclosure** 82:9 83:11
**nope** 103:19
**normal** 75:9
**normally** 67:2
**nos** 159:1 165:3
**notary** 54:4
182:7,18
185:13,19
**note** 54:9
116:22 183:10
**noted** 185:7
**notes** 64:19
120:1 178:18
**noticing** 55:13
55:14

november
  129:13,14
  132:2 182:19
number  55:1
  63:18 68:19
  69:13 136:4
  137:20 158:21
  181:10
numbers  68:24
  69:3
ny  183:15

**o**

o  56:6 65:1
  70:5 74:24
  80:14 82:12
  91:11,11,17
  103:15 140:9
oath  56:4
  103:17
object  85:8
objecting  123:7
objection  68:1
  90:22 101:6,11
  109:15,18,23
  114:6,11 115:6
  116:22 117:1
  117:12 118:2
  121:18 122:5
  123:9 125:18
  128:2,24
  135:21 136:16
  141:11 143:5
  143:18 149:21
  153:5,14 154:6
  155:6,19 162:7

  164:4 168:1
  173:13 174:24
  175:8 176:14
objections
  55:11
obtain  80:24
obtained  117:7
  150:17 155:13
obviously
  66:10 72:19
  89:4
occasion  59:20
  93:2 118:4
occasional
  115:18,21
occasions
  102:24
october  119:24
offer  153:12
offered  75:16
offering  64:1
  71:25 149:3,19
offhand  107:15
office  107:9,11
  107:16,16,17
  107:18,20
  108:3,11,25
  116:12 144:17
officer  182:7
official  60:15
  182:15
offload  89:24
oh  59:8 65:7,19
  66:25 67:9
  82:12 83:3

  95:7 104:18
  106:1 110:18
  115:9 117:18
  117:20 120:7
  124:9 132:16
  133:13 147:2
  151:4 152:8
  180:16,19
okay  54:18,21
  56:19,20 57:3
  57:6,11,20,21
  57:24 58:3,8
  58:13,19,21,25
  59:2,4,9,14
  60:1,3,6,14,22
  61:1,5,5,14,19
  61:23,25 62:7
  62:14,18,24
  63:7,13,14,21
  64:4,12,18
  65:4,7,11,21
  66:1,10,15,23
  67:7,10,15
  68:9,14,17
  69:12,18,23
  70:11,17 71:9
  71:13,17,20
  72:3,12 73:2,6
  73:8,11 74:7
  74:14,21 75:2
  75:8,20,23
  76:2,4,20 77:6
  77:18,20,23
  78:1,13,22
  79:1,6,12,23

  80:2,19 82:8
  82:17 83:2,4
  83:10,13,13,18
  83:23,25 84:4
  84:14 85:3,21
  86:8,18,25
  87:16 88:11,14
  89:4 90:13,18
  91:5,10,14,23
  92:2,8,13,20,24
  93:22,25 94:10
  95:17 96:21,23
  96:24 97:9
  98:4,20,23
  99:4,19,24
  100:22 101:10
  101:19,25
  102:5,11,19
  103:7,8,20
  105:23 106:3,6
  111:20 112:2,8
  112:10 113:6
  113:12,19
  115:11 118:15
  118:24,25
  119:1,5,6,7
  120:1,3,10
  122:11,16,21
  123:2,18
  124:12,16
  125:24 126:4
  126:18,24
  129:6,18 130:1
  130:2,16,23
  131:18,21

132:8,12,23
133:5,8,10,13
133:20 134:7
134:19,24,25
135:4,8,11,17
135:25 136:6
136:12 137:15
137:18,22
138:24 139:9
140:4,20 141:1
141:3,5,24
143:2,10,22,25
144:6 145:2,7
145:10,13,14
145:15,19
146:18,21,25
147:3,6,12,21
147:23 148:9,9
148:10,25
149:2,5,12
155:20,23
156:25 157:13
157:17,24
158:18 159:3,6
159:11,19,25
160:1,2,8,13,13
161:5,6,7,15,18
161:21 162:12
162:25 163:9
164:15,22,25
165:5,12,15,19
166:3,6,12,12
166:14,18,22
167:3,7,10,13
167:16,21

168:7,11,18,21
169:1,16,18,25
170:10,13,16
170:20 171:1,4
171:9,14,23,25
172:3,4 173:22
174:8 176:16
177:6 178:15
179:8,14,18,23
180:9,10,23,24
180:25 181:5,8
**old** 138:18
**olin** 80:11,13
80:16,18 81:2
81:5
**once** 99:13
115:18 129:8
148:10
**ones** 70:23
152:4
**open** 56:17
112:5 145:12
159:7,9 165:6
171:18,19
**operation** 83:8
**operations**
80:17 84:8
**opportunity**
81:11
**option** 75:16
**oral** 54:1
**orange** 79:2
119:24 120:4
120:14

**order** 101:21
114:23 115:1
115:20 152:9
152:12 179:24
180:2,4,10,15
180:18
**ordering** 152:5
**orders** 72:4
179:18
**oregon** 128:12
128:16
**orientation**
137:24 138:1
138:13,16,25
139:3,3,4,21,24
**osha** 139:9,12
139:17
**outcome** 55:8
182:14
**outside** 109:5
110:24 111:2
121:3,6,16,23
121:23 122:3
122:12 127:2
141:14
**outsource** 67:5
120:22,25
151:7
**outsourcing**
153:7
**own** 108:23,24
109:5,8,10,14
121:8 124:13
124:15 127:1
135:14,15

136:11,14
144:24,25
152:13
**owned** 105:10
122:12 127:4
155:4
**owner** 94:20
142:20

**p**

**p** 52:1,1,8 65:1
88:21 91:17
105:6 145:25
146:15
**pacific** 83:22
83:24 84:2
133:16 144:5
178:21
**page** 53:9
57:15 58:9,13
59:9,11,11,12
60:10 62:2,5
63:12,13,14,16
65:5,15,23
66:1,15 67:17
67:19 68:17,19
68:20 71:14,17
71:18,18,21
72:20 73:15
86:11,14 93:14
102:5 134:12
148:17 160:3
160:11,18
161:2,3,8,13,15
161:18,21
163:18 171:21

172:3 184:4,7
184:10,13,16
184:19
**pages** 53:2
63:12 72:19
119:3
**paid** 116:2,2
130:21,22
140:22 147:8
147:13
**palmer** 54:17
55:20
**paper** 51:3 52:2
54:20,23 55:19
55:20 59:7,15
60:23 61:3,9
61:13,18 63:3
64:1,3,11,15
65:23 66:8
69:2 70:9,22
74:19 77:4
81:6 82:15
83:8 84:22
92:9,17 93:1
98:25 99:11
100:3 102:25
103:5,13
104:23 111:6,8
111:14,15
113:21,25
114:4,16,18
115:5,14,25
116:5,20,24
117:9,14,19,25
118:3 121:6

124:2,5,21,22
125:2,8,14,16
125:20 127:20
127:23,24,25
129:13,20
130:4,8,11,14
130:17,20,25
131:4,10,14
134:6,8,13,14
134:16,20,22
134:22 137:4,5
137:11 138:19
139:8 141:19
142:8,12,25
143:7,8,11
146:19 147:1
149:1,19 150:1
150:7,13,21
151:2,9,11,22
152:21,25
153:3,23 154:1
154:2,4,9,11,19
155:10,13
156:15 157:2
157:15 158:5
160:9 162:20
163:14,15,16
163:21 164:6,8
173:15,21,22
176:7,8 177:17
183:4 184:1
185:1
**paper's** 93:19
99:24 110:16
163:21

**paragraph**
89:12 161:21
**parasuraman**
105:3,5,8
**parents** 129:22
**parker** 77:3
**part** 65:11
81:13,21,24
82:13 83:7
84:7 86:25
90:10 92:20
93:12 96:25
97:25 116:14
135:20 137:9
175:20,23
**participants**
54:12
**participate**
84:6
**particular**
58:25 63:25
66:12,12 67:23
69:17 70:14,18
74:7,21 77:4
81:4,7 82:9
84:2 85:21
86:21,25 87:7
87:24 89:12
90:1,21 92:13
93:10 97:18
103:4 108:7
150:10 152:18
**parties** 54:15
92:10 182:12
182:13

**parts** 86:17
**party** 55:7
120:22 121:1
176:19
**pass** 99:2
**password**
164:19
**past** 62:19
64:16
**patent** 127:5
**patents** 109:8
127:4
**pay** 130:12
**payable** 68:10
71:23 81:25
85:1 92:21,23
103:23 104:19
115:17,24
142:23 143:20
147:10 157:22
178:2
**paying** 64:11
**payment** 92:13
167:5
**payments**
130:11,18,19
**payroll** 130:21
140:21
**peninsula**
168:11
**pennsylvania**
52:4
**people** 67:2
134:17 135:10
151:16 152:11

157:5 180:20

**percent** 74:11
80:22 87:17

**percentage**
105:13 114:22

**perfect** 133:13

**performed**
146:18

**permitted**
71:21 163:3

**person** 61:23
86:22 105:15
108:20 124:6,8
143:20 153:19
157:20 178:1,2
178:14

**personal** 58:22
88:6 110:21
174:14

**personally**
60:16,18 66:16
135:9 157:2

**personnel**
129:20 154:23

**ph.d.** 117:5

**phone** 59:21
108:6 137:9
146:8

**piece** 140:12
160:9

**pitch** 67:4
134:11

**pittsburgh** 52:4

**place** 52:9
54:15 68:7

72:10 114:20
115:1,20
129:13

**placeholder**
171:2

**places** 128:20
129:3

**plaintiff** 51:4
52:2

**plants** 66:10

**platform**
173:24 174:7

**playing** 84:22
85:2

**please** 54:9
55:11,22 61:20
63:12 95:24
100:5 104:18
112:9 126:18
137:19 148:8
149:6 159:16
165:6

**plotting** 169:22

**plug** 168:14
170:8 172:21
174:11 175:11

**plugged** 168:24
169:9

**plugging** 175:1

**plus** 160:7

**point** 65:4 68:8
68:11 72:18
79:12 85:5
96:15 114:22
127:13 131:2,8

131:23 137:23
138:19 173:4

**popular** 78:23
78:24 79:11
180:22

**portion** 126:8

**portland**
128:12,16

**possible** 56:25
57:14 100:8
129:11

**possibly** 62:13
100:20 103:6
112:17 113:2
119:19 126:12
126:14

**potential**
161:22 163:4

**powder** 75:6

**powdered**
75:17

**powerpoint**
53:12,18 87:18
87:20,25 88:2
126:4,6,9,13,15
133:20

**premier** 96:8

**prepare** 87:24
94:24 164:17
164:20

**prepared** 94:23

**preparing**
126:8

**presence** 136:4

**present** 52:11
155:25 156:1

**presentation**
87:18 125:11
126:7,12
127:19,21,22
127:24 128:4
129:12,18
133:22,24
134:7,19,21
141:15,18

**presentations**
110:14

**presented**
126:13,15
129:1 133:17

**presenting**
134:11

**preston** 124:10
124:11,12,16
124:18,19
125:11,19
135:11,13

**preston's**
124:23 125:3
125:17

**pretty** 88:2
152:6

**prevent** 89:16

**previous** 68:23
84:17,20 103:9
126:12 162:22
172:11,16

**previously**
65:13 70:24

78:21 103:20
113:20 121:9
130:3 140:16
144:16 145:11
**price** 64:2,5,9
64:10 72:1
98:16,22 99:1
99:10,18
124:22,25
125:4 149:3,17
153:12,18,19
153:22 154:1
155:9,10,18
156:6 157:18
**prices** 63:15
91:11,12,20
99:17
**pricing** 64:1,10
68:24 70:24
71:24,25 75:17
81:15,19,20,21
98:11,13,18,25
153:8,9 155:22
156:2,5,12
157:5,15,23
**print** 160:5
**printed** 59:17
60:3
**prior** 92:2,3
**private** 133:3
**probably** 66:25
77:17 78:21
79:21 88:9
97:15 119:21
120:6,9 126:7

126:7 134:21
148:23 149:23
150:19 157:6
159:12 160:4
162:24 166:20
168:16
**problem** 91:3
119:23 161:13
**proceed** 88:13
**proceeding**
55:11
**proceedings**
54:6
**process** 73:13
88:1 98:16
123:17 158:25
**processed**
95:19,24 96:5
**processing** 82:8
92:14
**procured**
122:22
**procurement**
53:11 56:18
61:1 154:18
**procures**
122:17
**product** 61:10
61:14,17 63:24
63:24,24 68:24
69:3,17 70:9
74:12 75:5,25
76:1 78:23,24
79:11,22 81:3
84:9 87:4 88:3

89:22 90:5,10
91:8,9,11,11,20
96:17 98:2
99:16 114:4,9
114:24 124:1,4
124:17,19,20
125:3,12
149:22,25
150:2,10
151:10,19,23
152:9,12,18
153:8 155:14
155:15 156:3
156:12 158:6,7
158:10,15
**production**
121:3
**products** 63:15
65:10,22 66:12
67:5 81:6
82:25 85:2,18
86:17 88:10
91:14 92:2
96:19 116:10
120:15,19,22
120:25 121:5
133:17,18
134:3 136:11
136:14 150:10
151:6,12 152:4
152:24 154:16
154:20 156:2,5
**profession**
172:25

**professional**
155:23 174:6
**program** 63:15
93:19 94:3,16
94:19
**pronouncing**
89:1
**proper** 174:22
**properly** 75:10
**property**
144:25
**proposing**
86:23
**provide** 72:1
76:15,18 78:13
78:15 81:6
83:4 84:18
95:4 116:5,9
134:3,23 137:7
138:1,7,12
149:25 150:5,6
151:5,10,13
152:20,25
164:18,22
176:6
**provided** 70:22
74:17 75:5
79:6 80:5,7
81:13 82:25
83:7 84:19
103:21 104:24
121:6 124:1,21
125:13 134:6
137:5,15
138:23 139:24

141:18 146:24
147:1 149:1
151:1 153:13
158:6
**provider** 70:10
**providing** 91:2
93:1 118:5
121:20 125:2,5
125:7 134:22
147:7 149:22
149:24 150:8
155:9,10 156:5
156:6,7,12
158:4,8,12
**pry** 147:14
**public** 54:4
182:7,18
185:19
**pull** 86:20
131:18 158:18
162:21 166:12
**pulled** 166:15
177:12
**purchase** 72:4
116:19 117:9
124:23
**purchased**
120:12 155:3
155:14
**purchasing**
77:17 116:18
124:4,6 154:11
154:15,16,20
154:24

**purpose** 66:23
98:1
**purposely**
60:17
**purposes**
106:12
**put** 60:15 61:11
72:2 84:12
91:4 96:3
153:7 157:15
157:24 158:2,9
168:4 169:22
172:22
**putting** 91:5

**q**

**qc** 127:13
**qualification**
94:18
**qualified** 69:10
94:7
**qualify** 94:15
**quality** 54:10
54:11
**quarter** 90:4
**question** 58:16
65:11 67:23
72:21 73:22
75:4 83:16
87:12 91:20
93:17 95:23,24
96:3 99:6
100:1 102:7
103:18 113:13
119:7,8 120:11
120:21 122:16

122:19 126:5
131:11 138:12
139:22 142:17
143:12 145:8
158:13 168:18
172:23 177:6
179:3
**question's**
61:22
**questionnaires**
100:19,20
**questions** 61:21
72:12 73:12
81:10 87:6,21
97:10 99:23
102:20 103:9
103:10 119:20
123:3,25
129:10 132:4
144:2 177:24
178:19 179:9
**quick** 100:7
**quickbooks**
72:6 164:19,24
173:1,2,6
**quickly** 129:10
**quite** 67:10
145:4
**quote** 96:15
149:6,11

**r**

**r** 52:1 65:1 70:5
91:17 92:6
105:6,6,6
106:19 140:9

182:1 184:3,3
**r&d** 127:13
**radius** 81:1
**rail** 109:10,12
**ran** 178:12
**range** 112:15
**ray** 88:25 89:8
89:21
**rc.com** 52:10
**read** 62:9,12
63:1 72:20
73:6 79:20
84:5 89:11,12
92:15 99:25
119:4 160:14
161:2 162:2
179:19 183:9
185:5
**reading** 64:8
**reads** 62:15
**ready** 58:20
88:13 114:23
114:25 152:9
152:12,18
165:20
**real** 104:13
109:5
**realize** 56:10
**really** 88:24
99:2,5 116:13
118:8 119:3,19
130:10 139:14
139:15 157:8
161:11 168:2
172:23 177:16

177:18
**reason** 64:5
65:11 84:10
147:18 167:24
168:12,19
169:20 183:11
184:6,9,12,15
184:18,21
**reasons** 84:10
**rebrand** 120:12
**rebranded**
120:15
**recall** 66:24
107:21,23
113:22 118:13
119:8,11 124:2
124:8 129:12
129:15,18
131:24 132:1,4
132:12 133:14
133:21 144:17
146:21 148:11
162:21,22
164:22 165:8
166:18,20
177:7
**recap** 132:3
**receipt** 183:18
**receivable**
68:10 71:23
81:25 85:1
92:21 103:23
104:19 115:17
115:24 130:21
142:23 143:20

147:10 157:22
178:2
**receive** 139:3,4
139:17,25
140:1
**received** 74:13
112:16 114:17
114:19 115:5
115:15 138:15
138:24 139:2
139:12,20
176:11 177:9
**recognize**
58:17 60:6,10
61:6 75:21
79:19 83:16
92:10 112:11
126:6 148:22
**recognized**
80:10
**recollection**
86:19
**record** 54:7,16
55:10 73:11,20
79:17 82:17
89:13 96:3
100:13,14,16
138:10 144:11
144:12,14
159:19 177:14
178:18,23,24
179:1,19 181:8
**record's** 171:20
**recorded** 54:14
54:22

**recording**
54:10,14
**reduce** 98:12
99:17
**reduced** 98:24
**reductions**
98:16 99:10
**refer** 78:22
88:4
**reference** 64:13
65:5 66:3,15
70:1,7 87:19
88:18 93:15
101:3
**referenced**
183:6
**references**
69:13 79:1
**referred** 62:1
87:25
**referring** 77:18
94:10 122:1
**refers** 82:9
**reflecting**
167:7
**refresh** 66:19
86:14 87:21
106:13 118:22
131:19
**refreshes** 74:4
**refreshing**
112:1
**regard** 56:14
61:2 62:9
70:20 72:12

100:2
**regarding**
74:10 114:14
115:3 130:24
132:17
**regularity**
99:13
**regulation** 63:2
**reintroduce**
57:22
**relate** 151:3
**related** 55:7
87:19 103:1
**relating** 66:6
**relationship**
130:4,9,14
142:15 150:20
150:21 161:24
164:13
**relative** 182:12
**remember** 61:4
67:9 69:1,5
75:19 77:5
80:7,10,11
83:9,12 84:1,1
86:8 87:12,23
88:10 89:7,8,9
91:20 95:8,14
95:15 97:19
100:21 101:24
103:1,25 107:8
107:14 110:11
110:15 112:22
112:24 119:13
119:14 124:9

126:8,13 128:5
129:21,22
132:6,14,25
138:17 146:9
146:23,25
152:23 159:11
161:10 162:23
**remembered**
54:1 76:5
**remind** 103:17
**reminder** 61:19
103:12 150:25
**reminding**
158:22
**remote** 55:2
**remotely** 55:9
**repack** 120:11
**repackage**
120:19,20
**repackaging**
120:14
**repeat** 95:24
106:17 139:22
**repeated**
173:14
**rephrase**
101:11
**reported** 51:25
142:18
**reporter** 55:5
55:22 61:20
64:25 65:2
67:13,13,15
70:4 71:1,1,3,6
71:9 76:9 78:4

78:8 80:12
82:11 87:9
88:21,22 91:16
92:5 95:23
105:5 106:17
106:20 126:21
126:23 140:8
140:10 149:9
149:12,14
179:14,18,23
180:1,7,25
181:5,7 182:6
**reporting**
142:15 174:23
**represent**
103:13 129:19
**represented**
103:18
**representing**
55:3,18 127:25
129:19
**represents**
63:22 68:18
83:21
**republic**
169:18 170:1
170:17 171:9
172:14,16
174:15
**request** 96:17
97:5
**requested**
134:18
**requesting**
149:25 150:14

**require** 75:8
163:19 169:24
**required** 89:22
116:16 149:23
185:13
**requires**
163:25
**reselling**
116:20
**reserved**
181:14
**residing** 54:5
182:19
**resin** 65:8,9
**resins** 64:20
**resources**
150:9
**respect** 60:23
73:12 100:5
**respond** 61:21
87:2 100:8
**responding**
98:4
**response** 85:12
130:22
**responsible**
114:3 178:5
**rest** 70:20
99:23
**retained** 62:24
181:11
**retired** 138:18
**rettinger** 91:21
**return** 53:25
90:5,11,12

91:7 164:21
168:23 170:2
170:12 171:19
171:23 183:13
183:17
**returning**
89:19 90:10
91:8
**returns** 164:17
164:18
**revenue** 167:7
**review** 62:20
69:14,14 81:12
82:13 88:11
112:8 113:12
119:1 135:1
148:10 161:4
164:11 170:11
172:5 178:17
183:7
**reviewed** 69:2
69:16
**reviewing**
119:3
**reviews** 62:19
**rice** 80:9,10,11
**richardson**
77:14,16
**right** 57:7,21
58:5,11 62:25
63:6,18,19
64:13 65:24
66:2,13 67:20
68:11,21,22
69:7,7,8,20

72:24 73:4,11
75:2,3 76:22
79:5,14 84:9
85:4,6,23 86:6
86:20 87:10,20
88:4,16,19
90:6,8,21 96:2
97:14 100:22
101:1,10,17,19
102:2,17 104:8
105:15,18
108:12 112:14
112:15 113:11
114:10 120:13
120:16,17
121:10,21
124:24 125:14
125:15,15
127:20,23
128:1 130:5
134:8,20
135:13 137:24
138:21 139:15
140:15,17
141:19 142:7
142:16,24
143:4,16,23
144:8 145:4,20
145:23,25
146:19 147:16
149:3,7,17
151:24 153:1
153:17,20,24
154:15,25
155:8,22 156:3

156:16,19,21
157:1 158:14
159:13,14,17
160:3,11,20
161:8,19 162:2
163:5,10,13,15
163:22,25
164:3 165:9,17
167:1,2,5,6
168:23 169:12
170:2,18 171:1
171:4,10 172:8
172:11,14
173:19 175:2
177:22 178:4
178:11 181:7
**risk** 129:7
**riverdale** 79:3
80:3
**robinson** 51:25
52:8 54:4 55:5
55:16 182:6,18
**role** 85:3
154:17
**roles** 84:23
85:2
**rome** 79:2
**room** 144:22
**rosin** 64:19
65:9
**rotate** 161:2
**rough** 181:2,3
**roughly** 180:6
**rounding** 97:10

**row** 70:3
167:21 168:11
169:3,11
170:15 171:1,8
172:6
**rule** 63:2
**run** 96:16,16
115:2 151:12
151:13
**running** 105:7
151:4 152:5,18

**s**

**s** 52:1 53:8 65:1
65:1,1 87:9
91:11,17,17,17
105:6,6 106:19
106:19 170:22
184:3
**safety** 76:5,8,10
137:1,3,7,10,15
137:19,23
138:1,12,15,19
138:21,24
139:2,3,4,7,20
139:24 157:25
158:1,3,10
**sake** 119:2
**salaries** 113:3
**salary** 112:14
112:15 113:4
**sales** 67:4 82:5
101:23 116:6,8
116:11,18,25
133:22,24
134:4,7,11

135:6 140:2,3
157:20
**sap** 92:18 93:7
134:5
**satisfied** 151:22
**savings** 117:18
117:24
**saw** 172:10
**saying** 56:21
77:16 91:2
96:15 99:6,7
121:21,24
128:4 144:7
152:6 156:18
156:18 173:20
178:8
**says** 57:12
59:12 62:4
63:14,19 69:10
69:11 74:14
77:23 80:9
89:13,18 92:9
99:2 120:1,11
120:14,21
122:16 127:13
131:13 134:24
137:18,23
139:23 140:6
140:12 141:4,6
141:23,25
145:16,19
149:6 161:21
163:18 166:22
166:25 167:1,4
167:22 168:11

169:3,12
170:21 171:17
**schedule** 101:2
**scheduling**
56:11
**school** 105:18
**scientists**
127:14,16
128:1
**scott** 135:2,19
135:19
**screen** 54:14
73:2,4,19
86:11 93:11
94:22 102:3
111:24 123:12
160:11,12,16
160:21 166:10
171:14,16
**scroll** 58:15
63:7 67:17
69:13,25 75:20
83:13 86:14
120:10 126:18
127:10 128:7
136:3 137:18
140:4 141:3,22
160:3 161:1,4
161:8 169:11
170:13,20
171:1 172:3
**scrolling**
170:14
**se** 69:9,11

**seal** 161:16
182:15
**seattle** 182:19
**second** 57:23
58:19 62:9,11
62:15,19 63:1
82:13 93:14
101:19 112:8
119:23 120:7
120:10,11
149:5 160:3
161:1,15 166:3
180:25
**secretary** 178:3
**section** 172:5
**see** 56:18 57:1
57:7,17,21
58:2 59:6,9,10
59:14,18 60:3
60:4,9 61:25
62:2,2,21,24
63:1,8 64:12
64:12,13 65:7
65:7 66:3
67:18 69:7,11
70:5 72:16,16
72:22 73:3,9
73:18 74:4,15
74:24 77:3,7,9
77:10,16,23
83:14 86:25
88:24 92:15
93:18 94:22
95:8 98:24
99:8 102:3,6,7

106:5 111:24
112:3 119:23
119:24 120:1,2
120:12,23
122:19 125:24
127:13,14
128:9 131:3
134:12 139:10
140:12 141:7
142:1 156:5
159:3,5 160:7
160:12,20
165:10,19,24
166:15,22
167:22 169:4
170:15,21
171:2 172:6
177:12
**seeing** 57:24
79:1 128:5
133:14 141:21
148:11 159:11
173:7
**seemed** 134:10
**seems** 67:10
113:15 134:4,9
180:21
**seen** 54:13 66:6
74:3 78:20
133:15
**sekur** 105:3,6
145:25 146:6
146:10,12,15
**sekur's** 105:25

**selected** 147:18
**sell** 124:16,19
**selling** 124:5
**sells** 122:18
**selma** 80:2
**send** 100:18
163:3,9 164:11
174:3 181:2
**sending** 90:3
94:22 145:22
165:12,15
**sent** 77:21
89:22 96:14
98:5 162:25
164:3 169:10
183:14
**sentence**
128:15
**separate** 64:11
76:20 113:4
**service** 125:7
125:13,15
131:15 150:8,8
150:20,24
151:1,12 152:7
156:7 157:6
**services** 67:24
84:18 103:21
103:22 106:14
116:4 147:7
152:20 156:2
**set** 107:15
118:6 182:15
**setting** 104:20

**seven** 97:6
99:21
**share** 56:13
72:22 73:2,14
97:4 102:2
106:2 123:12
145:3 160:3,15
160:16 166:8
166:10
**share's** 160:5
**shared** 64:15
94:21 133:1
**sharing** 83:13
164:15 171:14
171:16
**sheet** 67:18
75:23,24 76:6
76:8,10 157:25
158:3,10
166:15,18
168:5 169:2,23
170:9 172:22
173:7 174:2,7
174:12 183:11
**sheets** 173:10
173:18
**ship** 89:13
**shipment** 84:4
84:7 152:13
**shiv** 60:4 74:8
85:17,22 86:24
88:25 93:24
94:2,12,19
97:19 98:6,18
99:6 104:4,6

104:12 105:12
105:16,21,23
105:25 107:16
108:2,8 110:3
110:16 111:11
116:4,4,7,18,24
117:5 122:1,2
122:3,14 127:7
127:25 128:22
130:24 133:5,8
133:17 138:7
138:12,22
139:17 140:25
142:15,18
143:14,22
144:16,19,25
145:19 146:2,4
146:10,15
147:6,18 149:5
155:1 157:10
157:18,24
162:4,12,16,22
162:25 170:8
170:11 171:25
173:18 174:18
175:3,25 176:3
176:6,17
178:12 179:4
**shiv's** 110:21
175:22
**shop** 156:15
**shopping**
153:18
**short** 100:10
115:2 123:24

152:5
**shortly** 97:15
123:4
**show** 67:1
93:15
**showed** 62:23
145:3
**showing** 68:23
81:9 97:13
101:21
**shows** 62:21
134:12
**shreyans**
106:15,24
**sic** 68:5
**side** 68:8 81:22
81:23 112:15
156:12 157:8
160:4,10
161:16
**sign** 64:7 163:9
164:11 171:25
183:12
**signature** 59:14
59:17 60:3,7
77:21 161:13
161:15,18
181:14 182:17
**signatures** 59:6
59:10 171:25
**signed** 63:4
159:16 183:20
**significance**
60:12 75:4
76:13

**significant**
82:22 101:13
**similar** 68:22
**simply** 58:16
65:14 67:23
72:21 117:9
**simultaneously**
129:9
**single** 143:16
173:19
**sit** 123:10
166:8
**sitar** 176:1
**sitaraman**
133:6 154:17
154:20 155:3
162:5,17
175:15 176:1,4
176:4,10
**site** 95:22,25
**six** 177:15
**size** 64:20
**slide** 126:5,19
127:10 128:8
128:10,14,15
128:17,21
133:13,15,18
133:19 134:12
134:24 135:19
135:23,25
136:2,3,3,12,17
137:18,20
139:9,19,23
140:4,5,5
141:3,10,18,22

141:22
**slide's** 134:10
**slides** 126:11
126:11 134:10
141:15
**slight** 111:18
**slightly** 144:4
160:8
**slip** 151:18
**small** 84:21
121:9 173:6
**smaller** 123:4,6
151:20
**social** 176:20
177:3
**sodium** 64:14
64:22 74:14,17
79:1 120:15
150:14
**software** 92:13
92:17,25 93:3
164:20
**sold** 122:22
124:20,20
152:21 153:23
**sole** 127:22
**solutions** 55:4
55:6 181:11
183:23
**somebody**
83:10 129:1
**sorry** 55:24
59:4 76:9 78:4
80:12 85:9
86:1 87:23

88:10 91:16
92:15 95:9
106:17 107:24
107:25 109:17
112:22 113:8
117:20,22
119:21 120:7
124:9,18
126:17 134:1
134:10 138:10
139:22 140:8
142:17 146:23
149:9 150:17
156:22 161:11
170:14 174:9
174:25 175:9
176:2 179:14
**sort** 165:1
**sosperse** 64:24
64:25 65:15
91:15,17
152:23,24,25
153:4
**soto** 91:10,11
91:13,19,23
92:1,2
**sound** 79:3
**sounds** 79:5
84:3
**source** 93:22
**sourcing**
163:19
**south** 54:3
94:15,15 95:13
95:14,16

103:21,24,25
104:5,7,10,22
104:25 105:7,8
105:10,23
106:16 136:22
146:16,25
147:3,5,7,8
176:11
**south's** 107:6,9
**space** 84:12
107:11,16
108:11,11,25
144:17 150:4
**speak** 146:8
**speaking** 89:9
**speaks** 135:9
**specific** 64:4
65:5 80:2 87:1
91:24 94:10,13
**specifically**
74:14 88:18
95:11
**specifications**
63:15 97:18
**speculate** 74:4
**speculating**
156:21
**speculation**
90:22,25 154:7
156:22,23
157:4
**speed** 97:3
101:20 123:23
**speeds** 113:19

**spell** 106:18
**spelled** 70:4
105:5,6 126:21
126:22
**spellings**
179:16,20
**spoke** 64:19,20
102:8 132:12
132:15 176:16
179:4
**spread** 81:5
**spreadsheet**
53:24 165:21
168:22
**springfield**
128:23
**ss** 182:3
**staff** 151:3
**stamp** 60:10,10
60:12,13,19,23
60:24 61:2
96:22 106:12
**stamped** 66:2
77:7 93:13
**stand** 106:13
170:24
**standard** 180:4
180:5,10,14
**standing**
180:15,18
**stands** 76:6
**start** 93:1,3
123:17 131:19
159:8

**started** 73:23
85:16 92:17
93:6 112:20
133:18 137:14
173:21 174:2,4
174:4,6
**starts** 86:12
**state** 54:5
55:10,12 67:7
95:7 136:12
139:20 182:3,8
182:18
**statement**
120:18 175:1
**states** 51:1
54:24 109:6
110:25 111:1,3
121:4,7,13,16
121:17,21,22
121:24 122:3
122:10,13,15
127:3 142:6
143:16 173:19
**stay** 144:19
**stepping** 81:7
**stop** 97:4
164:15 171:14
**stopped** 131:14
**store** 173:6
**straight** 106:10
125:16
**strain** 160:15
**street** 54:3
**strength** 64:20
64:24 65:6,8,8

**strike** 78:14
106:23
**stuff** 133:4
151:17 158:13
158:16
**subcontractors**
163:20
**subject** 74:14
76:12 84:4
87:7
**submit** 95:6
**subscribed**
185:14
**substantial**
115:25 130:19
**sufficient**
102:13
**suit** 176:8
**suite** 52:4
**sulfamic** 87:8
87:14
**super** 169:3
**supplied** 61:15
64:15 65:17,20
65:23 66:12
75:10 76:21
80:5 88:7
111:15 113:25
143:8,11
**supplier** 81:2
81:19 82:14,22
84:15 87:6
88:15 89:3
93:19 94:16
98:5,7,8

101:16 116:16
116:19 162:4
163:21 164:2
**supplier's**
161:25 162:1
**suppliers** 74:12
75:16 80:18,19
80:24 81:13
82:21 85:17
91:13,24,25
94:1 100:19
103:5 111:1
116:1 117:10
118:5,10
134:17 158:7
161:22
**supplies** 130:12
151:5
**supply** 75:11
78:2,18 79:25
80:17,21 81:22
83:7 84:8
87:14 89:4
91:14 100:23
100:25 128:9,9
152:19
**supplying**
63:10 66:8
92:2 96:12
152:5
**support** 72:5
**suppose** 62:22
62:23
**supposed** 115:7
133:3

**supposedly**
105:7
**sure** 58:12 63:3
64:23,24 66:21
68:6 69:19
74:11,23 75:10
76:6 77:1
79:20 80:23
81:22 83:23
85:1 92:16
95:3,17 100:20
102:12,15
110:7 112:6
113:2 115:2,11
119:8 130:21
138:9,14
147:10 151:22
152:3,17
156:19 160:17
**surprise** 63:5
96:14
**swear** 55:23
**switch** 81:20
**switched** 93:8
**sworn** 56:3
185:14
**sync** 180:21
**system** 92:14
92:17 93:6,10
96:19 114:20
118:6,7 134:15
**systems** 93:5

| t |
|---|

**t** 53:8 56:6
67:14 88:21
91:11 103:15
182:1,1 184:3
184:3
**tack** 158:20
**tad** 123:4,5
**take** 54:15
56:20,20,20
58:7,14 72:10
72:16 76:4
86:13 88:11,11
89:14 90:10,20
91:19 96:21
97:5,24 99:19
99:25 100:5
106:11 108:18
112:5,8 119:1
123:15 128:7
129:7 131:20
144:2,3 148:7
164:25 165:2
167:18 178:17
178:20
**taken** 54:2 85:5
92:1
**takeover** 92:3
**takes** 58:11
**talk** 134:4
**talked** 62:8
**talking** 61:15
68:12,19 79:12
82:5 99:20
135:5 176:19

**tank** 102:9
114:22
**tanker** 84:12
84:12 89:23
90:1 98:3
**tap** 88:6
**tasks** 143:23
**tax** 53:25 82:1
82:5 93:20
94:4 117:18,24
125:21 164:17
164:18,21
168:23 170:2
170:11 171:23
171:23
**taxes** 170:11
**teach** 160:2
**team** 134:2,24
135:25 140:6,8
**technical** 57:1
**telephone** 67:3
132:9,11
**tell** 58:21 63:21
69:14 70:7
75:23 76:13
77:12 80:16
86:13 88:7,12
103:21 104:12
104:22 108:2
114:9 116:7
118:10,24
129:16 130:7
130:14 132:17
133:20 135:1,4
147:6 150:25

154:14 159:16
174:16 177:4
177:14 179:5
**telling** 102:8
130:23 173:9
**tells** 75:24
157:18
**ten** 83:2 107:25
112:22 139:9
139:12,17
**tennessee** 54:25
95:7,17 107:12
107:13,17,19
108:5
**tenure** 61:8,8
**term** 105:16
**terminated**
130:8 131:9
**termination**
130:24
**terms** 56:11,12
58:5 62:4
73:17 75:9
82:22 98:23
**terrance** 52:11
55:3
**terry** 179:19
180:14
**testified** 56:5
71:14 73:23
103:20 105:9
113:20 125:13
130:3 144:16
173:11

**testify** 177:2,4
177:10
**testifying**
175:25 176:3
**testimony** 62:8
64:16 70:19
84:17 90:6
104:6 106:22
107:1 111:5
115:3 119:17
121:9 122:8,11
124:2 131:23
140:16 142:22
154:23 156:14
168:21 169:25
172:16 173:18
179:6 181:9
183:9,18 185:8
**texarkana** 86:8
**text** 108:6
119:24 120:5
120:14 140:12
141:25
**thank** 55:20
56:8 58:2,21
59:6 61:25
63:7 65:2
72:12 78:8
88:22 91:10
96:2,8 100:11
103:8,11
106:20,22
113:6 123:2
126:23 136:7
140:10 148:19

149:12 158:22
158:22 179:9
179:11,13,21
179:22 181:4
**thanks** 67:15
100:10 113:19
116:4 143:12
149:13
**that'd** 181:4
**thing** 79:10
95:13 98:6
119:4 134:4
157:21 180:22
**things** 85:19
95:9 101:20
107:25 113:19
123:23 129:8,8
148:3 166:7
177:23
**think** 66:22
69:9 76:8
84:10 87:15,23
90:25 91:17
93:7 97:12
119:16 126:10
130:3 131:9
134:3 144:1
147:24 148:1
150:24 152:17
155:11 160:13
174:6,22 180:4
**thinking** 123:5
**third** 64:1 65:5
69:8 89:12
120:21,22

121:1 127:13
161:18,21
**thought** 76:5
92:18
**three** 62:23
65:23 69:9
71:17,21 86:11
100:4 102:5
112:4 149:10
177:11,22
**tight** 123:10
166:8
**till** 85:17
**time** 55:12
56:20 58:7,10
58:11 59:20
61:10,23 64:7
66:25 79:12,21
84:6,25 85:2,5
87:18 91:4
92:16 96:20
100:3,13,16
103:10,18
108:7 112:5
114:17,19
115:5,15 116:2
116:3 118:5,8
118:11 119:2
122:17,21,22
123:21,22,24
127:14,16
128:1 129:17
130:22 137:14
138:8 141:20
144:1,11,14

146:24 150:1,2
150:8,20,24
151:1,5,10,10
151:19,23
152:5,17 159:7
159:12 161:11
166:18,21
176:16 177:13
177:15,18
178:21,23
179:1 183:19
**timeframe**
73:17 180:4
183:8
**timely** 102:16
**times** 75:16
81:11 88:15
97:17 99:14
100:18,23
107:20 155:20
173:14
**timing** 133:13
**title** 86:16
126:19 128:8
136:4
**titled** 127:11
**today** 55:5
123:24 168:9
**today's** 57:22
180:7 181:9
**together** 85:22
105:18 116:12
158:20 178:10
**told** 131:1
132:19,20,25

133:7 138:22
147:8,9 157:15
158:13 162:10
163:12 164:10
173:23 177:5,5
177:7,9 179:7
**tom** 80:9,10,11
**took** 68:7
123:16 168:3
172:13
**tool** 160:10
**top** 62:5 63:14
64:14 77:9
83:19 120:1
141:6 152:3
161:8 166:22
170:20,21
**total** 181:10
**totally** 108:1
**totes** 149:1
150:2,4,5
**tour** 169:6
**tours** 169:4
**towards** 172:1
**town** 128:8
161:4
**townsend** 52:3
53:6 54:19
55:17,18 56:23
57:14,20 58:2
68:1 73:10
85:8 90:22
97:16 100:7
101:6 103:11
103:13,16

106:9,21
109:21 110:2
111:23 114:7
114:13 115:8
115:13 116:23
117:4,12,15
118:2,9,21
121:25 122:7
123:6,10,14
125:23 126:22
126:25 128:6
129:5 131:17
135:24 136:18
140:9,11
141:11,17
143:9 144:1,8
144:15 148:6
148:14,17,20
148:21 149:11
149:13,15
150:12 153:11
153:21 154:10
155:12,17
156:13 159:2
160:20,24
162:11 164:14
165:4 168:6
171:13 173:17
175:4,14
176:15 178:16
179:2,9,15,21
180:3,9,11,13
180:16,19,23
181:6 183:1

**track** 108:7
148:15
**training** 137:2
137:3,7,10,15
138:13,16,25
139:3,4,4,10,13
139:17
**trainings** 138:5
138:6,20,21
139:7
**trank** 90:3
**transcribe**
61:23
**transcribed**
182:9
**transcript**
182:10,11
183:6,20 185:5
185:8
**transferred**
176:11
**transition**
135:6
**travel** 110:3
144:17
**traveled** 107:16
110:5,9
**traveling**
110:12 115:22
129:16,24
**travelled**
144:19
**travelling**
129:23 132:2

**trial** 70:1,7
86:23 176:1,4
**trick** 160:2
**tricky** 106:5
**tried** 148:2
151:5
**trip** 90:8 110:6
**trouble** 100:22
**truck** 89:23,24
89:25 90:4,4,8
90:9,13,17
91:3 98:3,8,9
98:10
**truckload**
150:4
**true** 182:10
185:8
**truly** 156:10
**trust** 64:23
**truth** 129:16
177:14
**try** 61:11 70:10
72:25 91:4
116:16 123:11
129:8,9 131:18
**trying** 61:16
81:8 87:5
89:21 91:1
97:3,13 101:20
132:19 134:2,5
135:6 150:6
151:9 175:16
**tryout** 125:12
**turn** 68:17
99:24 106:2

**twice** 107:22
115:18
**two** 66:21
78:12 79:13
87:21 95:1
99:14 102:19
107:23 119:3
129:8 152:8
158:18 159:3
164:25 178:19
**tynes** 124:10
135:11,13
**type** 61:12
62:14,18 76:3
**typically** 87:2

**u**

**u** 70:5 87:9
105:6
**u.s.** 111:16
127:17,20
141:14 142:5
**uh** 61:24 69:4
70:2,6 73:1
77:8 85:15
126:1 127:12
135:12 137:25
140:7 170:23
**ultimately**
87:14 116:20
**unable** 57:4
**under** 59:17
60:22 90:18
103:17 120:15
143:4 167:3
168:22 182:7,9

**undergo** 137:1
**understand**
89:2 90:6
98:14 99:6,15
108:1 117:16
117:24 121:20
126:18 133:23
153:6 158:14
158:16 162:15
173:24 174:13
**understanding**
65:16,21 66:11
74:17 75:13
83:25 93:18,25
94:6 117:21,21
118:3 130:8
155:23 158:11
170:3
**understands**
97:20
**understood**
108:20 138:6
143:12 152:2
**unit** 54:21
**united** 51:1
54:24 109:5
110:25 111:1,2
121:4,7,12,16
121:17,21,22
121:23 122:3,9
122:12,15
127:2 142:6
143:16 173:19
**update** 93:5
94:25 133:10

133:18
**upload** 92:18
93:7 106:4
118:18 123:16
129:9
**uploaded** 56:24
123:19 171:16
**uploading**
93:10 123:3
**use** 61:1 90:2
104:4,5,7,12,14
105:25 131:14
147:9
**used** 60:15
85:18 89:15
104:9 146:15
173:18,20
181:10 183:20
**using** 93:3
146:10,13
152:12 164:20
173:10
**usually** 180:14
180:20

**v**

**v** 51:5 67:14
183:4 184:1
185:1
**valliant** 65:9
67:10,13,14
87:20 88:7
128:23 149:7
149:11
**value** 125:5
149:19 153:3,7

153:10,12,13
**various** 62:1,9
63:9 73:16
79:2 80:6
92:10 96:12
97:1
**vehicles** 109:14
109:16,22,25
**vendor** 114:9
114:16 151:9
155:21
**vendors** 81:6
110:24 111:15
114:2,2,3
120:12,19
122:18,22
134:16 143:8
143:11 158:7
**verify** 183:9
**veritext** 55:3,5
181:11 183:14
183:23
**veritext.com.**
183:15
**versaney**
119:12
**versus** 54:23
**vicksburg** 79:3
**video** 54:14,22
54:22 180:12
180:21
**videographer**
52:11 54:7,21
55:4,22 100:12
100:15 144:10

144:13 178:22
178:25 180:11
180:15,17,21
180:24 181:8
**videographer's**
97:5
**view** 56:21
160:6
**virginia** 128:19
**virtually** 54:10
**visit** 66:23
107:9,12,20
110:16,19
137:10 138:3
139:8
**visited** 66:17
66:20 87:22
139:5
**visiting** 129:22
**visits** 107:23
**volume** 51:10
54:2,22 82:22
181:12

**w**

**wait** 123:24
131:2
**waiting** 171:19
**want** 58:11,19
62:7 69:20
74:4 76:5
84:11 131:14
166:10 169:3
178:17 179:23
180:1 181:1

**wanted** 60:24
67:5 91:2
114:15 134:16
149:25 150:4,6
151:12,14
158:2
**warehouse**
128:9,12,16,19
**warehouses**
128:22 129:2
**warn** 123:4
**washington**
54:3,5,5 182:3
182:8,18
**water** 101:22
102:1
**way** 54:3,5 64:8
68:3 73:20
74:5 101:21
105:1 107:2
118:1,3 131:15
**we've** 72:8
78:20 150:24
**weather** 100:23
101:13
**web** 57:15
**website** 95:18
96:5
**week** 180:7
181:3
**weeks** 152:8
**weiss** 52:11
55:3
**went** 70:24
87:18 104:14

105:18 106:10
107:15 113:3
119:19 125:21
142:15 168:2
**western** 54:25
**wet** 64:20,24
65:6,8,8
**wheeler** 86:8
86:15
**whereof** 182:15
**win** 61:17
156:2
**wish** 119:4
**wit** 54:6
**withdraw**
65:14 68:3
**witness** 53:2
54:13 55:23,24
57:4,9,12,18
58:1 65:1 71:2
71:5,8 76:10
78:6 80:13
89:18 91:17
92:6 95:25
100:2,11
106:18 109:17
144:6 160:22
179:13 182:15
183:8,10,12,19
**woman** 106:24
**won** 65:18
153:8
**wood** 71:3,6
**word** 70:23
71:8,9

**words** 149:10
**wore** 99:8
**work** 60:20
62:16 83:11
94:5 97:7
103:4 107:17
108:2,14,18
113:14 116:9
124:12,14
129:25 132:5
135:13 136:1
140:17 143:3
144:5 151:23
174:7 176:19
177:10,21,21
**worked** 58:22
70:14 92:14
93:21 104:9
108:8,15,21
116:12 118:7
138:4 143:6,7
177:11,11,22
**working** 56:11
73:24 74:2
88:14 116:12
123:11 129:24
142:8 143:15
143:22 156:1
173:12,14
**works** 70:10
124:24 144:8
**worldwide**
141:25 142:3
143:15

**writing** 120:4
165:8
**written** 148:23
**wrong** 64:8
**wrote** 75:22
159:12
**ws** 172:19

**x**

**x** 53:1,8 56:6
103:15

**y**

**y** 106:19
119:13
**yeah** 57:18
75:1,1 76:8
85:13 90:25
97:12 100:2,7
100:9 104:4,19
113:17 117:21
118:16 120:9
122:2 132:24
134:21 142:18
143:17 148:20
150:18 154:2
159:8 160:11
180:7,9,10
181:1,4
**year** 59:3,5
62:22 79:13
99:14,17
115:18,18
171:23
**year's** 176:18
176:18,21,21

**years** 62:23
   64:23 79:14
   95:1 99:9,14
   107:25 112:22
   115:17 155:24
   177:11,23
**yellow** 69:11
   120:4
**yep** 67:19
   112:2,7 113:15
   124:11 149:14
   180:1
**young** 102:22
   102:25 119:12
   119:15,17

**z**

**z** 70:5
**zeros** 112:4
**zoom** 55:2
**zurich** 51:6

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.