# **Exhibit 28**

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TENNESSEE
2                    WESTERN DIVISION
3      INTERNATIONAL PAPER COMPANY,
4                 Plaintiff,

                                   Case No.
5           vs.              2:22cv-02789-MSN-CGC
6      BEAZLEY INSURANCE COMPANY, INC.,
       and ZURICH AMERICAN INSURANCE
7      COMPANY,
8                 Defendants.
9

10     VIDEOTAPED
       DEPOSITION OF:  MARK W. ALLEN
11                     (Appearing via Zoom)
12     DATE:           December 20, 2023
13     TIME:           10:05 AM
14     LOCATION OF
       THE WITNESS:    Charleston, SC
15

       REPORTED BY:    Sandra K. Bjerke, RDR, CRR, CBC
16                     (Appearing via Zoom)
17
18
19
20
21
22
23
24
25

1    APPEARANCES OF COUNSEL:

2         ATTORNEYS FOR THE PLAINTIFF
              INTERNATIONAL PAPER COMPANY:

3

              K&L GATES, LLP
4             BY:  NATHAN TOWNSEND
                   (Appearing via Zoom)
5             210 Sixth Avenue
              Pittsburgh, PA  15222
6             (412) 355-6500
              nathan.townsend@klgates.com

7

8

         ATTORNEYS FOR THE DEFENDANT
9             BEAZLEY INSURANCE COMPANY, INC.:
10            ROBINSON & COLE LLP
              BY:  WILLIAM MAXWELL DALEY
11                 (Appearing via Zoom)
              One Boston Place, 25th Floor
12            Boston, MA  02108
              (617) 557-5996
13            wdaley@rc.com

14

15       ALSO PRESENT:

16            Roosevelt Harrison, Videographer
              (Appearing via Zoom)

17

18

19

20

21

22

23

24            (INDEX AT REAR OF TRANSCRIPT)

25

1                    THE VIDEOGRAPHER:  All right.  Good

2        morning.  We're now on the record.  The time on the

3        monitor is 10:05 AM Eastern Standard Time.  Today's

4        date is December 20th, 2023.

5                    This is the video-recorded deposition

6        of Mr. Mark W. Allen in the matter of International

7        Paper Company versus Beazley Insurance Company,

8        Inc., et al., filed in the United States District

9        Court for the Western District of Tennessee,

10       Western Division.  This deposition is being

11       conducted remotely through Zoom.

12                    Counsel, please introduce yourselves,

13       after which our court reporter will swear in

14       Mr. Allen.

15                    MR. DALEY:  Nate, do you want to take

16       it?

17                    MR. TOWNSEND:  Sure.  Good morning.

18       This is Nathan Townsend from K&L Gates representing

19       International Paper Company.

20                    MR. DALEY:  And William Daley from

21       Robinson & Cole on behalf of Defendant Beazley

22       Insurance Company.

23                    (Whereupon, the oath was administered

24       to the witness by the court reporter.)

25                    MR. DALEY:  Nate, stipulation as to all

1    objections except as to form reserved until trial?

2              MR. TOWNSEND:  Yes, that's appropriate.

3    Thanks, Max.

4              MR. DALEY:  Okay.  Great.  Of course.

5                   MARK W. ALLEN,

6    being first duly sworn, testified as follows:

7                      EXAMINATION

8    BY MR. DALEY:

9         Q.   And, Mr. Allen, I know -- just

10   introduced ourselves for the record, but as you

11   know, my name's Max Daley.  I represent the

12   defendant in this matter, Beazley Insurance

13   Company, and we are the ones who served you with

14   the subpoena to testify here today.

15              If you could, just take a second and

16   place your name on the record and just spell that

17   out.

18        A.   Mark W. Allen.  M-A-R-K, W, A-L-L-E-N.

19        Q.   Thank you, Mr. Allen.  Mr. Allen,

20   sometimes what we do is if a witness wants to

21   review the transcript and see if there are any

22   corrections that they want to make, we'll give them

23   a copy of the transcript and they'll have 30 days

24   to make those changes and get it back to the court

25   reporter.  And if they don't have any changes or if

1      they don't return the transcript within that 30

2      days, it's deemed to be signed and accurate.

3                  Would you like to have the opportunity

4      to review your transcript here?

5            A.    Sure.

6            Q.    Okay.  And so what will happen is the

7      reporter will -- the reporter or myself will get

8      that to you, and you'll have 30 days to review

9      that, make any annotations and then return it.

10     Okay.  So that sounds good.

11                 Mr. Allen, have you ever gone by any

12     other names?

13           A.    No.

14           Q.    And what's your date of birth?

15           A.    April 12th, 1956.

16           Q.    And you currently live in South

17     Carolina; is that correct?

18           A.    Correct.

19           Q.    Have you lived in any other states?

20           A.    Yes.

21           Q.    How many?

22           A.    Two; Louisiana and Mississippi.

23           Q.    For about how long did you live in

24     each?

25           A.    Mississippi was four.  That was easy.

1    Louisiana, a little more complicated.  13, I think.

2         Q.   Do you recall roughly the time periods

3    you were in both?

4         A.   Oh, yeah.  Time periods I know for

5    sure.  In Louisiana, I was there from '78 to '87.

6    And Mississippi, '87 to -- I'm sorry.  Not

7    eighty -- that's not right.  '87.  I mean, back in

8    there.  I thought it was easy.  I'll have to

9    remember it because I lived in three different

10   locations in Louisiana, so I kind of -- moved to

11   Mississippi in '97.  And then in -- moved to --

12   back to South Carolina in 2000, more or less.

13        Q.   Okay.  That works.  Sometimes okay to

14   take the scenic route; right?

15        A.   Yeah.  Well, I worked for International

16   Paper, actually, so -- Arizona Chemicals originally

17   and then International Paper.

18        Q.   Got it.  Okay.  And have you ever been

19   deposed before?

20        A.   No.

21        Q.   So I'm going to go over what I call the

22   ground -- kind of the ground rules for the

23   deposition.  My opposing counsel, Nate here, has

24   heard these from me far too many times already, so

25   I'll apologize to him, but it doesn't take too

1    long, Mr. Allen.  And these are just kind of

2    helpful things to keep in mind throughout the day

3    that should just make the process a little more

4    smoother, you know, and keep us as efficient as we

5    can be here.

6              So in the deposition it's going to be

7    my job to ask questions, and your answers to those

8    questions will be recorded by the reporter.  In

9    order for her to do that we both need to speak up,

10   you need to answer my questions orally because she

11   can't take down a um-hum or a head nod or things

12   like that; right?

13             And so does that make sense, that

14   whenever we're interacting today to try to speak up

15   and make sure that whatever your answer to my

16   question is, you make it an oral statement?  Does

17   that make sense?

18        A.   Sure.

19        Q.   So I just said my job today will be to

20   ask questions.  Perhaps better stated, my job today

21   will be to ask clear questions, questions you can

22   understand.  And if you don't understand any of my

23   questions today for any reason, please don't try to

24   decipher, you know, and try to figure out where I

25   might be going with it.  Just let me know you don't

1    understand the question.

2            If there's a piece of it, right, if you

3    can specify, you know, I don't understand what you

4    mean by this or that or if there's any way to kind

5    of let me know the specific piece of the question

6    that doesn't work, that would be great.  But

7    otherwise, if you just let me know if you don't

8    understand the question, I'll try to ask a better

9    question.  Does that make sense?

10           A.    Sure.

11           Q.    If you need a break at any point in

12   time today, you know, for any reason just let us

13   know.  Pretty much the only exception to that will

14   be if you're in the middle of answering a question

15   and you realize you need a break, I'll probably ask

16   you to finish your answer before we take the break,

17   but other than that, if you need time today it

18   shouldn't be an issue.  Does that make sense?

19           A.    Yes.

20           Q.    So we went over -- I'll ask the

21   questions, you'll give the answers.  Hopefully

22   they're good questions you can give an answer to.

23           Whenever one of us is speaking, though,

24   we should try not to speak over each other, you

25   know, and that will apply for me, you and Nate;

1     right?  We want the court reporter to be able to

2     make a clean transcript, and it's difficult for her

3     if we're talking over each other to accurately

4     record what we're all saying and in the correct

5     order.

6            So as we go on today I'm sure you'll

7     get comfortable more or less with my cadence,

8     right, and you'll know when I'm about to finish up

9     the question and it will be very natural for you to

10    want to start to speak and jump in.  But if you

11    just take a -- let me make sure I'm done, take a

12    tick before you start to answer, that should help

13    us generate a clean transcript today.  Does that

14    make sense?

15        A.   Yes.

16        Q.   Sometimes it might happen today that

17    you'll -- you know, I'll ask a question, it will be

18    one you understand and give an answer to, and then,

19    you know, we'll get down the road a little bit and

20    maybe an answer to another question will jog your

21    memory or, you know, you'll just remember

22    something, something that you would have added on

23    to that answer earlier.

24            If that happens today I would just ask

25    that you say, you know, I just remembered another

1   part of that answer I was giving earlier about, you

2   know, X or Y and just give us whatever that

3   additional piece of information is.  Does that make

4   sense?

5        A.   Yes.

6        Q.   And do you understand that the oath

7   you've taken today is the same oath that you would

8   take in a court of law and you have a duty to

9   testify as if testifying at trial?

10       A.   Yes.

11       Q.   Okay.  I am next going to ask you some

12  questions about your ability to testify accurately

13  and truthfully here today.  I'm not trying to imply

14  anything by these questions; right?

15            Some of them are the kinds of questions

16  that if someone were to just ask you on the street

17  you might take the wrong way and I would certainly

18  understand, but we're just trying to make sure that

19  you're in a state today where you can give

20  competent testimony, you know, and certainly not

21  trying to imply anything by them.

22            And so the first one of those questions

23  would be:  Do you have any medical condition or

24  impairment that would inhibit your ability to

25  testify truthfully today?

1              A.    No.

2              Q.    Are you taking any medications or drugs

3       of any kind that might make it difficult for you to

4       understand and answer my questions today?

5              A.    No.

6              Q.    Have you had anything alcoholic to

7       drink in the last eight hours?

8              A.    No.

9              Q.    Are you sick at all today?

10             A.    No.

11             Q.    Lucky you.  I'm fighting a cold off

12      myself, but wasn't going to call today off, but

13      happy to hear that.

14                   Are you currently under a doctor's care

15      for any illness that would impact your ability to

16      testify here today?

17             A.    No.

18             Q.    And lastly, is there any reason you can

19      think of why you would not be able to answer my

20      questions completely and accurately today?

21             A.    No.

22             Q.    Next question, similar vein.  Again,

23      don't mean to imply anything by it.  Just a

24      standard question.  Have you ever been convicted or

25      charged with a crime?

1          A.    Yes.

2          Q.    And what was it?

3          A.    It was indecent exposure.

4          Q.    And when was that?

5          A.    40 years ago.

6          Q.    Anything else?

7          A.    No.

8          Q.    In preparing for your testimony here

9     today did you discuss this case with anybody?

10         A.    Yes.

11         Q.    Who was that?

12         A.    You.

13         Q.    And when was that?

14         A.    I don't remember.  Couple of weeks ago.

15         Q.    Do you recall how long we spoke for,

16     roughly?

17         A.    30 minutes.

18         Q.    Do you recall what we discussed?

19         A.    Basically what the deposition was

20     about.

21         Q.    Did you review any documents to prepare

22     for today?

23         A.    No.

24         Q.    Did you try to find any documents to

25     prepare for today?

1            A.    No.

2            Q.    Do you think you have any documents

3     that would help you with your testimony today?

4            A.    No.

5            Q.    So there'll be some terms that I might

6     use frequently today, and I just want to make sure

7     that we have a mutual understanding of what I'll

8     mean by those terms.  So I'll just run through

9     those, make sure we're on the same page.

10                 Of course, like I said earlier, right,

11    if you don't understand what I'm saying by any of

12    these or you're not familiar with that entity, just

13    let me know.

14           A.    Okay.

15           Q.    And so the first one will be

16    International Paper.  I might refer to them as IP.

17    Does that make sense?

18           A.    Yes.

19           Q.    The second one is going to be Sitaraman

20    Jagannath.  I might call him Jagannath or Jag.

21    Does that make sense?

22           A.    Jag would probably be best.

23           Q.    I will refer to him as Jag.  The next

24    one will be --

25                 (Court reporter asked for clarification

1    due to feedback.)

2              THE WITNESS:  That's how he referred to

3    himself.

4    BY MR. DALEY:

5         Q.   Certainly.  No, that's -- and saves me

6    a couple syllables and our reporter at least a few

7    letters there at the end.

8              Next up will be Shiv Kumar Seetharaman.

9    I will refer to him as Shiv.  Does that make sense?

10         A.   Sure.

11         Q.   The next one is Diversified Global

12    Sourcing, Incorporated.  I'll refer to that as DGS.

13    Does that make sense?

14         A.   Yes.

15         Q.   The next one is going to be Mid South

16    Diversity Group, Inc.  I'll call them Mid South.

17    Does that make sense?

18         A.   Sure.

19         Q.   Okay.  And that will be it for now.

20    And so what we're going to do next is turn to your

21    background a bit and just kind of talk about

22    education, job history and some things like that.

23    And so with that, what is your highest level of

24    formal education?

25         A.   Master's degree.

1          Q.    And where did you get your master's?

2          A.    LSU.

3          Q.    And what did you get your master's in?

4          A.    Chemical engineering.

5          Q.    And what year did you graduate?

6          A.    '86.  No.  '87.

7          Q.    Okay.  '86 or '87.

8          A.    Yeah.  I -- it's been a while.

9          Q.    Understandable.  And did you have any

10    special concentration other than chemical

11    engineering while you were there?

12          A.    Yes; process control.

13          Q.    Could you describe that to me just a

14    little bit, if you could, from a 10,000-foot point

15    of view?

16          A.    Using computer programs to manipulate

17    flows to make product within specification.

18          Q.    Okay.  Thank you.

19          A.    Is that good enough?

20          Q.    That's good enough.  For what it's

21    worth, that was pretty good on my end.

22                And so for undergrad, where did you go?

23          A.    University of South Carolina.

24          Q.    And what was your major there?

25          A.    Chemical engineering.

1          Q.   And when did you graduate?

2          A.   '78.

3          Q.   Do you hold any professional

4     certifications or accreditations?

5          A.   No.

6          Q.   Any other specialized training?

7          A.   No.

8          Q.   Any other education, maybe, you know, a

9     degree you didn't finish or anything like that?

10         A.   No.

11         Q.   All right.  And we're going to turn to

12    your employment history here next.  So graduated

13    with your undergrad degree in '78?

14         A.   Correct.

15         Q.   Did you go into the field at all then,

16    or did you go to graduate school right from there?

17         A.   Yes.  I moved to Lake Charles,

18    Louisiana, and worked for Olin Chemicals from

19    eighty -- from '78 to '82.

20         Q.   And what did you do at Olin?

21         A.   I was a process engineer.

22         Q.   And could you tell me a little bit

23    about what that entailed?

24         A.   Well, I held various positions while

25    there.  So the last position I had was in a process

1  design group and designed equipment.  Well, close

2  enough.  Designed the equipment to improve the

3  process, worked on projects.

4          Q.   And would that be the chemical

5  production process?

6          A.   Roughly, yes.  Or supporting equipment.

7          Q.   And did you say you were there for

8  roughly four years?

9          A.   Right.

10         Q.   And was that when you went back to

11 school for your master's?

12         A.   A little bit later.  I was unemployed

13 for a couple of years, actually.

14         Q.   Okay.  And so then you went back, got

15 your master's at LSU?

16         A.   Correct.

17         Q.   And what was the first position you

18 held after that?

19         A.   With -- it started out being Reichhold

20 Chemicals.  R-E-I-C-H-O-L-D.  And Reichhold was

21 purchased by Arizona Chemicals and -- or at least

22 my plant was, several plants, and so it became

23 Arizona Chemicals, which was a division -- started

24 out being a division of International Paper.  No.

25 A subsidiary of and became a division of.  I'm not

1      exactly sure what the legal differences there are,

2      but anyhow.

3              Q.   Okay.

4              A.   So I was there until eighty -- no.

5      '96.  '87 to '96; is that right?  Something close.

6              Q.   Roughly.

7              A.   Roughly.

8              Q.   Roughly is fine.  Sorry if I

9      interrupted.  But especially if I'm asking you

10     about -- you know, if we're going a ways back, you

11     know, I don't expect you to always have exact dates

12     for anything, and that's probably something I

13     should have said earlier.

14              If I do ask you about any time periods

15     today and you're not sure about them, you know, the

16     best estimation you can give is, you know, just

17     fine and, you know, it could be a range of years,

18     it could be a time of the year.  You know, whatever

19     it is that helps you place it at some point in

20     time, if you could just give me that reference

21     point, that's great.  So especially on these when

22     we're just kind of talking about job history, you

23     know, it doesn't have to be exact, certainly.  So

24     rough estimations are just fine.

25              Okay.  And so you were there for --

1          A.    Roughly six years.

2          Q.    -- about -- okay.  Yeah.  About six

3    years.  Was that a similar position to the one that

4    you held at Olin?

5          A.    I was the plant engineer at the Arizona

6    Chemical plant, so I did a multitude of things.

7          Q.    Could you describe those a little bit?

8          A.    Well, I did capital projects, installed

9    computer systems, I -- the last little while that I

10   was there I was the production manager for one of

11   the units.  Area supervisor I think was the

12   official -- in charge of scheduling and personnel

13   and that kind of stuff.

14         Q.    Okay.  And so early to mid-'90s you

15   leave Arizona Chemical.  Where do you end up?

16         A.    International Paper, Vicksburg,

17   Mississippi.

18         Q.    And so you mentioned that Arizona

19   Chemical became a subsidiary or division of

20   International Paper; is that right?

21         A.    It always was.  The plant that I was

22   part of was purchased by Arizona Chemicals.

23         Q.    And so when you went to work at IP, was

24   that taking a new position or was it a transfer?

25         A.    It was a completely different job, but

1     it was -- it was a transfer.  All of my time at

2     Arizona Chemicals was counted as International

3     Paper time, so it was all within the same big

4     company.

5            Q.   Okay.

6            A.   I became -- I was part of the process

7     technology group control systems implementation.

8            Q.   And what did you do in that role?

9            A.   Programmed computers to make the

10    process better.

11           Q.   And would that be the paper production

12    process?

13           A.   Everywhere in the mill.

14           Q.   So for the various processes that the

15    mill utilized?

16           A.   The paper machine, the digesters, the

17    lime kiln.  All of the various areas.

18           Q.   And about how long did you hold that

19    position for?

20           A.   Well, I was four years in Vicksburg and

21    then four years in Georgetown, South Carolina.

22           Q.   And so when you were in Vicksburg, were

23    you responsible for any other mills or just the

24    Vicksburg mill?

25           A.   I became responsible for a short time

1    of the Bastrop mill called the Louisiana mill when

2    my counterpart there was killed by a drunk driver.

3           Q.   Okay.  All right.  And so that was for

4    about four years there?

5           A.   Right.

6           Q.   And then you said you went to

7    Georgetown, South Carolina?

8           A.   Correct.

9           Q.   Was that a similar position?

10          A.   Exactly the same position.

11          Q.   Any reason for the move given that it

12   was a similar position or...

13          A.   I moved to South Carolina because my

14   parents were in Charleston and getting old.

15          Q.   Got it.  And about how long did you

16   have that position for?

17          A.   Until IP eliminated the department in

18   two thousand -- no.  2000.  Maybe 2001.  I don't

19   remember exactly.

20          Q.   Okay.  And was that a one-mill position

21   or a multiple-mill position?

22          A.   I was sent to other mills, but I really

23   didn't have any responsibility for -- none of the

24   projects that we were proposing at the other mills

25   came to pass, so I didn't really work at any of the

1    other mills.

2         Q.   And so you were there until about

3    2000-2001.  What was the next position you held

4    after that?

5         A.   I semiretired at that point and my

6    parents had died and so I was managing the estate

7    and that kind of stuff.

8         Q.   Okay.  And about how long did that

9    semiretirement last?

10        A.   Until about 2008, 2009.  Somewhere in

11   there.

12        Q.   Okay.  And what position did you take

13   in 2008-2009?

14        A.   A customer service rep for DGS.

15        Q.   And how did you learn about that

16   position, if you recall?

17        A.   Craigslist.

18        Q.   And so I take it you applied.  Was

19   there an interview process?

20        A.   Yes.

21        Q.   Do you recall what it looked like?

22        A.   I drove up to Georgetown and met

23   with -- well, I call him Kumar, but you call him

24   Shiv, and Jyotika, the other -- she was the office

25   manager, and, you know, talked about what the

1   contract that they were hoping to get looked like

2   and how I might be able to help them locally.

3   Relatively locally, anyhow.

4          Q.   And what did that contract look like?

5          A.   I don't know what the contract looked

6   like.  I know it was for supplying wet strength to

7   the Georgetown mill.

8          Q.   And could you describe what wet

9   strength is?

10         A.   It is a chemical additive to the paper

11  when they're producing drywall tape.  It helps the

12  paper be strong when it's wet.

13         Q.   And did you ultimately accept that

14  position?

15         A.   Yes.

16         Q.   And that was in 2008 or 2009?

17         A.   Somewhere in there, yeah.

18         Q.   And the position was as a customer

19  service rep; is that right?

20         A.   The official title was technical

21  service, but I didn't do any technical service.  I

22  was -- it was customer service.

23         Q.   And so what would you say that you did

24  do in your position?

25         A.   I interfaced with the production

1    engineer for scheduling.  They were unhappy with

2    their previous supplier, and so scheduled trucks to

3    be delivered there at an appropriate time.

4         Q.   And this was when you started in about

5    2008 or 2009?

6         A.   Roughly, yes.

7         Q.   And did you do anything else at that

8    time?

9         A.   No.

10        Q.   And about how long were you at DGS?

11        A.   Until -- until the contract was

12   canceled in -- when was it, 2019?

13        Q.   And so over the roughly 10 years there,

14   did you hold any other positions other than

15   technical service?

16        A.   No.  Can't be 10 years.  So somewhere

17   the dates are wrong, but it was about eight years,

18   so...

19        Q.   So maybe 2010 or 2011 you started as

20   opposed to --

21        A.   Maybe.

22        Q.   Yeah.  Somewhere in that range.

23        A.   Yeah.

24        Q.   And over the course of your time there

25   did the number of mills that you worked with

1    change?

2         A.   Yes.

3         Q.   And could you describe that to me a

4    little bit?

5         A.   We picked up other chemicals and other

6    mills, and what that process was, I don't know, but

7    at the end it was nearly 10 mills.  Something in

8    that vicinity.  Mostly at the end it was bleach,

9    but we did also size for the Springfield -- is it

10   Oregon or Washington?  Somewhere up in the

11   Northwest.  And another chemical -- I forget which,

12   what it was -- for a mill that shut down in

13   Alabama?  I forget.

14        Q.   And so when you left DGS in 2019, did

15   you take another position after that?

16        A.   No.  I retired.

17        Q.   And so you've been retired since then?

18        A.   Yes.

19        Q.   So I want to talk about DGS a little

20   bit.  As far as employees go, I've referred to him

21   as Shiv.  I see -- I heard you say you refer to him

22   as Kumar.  Could you describe to me a bit what his

23   role was at DGS?

24        A.   He was the boss.  Owner, you know.

25   Whatever.

1          Q.   And what were your interactions with
2     him like?
3          A.   On the telephone.  I think I was
4     face-to-face with him twice:  once for the initial
5     interview and then another time in Memphis, and
6     don't remember exactly when that was, but...
7          Q.   Did you speak with him often?
8          A.   Not too often.  Only when there was a
9     problem, really, or when we were picking up a new
10    mill or he had wanted me to go someplace or -- you
11    know, it was...
12         Q.   And so you were largely self-sufficient
13    in your role; is that right?
14         A.   Yes.
15         Q.   Did you know what Shiv's background was
16    in chemicals?
17         A.   Not really.
18         Q.   Did you know his education?
19         A.   No.
20         Q.   All right.  I am going to butcher this
21    pronunciation and I heard you say it earlier.  I
22    told myself I would try to remember.
23         A.   Jyotika.
24         Q.   Jyotika?
25         A.   Jyotika, yeah.

1          Q.    Jyotika.

2          A.    Right.

3          Q.    Jyotika Balsara?

4          A.    Sounds right.

5          Q.    Okay.  Could you -- what was her role

6     at DGS?

7          A.    She handled the money.

8          Q.    And did you work with her often?

9          A.    Well, I sent her -- when I ordered a

10    truck I sent her a copy of the bill of lading or

11    the -- you know, the scheduling request and so that

12    she would know that a bill was coming and, you

13    know, that kind of stuff, but I didn't -- she was

14    in California, I'm in Charleston, so, you know,

15    it...

16         Q.    And so she took care of order

17    processing; is that right?

18         A.    Bills.  I mean, accounts receivable,

19    accounts payable.

20         Q.    Would you say that you were the one

21    responsible for placing the order?

22         A.    Yes.

23         Q.    And then she would handle the

24    accounting piece of it, I guess we could call it?

25         A.    Yes.

1          Q.    What about Heather Darnell?

2          A.    She came on later to assist me.  She

3     did data entry and covered for me when I was

4     traveling.

5          Q.    Do you recall roughly how long she was

6     there for?

7          A.    No.  Three years, maybe.  I...

8          Q.    And did you say she was there up until

9     you were?

10         A.    Yes.

11         Q.    So she left in 2019, joined in roughly

12    2015, 2016?

13         A.    Roughly.

14         Q.    And she assisted you with data entry

15    and kind of covering when you weren't around; is

16    that right?

17         A.    Correct.

18         Q.    Anything else she did?

19         A.    No.

20         Q.    And do you know what her background

21    was?

22         A.    She worked for Boeing for some time.

23    Other than that, I don't.  She said she was an

24    engineer.  I knew her from church.

25         Q.    Do you know if she had any degrees?

1      A.   No.  I don't know what -- I mean, I
2   think she did, but I don't know what they were.
3      Q.   Okay.  What about Robert Slupski,
4   Slupski?  I could be pronouncing that wrong as
5   well.
6      A.   Don't know who that is.
7      Q.   Not familiar?  Are there any other DGS
8   personnel that you're familiar with?
9      A.   There were -- as far as I know there
10  were no other DGS people.  There were some
11  subcontractors, but they weren't DGS people.
12     Q.   And who were those subcontractors?
13     A.   I don't remember their names.
14     Q.   Do you recall what they did?
15     A.   The one that I can think of did organic
16  cleaning.
17     Q.   And where did they do organic cleaning?
18     A.   I don't know.
19     Q.   For clients of DGS?
20     A.   Yes.  They had their own clients, of
21  course, but Kumar would -- had put them in contact
22  with paper mills that we were doing business with
23  to clean machine floor and stuff like that.
24     Q.   And any other subcontractors like that
25  you can think of?

1          A.    There were a couple of other guys at

2     the Memphis meeting, the last Memphis meeting, but

3     I don't know who they are.

4          Q.    And was that a meeting with IP?

5          A.    Yes.

6          Q.    Do you know who DGS's clients were?

7          A.    As far as I know, International Paper

8     was the only one.

9          Q.    Turning back to your role specifically

10    at DGS, I take it for the first five years or so

11    you were there you were largely self-sufficient; is

12    that right?

13         A.    Yes.

14         Q.    Then the last three years you had

15    Heather Darnell kind of in an assistant role; is

16    that right?

17         A.    Yes.

18         Q.    And your responsibilities during that

19    time period were pretty consistent; is that right?

20         A.    Increasing as we gained other mills,

21    but yes, which is why I got an assistant later on.

22         Q.    And would that be increasing in scope

23    or just magnitude?

24         A.    Just magnitude.

25         Q.    So doing the same work on a larger

1    scale.

2         A.   With more mills.

3         Q.   And so would you go to the mills as

4    part of your responsibilities?

5         A.   Yes.

6         Q.   Could you describe that to me a bit?

7         A.   When we got the business at the mill I

8    would go to the mill and do a safety check

9    inspection for where the trucks would be unloading,

10   making sure there was an eyewash station and safety

11   shower, easy access and all of that kind of stuff.

12        I would contact the -- either contact

13   the process control group at that mill or the area

14   supervisor or the production engineer would do it

15   for me to -- because of my background with

16   International Paper, I knew the data systems that

17   were available and had them send me tank level data

18   so that I could monitor the tank levels and

19   schedule the trucks when it was needed.

20        Q.   And so it sounds like that was part of

21   the initial reach-out when you would get a new

22   mill.  Would you continue to go to the mills after

23   that?

24        A.   Not usually, but occasionally.

25        Q.   Is there anything in particular that

1      would prompt you to go to a mill --

2             A.    A problem.

3             Q.    I'm sorry?

4             A.    A problem.

5             Q.    Could you give me an example of that?

6             A.    Not offhand.

7             Q.    Maybe if there was an issue with a

8      delivery you would go to the mill; would that be

9      right?

10            A.    Mostly with -- an issue with -- well,

11     yeah, I guess that would be -- it wouldn't just be

12     an issue with one delivery, but if there was a

13     systemic problem I'd go to the mill and work out

14     what the problem was.

15                  I was in telephone communication with

16     the area manager or the production engineer

17     regularly, but mostly I became invisible to them

18     because I took care of their inventory.

19                  If I heard from them, that meant that

20     it was not good news.  Or else they were having an

21     annual outage and wanting to let me know that, hey,

22     we're not going to be -- you know, whatever.

23            Q.    All right.  You mentioned you were

24     familiar with the data that they had available from

25     the mills.  Were you also familiar with the

1   hardware?

2          A.   Yes.

3          Q.   Did that also assist you in your role?

4          A.   I was able to talk the paper mill

5   language with the people, so I -- yes.

6          Q.   And did that help facilitate the

7   ordering process?

8          A.   Not -- not really.  I mean, the

9   ordering was based on inventory.  So it was more

10  understanding what the product was being used for.

11  I understood that, and so that helped me understand

12  when to order and that kind of stuff.

13         Q.   Would you also meet with suppliers in

14  your role?

15         A.   Yes.

16         Q.   Could you describe that to me?

17         A.   That was typically just the initial

18  contact when -- for instance, at one of the mills

19  we worked with Olin to get the bleach.  And so I

20  went to their office and talked to about where we

21  could get the product from to deliver to the mill,

22  and there were two different specifications of

23  bleach that were required and two different

24  production facilities that they had to come from

25  and that kind of stuff.

1        Q.    And in your role did you help
2   coordinate the logistics of handling the different
3   types of specs and the different delivery points?
4        A.    Yes.
5             MR. TOWNSEND:  Objection to form.
6             THE WITNESS:  Pardon me?
7   BY MR. DALEY:
8        Q.    So Nate -- sorry.  Nate will object to
9   questions from time to time.  You'll still be able
10  to answer.  He's putting the objection on the
11  record.
12       A.    Oh.
13       Q.    So he was objecting to the form of my
14  question because I asked you both -- I think, at
15  least, he was objecting because I asked you about
16  both the specifications and the delivery points, so
17  he was objecting as compound.
18             I could be wrong there, but that was my
19  interpretation, and so he's objecting to that, but
20  you're still free to answer to the extent you
21  understand the question and can answer the
22  question.
23             Okay.  And so --
24       A.    With specifications, I understood what
25  the specifications were and handled them.

1          Q.    Was it common to have different
2     specification requirements?
3          A.    No.
4          Q.    And so that made that mill's order
5     unique in some way; is that right?
6          A.    Yes.
7          Q.    Would that be the same for the multiple
8     delivery points?
9          A.    I don't understand.
10         Q.    Yeah, my apologies, and maybe I
11    misinterpreted.
12               I think you said -- oh, there were two
13    different facilities that you sourced the different
14    specs from; is that right?
15         A.    Yes.
16         Q.    And was that outside the ordinary as
17    well?
18         A.    Yes.
19         Q.    And other than Olin, are there other
20    suppliers that you would meet with?
21         A.    Yes.  And I don't remember their name,
22    but they were headquartered in Houston.  Again, I
23    only met -- usually met with them once just for
24    initial setup, and then all the rest was by
25    telephone or email.

1          Q.   And would you go to the supplier's

2     headquarters to meet with them?

3          A.   Typically.

4          Q.   And would they explain to you the

5     different products that they would be selling to

6     IP?

7          A.   There weren't really separate -- I

8     mean, different products.  It was different

9     production facilities, which one's closest and

10    shipping costs and that kind of stuff.

11         Q.   Would you refer to that as logistics?

12         A.   Yes.

13         Q.   So would -- would you say you would

14    work with them to streamline the logistics to IP?

15         A.   Yes.

16         Q.   Would that be an ongoing relation -- or

17    I'll rephrase that.

18              Was that a continuing line of

19    communication between you and the supplier

20    throughout the term of the contract?

21         A.   Once the -- you know, the source

22    location was determined, that typically was the end

23    of it unless they were having an annual outage and

24    needed to be sourced from another place or

25    something like that, but -- so I'm not sure

1    "ongoing" is an accurate -- but more or less.

2         Q.   So once a plan -- once an initial plan

3    was agreed on with a supplier, you would more or

4    less touch base with them if something came up.

5         A.   Well, I would put my orders in to them,

6    you know, on an ongoing basis, but as far as

7    changing the source location, that was only if they

8    were having an issue.

9         Q.   Anything else you would meet with the

10   suppliers with respect to?

11        A.   No.

12        Q.   And so you mentioned that you would

13   coordinate orders for the mills; is that right?

14        A.   Yes.

15        Q.   Could you describe to me what that

16   process looked like?

17        A.   I would enter into a spreadsheet the

18   tank level on a daily basis and then project out,

19   based on current usage, when they would need to

20   receive a truck and schedule the truck accordingly.

21        Q.   And would there also be times where IP

22   or the mills might reach out for orders other than

23   the ones you just described?

24        A.   They were -- maybe it was just

25   Vicksburg; didn't want me to actively manage their

1    inventory.  So they would contact me when they

2    wanted a truck, but I would still monitor their

3    tank level and, on occasion, would have to call the

4    operator and say, hey, don't you need a truck?  And

5    they would either tell me, no.  We're going into an

6    annual outage and we're letting the tank level go

7    down, or yes.  Oops.

8         Q.   Certainly.  Okay.  All right.  So

9    orders generally was monitoring tank levels at the

10   mills, projecting need, and then placing the orders

11   to meet that need; is that right?

12        A.   Correct.

13        Q.   Anything else that was a part of that?

14        A.   Not that I can think of.

15        Q.   And so once you placed the order, I

16   think you said you would also coordinate on the

17   mill deliveries; is that right?

18        A.   I don't understand.

19        Q.   Would you arrange for the deliveries to

20   the mill?

21        A.   Yes.

22        Q.   And could you describe to me a bit what

23   that process looked like?

24        A.   Well, I would place an order with the

25   supplier with a delivery date and quantity, and

1      they would take care of scheduling the truck and
2      getting it there.
3          Q.   And if there were issues with that,
4      would IP reach out to you?
5          A.   If there were issues with that the
6      supplier would reach out to me and say, hey, our
7      truck driver broke down or whatever, and we would
8      have to say, okay.  Well, they can wait another two
9      days or we need to do something.
10         Q.   And what might "doing something" look
11     like?
12         A.   Expediting from another location or --
13     it didn't happen much.
14         Q.   Okay.  And I think you said that as
15     part of your initial mill visit you would make sure
16     there were satisfactory --
17         A.   Safety showers and eyewashes.
18         Q.   -- delivery points and logistical
19     pieces associated with delivery; is that right?
20              MR. TOWNSEND:  Objection to form.
21     BY MR. DALEY:
22         Q.   You can answer, Mr. Allen.
23         A.   Yes.  The -- making sure that the truck
24     would have access to the unloading point, that the
25     procedure for the truck driver unlocking the

1   delivery point.  You know, what that was changed

2   from mill to mill.  And making sure the safety

3   equipment was available.

4       Q.   Is that something that would

5   occasionally change over the life of a contract?

6       A.   No.

7       Q.   So we've spoken a little bit about

8   monitoring and managing the inventory levels at the

9   mills; is that right?

10      A.   Yes.

11      Q.   And that's something you did?

12      A.   Primarily my job.

13      Q.   And you mentioned one way of doing that

14  was -- I'd call it, I guess, a manual process.  Is

15  that right?

16              MR. TOWNSEND:  Objection to form.

17              THE WITNESS:  I don't understand the

18  question.

19  BY MR. DALEY:

20      Q.   Yeah.  And so I think you mentioned

21  that based on your time at IP you had an

22  understanding of what data was available to the

23  mills; is that right?

24      A.   Yes.

25      Q.   And that data included what levels of

1    supplies of certain chemicals were available to the

2    mill; is that right?

3         A.   Yes.

4         Q.   I think you said before that the

5    mill -- some of the mills, at least, would report

6    those levels to you; is that right?

7         A.   It was automatic.  It was

8    computer-generated with the exception of, I think,

9    one mill where the tank level was not connected to

10   the PI system.  That's P-I, which is the mill

11   information -- I don't remember exactly what the

12   definition of that is, but -- so the operator would

13   go out there and take a manual reading and he would

14   enter it into another system which communicated

15   with PI and got me the data.

16        Q.   Okay.  And the first process you

17   described there, the computer-generated system, is

18   that what you would refer to as remote telemetry?

19        A.   Yes.

20        Q.   And could you give me your definition

21   of what remote telemetry is?

22        A.   There's an instrument on the tank that

23   measures the tank level and it -- that instrument

24   sends the information to the PI and PI would email

25   me what that level was.

1      Q.   And you said that was the primary

2   function of your role at DGS; is that right?

3      A.   The monitoring tank levels and

4   scheduling deliveries, yes.

5      Q.   And so that's something you did

6   throughout your entire time there; is that right?

7      A.   Yes.

8      Q.   Would you often receive complaints from

9   the mills about the remote monitoring that you were

10  doing?

11     A.   No.

12     Q.   Were you often able to meet the mills'

13  needs based on the remote telemetry that you were

14  conducting?

15     A.   Almost always.

16     Q.   Did the mills appreciate that you were

17  able to conduct that remote telemetry?

18     A.   Absolutely.

19     Q.   Would they tell you that?

20     A.   Yes.  When I would talk to an area

21  manager he would say, I'm glad that I don't have to

22  talk to you.  And that was usually if he forgot to

23  tell me that they were going into an annual outage

24  and I sent a truck, and he would say, oops.  I

25  meant to tell you.  I forgot you did that.

1          Q.   Okay.  That makes sense.  All right.
2     Would you ever assist the mills with calibration of
3     chemicals based on things like weather, storage or
4     other variables?
5          A.   No.
6          Q.   Do you know if that's something that
7     DGS did generally?
8          A.   No.  Yes, I know we didn't do it.
9          Q.   Are there instances where mills might
10    encounter special needs like a shortage or another
11    supplier not being able to deliver product where
12    they would reach out to DGS?
13         A.   Yes.  Rarely.  Only a couple of
14    occasions that I can think of, but we weren't --
15         Q.   And --
16              (Court reporter asked for clarification
17    due to voice overlap.)
18              THE WITNESS:  We were not able to help
19    them either.  It was weather-related.
20    BY MR. DALEY:
21         Q.   And so the instances where they did
22    reach out, you're not familiar with one where DGS
23    was able to meet the need.
24         A.   I don't remember one, no.
25              MR. DALEY:  All right.  We've been

1    going about an hour now.  I need to refill coffee.

2    So maybe we can go off the record, if that sounds

3    good with the videographer.

4              THE VIDEOGRAPHER:  Yes, sir.  The time

5    on the monitor is 11:10 AM, and we're going off the

6    record.

7              (A recess transpired from 11:10 until

8    11:29.)

9              THE VIDEOGRAPHER:  The time on the

10   monitor is 11:29 AM, and we're back on the record.

11   BY MR. DALEY:

12        Q.   Okay.  Mr. Allen, I'd like to ask you a

13   bit more next about your interactions with IP

14   personnel.

15              Earlier you described your interactions

16   with employees at the mills, and that was generally

17   centered around placing orders, coordinating

18   deliveries and kind of the initial contacts once a

19   contract was in place; is that right?

20        A.   Yes.

21        Q.   Were there any other communications you

22   would have with the mills on any regularity?

23        A.   Not any regularity.

24        Q.   Any others that you can think of?

25        A.   There was one instance where the mill

1    wanted us to purchase some equipment because their

2    capital budget was -- didn't allow for it and then

3    expense it and we did that.  I can't think of

4    anything, offhand, other than that.

5          Q.   If you'd give me one second, I think I

6    might have that communication.

7               MR. DALEY:  Nate, did you not mark

8    the -- did you not stamp the other exhibit yet?  Is

9    that right?

10              MR. TOWNSEND:  That's right.  Yeah, I

11   only put it in there, and then I stopped.

12              MR. DALEY:  Okay.  Got you.  Okay.  So

13   we will -- so I can proceed with this one as

14   Exhibit 1.

15              MR. TOWNSEND:  Okay.

16              MR. DALEY:  And then whenever -- if you

17   want to put that in again and mark it, I mean, we

18   can ignore whatever's there and only go with the

19   stamped exhibits.  That's fine.

20              MR. TOWNSEND:  Sounds good.

21              MR. DALEY:  Excellent.  Okay.  Thanks,

22   Nate.

23              (EXHIBIT 1, Email Chain to Mr. Kumar

24   from Mr. Allen dated 3-14-13, marked for

25   identification.)

1    BY MR. DALEY:

2         Q.   Mr. Allen, if you go to the file where

3    you did previously see your LinkedIn profile there

4    should now be another document there which has been

5    marked as Exhibit 1.  If you could try to open that

6    up.  If you can't open it up, let me know so we can

7    figure it out.  And if you can, just take a look at

8    it and let me know when you're done.

9         A.   I've got it open.

10        Q.   Take your time looking it over.  No

11   rush.

12        A.   I remember this, yes.

13        Q.   And so could you identify what this

14   document is?

15        A.   That's the communication I had with the

16   area manager about purchasing the skids for their

17   use.

18        Q.   And you testified earlier that DGS

19   completed this purchase; is that right?

20        A.   To the best of my knowledge, yes.

21        Q.   Do you recall any similar instances to

22   this where DGS made any capital purchases?

23        A.   There were other times when it was

24   talked about, but I don't remember any that

25   actually happened.

1          Q.   Okay.  And so other than the purchase
2     of the skids that we looked at here -- and I guess
3     while we have it up, DGS, to the best of your
4     knowledge, purchased the skids from this mill for
5     $40,000, as reflected in the email; is that right?
6          A.   I was not involved in the purchase, so
7     how much it was, I'm not sure, but yeah.
8          Q.   Okay.  And so is it fair to say that
9     the email thread that's reflected in Exhibit 1 was
10    the extent of your involvement with that purchase?
11         A.   Yes.
12         Q.   And so other than the communications
13    that are reflected in Exhibit 1 and the types of
14    communications that we discussed earlier, are there
15    any other types of communications that you would
16    have with IP?
17         A.   I'm sorry.  I was distracted.  What?
18    Say that again.
19         Q.   Certainly.  No, and that's not --
20    that's never a problem.  No need to apologize.
21    Like I said before, you know, if I ask a bad
22    question, just let me know; right?  It might have
23    been that.  You might just be being polite saying
24    you were distracted, but I'm always happy to repeat
25    it either way.

1          And so we had discussed some certain

2     types of communications earlier that were

3     associated with your responsibilities,

4     communications with IP.  You recall that; right?

5          A.   Yes.

6          Q.   And then I had asked if there were any

7     other communications that you had with IP on any

8     regularity, and I believe you said no; is that

9     right?

10          A.   Correct.

11          Q.   And then I had asked if there were any

12     other types of communications generally, and you

13     had mentioned the communication that's the subject

14     of Exhibit 1; is that right?

15          A.   Yes.

16          Q.   And so can you think of any other

17     communications either similar to Exhibit 1 or that

18     would otherwise fall within that general category

19     of communications that you had with IP?

20          A.   None that came to any substance.  There

21     were requests from IP to handle temporary storage

22     or things like that that we were just not able to

23     satisfy.

24          Q.   Do you recall if there were discussions

25     at DGS about making attempts to satisfy those

1  requests?

2         A.   I handled the request, so it was -- it

3  was not a -- it was not a money thing.  It was a

4  logistics thing; that I would contact our suppliers

5  and see what kind of arrangements could be made and

6  if there -- and typically there were no

7  arrangements that could be made, so it was not

8  something that we could handle.

9         Q.   And so I think you mentioned that one

10  of those was storage; is that right?

11        A.   Yes; temporary storage.

12        Q.   Temporary storage.  Are there any other

13  similar things you can think of in that vein?

14        A.   I would arrange for tote bins to be

15  delivered, which was not our typical way of

16  delivering product.  And so -- but that was special

17  requests from the mill that I arranged through our

18  suppliers.

19        Q.   And so -- special request for delivery

20  in tote bins --

21             (Court reporter asked for clarification

22  due to feedback.)

23  BY MR. DALEY:

24        Q.   And so if the mill made a special

25  request for deliveries to be in tote bins, DGS

1      would do what it could to accommodate that request.

2              A.    Yes.  And typically we could

3      accommodate that request.

4              Q.    So other than temporary storage and

5      tote bins, are there any other types of requests

6      you can think of?

7              A.    No.

8              Q.    So other than those communications

9      we've discussed, are there any other communications

10     with IP that you would have?

11             A.    Not that I can think of.

12             Q.    And so --

13             MR. DALEY:  Strike that.

14     BY MR. DALEY:

15             Q.    Did you ever have meetings with IP?

16             A.    Not on a regular basis.

17             Q.    But you had some meetings with IP, I

18     take it from that; is that right?

19             A.    Yes.

20             Q.    Do you recall roughly how many?

21             A.    We had two in Memphis with IP Global

22     Sourcing, and I'm sure I met with mill -- well, in

23     the first couple of years I met regularly with the

24     Georgetown mill production engineer every couple of

25     months.  And then I can't think of -- I'm sure

1    there was other mills that I visited after the
2    first initial visit, but I can't think of one right
3    now.
4         Q.   Okay.  And so focusing on the two
5    meetings in Memphis, could you please describe the
6    first one that you recall?
7         A.   I really don't remember the meeting.  I
8    remember it happened, but I don't remember anything
9    about it.
10        Q.   Okay.  And what about the second
11   meeting in Memphis?
12        A.   That was -- we were trying to justify
13   our existence when Jag was retiring.
14        Q.   Okay.  And could you describe that in a
15   little more detail?
16        A.   We were asked what services we provided
17   and how often we visited mills and things like
18   that.  It was not a -- it was -- the atmosphere was
19   adversarial.
20        Q.   Do you recall when that meeting was?
21        A.   Oh.  October, November of 2019, I
22   think.  Somewhere in there.
23        Q.   And do you recall who was in attendance
24   at that meeting?
25        A.   No.  I know Jag was there, and there

1    were several other people, but I don't know who

2    they were.

3            Q.   You were there; right?

4            A.   Yes.  And so were -- so was Heather and

5    so were the subcontractors.

6            Q.   One of those being a cleaning company,

7    is that right, that we talked about earlier?

8            A.   Yes.

9            Q.   And was there another one in addition

10   to the cleaning company?

11           A.   There were a couple more.  I don't

12   remember who they were.

13           Q.   I think you said Heather was there.

14   Was Shiv there?

15           A.   No.  He was on by speakerphone, but he

16   was in South Asia someplace.

17           Q.   Anyone else from DGS in attendance?

18           A.   Jyotika was also on by speakerphone

19   from a different South Asian place.

20           Q.   And Jag -- let me rephrase that.  Was

21   Jag the only person from IP that you recognized?

22           A.   Yes.

23           Q.   Do you recall what you -- and when I

24   say "you" I mean DGS -- told IP that it did for

25   services?

1          A.     We attempted to tell what we did but

2      were not allowed much -- much leeway in our

3      answers.

4          Q.     Would it be accurate to say you didn't

5      feel it was a receptive audience?

6          A.     It was definitely not a receptive

7      audience.

8          Q.     Did they explain to you why?

9          A.     No.

10         Q.     Did you have any follow-up from that

11     meeting?

12         A.     You garbled a little bit.  Repeat that.

13         Q.     My apologies.  Did you have any

14     follow-up from that meeting?

15         A.     Just when Kumar said the contract had

16     been canceled and to cancel all shipments.

17         Q.     Did you have any communications with IP

18     after the contract was terminated?

19         A.     I had people contacting me.  I

20     contacted all of the mills, saying that the

21     contract had been canceled and that they needed to

22     assume responsibility for inventory and suggested

23     delivery times.  And I canceled all of the

24     shipments from our suppliers, had a couple of phone

25     calls as a result of that email.  They were quite

1    surprised and disappointed.

2         Q.   Did they say why they were

3    disappointed?

4         A.   Because we supplied them with good

5    service.

6         Q.   And about how long after the contract

7    was terminated did you leave DGS?

8         A.   Almost immediately.  I think I got one

9    more paycheck, and that was it.

10             MR. DALEY:  I'm going to pull up

11   another document here in Exhibit Share.  Just give

12   me a sec.

13             (EXHIBIT 2, DGS PowerPoint dated

14   1-23-13, marked for identification.)

15   BY MR. DALEY:

16        Q.   Okay, Mr. Allen.  There should be

17   another document in Exhibit Share.  Same place

18   where the last one was.  If you could go in there,

19   try to open that up.  Open it up if you can.  Let

20   me know if you have any issues.  And then if you

21   can open it up, take a look at it and let me know

22   when you're done.

23        A.   I don't find it.

24        Q.   Maybe if you refresh the page, I think

25   it should be there.

1          A.    Okay.  It's opening.

2          Q.    And so once you get it open, take a

3     second to look at it.  Take as long as you need,

4     and just let me know when you're done.

5          A.    It says "May take a while."

6          Q.    Is it still opening?

7          A.    Yes.

8          Q.    Okay.  Yeah.  No.  I mean, take your

9     time.  Just let us know when it's done and once

10    you've had a chance to look at it.

11         A.    Okay.  (Perusing.)  Okay.  I've looked

12    at it.

13         Q.    Okay.  Do you recognize that document?

14         A.    Yes.

15         Q.    Could you identify it?

16         A.    Yes.  That was the first Memphis

17    meeting.

18         Q.    And so on that first page there it says

19    January 23, 2013.  Does that seem generally right

20    with respect to when the first meeting would have

21    occurred?

22         A.    Yes.

23         Q.    And you were present at this meeting;

24    is that right?

25         A.    Yes.

1          Q.    Does reviewing this document refresh
2     your recollection of that meeting?
3          A.    Yes.
4          Q.    Could you describe that meeting now?
5          A.    We had lots of discussion with the
6     technology group people that were present about
7     alternate sourcing and things like that.  I really
8     don't remember much else about it.
9          Q.    Okay.  Was the technology group a group
10    that you would otherwise communicate with at IP
11    outside of this one meeting?
12         A.    No.
13         Q.    Was this meeting the only time you
14    interacted with that group?
15         A.    Yes.  Well, while I was at DGS.
16         Q.    Thank you.  So if you scroll to page 4
17    of the PDF here.  Just let me know when you're
18    there.
19         A.    Looking for page numbers.  One, two,
20    three, four.  Okay.  Team Composition and
21    Experience?  Is that what you're looking at?
22         Q.    Correct.  And in the future I'll try to
23    identify the header there at the top.
24               So we discussed Shiv.
25         A.    Jyotika.

1          Q.   Jyotika.  Thank you.  There's you.  And
2     then the next four names here, are those names that
3     you recognize?
4          A.   Preston I recognize.  He's the cleaning
5     guy.  I don't recognize the other guys.
6          Q.   And so when you say "the cleaning" --
7          A.   They're in South Asia.
8          Q.   I apologize.  I started to speak.  You
9     weren't done.  Could you just repeat what you said,
10    and then I'll go back to where I was going, please.
11         A.   They worked for Kumar in other -- in a
12    different capacity than our contract with IP.
13    Kumar has -- had other businesses in South Asia,
14    and they worked for him in those businesses.
15         Q.   Do you know what those businesses were?
16         A.   No.  Something to do with oil.
17         Q.   And so you said you recognized Preston;
18    is that right?
19         A.   Yes.
20         Q.   And you said that was the cleaning guy;
21    is that right?
22         A.   Yes.
23         Q.   And is that the organic cleaner
24    subcontractor we were talking about earlier?
25         A.   Yes.

1          Q.   So if you scroll down to page 10 which

2     is entitled 2012 Business Segments, and just let me

3     know when you're there.

4          A.   Okay.

5          Q.   Are you familiar with what's reflected

6     on the screen there?

7          A.   Yes.

8          Q.   Could you describe it to me?

9          A.   Those were the different chemicals that

10    we supplied to -- oops -- to the -- and those were

11    the mills that we were servicing at the time.

12         Q.   And were you involved in servicing all

13    of those mills?

14         A.   Yes.

15         Q.   And generally, your responsibilities

16    with respect to those mills were what we talked

17    about earlier; is that right?

18         A.   Yes.

19         Q.   Does looking at this list of mills and

20    products remind you of any other responsibilities

21    that you had --

22         A.   No.

23         Q.   -- for DGS?

24         A.   No.

25         Q.   And if you scroll down to page 14 it's

1    entitled Green Cleaning Agents.

2         A.    Okay.

3         Q.    Is that the name of the organic

4    cleaning company that you referenced earlier?

5         A.    Yes.

6         Q.    And that would be the one that Preston

7    was associated with; is that right?

8         A.    Yes.

9         Q.    And then if you scroll down to page 17,

10   that's entitled 2013 Activity.

11        A.    Okay.

12        Q.    Do you see where it says "Rosin size

13   supply and trials at Mansfield and Riegelwood"?

14        A.    Yes.

15        Q.    Were you involved with that?

16        A.    Marginally.

17        Q.    Could you describe your involvement

18   with that, please?

19        A.    The trials were conducted by the mills

20   with the -- whatever relationship they have with

21   technology.  We supplied them with a onetime

22   delivery of the size.  Neither one of them panned

23   out, to my memory.  Certainly Riegelwood did not.

24   I'm not sure about Mansfield.  I don't think so.

25        Q.    Did DGS conduct other trials for IP?

1         A.   We didn't conduct the trials.  We

2   supplied the product for the trials.

3         Q.   And so the supplier conducted the

4   trial; is that right?

5         A.   No.  International Paper did.

6         Q.   So IP would run the trial, and DGS

7   would arrange for the product needed --

8         A.   Correct.

9         Q.   -- to run the trial.

10        A.   Correct.

11        Q.   Do you recall other trials that DGS

12   provided product for to IP during your time there?

13        A.   Not that I was involved in, at least.

14        Q.   On that next item down there says

15   "Develop polymer island concepts," are you familiar

16   with that?

17        A.   I was not involved.

18        Q.   And the last one that says "Supply ASA

19   to Riverdale and Courtland," were you involved with

20   that?

21        A.   No.

22        Q.   That's all I have for that one.  You

23   can put that down.  I'm going to put another

24   document in there, Mr. Allen.  That will be Exhibit

25   3.

1              (EXHIBIT 3, Email to Mr. Hamilton from

2      Mr. Allen dated 9-5-18, marked for identification.)

3      BY MR. DALEY:

4          Q.   It should be there now.  If you could

5      do the same thing.  Go in there, pull it up, let me

6      know if you have any issues and let me know once

7      you've had a chance to look at it.

8          A.   Okay.

9          Q.   Do you recognize that document?

10          A.   Yes.

11          Q.   Could you identify it for us?

12          A.   There was an incident.  Harcros was a

13      supplier for -- this is the mill that I told you

14      there were two different specs for the hypo that

15      was delivered there, and Harcros was the supplier

16      for the paper mill part, and we supplied for --

17      let's see here.  I guess I have it backwards.  We

18      supplied for the paper mill, and they supplied for

19      the water plant.

20              The details I don't remember, but there

21      was an issue with one of the -- one of the specs,

22      and I don't remember what it was, that interacted

23      with the -- the product that Nalco -- is that

24      right?  Is that Nalco?  Yeah.  That they managed

25      their wastewater treatment and one of their

1    products interacted with something in the hypo and

2    it could have been bad and that's all I remember

3    about it.  It's -- the details are sketchy to my

4    memory.  But as long as they knew about it it was

5    okay, but -- but they -- so I let them know about

6    it.

7            Q.   And so this email is you reaching out

8    to the mill to let them know about it.

9            A.   Correct.

10           Q.   And that was consistent with your

11   duties while you were at DGS; is that right?

12           A.   Well, the typical -- it wasn't my

13   typical responsibility, but I noticed that my tank

14   level -- let me try to remember the details.  Okay.

15   Yeah.

16               Okay.  Nalco was treating the water

17   going into the paper mill, and I noticed an

18   inventory increase when I had not scheduled a

19   delivery and did some investigation through the

20   mill or with the mill and then I let them know

21   about this.

22               So it was an unusual situation, but I

23   knew that there was a reason that we had special

24   specs for the paper mill.  And when a delivery got

25   there that was not ours, I needed to let them know.

1        Q.   And so you were able to -- misdelivery

2    based on the inventory monitoring that you were

3    conducting; is that right?

4        A.   Yes.

5             (Court reporter asked for clarification

6    due to feedback.)

7    BY MR. DALEY:

8        Q.   And so you were able to identify this

9    misdelivery based on your inventory monitoring; is

10   that correct?

11       A.   Yes.

12       Q.   Do you recall if you got any follow-up

13   from the mill on this?

14       A.   Yes.  They notified Nalco and I was in

15   communication with Nalco also and they were able to

16   handle it.

17       Q.   And do you know what mill that was?

18       A.   I don't remember.

19       Q.   I'm going to put another document in

20   the chat here.  Give me one second.  I'll let you

21   know when it's there, and then I'll ask you to do

22   the same thing we've done previously, which is try

23   to open it up, take a look and let me know if you

24   have any issues.  And if you don't have any issues,

25   let me know when you're done reviewing.  And that

1      should be there now, and I believe that's marked as

2      Exhibit 4.

3                     (EXHIBIT 4, Email to TF Rice from

4      Mr. Allen dated 2-19-13, marked for

5      identification.)

6                     THE WITNESS:  Okay.

7      BY MR. DALEY:

8             Q.   Do you recognize that document?

9             A.   Yes.

10            Q.   Do you recall what this email relates

11     to?

12            A.   Let me see.  I don't remember what mill

13     it was.  I remember the -- I remember doing it.  I

14     don't remember what the issue was.

15            Q.   And so if we read the email it says:

16                     In order to make sure that all of the

17     issues with loads to IP are resolved, I will be

18     making a visit to your McIntosh plant on Wednesday

19     while you are there, and then revisiting the

20     Riverdale and Courtland mills to reassure them that

21     they have been resolved.  I look forward to meeting

22     with you and your customer service team.

23                     Did I read that right?

24            A.   Yes.

25            Q.   And so would I be accurate to say that

1    based on this email you were planning to visit the

2    McIntosh, Riverdale, and Courtland mills to address

3    certain issues that had come up with respect to

4    DGS's services to IP?

5              MR. TOWNSEND:  Objection to form.

6              THE WITNESS:  McIntosh was the Olin

7    facility, and Riverdale and Courtland were IP

8    mills.  I don't remember what the -- what the issue

9    was or how it was resolved.

10   BY MR. DALEY:

11        Q.   And so here you were visiting -- you

12   were planning to visit a supplier --

13        A.   Correct.

14        Q.   -- to resolve an issue as it relates to

15   the McIntosh plant; is that right?

16        A.   As it -- as it relates to Riverdale and

17   Courtland mills.

18        Q.   And so you were going to visit the Olin

19   McIntosh plant in relation to the product being

20   supplied to IP's Riverdale and Courtland mills; is

21   that right?

22        A.   Correct.

23        Q.   And you don't recall what the specific

24   issue was; is that right?

25        A.   I do not recall.

1          Q.   Do you recall if the issue was

2     resolved?

3          A.   I remember that as a result, I think

4     Harcros got the water treatment or whatever they

5     were supplying back at wherever that was, but I

6     think that's what this is about, but I don't

7     remember anything else having an -- being an --

8     about the issue.  I just don't remember.

9               MR. DALEY:  Okay.  I am going to place

10    another exhibit in the chat.  We'll do the same

11    thing.  This will be Exhibit 5.  Not there yet.

12    Just moving a stamp here.  Okay.  I'm going to

13    introduce that.  That should be in the chat.

14               (EXHIBIT 5, Email Chain to Mr. Phillips

15    from Mr. Allen dated 7-6-18, marked for

16    identification.)

17    BY MR. DALEY:

18          Q.   And so if you can pull that up and let

19    me know if you can access it.  And if you can

20    access it, take a look at it and let me know when

21    you're done.

22          A.   Okay.

23          Q.   And do you recognize that document?

24          A.   Sort of.

25          Q.   Could you identify it?

1        A.   There were two different locations at
2     the Texarkana facility where we delivered bleach,
3     and it was about a low -- low inventory level or
4     something like that that I was letting Sonny know
5     that I was trying to handle.  I don't remember much
6     else about it.  Texarkana -- that happened at
7     Texarkana more frequently than I like to think.
8        Q.   And you say here that you had to switch
9     loads to get a truck out today.  Do you know what
10    you meant by "switch loads"?
11       A.   Switch the delivery point from the LoD
12    to the -- or from the cooling tower to the LoD.  I
13    think that's what it was about.  I -- again, I
14    don't remember.
15       Q.   And are the LoD and the cooling tower
16    two different delivery points at that mill?
17       A.   Yes.
18       Q.   And so to the best of your
19    recollection, when you say "switch loads," it would
20    have meant taking a load from the cooling tower and
21    sending it to the LoD?  Does that sound right?
22       A.   Sounds right.
23       Q.   Okay.  And that would be to account for
24    low inventory at the LoD; is that right?
25       A.   Yes.  And/or the cooling tower.

1          Q.   And that would have been consistent

2    with your inventory monitoring; is that right?

3          A.   Correct.

4          Q.   And so you also would have arranged for

5    the delivery to be moved; is that right?

6          A.   Yes.

7          Q.   All right.  I am going to put another

8    document in the chat.  This one -- okay.  Yeah.

9    This will be Exhibit 6.

10               (EXHIBIT 6, DGS Purchase Order to

11    Plasmine Technology dated 1-5-12, marked for

12    identification.)

13    BY MR. DALEY:

14          Q.   All right.  And so the same thing we've

15    done, Mr. Allen.  If you're still in that window,

16    if you refresh it there'll be another document

17    there.  I would just ask that you try to open it

18    up.  Let me know if you have an issue.  If you

19    don't have an issue, take a look at it and let me

20    know when you're done.

21          A.   Okay.  It opened.  (Perusing.)  Okay.

22          Q.   And do you recognize that document?

23          A.   That's not a document that I typically

24    saw, but I'm sure I did.

25          Q.   Who would prepare that document,

1    typically?

2              A.    Jyotika.

3              Q.    And so you would give her the

4    information -- I'm sorry.

5                    How would that document come about

6    being made?

7              A.    When -- whenever we picked up a mill --

8    in this case, the Springfield, Oregon mill -- this

9    purchase order would be generated and I'd get a

10   copy.  I was not -- I was not the -- what do I want

11   to say?  The -- I was just copied for information

12   purposes.

13             Q.    You didn't draft the document.

14             A.    No.

15             Q.    Would it be based on information that

16   you supplied?

17             A.    No.  This is at the beginning of a

18   contract so that I have the purchase order number.

19             Q.    And so would the purchase order number

20   come from IP?

21             A.    Yes.

22             Q.    And then you would provide -- and when

23   I say "you" I mean DGS would provide the purchase

24   order to the supplier; is that right?

25             A.    Correct.

1          Q.   But you weren't involved in that
2     process.
3          A.   No.
4               MR. DALEY:  Nate, I take it you are
5     going to have some questions today.  Maybe if we
6     could go off the record quick right now and talk
7     about the plan going forward.  Does that make
8     sense?
9               MR. TOWNSEND:  Sure.
10              THE VIDEOGRAPHER:  The time on the
11    monitor is 12:19 PM, and we're going off the
12    record.
13              (A recess transpired from 12:19 until
14    1:01.)
15              (EXHIBIT 7, Email Chain to Mr. Bertoldo
16    from Mr. Allen dated 7-13-17, marked for
17    identification.)
18              THE VIDEOGRAPHER:  The time on the
19    monitor is 1:01 PM, and we're back on the record.
20    BY MR. DALEY:
21         Q.   Okay, Mr. Allen.  I fear that you're
22    probably growing very bored of this process, but if
23    you could go to our Exhibit Share website there,
24    refresh that.  There should be a document there
25    that's marked Exhibit 7.  And if you could do what

1    we've been doing.  Just pull that up.  I'm going to
2    assume at this point you won't have any issues.  So
3    just -- if you have an issue, of course, let me
4    know.
5            A.   Okay.
6            Q.   But take a look at it and let me know
7    when you're done.
8            A.   (Perusing.)  Okay.
9            Q.   Okay.  Do you recognize that document?
10           A.   Yes.
11           Q.   Okay.  Do you recall the scenario being
12   discussed in that document?
13           A.   I do.  I don't remember which mill it
14   is, but yes, I do.
15           Q.   Okay.  And would addressing safety
16   concerns like this be something that was a part of
17   your duties when you were at DGS?
18           A.   Yes.
19                MR. TOWNSEND:  Objection to form.
20   BY MR. DALEY:
21           Q.   I'm sorry.  If you could just restate
22   the answer --
23           A.   Yes.
24           Q.   -- Mr. Allen.
25           A.   Yes.

1         Q.   And so in addition to this email, do

2    you recall other times where you raised safety

3    concerns with IP generally?

4         A.   I don't remember any specific time, no.

5         Q.   Okay.  And so you don't remember any

6    specific times, but it's something that you would

7    generally do; is that right?

8         A.   Yes.

9         MR. TOWNSEND:  Objection to form.

10   BY MR. DALEY:

11         Q.   And if you could just restate your

12   answer, Mr. Allen.

13         A.   Yes.

14         Q.   Thank you.  I'm going to pull up

15   another document in the chat here, Mr. Allen, and I

16   know you're very familiar with the process.  So

17   this will be marked as Exhibit 8.

18         (EXHIBIT 8, Email Chain to Mr. Allen

19   from Mr. Jagannath dated 7-10-13, marked for

20   identification.)

21   BY MR. DALEY:

22         Q.   And that should be there now.  If you

23   could pull that up, take a look at it.  It's a

24   one-page email, and let me know when you're done.

25         A.   Okay.  It loaded.  Let's see here.

1    (Perusing.)  Okay.  I've read it.

2          Q.   Do you recognize it?

3          A.   I do not.  I mean, I recognize the --

4    that it is in my email string, but I don't remember

5    the incident.

6          Q.   And so middle of that top email from

7    Jag there, do you see where it says "am OK

8    discontinuing the daily call to the mill"?

9          A.   Yes.

10         Q.   You don't recall that?

11         A.   Vaguely, but no details.

12         Q.   Was it out of the ordinary for you to

13   have a daily call with the mill?

14         A.   Yes.

15         Q.   And so on the first line there where it

16   says:

17              DGS kept the mill in hypo over the long

18   holiday weekend.  If you are comfortable that

19   things are stabilized and the systems are set up to

20   move smoothly, am OK discontinuing the daily call

21   to the mill.

22         A.   Apparently there was a delivery issue.

23   I do not remember any of the details.

24         Q.   But based on this email, it says that

25   DGS was able to keep the mill in hypo over the long

1    holiday weekend; is that right?

2          A.    Correct.

3          Q.    And so this is a communication with

4    Jag.  Did you communicate with Jag frequently?

5          A.    No.  If I communicated with Jag, it

6    was -- there was an issue, and that was not a good

7    thing.

8          Q.    So generally you would only communicate

9    with Jag if there were issues.

10         A.    Correct.

11               MR. DALEY:  Okay.  I'm putting another

12   document in the chat.  This will be Exhibit 9.

13               (EXHIBIT 9, Email to Mr. Reed from

14   Mr. Allen dated 6-8-17, marked for identification.)

15   BY MR. DALEY:

16         Q.    It's a very short email.  If you could

17   pull that up, Mr. Allen, and let me know when

18   you're done.

19         A.    (Perusing.)  Okay.

20         Q.    Okay.  And the email says:

21               I have requested a load for Riverdale

22   by Monday, but Hazel says that she is not able to

23   find a driver available until Thursday.  Do you

24   have any resources that you have access to, to find

25   a driver?

1                Did I read that correctly?

2        A.    Yes.

3        Q.    And this email is from you?

4        A.    Yes.

5        Q.    And would this be an example of you

6    helping to coordinate deliveries to the mills?

7        A.    Yes.

8        Q.    All right.  I'm going to put another

9    document in the chat.  This one -- well, I'm sorry.

10   I'm going to put a document in Exhibit Share.  This

11   one will be marked as Exhibit 10.

12                (EXHIBIT 10, Email chain to Mr. Allen

13   from Mr. Klobucar dated 11-25-15, marked for

14   identification.)

15   BY MR. DALEY:

16       Q.    And that should be there now,

17   Mr. Allen.  If you could try to access that, open

18   it up, take a look.  It's a two-page email, and let

19   me know once you're done.

20       A.    (Perusing.)  Okay.

21       Q.    Do you recognize that document?

22       A.    I -- basically.

23       Q.    And earlier today we discussed DGS

24   meeting IP mills' need for totes with respect to

25   certain chemicals.  Do you recall that?

1        A.    Yes.

2        Q.    And would this email thread be an

3   example of DGS meeting a need for totes at a mill?

4        A.    Yes.

5        Q.    And about halfway down the first page

6   here the email says:

7             Mark, Do you have he [sic] ability to

8   get size totes?  If so, what lead time are we

9   looking at?  We need 10 here ASAP due to one of our

10  pumps going out, exclamation mark.

11            Did I read that right?

12       A.    Yes.

13       Q.    And so would this be an example of IP

14  reaching out to DGS in a situation where they had

15  critical need for chemicals?

16       A.    Yes.

17       Q.    And based on your response above that,

18  was DGS able to meet that critical need?

19       A.    Yes.

20       Q.    Okay.  I'm getting close to the end of

21  my list here, I promise.  About -- I have three or

22  four more documents, and then I will be done.  With

23  that said, I will introduce the next one into

24  Exhibit Share.  I believe this will be Exhibit 11.

25       A.    You certainly read a lot of emails.

1          Q.   More than you would likely care to
2     know, Mr. Allen.
3               (EXHIBIT 11, Email Chain to Mr. Allen
4     from Mr. Bertoldo dated 5-8-17, marked for
5     identification.)
6     BY MR. DALEY:
7          Q.   And so that one should be there now.
8     If you could open that up, let me know when you're
9     done, and that would be great.
10         A.   Okay.  (Perusing.)  Okay.
11         Q.   And so the first -- do you recognize
12    this document?
13         A.   More or less.
14         Q.   Could you identify it?
15         A.   I don't remember what mill this is.
16    What do you want me to do to identify it?  I don't
17    understand.
18         Q.   Okay.  And so is this an email thread
19    relating to an order of hypo at an IP mill?
20         A.   Yes.
21         Q.   And so the first full email on the
22    second page there, it says:
23               I have noticed that the level in the
24    hypo tank at the GAC has been slowly going down.
25    That hypo is very old, and has lost its strength.

1    Are y'all using hypo from the GAC now?  Should I

2    schedule a load, or at least part of a load, to be

3    delivered there soon?

4              Did I read that right?

5         A.   Yes.

6         Q.   Was that an email from you to the mill?

7         A.   Yes.

8         Q.   And so earlier today we spoke about a

9    large component of your job being monitoring the

10   level of chemicals at the mill.  Do you recall

11   that?

12        A.   Yes.

13             MR. TOWNSEND:  Objection to the form.

14   BY MR. DALEY:

15        Q.   If you could restate your answer,

16   Mr. Allen, please.

17        A.   Yes.

18        Q.   And would this be an example of you

19   monitoring those inventory levels at the mill?

20        A.   Yes.

21        Q.   And is it also an example of you

22   reaching out to the mill in the first instance to

23   see if they would like a delivery of hypo?

24        A.   Yes.

25        Q.   And that was based on your monitoring

1    of the inventory levels; is that right?

2         A.   Correct.

3         Q.   And so if we scroll up to the bottom of

4    the first page, it says:

5              We are trying our best to get you a

6    load there ASAP, but this time of year we need 2 to

7    3 day lead time to schedule a delivery.

8              Do you see that?

9         A.   I saw it.  I mean, I can't find it

10   right this second.  Yes, I found it.  Yes.

11        Q.   Did I read that accurately?

12        A.   Yes.

13        Q.   And that's an email from you to the

14   mill again?

15        A.   Yes.

16        Q.   And then the second email on the top of

17   that page, it says:

18              We moved some things around and will

19   have a truck headed your way within the hour.  It

20   should arrive around 3 PM.

21              Did I read that right?

22        A.   Yes.

23        Q.   And would that be an example of DGS

24   meeting an instance of critical need from the IP

25   mills?

1                    MR. TOWNSEND:  Objection to form.

2                    THE WITNESS:  Yes.

3                    MR. DALEY:  All right.  I'm going to

4      put another document into the chat.  If you give me

5      one sec, Mr. Allen, I'll let you know when it's

6      there and I'll ask you to open it up, take a look

7      and let me know once you're done.  It will be a

8      one-page email, and it will be marked as Exhibit

9      12.

10                   (EXHIBIT 12, Email Chain to Ms. Edwards

11     from Mr. Allen dated 6-3-14, marked for

12     identification.)

13                   THE WITNESS:  Okay.  (Perusing.)  Okay.

14     BY MR. DALEY:

15          Q.    Do you recognize this document?

16          A.    Yes.

17          Q.    Could you identify it?

18          A.    The Orange mill reached out to me about

19     contingency plans, and I answered her question.

20          Q.    And those contingency plans related to

21     hurricane season; is that right?

22          A.    Yes.

23          Q.    And is that something that you would do

24     in your capacity at DGS?

25          A.    Yes.

1          Q.   Do you recall instances other than this

2     where you helped mills with contingency planning?

3          A.   Not offhand.

4          Q.   While you don't remember any specific

5     instances, do you recall generally providing that

6     type of support to IP mills?

7          A.   Yes.

8               MR. DALEY:  I have two more documents

9     that I'm going to introduce, the first one of which

10    will be Exhibit 13.  It's going to be a two-page

11    email thread.

12               (EXHIBIT 13, Email Chain Ms. Sanders

13    from Mr. Allen dated 12-16-15, marked for

14    identification.)

15    BY MR. DALEY:

16         Q.   Mr. Allen, I suspect you know what I'm

17    going to ask you to do, but if you could please

18    head over to Exhibit Share, open that up, take a

19    look and please let me know when you're done.

20         A.   This one isn't labeled.  Hmm.  Is this

21    to Cindy Phillips?

22         Q.   No.  This one should say Exhibit 13.

23    The numbers at the top, it should say DGS with an

24    underscore, a series of zeros, and the last four

25    digits will be 2351.

1           A.   Oh, okay.  All right.  (Perusing.)

2      Okay.

3           Q.   Okay.  Do you recognize that email?

4           A.   Yes.

5           Q.   Could you please identify it?

6           A.   There was an incident at the Orange

7      mill with a driver.  I do not remember any of the

8      details, but that's -- this is the email thread

9      about that incident.

10          Q.   And if there were issues with the

11     drivers at the mills, was it common for IP to reach

12     out to you like this?

13          A.   Yes.

14          Q.   And again, this is something that you

15     would have done in your capacity at DGS.

16          A.   Yes.

17               MR. DALEY:  I'm going to introduce

18     another exhibit which I will represent is an

19     attachment to that email that we were just looking

20     at, and you can ignore the one that I just

21     introduced.  I forgot to mark it, so I'm going to

22     reintroduce that again.  This will be Exhibit 14, I

23     believe.  I'm sorry.  Exhibit -- no.  Yeah.  Okay.

24     Well, Exhibit 15 with a sticker.  So if you could

25     pull up Exhibit 15 with the sticker, Mr. Allen.

1    Just let me know when you have that up.  I believe

2    it's a two-page document.

3                    (EXHIBIT 15, Investigation Form dated

4    11-18-15, marked for identification.)

5                    THE WITNESS:  Okay.  Investigation

6    form?  Is that --

7    BY MR. DALEY:

8         Q.    That's correct.  Yeah.  If you could

9    just take a look at that, let me know when you're

10   done and I will just have a few questions, and that

11   will be it for me today, in all likelihood.

12        A.    (Perusing.)  Okay.

13        Q.    Do you recognize that?

14        A.    Yes.

15        Q.    Could you please identify it?

16        A.    This is the answer from DXI, the

17   supplier, from their investigation of that

18   incident.

19        Q.    And is the report addressed to you?

20        A.    Yes.

21        Q.    And so is it right that after IP

22   reached out to you, you reached out to the supplier

23   to get a resolution with respect to the issue?

24        A.    Yes.

25        Q.    And is this something that you would

1      typically do if IP reached out to you about a

2      problem with a delivery?

3              A.   Yes.

4              Q.   And this is something you did in your

5      capacity at DGS.

6              A.   Yes.

7                   MR. DALEY:  All right.  That's all I

8      have for right now.  Thank you very much,

9      Mr. Allen.  Nate, I'll turn it over to you.

10                  MR. TOWNSEND:  Thank you, Max.

11                       EXAMINATION

12     BY MR. TOWNSEND:

13             Q.   Mr. Allen, we met at the beginning.  My

14     name is Nathan Townsend.  I represent International

15     Paper Company in this matter.  I'd remind you that

16     you are still under oath.  The rules that Max laid

17     down at the beginning also apply to my questions.

18     So if you would keep those in mind as we go about

19     this time, I would appreciate that.

20                  My first question for you, Mr. Allen:

21     How much money on a monthly basis did you make

22     while working for DGS when you first began working

23     for DGS?

24             A.   When I first began there, I believed it

25     was $1,500 a month.

1          Q.   So it was less than 25,000 a year; is
2     that right?
3          A.   Yeah.  It was like 18,000.
4          Q.   And when you finished working at DGS in
5     2019, how much were you making a month?
6          A.   2,500?  I don't remember exactly.  I
7     think it was about 2,500.
8          Q.   Okay.  And that comes out to 30,000.
9          A.   Yes.
10         Q.   Is that right?
11         A.   Might have been a little more than
12    that, but not much.  Less than 35.
13         Q.   Was your salary ever higher than
14    $30,000 while you were working at DGS?
15         A.   No.
16         Q.   Did you receive any retirement benefits
17    from DGS while you were working there?
18         A.   No.
19         Q.   Did you receive any health insurance
20    benefits while you were working for DGS?
21         A.   No.  I was an independent contractor.
22         Q.   Was Heather Darnell an independent
23    contractor?
24         A.   Yes.
25         Q.   Was Jyotika an independent contractor?

1          A.   I do not know.

2          Q.   When was the first time you met Jag?

3          A.   That first Memphis meeting, I believe.

4          Q.   And when you say "the first Memphis

5     meeting," that refers to --

6          A.   2013, according to that other document.

7          Q.   Had you ever met Jag when you were

8     working for Arizona Chemical?

9          A.   No.

10         Q.   Or when you were working for

11    International Paper?

12         A.   No.

13         Q.   I'm going to discuss with you your work

14    with inventory management.  What chemicals exactly

15    did you manage for International Paper?

16         A.   Wet strength for Georgetown.  The

17    chemicals that were listed in that -- that

18    PowerPoint document for the 2013 meeting.  It was

19    sodium bisulfite and size and hypo.

20         Q.   Was it any other chemicals?

21         A.   Say again?

22         Q.   Was it any other chemicals?

23         A.   Not that I had anything to do with.

24         Q.   Did DGS sell other chemicals to

25    International Paper?

1           A.    I think so, but I was not involved.

2           Q.    Earlier you testified that part of your

3     role was to place orders with different suppliers

4     for International Paper's chemicals; is that

5     correct?

6           A.    Yes.

7           Q.    Which chemicals did you place orders

8     for?

9           A.    Just those four.

10          Q.    The four from the 2013 PowerPoint?

11          A.    Yes.

12          Q.    How would International Paper receive

13     its other chemicals that were sold by DGS?

14          A.    I do not know.

15          MR. TOWNSEND:  All right, Mr. Allen.

16     I'm going to attempt to use Exhibit Share.  If you

17     would bear with me while I try this out.  I'm going

18     to use a different color so that you can recognize

19     that my exhibits are coming from International

20     Paper, and I'm going to list this as Exhibit 16.

21          (EXHIBIT 16, Email Chain to Ms. Balsara

22     from Mr. Allen dated 5-23-16, marked for

23     identification.)

24     BY MR. TOWNSEND:

25          Q.    Okay.  Mr. Allen, if you can refresh

1    and if you can spot Exhibit 16 and pull it up for

2    me.

3         A.    Okay.

4         Q.    And take as much time as you need to

5    review this document, please.

6         A.    (Perusing.)  Okay.

7         Q.    I think you testified earlier that you

8    only met Shiv in person on two occasions; is that

9    correct?

10        A.    To the best of my knowledge, yes.

11        Q.    Where did Shiv work from?

12        A.    California.

13        Q.    Did he work from Burlingame,

14   California?

15        A.    Yes.

16        Q.    Where did Jyotika work from?

17        A.    The same city.

18        Q.    And you worked from home; right?

19        A.    Yes.

20        Q.    Did Heather Darnell work from home?

21        A.    Yes.

22        Q.    And did Jyotika work from home?

23        A.    I think so.

24        Q.    Did Shiv work from home?

25        A.    I have no idea.  He was all over the

1    world.

2         Q.    This document down below dated -- the

3    first date is May 23rd, 2016, and it's coming from

4    you; is that right?

5         A.    Well, this says that it was from

6    Jyotika to Kumar.  So it's not from me.  Oh, let's

7    see here.  Apparently she forwarded him an email

8    from me.  So okay.

9         Q.    Do you remember writing up that email

10   from May 23rd, 2016?

11        A.    Not specifically, but I did this on

12   several occasions.  So yes.

13        Q.    And what are you trying to convey to

14   Shiv in this email?

15        A.    What chemicals and what mills that I'm

16   servicing.

17        Q.    On the right-hand column where it says

18   "Mill/Monitor," do you see that?

19        A.    Yes.

20        Q.    Is that -- are you telling Shiv which

21   places you monitor inventory and which places are

22   monitored by the mill?

23        A.    Yes.

24        Q.    So, for example, at the Georgetown,

25   South Carolina mill for wet strength, the mill was

1    monitoring wet strength as of that date; right?

2         A.   Well, let me clarify.  I monitored most

3    of these mills; not all of them.  But the -- this

4    is indicating where the order request comes from.

5              So, for instance, Franklin, Tennessee,

6    I managed their inventory.  Whereas with

7    Georgetown, since it was an intermittent product

8    use, I had to wait for the mill to tell me when

9    they were going to be making a run so that I could

10   schedule the order.

11             Likewise, with Mansfield and Orange,

12   did not have the capabilities set up at this point

13   for me to monitor the tank levels, and so they had

14   to tell me when they needed it.

15        Q.   Okay.  So when it says "Mill," someone

16   at the mill would tell you when they needed the

17   chemical; is that right?

18        A.   Correct.

19        Q.   So it looks like there were six mills

20   where you were placing orders based on monitoring

21   inventory; is that right?

22        A.   Yes.

23        Q.   And there were eight instances where

24   the mill was placing the order with you and you --

25   instead of you placing the order based on

1     monitoring; is that correct?

2          A.   So it appears.

3          Q.   Were there any other mills where you

4     monitored inventory and placed orders based on that

5     monitoring that you did not list on this email?

6          A.   No.

7          Q.   Thank you, Mr. Allen.  You can log out

8     of that one.

9               Did DGS own any factories?

10         A.   No.

11         Q.   Did DGS own any warehouses?

12         A.   No.

13         Q.   Did DGS own any buildings of any kind?

14         A.   No.

15         Q.   Did they lease any buildings of any

16    kind?

17         A.   There was a leased office in Memphis,

18    but to my knowledge, that's the only leased space

19    that they had.

20         Q.   Did you ever go to that leased office?

21         A.   No.

22         Q.   Would mail be sent to that leased

23    office?

24         A.   I have no idea.

25         Q.   If Shiv and Jyotika were in California

1    and you and Ms. Darnell were in South Carolina, who

2    was visiting the office in Memphis?

3              A.   When he was in Memphis, Shiv would be

4    at that office.

5              Q.   Did DGS lease any vehicles?

6              A.   No.

7              Q.   Did DGS own any vehicles?

8              A.   No.  Well, let me back up.  Not to my

9    knowledge on both of those.

10             Q.   Did DGS own any patents?

11             A.   Own any what?

12             Q.   Patents.  P-A-T-E-N-T.

13             A.   I do not know.

14             Q.   Did you ever see any DGS patents?

15             A.   No.

16             Q.   Did DGS lease any patents that you know

17   of?

18             A.   No.

19             Q.   Where did DGS --

20                  MR. TOWNSEND:  Strike that.

21   BY MR. TOWNSEND:

22             Q.   Did DGS obtain any of its chemicals

23   that it sold to International Paper from outside

24   the United States?

25             A.   No.

1          Q.   So it was all domestic suppliers?

2          A.   Yes.

3          Q.   Did DGS pay anyone to work for it

4     besides yourself, Ms. Darnell, and Jyotika?

5               MR. DALEY:  Objection.

6               THE WITNESS:  I have no idea.

7     BY MR. TOWNSEND:

8          Q.   Did DGS employ any scientists?

9          A.   I do not know.

10         Q.   Do you know when DGS was formed?

11         A.   No.

12         Q.   Were you required to undergo any sort

13    of safety training when you were hired by DGS?

14         A.   To enter the mills I was -- I went

15    through the mill safety training.

16         Q.   And that mill safety training was

17    conducted by International Paper personnel?

18         A.   Yes.  Well, or contractors or somebody,

19    yeah.

20         Q.   It wasn't conducted by anyone from DGS;

21    right?

22         A.   That's correct.

23         Q.   Did you perform any safety training for

24    anyone who worked for DGS?

25         A.   No.

1          Q.   Did Heather Darnell ever receive safety

2     training from anyone at DGS?

3          A.   No.

4          Q.   Did Jyotika ever receive training,

5     safety training from anyone at DGS?

6          A.   I do not know what she was trained on.

7          Q.   Did Jyotika ever visit any of the

8     mills?

9          A.   The Georgetown mill, but that's the

10    only one that I know of.

11         Q.   Did Heather Darnell ever visit any

12    mills?

13         A.   Yes.  I don't remember which ones.

14         Q.   Do you remember approximately what year

15    that may have been?

16         A.   No.

17         Q.   What did Shiv do for International

18    Paper?

19              MR. DALEY:  Objection.

20              THE WITNESS:  I do not know.  He -- he

21    was the owner of DGS.

22    BY MR. TOWNSEND:

23         Q.   Did Shiv ever visit any mills?

24         A.   He visited Georgetown.  I don't know of

25    any others.

1          Q.   And when you say "visited Georgetown,"
2     that was when you were interviewed --
3          A.   Yes.
4          Q.   -- to work for DGS?  Okay.
5          A.   He had a meeting with International
6     Paper personnel, and after that meeting he
7     interviewed me.
8          Q.   Do you remember who he would have met
9     at -- from International Paper that day?
10         A.   I have no idea.
11              MR. TOWNSEND:  Everyone, bear with me.
12    I'm getting another exhibit up.
13              MR. DALEY:  It gets easier, Nate.
14              MR. TOWNSEND:  Okay.  I'm introducing
15    Exhibit 17.  It's going to take a second, so just
16    hold on.  Okay.  That should be up now for everyone
17    to review.
18              (EXHIBIT 17, DGS PowerPoint
19    Presentation to International Paper dated 8-27-15,
20    marked for identification.)
21    BY MR. TOWNSEND:
22         Q.   Mr. Allen, I'm just going to warn you,
23    this is a big exhibit.  You take as much time as
24    you need, but I'll tell you now I'm not going to go
25    over every single one of the slides on this deck

1     and I'm happy to direct your attention to where I

2     want to focus, but you review as much of it as you

3     want and let me know when you're done.

4          A.   It says Exhibit 17 through 33?

5          Q.   Should have --

6          MR. DALEY:  Nate, if I might, the title

7     just says Exhibit 17 to Exhibit 33, but it's marked

8     Exhibit 17, if that's helpful.

9          MR. TOWNSEND:  Thanks, Max.  Yes, it's

10    marked 17 down in the bottom right-hand corner.

11         THE WITNESS:  It's loading still.  So

12    I -- all I saw was the title.  Okay.  (Perusing.)

13    Okay.

14    BY MR. TOWNSEND:

15         Q.   Mr. Allen, do you recognize this

16    document?

17         A.   No.

18         Q.   Okay.  To the best of your ability, can

19    you tell me what this is?

20         A.   It appears to be a presentation about

21    defoaming.

22         Q.   Is it coming from DGS?

23         A.   Apparently.

24         Q.   Can you scroll down to page 4, please?

25         A.   And it's titled?

1      Q.    It's titled About DGS --

2      A.    Okay.

3      Q.    -- Nanjing.

4      A.    Okay.

5      Q.    Mr. Allen, did DGS have a facility in

6    Nanjing?

7      A.    No idea.

8      Q.    Do you recognize that building in the

9    picture?

10     A.    I have nothing to do with defoamer.

11     Q.    Do you know who at DGS had something to

12   do with defoamer?

13     A.    No.

14     Q.    It says at the top left:

15           Focused on research, development,

16   sales, and production of antifoam and defoamer.

17           Do you know -- did I read that right,

18   Mr. Allen?

19     A.    You can read.

20     Q.    Do you know who at DGS performed

21   research on defoamer?

22           MR. DALEY:  Objection.

23           THE WITNESS:  I have no knowledge of

24   anything to do with defoamer.

25   BY MR. TOWNSEND:

1              Q.    Thanks, Mr. Allen.  I understand that

2       you don't have any knowledge, but that wasn't

3       actually my question.

4                    My question was:  Do you know of anyone

5       at DGS who performed research on defoamer?

6                    MR. DALEY:  Objection.

7                    THE WITNESS:  I have no knowledge of

8       anything that DGS had to do with defoamer.

9       BY MR. TOWNSEND:

10             Q.    Do you know who at DGS performed

11      research on antifoam?

12             A.    I have no knowledge of anything to do

13      with that.

14             Q.    So you never heard of anyone at DGS who

15      performed research on antifoam?

16                   MR. DALEY:  Objection.

17                   THE WITNESS:  No.

18      BY MR. TOWNSEND:

19             Q.    The next section says:

20                   Cooperates with Nanjing University and

21      Nanjing Forest University for antifoam research

22      products.

23                   Did I read that correctly as well?

24             A.    Yes.

25             Q.    Have you ever met anyone from Nanjing

1    University?

2            A.    No.

3            Q.    What about Nanjing Forest University?

4            A.    No.

5            Q.    Do you know if anyone working for DGS

6    cooperated with Nanjing University?

7            A.    I have no knowledge of anything to do

8    with this.

9            Q.    The bottom section says:

10                  Owns 41 Chinese national patents and

11    one international patent.

12                  Is that right?

13           A.    That's what it says.

14           Q.    You testified earlier that DGS did not

15    own any patents; is that right?

16           A.    To my knowledge.

17           Q.    So according to your knowledge, this

18    statement is not accurate; is that correct?

19                  MR. DALEY:   Objection.

20                  THE WITNESS:   I have no knowledge of

21    anything that -- any patents that DGS owns.

22    BY MR. TOWNSEND:

23           Q.    So just to review, you testified

24    earlier that you, Heather Darnell, and Jyotika

25    worked for DGS --

1          A.   As independent --

2          Q.   -- is that right?

3          A.   Well, Heather and I worked as

4     independent contractors.  I don't know about

5     Jyotika.

6          Q.   But the three of you received

7     compensation from DGS; right?

8          A.   Yes.

9          Q.   And you don't know of anyone else that

10     received compensation from DGS?

11          A.   I do not know of any -- any other, no.

12          Q.   So did Heather Darnell perform research

13     on antifoam?

14               MR. DALEY:  Objection.

15               THE WITNESS:  No.

16     BY MR. TOWNSEND:

17          Q.   Did Jyotika perform research on

18     antifoam?

19          A.   No.

20               MR. DALEY:  Objection.

21     BY MR. TOWNSEND:

22          Q.   Did Shiv perform research on antifoam?

23               MR. DALEY:  Objection.

24               THE WITNESS:  I have no idea.

25               MR. TOWNSEND:  We'll try to slow down,

1      Mr. Allen.  Mr. Daley is trying to get in

2      objections, and we'll want to be careful that those

3      are picked up on the record.  I apologize.

4                    MR. DALEY:  Thanks, Nate.

5      BY MR. TOWNSEND:

6            Q.   Mr. Allen, if you could scroll down to

7      the next page it also says About DGS Nanjing.

8            A.   This is going to get tedious.

9            Q.   Mr. Allen, DGS didn't own a facility in

10     Nanjing covering an area of 15 acres as presented

11     on this PowerPoint; correct?

12                    MR. DALEY:  Objection.

13                    THE WITNESS:  I have no idea.

14     BY MR. TOWNSEND:

15           Q.   You testified earlier that DGS didn't

16     own any buildings of any kind; correct?

17           A.   To my knowledge.

18           Q.   Did you ever receive an email from

19     someone working at the largest antifoam production

20     base in Asia owned by DGS?

21           A.   Nothing to do with antifoam.

22           Q.   Did Heather Darnell --

23           A.   No.

24           Q.   -- work with anyone from Nanjing?

25           A.   No.

1          Q.   Sorry.  Restate.  Thanks.  What about

2     Jyotika?

3          A.   Have no idea.

4          Q.   It says here that DGS Nanjing had 30

5     full-time scientists.  Did I see -- read that

6     correctly?

7          A.   That's what it says.

8          Q.   Have you ever met a scientist who

9     worked for DGS?

10         A.   No.

11         Q.   Have you ever heard of the name of a

12    scientist who worked for DGS?

13         A.   No.

14         Q.   Mr. Allen, if you'll scroll down to

15    slide 11, please.  It says -- title is DGS.  Then

16    there's some letters and numbers.  It's CS-500A-2.

17         A.   Okay.

18         Q.   Did DGS own a patent labeled DGS

19    CS-500A-2?

20              MR. DALEY:  Objection.

21              THE WITNESS:  I have no idea.

22    BY MR. TOWNSEND:

23         Q.   Did you testify earlier that DGS did

24    not own any patents?

25              MR. DALEY:  Objection.

1          THE WITNESS:  To my knowledge.

2     BY MR. TOWNSEND:

3          Q.   And you testified earlier that DGS

4     didn't lease any patents.

5          A.   To my knowledge.

6          Q.   So according to your knowledge, this is

7     not an accurate statement.

8          MR. DALEY:  Objection.

9          THE WITNESS:  I have no knowledge about

10    defoamer.

11    BY MR. TOWNSEND:

12         Q.   Mr. Allen, that wasn't quite what I

13    asked.

14         A.   You asked if I could verify that this

15    was incorrect; right?  That this was incorrect or

16    false, and I have no idea if it's false or true.

17         Q.   You've never heard of this patent

18    before; correct?

19         A.   I have no -- no dealings with antifoam

20    or defoamer, so no.

21         Q.   Mr. Allen, you testified earlier that

22    DGS had one customer; is that right?

23         A.   That I dealt with, yes.

24         Q.   And that was International Paper?

25         A.   Yes.

1          Q.   Did you ever hear of any other

2   customers?

3          A.   There were -- not domestically.

4          Q.   Were there international customers?

5          A.   Kumar had businesses in South Asia,

6   that I have no idea what they are.

7          Q.   When you say "businesses," are you

8   referring to DGS?

9          A.   The big umbrella, but not -- not the

10  part supplying chemicals to International Paper.

11         Q.   Why did DGS not supply to other

12  customers in the United States?

13         A.   I do not know.  I didn't deal with

14  contracts.

15         Q.   Sorry.  What was that?

16         A.   I did not deal with contracts.

17         Q.   You said that DGS was a big umbrella;

18  correct?

19         A.   Apparently.

20         Q.   But you also said that only three

21  people were compensated by DGS that you know of;

22  right?

23         A.   Yes.

24         Q.   So how do you know they were a big

25  umbrella?

1          A.    Because the businesses in South Asia

2     were also under DGS.

3          Q.    How do you know that?

4          A.    From Kumar.

5          Q.    What were the businesses?

6          A.    I have no idea.

7          Q.    So he told you that there were

8     businesses with DGS in South Asia, but he didn't

9     tell you what they were.

10         A.    It was -- didn't need to know.

11         Q.    Why did he tell you?

12         A.    Because he was always going over there.

13         Q.    Scroll down to slide 34, please.

14         A.    And?

15         Q.    It's labeled Logistics and Supply:

16    International Experience.

17         A.    Okay.

18         Q.    Do you see where it says "Currently

19    have over 2,000 customers"?

20         A.    Okay.

21         Q.    DGS didn't have over 2,000 customers,

22    did it?

23              MR. DALEY:  Objection.

24              THE WITNESS:  I have no idea.

25    BY MR. TOWNSEND:

```
1          Q.   Could you name one of the other
2     customers?
3          A.   It was not in my job description.
4          Q.   Shiv never casually mentioned to you
5     the name of anyone else he worked for?
6               MR. DALEY:  Objection.
7               THE WITNESS:  No.
8     BY MR. TOWNSEND:
9          Q.   See all these stars on the map?
10         A.   Yeah.
11         Q.   Can you tell me how many stars are in
12    the United States?
13         A.   Looks like five.
14         Q.   I have seven.  Is that more accurate?
15         A.   Maybe six.  One of them looks like is
16    in Canada.  Oh, there's another one under there.
17    Okay.  Seven.
18         Q.   Do you know what these stars represent?
19         A.   No.  Looks like one of them is me, one
20    of them is Heather, one of them is Memphis.  The
21    four white ones.  And one of them is Jyotika.  The
22    four white ones.  I don't know what the others are.
23         Q.   You already testified that DGS doesn't
24    have any buildings in the United States; right?
25         A.   That I know of.
```

1          Q.   And it doesn't have any warehouses in
2     the United States?
3          A.   No.
4          Q.   So what do the three black stars
5     represent?
6          A.   I do not know.
7          Q.   Scroll down to the next slide, please.
8     It's Logistics and Supply:  Local Supply Chain and
9     Warehousing.
10          A.   Okay.
11          Q.   In the first column it says:
12               Warehousing in Portland, Oregon.
13               You testified earlier that DGS does not
14     own warehouses in the United States; right?
15          A.   This has to do with defoamer.  I have
16     no idea.
17          Q.   But you testified to that; correct?
18          A.   To my knowledge.
19          Q.   Did you ever hear of DGS's defoamer
20     warehouse?
21               MR. DALEY:  Objection.
22               THE WITNESS:  I had no contact with
23     anything to do with defoamer.
24     BY MR. TOWNSEND:
25          Q.   Who at DGS would?

1           A.   I do not know.

2           Q.   Did you ever drive up to the warehouse

3      in Richmond, Virginia, that DGS owned?

4           A.   This has to do with defoamer.  I have

5      no contact with anything to do with defoamer.

6           Q.   So you didn't drive up to the warehouse

7      in Richmond, Virginia?

8           A.   Nope.

9           Q.   You testified earlier that you would

10     periodically visit International Paper mills; is

11     that correct?

12          A.   Yes.

13          Q.   Did you visit the Springfield mill in

14     Oregon?

15          A.   Yes.

16          Q.   Do you know how close Springfield is to

17     Portland?

18          A.   That's where I flew into.  I -- it's

19     been a while.

20          Q.   But you didn't stop by the Portland DGS

21     warehouse; correct?

22          A.   It was not on my trip agenda.  I had

23     nothing to do with defoamer.  That had to do with

24     the size contract.

25          Q.   Mr. Allen, the last slide, 38, titled

1     Safety Initiatives, if you could scroll down,

2     please.

3          A.    Okay.

4          Q.    DGS didn't have a mandatory safety

5     orientation for new employees; correct?

6          A.    Not that I know of.

7          Q.    So why would someone write that on this

8     slide?

9          A.    I do not know.

10         Q.    Do you think they were trying to -- do

11    you think the author of this slide was trying to

12    deceive his audience --

13              MR. DALEY:  Objection.

14    BY MR. TOWNSEND:

15         Q.    -- that there was mandatory safety

16    orientation?

17              MR. DALEY:  Objection.  Sorry, Nate.

18              THE WITNESS:  I have no idea what the

19    purpose was.

20              MR. TOWNSEND:  Mr. Allen, you can hop

21    out of that one whenever you want to.  I'm going to

22    be uploading another exhibit.  Hopefully I'll do it

23    right this time.  No promises.  It's going to take

24    a little while to load, so we can all just sit

25    tight.

1                    (EXHIBIT 18, DGS PowerPoint:  Aligned

2       Partnership, Aligned Success, dated 11-4-19, marked

3       for identification.)

4       BY MR. TOWNSEND:

5            Q.   Mr. Allen, if you could refresh, you

6       should have an Exhibit 18 up in your Exhibit Share

7       at this point.  Do you have that up yet, Mr. Allen?

8            A.   It's loading.  It says "May take a

9       minute."

10           Q.   No problem.  Just let me know when it's

11      up and if you could get familiar with it.  Just let

12      me know when you're done.

13           A.   Looks like I need more bandwidth.

14           Q.   Is it working for you now, Mr. Allen?

15           A.   Not yet.  Let's see.  "File preview

16      generation is still in progress.  You can stay on

17      this page and keep retrying manually or exit link

18      preview and return at a later time."  Hmm.  Try

19      again.  Ah, here we go.  Exhibit 18?

20           Q.   Yes, sir.

21           A.   (Perusing.)

22           Q.   Not to waste our time, Mr. Allen.

23      Sorry to interrupt.  I'm just making sure you

24      actually have it up now; is that right?

25           A.   I do have it up.

1        Q.   Okay.  Thanks.

2        A.   It's vaguely familiar, but I was not

3    the presenter.  I don't even remember being present

4    when it was presented, so this part doesn't look

5    familiar at all.  I don't know.

6        Q.   Okay.  You've already commented shortly

7    on this, but just to clear the record up, you have

8    seen this document before; is that correct?

9        A.   I'm not sure.  I've seen parts of it

10   before.

11       Q.   The first slide has a date of November

12   4th, 2019.  Is that the date that you went to

13   Memphis with Heather Darnell to present to

14   International Paper?

15       A.   Sounds right.

16       Q.   Is this the PowerPoint that was used in

17   that presentation?

18       A.   I don't know that it was completely

19   presented.  Or ever presented, actually.

20       Q.   Did you --

21       A.   That meeting -- that meeting was not --

22   well...

23       Q.   What were you going to --

24       A.   We didn't get to say much.

25       Q.   You didn't say much?  How long was the

1    meeting?

2         A.   I don't remember exactly, but it was an

3    hour, maybe two.

4         Q.   Did you create any of the slides for

5    this PowerPoint, or any of the content in this

6    PowerPoint, if you recall?

7         A.   Possibly the slide titled "DGS Presence

8    in the Mills," possibly.  At least contributed

9    content.  I did not create this slide because it

10   has products on here that I don't have anything to

11   do with.  Jyotika probably created the slide.

12        Q.   I'm sorry.  Who did you say probably

13   created the slide?

14        A.   Jyotika, probably.

15        Q.   And the slide we're referring to is

16   slide 10; is that correct?

17        A.   It doesn't -- page numbers don't show

18   up where I'm looking, but it says "DGS Presence in

19   Mills."

20        Q.   Thank you.  Mr. Allen, do you know

21   besides yourself who contributed content to this

22   PowerPoint?

23        A.   No.

24        Q.   Who spoke at the November 4th meeting?

25        A.   Let's see.  I tried to.  Kumar was on

1    speakerphone, and he spoke some.  I don't remember

2    anybody else.  No, I don't remember anybody else.

3           Q.   Did Shiv use this PowerPoint when he

4    was speaking?

5           A.   I don't remember.

6           Q.   And you didn't use this PowerPoint;

7    correct?

8           A.   I did not, no.

9           Q.   I understand we don't have page

10   numbers, but if you could scroll down to the third

11   slide it says "Diversified Global Sourcing, Inc.

12   (DGS) — Overview."

13          A.   Okay.

14          Q.   That first bullet point says:

15               Company envisioned in 2001 by a team of

16   PhD chemists dealing in cathodic protection and

17   field joint protection for pipelines in the oil and

18   gas industries.

19               Am I reading that correctly?

20          A.   Yes.

21          Q.   Is that your understanding of how DGS

22   was formed?

23               MR. DALEY:  Objection.

24               THE WITNESS:  I know that he had

25   company -- had businesses with the oil and gas

1    industry.  I don't know anything more about it than
2    that.
3    BY MR. TOWNSEND:
4         Q.   Does the year sound about right, 2001?
5         A.   I have no idea.
6         Q.   If you'd go down to the next slide, it
7    says "Team."
8         A.   Okay.
9         Q.   Next to Heather Darnell's description
10   it has the acronym SOO.  Do you see that?
11        A.   Yes.
12        Q.   What is SOO?
13        A.   Hmm.  I don't know.
14        Q.   Earlier you testified, if I'm
15   remembering correctly, that Ms. Darnell would serve
16   as a backup to you when you were traveling; is that
17   right?
18        A.   Yes.
19        Q.   Where would you be traveling to?
20        A.   Sometimes to the mills, sometimes on
21   vacation.
22        Q.   Are you familiar with the name Joe
23   Arnold?
24        A.   No.
25        Q.   What about Scott Minter?

1          A.    No.

2          Q.    Why are they included on the team slide

3     for DGS if you don't know who they are?

4          A.    I had no contact with them.  I don't

5     know.

6          Q.    Did you meet them at the November 4th

7     meeting?

8          A.    Possibly.  There were others there.  I

9     don't -- that I didn't know.

10         Q.    If you go down to the next slide, slide

11    5, it's titled "Current Presence — Distribution and

12    Manufacturing Centers."

13         A.    Okay.

14         Q.    DGS didn't have a distribution or

15    manufacturing center in Burlingame, California, did

16    it?

17         A.    That's where the corporate office was.

18         Q.    But it didn't have a distribution and

19    manufacturing center; right?

20              MR. DALEY:  Objection.

21              THE WITNESS:  Not that I know of.

22    BY MR. TOWNSEND:

23         Q.    DGS didn't have a distribution or

24    manufacturing center in South Carolina; right?

25         A.    Well, when you say "distribution," that

1      also includes me.  So yes.

2              Q.   So your home office.

3              A.   Yes.

4              Q.   Anything else besides your home office?

5              A.   No.  Well, Heather, but she's also here

6      in Charleston.

7              Q.   In Heather's home office; right?

8              A.   Yes.

9              Q.   DGS didn't have a distribution or

10     manufacturing center in Memphis; correct?

11             A.   That's -- that rent -- that leased

12     office space.

13             Q.   Nothing besides the leased office

14     space?

15             A.   Not that I know of.

16             Q.   DGS didn't have a distribution and

17     manufacturing center in Louisiana; correct?

18             A.   That's where the green cleaning guy was

19     based.

20             Q.   And he was a subcontractor?

21             A.   Yes.

22             Q.   He had his own company?

23             A.   Yes.

24             Q.   He serviced other clients besides DGS?

25             A.   Yes.

```
1              Q.   DGS didn't have a distribution and
2      manufacturing center in Chennai, India; correct?
3              A.   I have no idea.
4              Q.   Did DGS ever import chemicals from
5      Chennai, India, to sell to International Paper?
6              A.   No.
7              Q.   Did DGS ever import chemicals from
8      Nanjing, China, to sell to International Paper?
9              A.   No.  To my knowledge.
10             Q.   If you could scroll down again to slide
11     12 which is listed as "Safety Initiatives."
12             A.   Okay.
13             Q.   Earlier you testified that you did not
14     receive any safety orientation training from anyone
15     from DGS; correct?
16             A.   That's correct.
17             Q.   And you testified that Heather Darnell
18     didn't either; right?
19             A.   Correct.
20             Q.   And you testified that Jyotika didn't
21     either; right?
22             A.   I have no idea.
23             Q.   So this slide or this bullet point on
24     this slide is not accurate; correct?
25                  MR. DALEY:  Objection.
```

1             THE WITNESS:  It doesn't specify who is

2     conducting the safety orientation, so I can't say

3     that it is incorrect.

4     BY MR. TOWNSEND:

5             Q.   Did you receive 10 hours of OSHA

6     training from DGS?

7             A.   From DGS, no.

8             Q.   Did you receive --

9             A.   Hmm.  Probably not.

10            Q.   Did you ever undergo 10 hours of OSHA

11    training from anyone during the time period in

12    which you were working for DGS?

13            A.   I did not.

14            Q.   Did Heather Darnell?

15            A.   Not to my knowledge.

16            Q.   Did Jyotika?

17            A.   I have no idea.

18            Q.   Who were the managers at DGS?

19            A.   I presume I'm one of them, but I don't

20    know any others.

21            Q.   But you testified that you didn't

22    receive 10 hours of OSHA training previously;

23    right?

24            A.   That's true.

25            Q.   So this bullet point is not accurate;

1     correct?

2               MR. DALEY:  Objection.

3               THE WITNESS:  Not -- as far as it

4     applies to me.

5     BY MR. TOWNSEND:

6          Q.   And you said you presume you're one of

7     the managers; correct?

8          A.   Yes.

9          Q.   Did anyone at DGS ever track total

10    incidents recorded?

11         A.   We had no incidents, so there was

12    nothing to track.

13         Q.   And you had no incidences because

14    everyone was just working from home; right?

15         A.   Well --

16               MR. DALEY:  Objection.

17               THE WITNESS:  -- we didn't go to the

18    mills.

19    BY MR. TOWNSEND:

20         Q.   When you say "we," are you referring to

21    you --

22         A.   And Heather.

23         Q.   -- and Heather Darnell?

24         A.   Yeah.

25         Q.   And you said you would go to mills when

1     there --

2              A.    Infrequently, so...

3              Q.    What's that?

4              A.    Say again?

5              Q.    No.  Just repeat what you just said.

6              A.    I said infrequently, but yes, we would

7     go to mills.

8              Q.    Did DGS ever record lost-time

9     incidences?

10             A.    No.

11             Q.    Do you know what a lost-time incident

12    is?

13             A.    Yes.

14             Q.    Can you tell me what that is?

15             A.    Where you were injured on the job and

16    were no longer able to perform your job for --

17             Q.    So DGS employees wouldn't incur

18    lost-time incidences because they primarily worked

19    from home; correct?

20             A.    I would -- I would say so.

21             Q.    Except for occasional mill visits --

22             A.    Yes.

23             Q.    -- by you and Ms. Darnell.

24             A.    Yes.

25             Q.    If you could scroll down to slide 16,

1      it says "About DGS — Nanjing."

2                  MR. DALEY:  I'm sorry.  What number was

3      that, Nate?

4                  MR. TOWNSEND:  16.

5                  MR. DALEY:  Thank you.

6                  THE WITNESS:  "About DGS — Nanjing"?

7      Is that where we --

8      BY MR. TOWNSEND:

9           Q.   Correct.

10          A.   Okay.

11          Q.   First it says -- the first bullet point

12     says:

13                  Established in 1992.

14                  Is that right?

15                  MR. DALEY:  Objection.

16                  THE WITNESS:  That's what it says.

17     BY MR. TOWNSEND:

18          Q.   On the previous slide we read that DGS

19     was envisioned in 2001; is that right?

20          A.   Yep.

21          Q.   So why is it saying that DGS was

22     established in 1992 on this slide but envisioned in

23     2001 on slide 3?

24                  MR. DALEY:  Objection.

25                  THE WITNESS:  I have no idea.

1     BY MR. TOWNSEND:

2          Q.   It says "New factory established in

3     2019 and complete," is the second bullet point;

4     correct?

5          A.   That's what it says.

6          Q.   What's the new factory?

7          A.   I have no idea.

8          Q.   You never heard Shiv mention that a new

9     factory was under construction anywhere?

10              MR. DALEY:  Objection.

11              THE WITNESS:  No.

12    BY MR. TOWNSEND:

13         Q.   Why is DGS presenting this information

14    to International Paper?

15         A.   I have no idea.

16         Q.   Let's scroll down to the next slide,

17    please, Mr. Allen, and it's also "About DGS —

18    Nanjing."

19         A.   Okay.

20         Q.   You testified previously that DGS did

21    not import chemicals from China for sale to

22    International Paper; correct?

23         A.   That I know of.

24         Q.   Why is DGS telling International Paper

25    about its largest antifoam production base in China

1    if it doesn't import chemicals for sale to

2    International Paper from China?

3          A.    Potentially --

4                MR. DALEY:  Objection.

5                THE WITNESS:  -- for new business.

6    BY MR. TOWNSEND:

7          Q.    Do you remember what the purpose of the

8    November 4th, 2019 meeting was?

9          A.    I don't know.

10         Q.    Did you previously testify that it was

11   to justify your existence as DGS?

12               MR. DALEY:  Objection.

13               THE WITNESS:  That's what -- that's how

14   it ended up.  It was a -- when Jag was retiring and

15   someone else was taking over, so we were -- it was

16   supposed to be a meet-and-greet, as far as I knew.

17   BY MR. TOWNSEND:

18         Q.    Did Shiv tell you what the purpose of

19   the meeting was?

20               MR. DALEY:  Objection.

21               THE WITNESS:  As far as I knew, it was

22   a meet-and-greet.

23   BY MR. TOWNSEND:

24         Q.    That actually wasn't my question,

25   Mr. Allen.  Did Shiv ever tell you what the purpose

1    of the meeting was?  Do you recall?

2         A.    That was the purpose that he told me it

3    was.

4              MR. TOWNSEND:  Okay, Mr. Allen.  We're

5    done with this PowerPoint.  I'm going to be pulling

6    up the next one.  Rest assured, this one's smaller.

7              (EXHIBIT 19, Employee Information for

8    Jyotika Balsara, Mark Allen, and Heather Darnell,

9    marked for identification.)

10   BY MR. TOWNSEND:

11        Q.    Okay.  It should be introduced now, if

12   you could locate it.  It is Exhibit 19.

13        A.    Okay.

14        Q.    Any chance you've seen this before,

15   Mr. Allen?

16        A.    Possibly.

17        Q.    Can you tell me what the contents of

18   this document are?

19        A.    Actually, no, I haven't, because that

20   has salaries on it.  So I have never seen Jyotika's

21   salary.  So I don't know.

22        Q.    Are these job descriptions for you,

23   Ms. Darnell, and Jyotika?

24        A.    Appear to be correct.

25        Q.    Sorry.  Just to repeat that then, so

1      the job description for you appears to be correct;

2      is that right?

3             A.    Yes.

4             Q.    Is there anything left off of this

5      description?

6             A.    No.

7             Q.    And the job description for Heather

8      Darnell appears to be correct?

9             A.    Yes.

10            Q.    Is there anything left off of

11     Ms. Darnell's job description that you know of?

12            A.    No.

13            Q.    And lastly, is the job description for

14     Jyotika correct?

15            A.    Yes.

16            Q.    Do you know if anything has been left

17     out of that job description?

18            A.    I don't -- not that I know of.

19            Q.    You testified previously you didn't

20     know Jyotika's salary; is that right?

21            A.    That's correct.

22            Q.    So is it surprising to you that she was

23     making almost three times as much as you?

24            A.    No.

25            Q.    Was Jyotika related to Shiv by family?

1            A.    Not that I know of.

2            Q.    And apologies if I've already asked you

3     this.  This is the complete universe of people who

4     worked for DGS during your time there; correct?

5            A.    That I had contact with.

6                  MR. TOWNSEND:  Okay, Mr. Allen.  We're

7     going to pull up another exhibit.  I'm getting

8     better.  You should all be very pleased.

9                  THE WITNESS:  Not a very steep learning

10    curve, apparently.

11                  (Court reporter asked for clarification

12    due to feedback.)

13                  THE WITNESS:  I would like to imagine

14    that we're all just really sharp and that's why we

15    can perform this task.

16                  (EXHIBIT 20, Email Chain to

17    Mr. Phillips from Mr. Allen dated 7-6-18, marked

18    for identification.)

19                  MR. TOWNSEND:  Okay, Mr. Allen.  I have

20    introduced Exhibit 20.  And after doing all of my

21    gloating, I've realized that we have actually

22    uploaded this exhibit, so I'm going to go ahead and

23    do another one as 21.  Just bear with me.

24                  (EXHIBIT 21, Email Chain to Mr. Branch

25    from Mr. Allen dated 11-19-15, marked for

1      identification.)

2      BY MR. TOWNSEND:

3           Q.   Okay, Mr. Allen.  Now we should have

4      Exhibit 21 up.

5           A.   (Perusing.)  Okay.

6           Q.   And I appreciate you reviewing the

7      entire thing, but I'm actually just going to focus

8      on one email.  It's from you on November 19th,

9      2015, at 7:30 AM on the first page.  Can you direct

10     your attention there, please?

11          A.   Okay.

12          Q.   You say:

13               I don't like to travel on Monday,

14     because I schedule most deliveries for the week on

15     Monday.

16               Is that right?

17          A.   Yes.

18          Q.   So I'm trying to get an understanding

19     of your work, scheduling deliveries for a single

20     mill on a single week.  How long would it take you

21     to schedule deliveries, typically?

22          A.   Depending on the mill.  Some mills

23     would only require one delivery a week.  Some mills

24     would require -- like Texarkana would require two

25     or three deliveries a day.  So it depends.

1          Q.   Which mills required only one delivery

2   a week that you recall?

3          A.   Most of them.

4          Q.   When you say "most," could you try to

5   give me a number?

6          A.   Well, I don't remember how many mills

7   we ended up servicing, and at the end Texarkana was

8   sold to somebody else, so they weren't a customer

9   of ours anymore.  We did keep them for a while, and

10   then their purchasing department canceled the

11   contract.  So nearly all of them were either one or

12   two deliveries a week.

13          Q.   Okay.  How long would it take you to

14   schedule the two to three deliveries a week for one

15   of the mills?

16          A.   My typical day was like two or three

17   hours in the morning.

18          Q.   Two or three hours every day of the

19   week?

20          A.   Yes.  Well, five days a week.

21          Q.   Of course.

22          A.   But I was on call on the weekend.

23          Q.   How long would it take you to review

24   one of the emails from the PI system?

25          A.   That was a data point and it was

1    entered into a spreadsheet.  And so as soon as the

2    data was in the spreadsheet I could project out

3    when the need was.  So, you know, it -- none of the

4    spreadsheets by themselves took very long.

5           Q.   Would it take just a couple minutes,

6    perhaps?

7           A.   Perhaps.

8           Q.   Do you think it took two to three

9    minutes?

10          A.   Probably five to ten minutes per mill

11   per day for the spreadsheet part, and then working

12   with the suppliers for the deliveries.  So that --

13   yeah.

14          Q.   So was your work with DGS a part-time

15   job?

16          A.   Yes.

17          Q.   Did you have any other jobs?

18          A.   No.

19          Q.   Can you tell me what Trail Life USA is?

20          A.   It is a Christ-centered, outdoor

21   adventure program for boys.

22          Q.   I'll represent to you, Mr. Allen, just

23   to keep things moving along, that I understand you

24   were a volunteer for Trail Life USA?

25          A.   Still am.

1          Q.   How much time would you spend

2     volunteering for Trail Life USA on a weekly basis?

3          A.   Again, depends on the week, but

4     several -- well, five to ten hours a week,

5     probably.

6          Q.   And you weren't being compensated.

7     That was volunteer work?

8          A.   Yes.

9          Q.   Would you go on any camping trips for

10    Trail Life USA?

11         A.   Yes.

12         Q.   Were these overnight trips?

13         A.   Yes.

14         Q.   How often --

15              MR. TOWNSEND:  Strike that.

16    BY MR. TOWNSEND:

17         Q.   In 2013 how many overnight camping

18    trips did you do with Trail Life USA?

19         A.   In 2013 Trail Life USA didn't exist.

20         Q.   When did Trail Life USA begin to exist?

21         A.   January 1st, 2014.

22         Q.   So in 2014 how many overnight camping

23    trips did you undertake --

24         A.   None.

25         Q.   -- if you recall?  Ten?

1          A.    None.

2          Q.    None.  When was the first overnight

3    camping trip you took with Trail Life USA, if you

4    recall?

5          A.    Probably 2015, when my son joined the

6    first troop in this area.

7          Q.    Do you remember how many trips you

8    took -- overnight trips you took in 2015?

9          A.    Maybe three.

10         Q.    What about in 2019?

11         A.    2019?

12         Q.    (Moves head up and down.)

13         A.    Probably none.

14         Q.    No offense is meant by this, Mr. Allen.

15   Did someone else in your household serve as the

16   primary income creator?

17         A.    No.

18         Q.    And again, no offense meant.  How were

19   you all -- your family living off 30,000 a year

20   during the time you worked at DGS?

21         A.    It was supplemental income.  I have

22   investments.  2008 was a bad year for investments,

23   and that's the reason I looked for a job.

24         Q.    Back to Exhibit 21.  Is it accurate

25   that you would schedule most deliveries for the

1    week on a Monday?

2           A.   I would plan most of the deliveries on

3    Monday.  The scheduling I did every day.  But yes,

4    the heaviest scheduling was on Monday.

5           Q.   And there was no scheduling Tuesday

6    through Friday; right?

7           A.   There was scheduling Tuesday through

8    Friday, but if I was going out of town, like this

9    email suggests that I would be visiting -- where

10   would this be?  This would be -- I don't know where

11   this would be.

12          Q.   To speed things along, was it the

13   Franklin mill?

14          A.   Franklin mill?  Okay.  Then I would

15   plan around not being in the office.

16          Q.   Is the Franklin mill near Richmond,

17   Virginia?

18          A.   I think it's near Wilmington, North

19   Carolina.  No.  Oh, no, no.  Franklin, Virginia.  I

20   don't remember.

21               MR. TOWNSEND:  Okay, Mr. Allen.  You

22   know, we've been going a while, everyone.  I do

23   have more questions.  I would approximate another

24   hour, maybe less.  I don't know if we want to --

25   well, first of all, maybe we'll just go off the

1    record.

2                    THE VIDEOGRAPHER:  The time on the

3    monitor is 2:48 PM.  We're going off the record.

4                    (A recess transpired from 2:48 until

5    3:03.)

6                    THE VIDEOGRAPHER:  The time on the

7    monitor is 3:03 PM, and we're back on the record.

8                    MR. TOWNSEND:  Mr. Allen, I'm going to

9    be introducing another exhibit to you.  Working

10   through that right now, and I'll let you know when

11   it's up.

12                   (EXHIBIT 22, LinkedIn Profile for Mark

13   Allen, marked for identification.)

14   BY MR. TOWNSEND:

15           Q.   Okay.  It should be there now.  This is

16   Exhibit 22.

17           A.   Okay.

18           Q.   Do you recognize this document,

19   Mr. Allen?

20           A.   It looks like my LinkedIn profile.

21           Q.   And as far as you can tell, is

22   everything on this document accurate about your

23   work experience?

24           A.   Yes.

25           Q.   Why did you not list DGS on your

1     LinkedIn?

2        A.   Because the purpose of -- I created

3     this LinkedIn profile before DGS, and I updated it

4     to promote Trail Life.  I didn't -- I wasn't

5     looking for a job.

6        Q.   You mentioned -- you testified earlier

7     that part of your income comes from investments; is

8     that right?

9        A.   Majority of it.

10        Q.   How much time do you spend investing on

11    a weekly basis?

12        A.   None.  I have a portfolio set up that

13    generates -- or at that -- at the time when I got

14    the job with DGS I had a lot of real estate

15    investment trusts that vanished in 2008 and '09.

16    So that was where -- they were cash-generating

17    investments that disappeared.  And so -- but now --

18    you know, I also had investments that generated

19    dividends.  So I am not a stock trader.  I have

20    investments that generate income.

21        Q.   Back in 2011 how much time on a weekly

22    basis would you spend managing your investments?

23        A.   On a week -- not very much at all.

24    Again, they generated income.

25        Q.   This is not meant as an offense,

1    Mr. Allen, but what were you doing with your time
2    if you were doing two to three hours a day for DGS
3    and not much with your investments?
4         A.    I was renovating my house that I had
5    inherited from my parents.
6         Q.    And that's in South Carolina?
7         A.    Yes.  That's where I live now.  What
8    does this have to do with DGS?
9         Q.    Mr. Allen, again, not meant to offend,
10   but in this deposition I'll be asking the
11   questions, and I'll just stick to that.  But I
12   appreciate your answers.  I -- that's enough on
13   that exhibit.  Thank you.
14              Now when it comes to these inventory
15   monitor emails you would receive from the PI
16   system, who owned the software that enabled you to
17   receive tank levels from your inbox?
18        A.    International Paper.
19        Q.    So International Paper installed the
20   technology required to do that?
21        A.    Not for me, but yes.  That was their --
22   their mill information system.  It replaced
23   Millview.
24        Q.    So they -- they incurred the cost to
25   set up that system; correct?

1          A.    Yes.

2          Q.    And DGS did not incur that cost; right?

3          A.    No.

4          Q.    So all you had to do to start

5     monitoring tank levels was provide your email

6     address to the mill; is that right?

7          A.    Yes.

8               MR. DALEY:  Objection.

9     BY MR. TOWNSEND:

10         Q.    You didn't have to go out to the mill

11    to oversee any sort of installation of hardware or

12    software?

13         A.    No.  The information was already there

14    being distributed to the management and engineers,

15    and I just accessed it by email.

16         Q.    And that would include -- I was going

17    to ask you next, Mr. Allen, who else received the

18    tank level emails?

19         A.    Heather.

20         Q.    Would people at International Paper

21    receive the tank level emails?

22         A.    No.  They have access to real-time

23    data.

24         Q.    Would the suppliers of, let's say,

25    sodium hypochlorite, could they receive these tank

1    level emails?

2         A.   They could.

3         Q.   Do you know if they did?

4         A.   They did not.  But then they would also

5    have to have somebody to do something with it.

6         Q.   Understood.  Thank you.  I am

7    introducing Exhibit 23 here to you.  It should be

8    coming up soon.

9              (EXHIBIT 23, Email Chain to Mr. Allen

10   from Ms. Sanders dated 11-11-13, marked for

11   identification.)

12   BY MR. TOWNSEND:

13        Q.   Do you see that, Mr. Allen?  It should

14   have Exhibit 23 in the bottom right-hand corner of

15   the first page.

16        A.   I'm seeing it now.  Let's see.  From me

17   to -- okay.  Oh, Brenntag.  Okay.  (Perusing.)  All

18   right.

19        Q.   Any chance you remember this email back

20   from 2013?

21        A.   Let me read it and see.  (Perusing.)

22   Okay.  Yes, I vaguely remember this.

23        Q.   Okay.  And so am I correct that

24   Ms. Sanders from International Paper has reached

25   out to you requesting a, quote,

1      Corrective/Preventative Action Plan regarding a

2      near-miss incident for hypo delivery?  Is that what

3      I'm understanding Ms. Sanders --

4           A.   Yes.

5           Q.   -- is saying?

6           A.   Yes.

7           Q.   And she's asking you for this

8      Corrective/Preventative Action Plan; is that right?

9           A.   Yes.

10          Q.   And what do you do in response to

11     Ms. Sanders's email?

12          A.   I contact our supplier.

13          Q.   Is that because the supplier is

14     responsible for the transportation of the

15     chemicals?

16          A.   Yes.

17          Q.   So when you would arrange for a hypo

18     delivery, who would you contact?

19          A.   The sales department of the supplier.

20          Q.   And once you contacted the sales

21     department of the supplier, was it their

22     responsibility to find transportation and

23     ultimately move the chemical to the International

24     Paper mill?

25               MR. DALEY:  Objection.

1              THE WITNESS:  Yes.

2      BY MR. TOWNSEND:

3              Q.   And if any sort of transportation

4      problems arose, those problems were the

5      responsibility of the supplier; correct?

6              A.   Correct.

7              Q.   You testified earlier about the need to

8      expedite shipping of chemicals on occasion.  Do you

9      remember that testimony?

10             A.   Yes.

11             Q.   When you refer to expediting shipping,

12     did that mean you asked the supplier to find a

13     faster way to transport the chemicals?  Is that --

14             MR. DALEY:  Objection.

15     BY MR. TOWNSEND:

16             Q.   -- what that meant?

17             A.   I would look for alternate sources from

18     the -- from the supplier.  They have multiple

19     facilities, and we would look for ways to schedule

20     it from another facility that would be a

21     replacement for the order that was delayed.

22             Q.   So you would call different sales

23     personnel at one of the suppliers to find which

24     location could supply the chemical?

25             A.   I had a primary contact with each

1    supplier that took care of various production

2    facilities of theirs.

3         Q.   Okay.  So you would -- you would reach

4    out to the primary contact, and they would look

5    around for where the chemical could be supplied

6    from their operations; is that right?

7         A.   Correct.

8         Q.   Did Jyotika ever engage in any sort of

9    non-bookkeeping activities for DGS?

10         A.   She covered for me once, I think, when

11    I went to Brazil.  So maybe.  Probably.

12         Q.   Did you offer -- and please feel free

13    to ask for clarification if you don't know what

14    this is.

15              Did you offer any sort of technical

16    service to the mills in relation to the chemicals

17    that DGS was selling?

18         A.   No.

19         Q.   Did Jyotika offer any technical

20    service?

21         A.   No.

22         Q.   Did Heather?

23         A.   No.

24         Q.   So would it be possible for a

25    salesperson at one of the suppliers to monitor

1    International Paper's tank levels in the same way

2    you did?

3           A.   It would be possible.

4           Q.   And they could take that information

5    and arrange orders for International Paper; is that

6    right?

7           A.   If they had someone to do it.

8           Q.   Why would International Paper choose to

9    use your services instead of going directly to the

10   supplier?

11              MR. DALEY:  Objection.

12              THE WITNESS:  Suppliers don't offer

13   that service.

14   BY MR. TOWNSEND:

15          Q.   But they could offer that service.

16   That's right?

17          A.   They could for a price.

18          Q.   How much do you think that would cost

19   them?

20              MR. DALEY:  Objection.

21              THE WITNESS:  I have no idea.  I didn't

22   deal with dollars.

23   BY MR. TOWNSEND:

24          Q.   Do you know how much DGS was bringing

25   in in gross profit in 2011?

1          A.    I have no idea.  I didn't deal with

2     dollars.

3          Q.    For any of the years do you know?

4          A.    I have no idea.

5          Q.    Would it surprise you to learn that DGS

6     was making more than 3 million in gross profit

7     every year?

8               MR. DALEY:  Objection.

9               THE WITNESS:  I have no idea.

10    BY MR. TOWNSEND:

11         Q.    I understand you have no idea,

12    Mr. Allen, but does that number surprise you, or is

13    that something you would expect based on the

14    services you offered?

15         A.    We handled a lot of pounds of product.

16    So a small margin adds up.

17         Q.    What if the margin was 21 percent?

18         A.    Okay.

19         Q.    Would that surprise you?

20               MR. DALEY:  Objection.

21               THE WITNESS:  No.

22    BY MR. TOWNSEND:

23         Q.    What if the margin was 86 percent?

24               MR. DALEY:  Objection.

25               THE WITNESS:  That would be a bit much,

1    but whatever.

2    BY MR. TOWNSEND:

3         Q.   So you -- give me, if you can, the

4    complete packages of value that DGS was offering to

5    International Paper.

6         A.   I can only offer what value I provided

7    for International Paper.

8         Q.   What value did Jyotika provide?

9              MR. DALEY:  Objection.

10             THE WITNESS:  I can only offer the

11   value that I provided.

12   BY MR. TOWNSEND:

13        Q.   So you don't know what Jyotika

14   provided?

15        A.   No, other than the bookkeeping.  I

16   mean, she did the accounts receivable, account

17   payable.

18        Q.   So that was for DGS; right?

19        A.   But that's for DGS, that's correct.

20        Q.   What value did Shiv offer, if you know?

21        A.   I have no idea.

22        Q.   What value did Ms. Darnell offer, if

23   you know?

24             MR. DALEY:  Objection.

25             THE WITNESS:  The same as me.

1    BY MR. TOWNSEND:

2         Q.   Just to a lesser extent when she was

3    filling in for you; right?

4         A.   Correct.

5         Q.   So all the value that DGS was offering

6    that you know of came from your work and the work

7    of Ms. Darnell; is that right?

8              MR. DALEY:  Objection.

9              THE WITNESS:  That's the value that I

10   know we were providing.

11   BY MR. TOWNSEND:

12        Q.   If it was just the value that you

13   provided and the value that Ms. Darnell provided,

14   do you think that was worth $3 million a year?

15             MR. DALEY:  Objection.

16             THE WITNESS:  I didn't deal with

17   dollars, so it's not my job.

18   BY MR. TOWNSEND:

19        Q.   You mentioned earlier that you have a

20   lot of investments; is that right --

21        A.   Yes.

22        Q.   -- Mr. Allen?  So you understand how to

23   make a return --

24        A.   Yes.

25        Q.   -- on your investment.  Do you think

1    International Paper was getting a good return for

2    the $3 million it spent --

3              MR. DALEY:  Objection.

4    BY MR. TOWNSEND:

5         Q.   -- on this?

6              MR. DALEY:  Sorry, Nate.  Objection.

7              THE WITNESS:  It's not for me to say.

8    BY MR. TOWNSEND:

9         Q.   But what do you personally think?

10        A.   I will not offer an opinion.

11        Q.   Mr. Allen, you are here pursuant to a

12   subpoena served on you, and you are required to

13   answer all questions truthfully and to the best of

14   your knowledge.

15        A.   Yes, and I have.  Doesn't require me to

16   give an opinion.

17        Q.   So am I understanding that you are

18   refusing to tell me if you think DGS was a good

19   investment for International Paper when it is

20   making more than 3 million a year from your

21   services and the services of Ms. Darnell?

22             MR. DALEY:  Objection.

23             THE WITNESS:  Yes.

24   BY MR. TOWNSEND:

25        Q.   Okay.  I'll note at this time that

1      International Paper reserves the right to return to

2      question you, Mr. Allen, at another date on this

3      subject if we deem it necessary, and we'll continue

4      with our questions since we have a few others to go

5      through.

6                        Mr. Allen, did you know that Shiv is

7      the half-brother of Jag?

8              A.    I learned it from a FBI agent last

9      year.  Some -- somewhere in that vicinity.  Other

10     than -- before that I did not know.

11             Q.    Were you surprised to learn that?

12             A.    Yes.

13             Q.    Do they look alike?

14             A.    They're from the same part of the

15     world.

16             Q.    Who was the FBI agent?

17             A.    I don't remember his name.

18             Q.    Was it Marcus Vance?

19             A.    I don't remember his name.

20             Q.    Do you recall what kind of questions he

21     asked you when he met with you?

22             A.    Similar to the ones that you were

23     asking me today.

24             Q.    Did he ask you about the value that DGS

25     provided International Paper?

1          A.    No.

2          Q.    Did you ever have any conversations

3    with any attorneys from the US Department of

4    Justice?

5          A.    No.

6          Q.    Did you have any conversations with any

7    personnel from Beazley Insurance Company?

8          A.    No.  Well, not the insurance company

9    itself.  I had a conversation with -- is it Matt?

10   I'm sorry.

11         Q.    Mr. Daley?

12         A.    Pardon me?

13         Q.    Mr. Daley?

14         A.    Yes.

15         Q.    Aside from Mr. Daley, did you have any

16   conversations with anyone else from his law firm of

17   Robinson & Cole?

18         A.    No.

19         Q.    How many conversations did you have

20   with Mr. Daley?

21         A.    Just one.

22         Q.    And that was a couple of weeks ago in

23   advance of this deposition?

24         A.    Yes.

25         Q.    And I think you testified earlier that

1    that was a conversation that lasted about 30

2    minutes?

3         A.    Approximately.

4         Q.    What kind of questions did Mr. Daley

5    ask of you?

6         A.    He didn't ask me any questions.  I

7    asked him what this was about.

8         Q.    What did he say?

9         A.    He said it was a lawsuit between

10   International Paper and the insurance companies

11   about the services that DGS provided.

12        Q.    Did he give you any of his opinions on

13   the case?

14        A.    I don't remember exactly.  It was just

15   broad strokes, what -- what my deposition was going

16   to be concerned with.

17        Q.    And you may have already told me this,

18   but just to be clear, did he tell you what your

19   deposition was going to be concerned with?

20        A.    Just in general terms.

21        Q.    Can you give me an example of what he

22   may have told you?

23        A.    Like the questions that he asked me

24   earlier was, you know, that -- what I did, you

25   know, who I dealt with.  Those kinds of things.

1    Q.   Did you only have one meeting with the
2    FBI?
3         A.   Yes.  It was a phone call.
4         Q.   That was my next question.  Saving
5    time.  And it was only one agent --
6         A.   Yes.
7         Q.   -- that you spoke to?
8         A.   Yes.
9         Q.   Did you ever speak to anyone from the
10   law firm of Clark Hill?
11        A.   No.
12        Q.   Did the FBI agent show you any
13   documents?
14        A.   No.  It was a phone call.
15        Q.   You're right.  I apologize.  Did
16   Mr. Daley email you any documents?
17        A.   No.
18        Q.   Mr. Allen, do you remember when DGS
19   began selling chemicals to the Springfield mill?
20        A.   The date?  No, I don't remember.
21        Q.   Could you give me the year, maybe?
22        A.   Not a clue.
23        Q.   No problem.  I'm going to be
24   introducing another exhibit.  I'm going to -- just
25   for your sake I'm going to tell you that we have

1    two to three to go.

2            A.   Good.

3                 (EXHIBIT 24, Email to Mr. Kumar from

4    Mr. Violette dated 6-5-12, marked for

5    identification.)

6    BY MR. TOWNSEND:

7            Q.   Okay.  It should be uploaded now as

8    Exhibit 24.

9            A.   Okay.

10           Q.   Mr. Allen, I'm going to assume --

11   sorry.  I'm not sure if that's me.  Mr. Allen, I'm

12   going to assume you have not seen this email

13   before.  Is that correct?

14           A.   That is correct.

15           Q.   If you could take a moment to review

16   it, and then when you're done can you tell me what

17   Mr. Violette is telling Mr. Kumar?

18           A.   (Perusing.)  Wow.  (Perusing.)  Okay.

19           Q.   Was it your understanding for the

20   Springfield mill that DGS, the contract with DGS

21   did not call for any service?

22           A.   No, I was not aware of that.

23           Q.   So Mr. Violette's second sentence to

24   Mr. Kumar is not accurate?

25           A.   I never went anywhere "guns a blazing."

1          Q.   Did you assert to members of

2     International Paper that the contract did not call

3     for any service?

4          A.   I did not tell International Paper

5     that -- well, "service" is the keyword there.

6     There were Plasmine people on the ground at the

7     mill who were in charge of the application of the

8     size.  The service that I was contracted for was to

9     provide the size.  So that's...

10          Q.   When you say --

11               (Court reporter asked for clarification

12     due to feedback.)

13     BY MR. TOWNSEND:

14          Q.   When you say supplied the size, the

15     chemicals were supplied by Plasmine; is that right?

16          A.   Correct.

17          Q.   So Plasmine supplying the size, they're

18     in charge of application of the size.  What was

19     DGS's role?

20          A.   Just the ordering process.

21          Q.   So it was, quote, Mr. Violette take and

22     process orders, period?

23          A.   Apparently.

24          Q.   Well, would you agree with

25     Mr. Violette?

1          A.    That's not how it ended up, but yes, I
2     guess so.
3          Q.    Well, how did it end up?  Were there --
4          A.    I did -- I did end up monitoring the
5     tank levels and stuff, but at least at the
6     beginning, no.
7          Q.    When did you start monitoring the tank
8     levels for Springfield?
9          A.    This has been a while.  I don't
10     remember.
11          Q.    Was it at some point in 2012?
12          A.    I have no idea.
13          Q.    Any chance it was 2013?
14          A.    That's 10 years ago.  I don't remember.
15          Q.    To bring it current a little bit, was
16     it in 2019 that you started monitoring, or was it
17     earlier?
18          A.    I have no idea.
19          Q.    But you do remember monitoring tank
20     levels for size here?
21          A.    To the best of my recollection.
22               MR. TOWNSEND:  Okay.  We have two more
23     exhibits.
24               (EXHIBIT 25, Email Chain to Mr. Kumar
25     from Ms. Balsara dated 10-17-18, marked for

1    identification.)

2    BY MR. TOWNSEND:

3         Q.   Okay.  That should be coming in pretty

4    soon, Mr. Allen.  Have you been able to access it?

5         A.   It's loading.

6         Q.   Okay.

7         A.   Exhibit 24?  Is that it?

8         Q.   25, actually, unless I made a mistake.

9    It is a nine-page email chain.  The first email is

10   from Jyotika on October 17th, 2018.

11        A.   Okay.  From Jyotika, October 17th,

12   2018.  Okay.

13        Q.   And feel free to correct me, Mr. Allen,

14   but I am going to presume that you have not seen

15   this email either, but please take the time you

16   feel that you need to review it.  I'll tell you now

17   I'm going to be focused on the first two pages.

18        A.   (Perusing.)  Okay.  I've looked over

19   the first two pages.

20        Q.   Okay.  Let's discuss these, at least,

21   and if you feel like you need additional context,

22   feel free to read more.

23             Do you recognize any of the people that

24   Jyotika emailed on that first email?

25        A.   No.

1        Q.   Okay.  Is Jyotika -- it says -- if I'm

2     reading correctly, she says, "See notes below," and

3     then there is in the second email some

4     orange-colored text; is that right?

5        A.   Yes.

6        Q.   So is -- to the best of your

7     understanding, is Jyotika responding to questions

8     in this second email?

9             MR. DALEY:  Objection.

10            THE WITNESS:  She appears to be -- in

11    the first two pages appears to be responding to

12    questions, yes.

13    BY MR. TOWNSEND:

14       Q.   Okay.  Question No. 2 asked:

15            Does DGS repack or rebrand any goods

16    purchased from its vendors?

17            Is that right?

18       A.   Yes.

19       Q.   And her answer is:

20            No repackaging.  Some products are

21    rebranded under DGS name; e.g., DGS sodium

22    hypochlorite.

23            Is that right?

24       A.   Yes.

25       Q.   Is Jyotika accurate, that there's no

1    repackaging?

2          A.    Yes.

3          Q.    Did you ever put a DGS label on a

4    product supplied from another supplier?

5          A.    Yes.

6          Q.    Why would you do that?

7          A.    That's what I was told to do.

8          Q.    Who told you?

9          A.    Shiv.

10         Q.    Do you know why he told you to do that?

11         A.    No.

12         Q.    Question No. 3 says:

13               Does DGS manufacture any products or

14    outsource manufacturing to a third party?

15               And the answer is no; right?

16         A.    Correct.

17         Q.    Is Jyotika accurate to respond no?

18         A.    Yes.

19               MR. DALEY:  Objection.

20    BY MR. TOWNSEND:

21         Q.    Question 4 says:

22               Is DGS involved in the transportation

23    of goods from its vendors to its customers?  If no,

24    then how are the goods transported from vendors to

25    customers?

1            And her response reads:

2            No — product is drop-shipped to

3    customer.

4            Is that right?

5        A.   Yes.

6        Q.   Is Jyotika accurate that DGS was not

7    involved in the transportation of goods from its

8    vendors to its customers?

9            MR. DALEY:  Objection.

10           THE WITNESS:  Yes.

11    BY MR. TOWNSEND:

12        Q.   Could you restate that?

13        A.   Yes.

14        Q.   Thank you.  Question No. 5:

15           Does DGS handle any material from the

16    time it procured goods from its vendors and sells

17    them to its customers?  If yes, list the scientific

18    names of chemicals handled by DGS.

19           And her answer is no; is that right?

20        A.   Yes.

21        Q.   Is Jyotika accurate when she says DGS

22    does not handle any material from the time it

23    procures goods from its vendors and sells them to

24    its customer?

25        A.   Yes.

1              MR. DALEY:  Objection.

2              THE WITNESS:  Yes.

3     BY MR. TOWNSEND:

4         Q.    Thank you.  If you'll scroll down to

5     the second page real fast there's a question No. 7

6     which reads:

7              Has DGS undergone any

8     environmental/safety audit in the last five years?

9              And the answer is no; is that right?

10        A.    Yes.

11        Q.    Why did DGS not need to go --

12    undergo -- excuse me.  Let me restate.

13             Why did DGS not need to undergo any

14    environmental or safety audit in the last five

15    years?

16             MR. DALEY:  Objection.

17             THE WITNESS:  Above my pay grade.

18             MR. TOWNSEND:  Okay, Mr. Allen.  We're

19    going to go to our last exhibit.

20             (EXHIBIT 26, Email Chain to Ms. Riles

21    from Mr. Allen dated 7-17-17, marked for

22    identification.)

23    BY MR. TOWNSEND:

24        Q.    Okay.  This is Exhibit 26.  It should

25    be in Exhibit Share at this point.

1         A.   (Perusing.)  Okay.

2         Q.   Have you seen this email before; do you

3  recall?

4         A.   I authored it.

5         Q.   Can you tell me what you're doing in

6  this email?

7         A.   Explaining why the truck didn't get

8  unloaded.

9         Q.   Is Paula White from Georgia-Pacific

10  Company?

11         A.   I -- that name rings a bell.  I don't

12  see it on the email string.  Oh, let's see.  No.

13  Seems like she was my contact person with

14  Georgia-Pacific.

15         Q.   And Amy Riles is also from

16  Georgia-Pacific?

17         A.   Yes.

18         Q.   So in this first email, are you telling

19  Georgia-Pacific that the IP Georgetown mill needs a

20  load or loads of Amres 8870N for delivery?

21         A.   Yes.

22         Q.   Is this an example of you placing an

23  order for chemicals to one of the IP mills?

24         A.   Oh, I see.  There's Paula White.  Yes.

25         Q.   And from here, once you sent this

1    email, the rest of the responsibility for supplying

2    the chemical remained with Georgia-Pacific; is that

3    right?

4                    MR. DALEY:  Objection.

5                    THE WITNESS:  Yes.

6    BY MR. TOWNSEND:

7        Q.    And the responsibility for servicing

8    the chemical once it arrived at the mill was the

9    responsibility of Georgia-Pacific; is that right?

10       A.    No.

11       Q.    Whose responsibility was it?

12       A.    The application was -- I think Nalco

13   did that for IP at Georgetown.  I'm not entirely

14   sure.

15       Q.    But it wasn't anyone from DGS; right?

16       A.    No, it was not anyone from DGS.

17       Q.    Mr. Allen, are you aware that Jag was

18   arrested in December of 2019 by the FBI?

19       A.    No.

20       Q.    Are you aware -- did Shiv ever tell you

21   why DGS lost its contract with International Paper?

22       A.    No.

23       Q.    Did you ever ask him?

24       A.    No.

25       Q.    Were you not curious?

1                 MR. DALEY:  Objection.

2                 THE WITNESS:  When I left the Memphis

3       meeting, that was clear, that something was up.

4       That meeting did not go well.

5       BY MR. TOWNSEND:

6           Q.   Are you aware that Jag was charged with

7       wire fraud with the United States Department of

8       Justice?

9           A.   No.

10          Q.   Are you aware that Jag's bank accounts

11      were frozen as part of that criminal investigation?

12          A.   No.

13          Q.   Are you aware that Shiv's bank accounts

14      were frozen as part of that investigation?

15          A.   No.

16          Q.   Are you aware that Shiv agreed to

17      testify against Jag in the criminal matter?

18          A.   No.

19          Q.   Do you know if Shiv was willing to

20      testify against anyone else than Jag --

21          A.   No.

22          Q.   -- in the matter?

23          A.   No.

24          Q.   Why do you think International Paper

25      wanted to terminate its contracts with DGS?

```
 1              MR. DALEY:  Objection.
 2              THE WITNESS:  I did not have any idea.
 3    BY MR. TOWNSEND:
 4         Q.   Now that you know that Shiv and Jag are
 5    brothers, do you think it's because there was a
 6    conflict of interest?
 7         A.   Possibly.
 8              MR. TOWNSEND:  Mr. Allen, thank you for
 9    your time.  I don't have any more questions,
10    subject to any possible further questioning from
11    Mr. Daley.
12              MR. DALEY:  No.  I'm all set as well,
13    Mr. Allen.  Thank you.  I realize it was a longer
14    day today, but I appreciate you bearing with us and
15    sticking around for the whole day and not cutting
16    out on us.  So thank you very much.
17              THE WITNESS:  Okay.  Are we done?
18              MR. TOWNSEND:  Yes.  Thank you,
19    Mr. Allen.  Hey, Max, do you mind staying on for
20    just a second to discuss scheduling?
21              THE VIDEOGRAPHER:  The time on the
22    monitor is 3:46 PM, and we're going off the record.
23    Sorry.
24              (Off the record.)
25              THE REPORTER:  Mr. Townsend, did you
```

1    want to order a transcript, a copy?

2                    MR. TOWNSEND:  Yes, ma'am.  Standard

3    time works for us.

4                    THE REPORTER:  Okay.  Very good.  Thank

5    you.

6                    (Off the record.)

7                    MR. DALEY:  And, Sandy, if you have a

8    rough, too, we'll take that whenever you get it.

9                    MR. TOWNSEND:  Oh, yeah, that would be

10   great.

11                   MR. DALEY:  And same thing.  Standard,

12   full PDF is great.

13                   THE REPORTER:  Okay.  Very good.  Thank

14   you.  I will do that.

15                   (The right to read and sign this

16   transcript was not waived.)

17                   (The deposition was concluded at

18   3:46 PM.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3            I, Sandra K. Bjerke, Registered

4    Professional Reporter and Notary Public for the

5    State of South Carolina at Large, do hereby certify

6    that the foregoing transcript was transcribed to

7    the best of my ability using the Zoom technology

8    platform, including, but not limited to, its

9    inherent shortcomings of garbled speech,

10   overmodulation, and voice-overlap cancellation;

11           I further certify that I am neither

12   related to nor counsel for any party to the cause

13   pending or interested in the events thereof.

14           Witness my hand, I have hereunto

15   affixed my official seal this 4th day of January,

16   2024 at Charleston, Charleston County, South

17   Carolina.

18

19

20

21

22

23



24                    Sandra K. Bjerke, RDR, CRR, CBC

                     My Commission Expires

25                   May 6, 2030

1                    I N D E X

2

3                                    Page      Line

4    MARK W. ALLEN                    4         5

5    EXAMINATION                      4         7

6    BY MR. DALEY

7    EXAMINATION                      84        11

8    BY MR. TOWNSEND

9    CERTIFICATE OF REPORTER          163       1

10

11

12

13        REQUESTED INFORMATION INDEX

14

15        (No Information Requested)

16

17

18

19              E X H I B I T S

20

21                                   Page      Line

22   EXHIBIT 1, Email Chain to        45        23

23   Mr. Kumar from Mr. Allen dated

24   3-14-13

25   EXHIBIT 2, DGS PowerPoint        54        13

1    dated 1-23-13

2    EXHIBIT 3, Email to            61        1

3    Mr. Hamilton from Mr. Allen

4    dated 9-5-18

5    EXHIBIT 4, Email to TF Rice    64        3

6    from Mr. Allen dated 2-19-13

7    EXHIBIT 5, Email Chain to      66        14

8    Mr. Phillips from Mr. Allen

9    dated 7-6-18

10   EXHIBIT 6, DGS Purchase Order  68        10

11   to Plasmine Technology dated

12   1-5-12

13   EXHIBIT 7, Email Chain to      70        15

14   Mr. Bertoldo from Mr. Allen

15   dated 7-13-17

16   EXHIBIT 8, Email Chain to      72        18

17   Mr. Allen from Mr. Jagannath

18   dated 7-10-13

19   EXHIBIT 9, Email to Mr. Reed   74        13

20   from Mr. Allen dated 6-8-17

21   EXHIBIT 10, Email chain to     75        12

22   Mr. Allen from Mr. Klobucar

23   dated 11-25-15

24   EXHIBIT 11, Email Chain to     77        3

25   Mr. Allen from Mr. Bertoldo

1    dated 5-8-17

2    EXHIBIT 12, Email Chain to        80        10

3    Ms. Edwards from Mr. Allen

4    dated 6-3-14

5    EXHIBIT 13, Email Chain          81        12

6    Ms. Sanders from Mr. Allen

7    dated 12-16-15

8    (The number 14 was not used.)

9    EXHIBIT 15, Investigation Form   83        3

10   dated 11-18-15

11   EXHIBIT 16, Email Chain to        87        21

12   Ms. Balsara from Mr. Allen

13   dated 5-23-16

14   EXHIBIT 17, DGS PowerPoint        95        18

15   Presentation to International

16   Paper dated 8-27-15

17   EXHIBIT 18, DGS PowerPoint:       110       1

18   Aligned Partnership, Aligned

19   Success, dated 11-4-19

20   EXHIBIT 19, Employee             124       7

21   Information for Jyotika

22   Balsara, Mark Allen, and

23   Heather Darnell

24   EXHIBIT 20, Email Chain to        126       16

25   Mr. Phillips from Mr. Allen

1    dated 7-6-18

2    EXHIBIT 21, Email Chain to        126      24

3    Mr. Branch from Mr. Allen

4    dated 11-19-15

5    EXHIBIT 22, LinkedIn Profile      133      12

6    for Mark Allen

7    EXHIBIT 23, Email Chain to        137      9

8    Mr. Allen from Ms. Sanders

9    dated 11-11-13

10   EXHIBIT 24, Email to Mr. Kumar    150      3

11   from Mr. Violette dated 6-5-12

12   EXHIBIT 25, Email Chain to        152      24

13   Mr. Kumar from Ms. Balsara

14   dated 10-17-18

15   EXHIBIT 26, Email Chain to        157      20

16   Ms. Riles from Mr. Allen dated

17   7-17-17

18

19

20

21

22

23

24

25

1    Mark W. Allen

2    markwallen56@gmail.com

3                    January 4, 2024

4     International Paper Co. v Beazley Insurance Co. Inc., Et Al

5        12/20/2023, Mark W. Allen (#6355041)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

1    International Paper Co. v Beazley Insurance Co. Inc., Et Al

2    Mark W. Allen (#6355041)

3              E R R A T A   S H E E T

4    PAGE\_\_\_\_\_ LINE\_\_\_\_\_ CHANGE_____

5    _____

6    REASON_____

7    PAGE\_\_\_\_\_ LINE\_\_\_\_\_ CHANGE_____

8    _____

9    REASON_____

10    PAGE\_\_\_\_\_ LINE\_\_\_\_\_ CHANGE_____

11    _____

12    REASON_____

13    PAGE\_\_\_\_\_ LINE\_\_\_\_\_ CHANGE_____

14    _____

15    REASON_____

16    PAGE\_\_\_\_\_ LINE\_\_\_\_\_ CHANGE_____

17    _____

18    REASON_____

19    PAGE\_\_\_\_\_ LINE\_\_\_\_\_ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Mark W. Allen                      Date

25

1      International Paper Co. v Beazley Insurance Co. Inc., Et Al

2    Mark W. Allen (#6355041)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Mark W. Allen, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Mark W. Allen                        Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

**&**

**&** 2:10 3:21
147:17

**0**

**02108** 2:12
**02789** 1:5
**09** 134:15

**1**

**1** 45:14,23 46:5
47:9,13 48:14
48:17 164:9,22
165:2 166:17
**1,500** 84:25
**1-23-13** 54:14
165:1
**1-5-12** 68:11
165:12
**10** 24:13,16
25:7 58:1
75:11,12 76:9
112:16 118:5
118:10,22
152:14 165:10
165:21 166:2
**10,000** 15:14
**10-17-18**
152:25 167:14
**10:05** 1:13 3:3
**11** 76:24 77:3
102:15 164:7
165:24
**11-11-13**
137:10 167:9

**11-18-15** 83:4
166:10
**11-19-15**
126:25 167:4
**11-25-15** 75:13
165:23
**11-4-19** 110:2
166:19
**110** 166:17
**11:10** 44:5,7
**11:29** 44:8,10
**12** 80:9,10
117:11 165:21
166:2,5 167:5
**12-16-15** 81:13
166:7
**12/20/2023**
168:5
**124** 166:20
**126** 166:24
167:2
**12:19** 70:11,13
**12th** 5:15
**13** 6:1 81:10,12
81:22 164:25
165:19 166:5
**133** 167:5
**137** 167:7
**14** 58:25 82:22
165:7 166:8
**15** 82:24,25
83:3 101:10
165:13 166:9
**150** 167:10

**152** 167:12
**15222** 2:5
**157** 167:15
**16** 87:20,21
88:1 120:25
121:4 166:11
166:24
**163** 164:9
**17** 59:9 95:15
95:18 96:4,7,8
96:10 166:14
**17th** 153:10,11
**18** 110:1,6,19
165:16 166:14
166:17
**18,000** 85:3
**19** 124:7,12
166:20
**1956** 5:15
**1992** 121:13,22
**19th** 127:8
**1:01** 70:14,19
**1st** 130:21

**2**

**2** 54:13 79:6
102:16,19
154:14 164:25
**2,000** 105:19,21
**2,500** 85:6,7
**2-19-13** 64:4
165:6
**20** 1:12 126:16
126:20 166:24
167:15 170:15

**2000** 6:12
21:18
**2000-2001** 22:3
**2001** 21:18
113:15 114:4
121:19,23
**2008** 22:10
23:16 24:5
131:22 134:15
**2008-2009**
22:13
**2009** 22:10
23:16 24:5
**2010** 24:19
**2011** 24:19
134:21 141:25
**2012** 58:2
152:11
**2013** 55:19
59:10 86:6,18
87:10 130:17
130:19 137:20
152:13
**2014** 130:21,22
**2015** 28:12
127:9 131:5,8
**2016** 28:12
89:3,10
**2018** 153:10,12
**2019** 24:12
25:14 28:11
51:21 85:5
111:12 122:3
123:8 131:10
131:11 152:16

159:18
**2023**  1:12 3:4
**2024**  163:16
168:3
**2030**  163:25
**20th**  3:4
**21**  126:23,24
127:4 131:24
142:17 166:11
167:2
**210**  2:5
**21898**  163:23
**22**  133:12,16
167:5
**23**  55:19 137:7
137:9,14
164:22 167:7
**2351**  81:25
**23rd**  89:3,10
**24**  150:3,8
153:7 167:2,10
167:12
**25**  152:24
153:8 167:12
**25,000**  85:1
**25th**  2:11
**26**  157:20,24
167:15
**2:22cv**  1:5
**2:48**  133:3,4

**3**

**3**  60:25 61:1
79:7,20 121:23
142:6 144:14
145:2,20

155:12 165:2,5
165:24 166:9
167:10
**3-14-13**  45:24
164:24
**30**  4:23 5:1,8
12:17 102:4
148:1 168:17
**30,000**  85:8,14
131:19
**33**  96:4,7
**34**  105:13
**35**  85:12
**355-6500**  2:6
**38**  108:25
**3:03**  133:5,7
**3:46**  161:22
162:18

**4**

**4**  56:16 64:2,3
96:24 155:21
164:4,5 165:5
168:3
**40**  12:5
**40,000**  47:5
**41**  99:10
**412**  2:6
**45**  164:22
**4th**  111:12
112:24 115:6
123:8 163:15

**5**

**5**  66:11,14
115:11 156:14

164:4 165:7
**5-23-16**  87:22
166:13
**5-8-17**  77:4
166:1
**500a**  102:16,19
**54**  164:25
**557-5996**  2:12

**6**

**6**  68:9,10
163:25 165:10
**6-3-14**  80:11
166:4
**6-5-12**  150:4
167:11
**6-8-17**  74:14
165:20
**61**  165:2
**617**  2:12
**6355041**  168:5
169:2 170:2
**64**  165:5
**66**  165:7
**68**  165:10

**7**

**7**  70:15,25
157:5 164:5
165:13 166:20
**7-10-13**  72:19
165:18
**7-13-17**  70:16
165:15
**7-17-17**  157:21
167:17

**7-6-18**  66:15
126:17 165:9
167:1
**70**  165:13
**72**  165:16
**74**  165:19
**75**  165:21
**77**  165:24
**78**  6:5 16:2,13
16:19
**7:30**  127:9

**8**

**8**  72:17,18
165:16
**8-27-15**  95:19
166:16
**80**  166:2
**81**  166:5
**82**  16:19
**83**  166:9
**84**  164:7
**86**  15:6,7
142:23
**87**  6:5,6,7 15:6
15:7 18:5
166:11
**8870n**  158:20

**9**

**9**  74:12,13
165:19 167:7
**9-5-18**  61:2
165:4
**90s**  19:14

**95** 166:14
**96** 18:5,5
**97** 6:11

**a**

**ability** 10:12,24
11:15 76:7
96:18 163:7
**able** 9:1 11:19
23:2 33:4 34:9
42:12,17 43:11
43:18,23 48:22
63:1,8,15
73:25 74:22
76:18 120:16
153:4
**above** 76:17
157:17 168:6
170:7
**absolutely**
42:18
**accept** 23:13
**access** 31:11
39:24 66:19,20
74:24 75:17
136:22 153:4
**accessed**
136:15
**accommodate**
50:1,3
**account** 67:23
143:16
**accounting**
27:24
**accounts** 27:18
27:19 143:16

160:10,13
**accreditations**
16:4
**accuracy** 168:9
**accurate** 5:2
37:1 53:4
64:25 99:18
103:7 106:14
117:24 118:25
131:24 133:22
150:24 154:25
155:17 156:6
156:21
**accurately** 9:3
10:12 11:20
79:11
**acknowledge...**
170:3
**acknowledg...**
168:12
**acres** 101:10
**acronym**
114:10
**action** 138:1,8
**actively** 37:25
**activities** 140:9
**activity** 59:10
**actually** 6:16
17:13 46:25
98:3 110:24
111:19 123:24
124:19 126:21
127:7 153:8
**added** 9:22

**addition** 52:9
72:1
**additional** 10:3
153:21
**additions** 170:6
**additive** 23:10
**address** 65:2
136:6
**addressed**
83:19
**addressing**
71:15
**adds** 142:16
**administered**
3:23
**advance** 147:23
**adventure**
129:21
**adversarial**
51:19
**affixed** 163:15
**agenda** 108:22
**agent** 146:8,16
149:5,12
**agents** 59:1
**ago** 12:5,14
147:22 152:14
**agree** 151:24
**agreed** 37:3
160:16
**ah** 110:19
**ahead** 126:22
**al** 3:8 168:4
169:1 170:1

**alabama** 25:13
**alcoholic** 11:6
**aligned** 110:1,2
166:18,18
**alike** 146:13
**allen** 1:10 3:6
3:14 4:5,9,18
4:19,19 5:11
7:1 39:22
44:12 45:24
46:2 54:16
60:24 61:2
64:4 66:15
68:15 70:16,21
71:24 72:12,15
72:18 74:14,17
75:12,17 77:2
77:3 78:16
80:5,11 81:13
81:16 82:25
84:9,13,20
87:15,22,25
91:7 95:22
96:15 97:5,18
98:1 101:1,6,9
102:14 103:12
103:21 108:25
109:20 110:5,7
110:14,22
112:20 122:17
123:25 124:4,8
124:15 126:6
126:17,19,25
127:3 129:22
131:14 132:21

133:8,13,19
135:1,9 136:17
137:9,13
142:12 144:22
145:11 146:2,6
149:18 150:10
150:11 153:4
153:13 157:18
157:21 159:17
161:8,13,19
164:4,23 165:3
165:6,8,14,17
165:20,22,25
166:3,6,12,22
166:25 167:3,6
167:8,16 168:1
168:5 169:2,24
170:2,4,12
**allotted** 168:20
**allow** 45:2
**allowed** 53:2
**alternate** 56:7
139:17
**american** 1:6
**amres** 158:20
**amy** 158:15
**annotations** 5:9
**annual** 32:21
36:23 38:6
42:23
**answer** 7:10,15
8:16,22 9:12
9:18,20,23
10:1 11:4,19
34:10,20,21

39:22 71:22
72:12 78:15
83:16 145:13
154:19 155:15
156:19 157:9
**answered**
80:19
**answering** 8:14
**answers** 7:7
8:21 53:3
135:12
**antifoam** 97:16
98:11,15,21
100:13,18,22
101:19,21
103:19 122:25
**anybody** 12:9
113:2,2
**anymore** 128:9
**apologies** 35:10
53:13 126:2
**apologize** 6:25
47:20 57:8
101:3 149:15
**apparently**
73:22 89:7
96:23 104:19
126:10 151:23
**appear** 124:24
**appearances**
2:1
**appearing** 1:11
1:16 2:4,11,16
**appears** 91:2
96:20 125:1,8

154:10,11
**appended**
170:7
**applicable**
168:8
**application**
151:7,18
159:12
**applied** 22:18
**applies** 119:4
**apply** 8:25
84:17
**appreciate**
42:16 84:19
127:6 135:12
161:14
**appropriate**
4:2 24:3
**approximate**
132:23
**approximately**
94:14 148:3
**april** 5:15
**area** 19:11
31:13 32:16
42:20 46:16
101:10 131:6
**areas** 20:17
**arizona** 6:16
17:21,23 19:5
19:15,18,22
20:2 86:8
**arnold** 114:23
**arose** 139:4

**arrange** 38:19
49:14 60:7
138:17 141:5
**arranged** 49:17
68:4
**arrangements**
49:5,7
**arrested**
159:18
**arrive** 79:20
**arrived** 159:8
**asa** 60:18
**asap** 76:9 79:6
**asia** 52:16 57:7
57:13 101:20
104:5 105:1,8
**asian** 52:19
**aside** 147:15
**asked** 13:25
34:14,15 43:16
48:6,11 49:21
51:16 63:5
103:13,14
126:2,11
139:12 146:21
148:7,23
151:11 154:14
**asking** 18:9
135:10 138:7
146:23
**assert** 151:1
**assist** 28:2 33:3
43:2
**assistant** 30:15
30:21

assisted 28:14
associated 39:19 48:3 59:7
assume 53:22 71:2 150:10,12
assured 124:6
atmosphere 51:18
attached 168:11
attachment 82:19
attempt 87:16
attempted 53:1
attempts 48:25
attendance 51:23 52:17
attention 96:1 127:10
attorney 168:13
attorneys 2:2,8 147:3
audience 53:5,7 109:12
audit 157:8,14
author 109:11
authored 158:4
automatic 41:7
available 31:17 32:24 40:3,22 41:1 74:23 168:6

avenue 2:5
aware 150:22 159:17,20 160:6,10,13,16

**b**

b 164:19
back 4:24 6:7 6:12 17:10,14 18:10 30:9 44:10 57:10 66:5 70:19 92:8 131:24 133:7 134:21 137:19
background 14:21 26:15 28:20 31:15
backup 114:16
backwards 61:17
bad 47:21 62:2 131:22
balsara 27:3 87:21 124:8 152:25 166:12 166:22 167:13
bandwidth 110:13
bank 160:10,13
base 37:4 101:20 122:25
based 33:9 37:19 40:21 42:13 43:3 63:2,9 65:1

69:15 73:24 76:17 78:25 90:20,25 91:4 116:19 142:13
basically 12:19 75:22
basis 37:6,18 50:16 84:21 130:2 134:11 134:22
bastrop 21:1
bear 87:17 95:11 126:23
bearing 161:14
beazley 1:6 2:9 3:7,21 4:12 147:7 168:4 169:1 170:1
began 84:22,24 149:19
beginning 69:17 84:13,17 152:6
behalf 3:21
believe 48:8 64:1 76:24 82:23 83:1 86:3
believed 84:24
bell 158:11
benefits 85:16 85:20
bertoldo 70:15 77:4 165:14,25

best 13:22 18:16 46:20 47:3 67:18 79:5 88:10 96:18 145:13 152:21 154:6 163:7
better 7:20 8:8 20:10 126:8
big 20:3 95:23 104:9,17,24
bill 27:10,12
bills 27:18
bins 49:14,20 49:25 50:5
birth 5:14
bisulfite 86:19
bit 9:19 14:21 15:14 16:22 17:12 19:7 25:4,20,22 31:6 38:22 40:7 44:13 53:12 142:25 152:15
bjerke 1:15 163:3,24
black 107:4
blazing 150:25
bleach 25:8 33:19,23 67:2
boeing 28:22
bookkeeping 140:9 143:15

**bored** 70:22
**boss** 25:24
**boston** 2:11,12
**bottom** 79:3
  96:10 99:9
  137:14
**boys** 129:21
**branch** 126:24
  167:3
**brazil** 140:11
**break** 8:11,15
  8:16
**brenntag**
  137:17
**bring** 152:15
**bringing**
  141:24
**broad** 148:15
**broke** 39:7
**brother** 146:7
**brothers** 161:5
**budget** 45:2
**building** 97:8
**buildings** 91:13
  91:15 101:16
  106:24
**bullet** 113:14
  117:23 118:25
  121:11 122:3
**burlingame**
  88:13 115:15
**business** 29:22
  31:7 58:2
  123:5

**businesses**
  57:13,14,15
  104:5,7 105:1
  105:5,8 113:25
**butcher** 26:20

**c**

**c** 17:20
**cadence** 9:7
**calibration**
  43:2
**california**
  27:14 88:12,14
  91:25 115:15
**call** 6:21 11:12
  13:20 14:16
  22:23,23 27:24
  38:3 40:14
  73:8,13,20
  128:22 139:22
  149:3,14
  150:21 151:2
**called** 21:1
**calls** 53:25
**camping** 130:9
  130:17,22
  131:3
**canada** 106:16
**cancel** 53:16
**canceled** 24:12
  53:16,21,23
  128:10
**cancellation**
  163:10
**capabilities**
  90:12

**capacity** 57:12
  80:24 82:15
  84:5
**capital** 19:8
  45:2 46:22
**care** 11:14
  27:16 32:18
  39:1 77:1
  140:1
**careful** 101:2
**carolina** 5:17
  6:12 15:23
  20:21 21:7,13
  89:25 92:1
  115:24 132:19
  135:6 163:5,17
**case** 1:4 12:9
  69:8 148:13
**cash** 134:16
**casually** 106:4
**category** 48:18
**cathodic**
  113:16
**cause** 163:12
**cbc** 1:15 163:24
**center** 115:15
  115:19,24
  116:10,17
  117:2
**centered** 44:17
  129:20
**centers** 115:12
**certain** 41:1
  48:1 65:3
  75:25

**certainly** 10:17
  10:20 14:5
  18:23 38:8
  47:19 59:23
  76:25
**certificate**
  163:1 164:9
**certifications**
  16:4
**certify** 163:5,11
**cgc** 1:5
**chain** 45:23
  66:14 70:15
  72:18 75:12
  77:3 80:10
  81:12 87:21
  107:8 126:16
  126:24 137:9
  152:24 153:9
  157:20 164:22
  165:7,13,16,21
  165:24 166:2,5
  166:11,24
  167:2,7,12,15
**chance** 55:10
  61:7 124:14
  137:19 152:13
**change** 25:1
  40:5 169:4,7
  169:10,13,16
  169:19
**changed** 40:1
**changes** 4:24
  4:25 168:10
  170:6

changing 37:7
charge 19:12
  151:7,18
charged 11:25
  160:6
charles 16:17
charleston 1:14
  21:14 27:14
  116:6 163:16
  163:16
chat 63:20
  66:10,13 68:8
  72:15 74:12
  75:9 80:4
check 31:8
chemical 15:4
  15:10,25 17:4
  19:6,15,19
  23:10 25:11
  86:8 90:17
  138:23 139:24
  140:5 159:2,8
chemicals 6:16
  16:18 17:20,21
  17:23 19:22
  20:2 25:5
  26:16 41:1
  43:3 58:9
  75:25 76:15
  78:10 86:14,17
  86:20,22,24
  87:4,7,13
  89:15 92:22
  104:10 117:4,7
  122:21 123:1

138:15 139:8
139:13 140:16
149:19 151:15
156:18 158:23
chemists
  113:16
chennai 117:2
  117:5
china 117:8
  122:21,25
  123:2
chinese 99:10
choose 141:8
christ 129:20
church 28:24
cindy 81:21
city 88:17
clarification
  13:25 43:16
  49:21 63:5
  126:11 140:13
  151:11
clarify 90:2
clark 149:10
clean 9:2,13
  29:23
cleaner 57:23
cleaning 29:16
  29:17 52:6,10
  57:4,6,20 59:1
  59:4 116:18
clear 7:21
  111:7 148:18
  160:3

clients 29:19,20
  30:6 116:24
close 17:1 18:5
  76:20 108:16
closest 36:9
clue 149:22
coffee 44:1
cold 11:11
cole 2:10 3:21
  147:17
color 87:18
colored 154:4
column 89:17
  107:11
come 33:24
  65:3 69:5,20
comes 85:8
  90:4 134:7
  135:14
comfortable
  9:7 73:18
coming 27:12
  87:19 89:3
  96:22 137:8
  153:3
commented
  111:6
commission
  163:24
common 35:1
  82:11
communicate
  56:10 74:4,8
communicated
  41:14 74:5

communication
  32:15 36:19
  45:6 46:15
  48:13 63:15
  74:3
communicati...
  44:21 47:12,14
  47:15 48:2,4,7
  48:12,17,19
  50:8,9 53:17
companies
  148:10
company 1:3,6
  1:7 2:2,9 3:7,7
  3:19,22 4:13
  20:4 52:6,10
  59:4 84:15
  113:15,25
  116:22 147:7,8
  158:10
compensated
  104:21 130:6
compensation
  100:7,10
competent
  10:20
complaints
  42:8
complete 122:3
  126:3 143:4
  170:8
completed
  46:19 168:17
completely
  11:20 19:25

111:18
**complicated**
  6:1
**component**
  78:9
**composition**
  56:20
**compound**
  34:17
**computer**
  15:16 19:9
  41:8,17
**computers** 20:9
**concentration**
  15:10
**concepts** 60:15
**concerned**
  148:16,19
**concerns** 71:16
  72:3
**concluded**
  162:17
**condition** 10:23
**conduct** 42:17
  59:25 60:1
**conducted** 3:11
  59:19 60:3
  93:17,20
**conducting**
  42:14 63:3
  118:2
**conflict** 161:6
**connected** 41:9
**consistent**
  30:19 62:10

68:1
**construction**
  122:9
**contact** 29:21
  31:12,12 33:18
  38:1 49:4
  107:22 108:5
  115:4 126:5
  138:12,18
  139:25 140:4
  158:13
**contacted**
  53:20 138:20
**contacting**
  53:19
**contacts** 44:18
**content** 112:5,9
  112:21
**contents**
  124:17
**context** 153:21
**contingency**
  80:19,20 81:2
**continue** 31:22
  146:3
**continuing**
  36:18
**contract** 23:1,4
  23:5 24:11
  36:20 40:5
  44:19 53:15,18
  53:21 54:6
  57:12 69:18
  108:24 128:11
  150:20 151:2

159:21
**contracted**
  151:8
**contractor**
  85:21,23,25
**contractors**
  93:18 100:4
**contracts**
  104:14,16
  160:25
**contributed**
  112:8,21
**control** 15:12
  20:7 31:13
**conversation**
  147:9 148:1
**conversations**
  147:2,6,16,19
**convey** 89:13
**convicted**
  11:24
**cooling** 67:12
  67:15,20,25
**cooperated**
  99:6
**cooperates**
  98:20
**coordinate**
  34:2 37:13
  38:16 75:6
**coordinating**
  44:17
**copied** 69:11
**copies** 168:14

**copy** 4:23
  27:10 69:10
  162:1
**corner** 96:10
  137:14
**corporate**
  115:17
**correct** 5:17,18
  9:4 16:14
  17:16 21:8
  28:17 38:12
  48:10 56:22
  60:8,10 62:9
  63:10 65:13,22
  68:3 69:25
  74:2,10 79:2
  83:8 87:5 88:9
  90:18 91:1
  93:22 99:18
  101:11,16
  103:18 104:18
  107:17 108:11
  108:21 109:5
  111:8 112:16
  113:7 116:10
  116:17 117:2
  117:15,16,19
  117:24 119:1,7
  120:19 121:9
  122:4,22
  124:24 125:1,8
  125:14,21
  126:4 135:25
  137:23 139:5,6
  140:7 143:19

144:4 150:13
150:14 151:16
153:13 155:16
170:8
**corrections**
4:22 170:6
**corrective**
138:1,8
**correctly** 75:1
98:23 102:6
113:19 114:15
154:2
**cost** 135:24
136:2 141:18
**costs** 36:10
**counsel** 2:1
3:12 6:23
163:12 168:14
**counted** 20:2
**counterpart**
21:2
**county** 163:16
**couple** 12:14
14:6 17:13
30:1 43:13
50:23,24 52:11
53:24 129:5
147:22
**course** 4:4
13:10 24:24
29:21 71:3
128:21
**court** 1:1 3:9
3:13,24 4:24
9:1 10:8 13:25

43:16 49:21
63:5 126:11
151:11
**courtland**
60:19 64:20
65:2,7,17,20
**covered** 28:3
140:10
**covering** 28:15
101:10
**craigslist** 22:17
**create** 112:4,9
**created** 112:11
112:13 134:2
**creator** 131:16
**crime** 11:25
**criminal**
160:11,17
**critical** 76:15
76:18 79:24
**crr** 1:15 163:24
**cs** 102:16,19
168:15
**curious** 159:25
**current** 37:19
115:11 152:15
**currently** 5:16
11:14 105:18
**curve** 126:10
**customer** 22:14
23:18,22 64:22
103:22 128:8
156:3,24
**customers**
104:2,4,12

105:19,21
106:2 155:23
155:25 156:8
156:17
**cutting** 161:15

| d |
|---|

**d** 17:20 164:1
**daily** 37:18
73:8,13,20
**daley** 2:10 3:15
3:20,20,25 4:4
4:8,11 14:4
34:7 39:21
40:19 43:20,25
44:11 45:7,12
45:16,21 46:1
49:23 50:13,14
54:10,15 61:3
63:7 64:7
65:10 66:9,17
68:13 70:4,20
71:20 72:10,21
74:11,15 75:15
77:6 78:14
80:3,14 81:8
81:15 82:17
83:7 84:7 93:5
94:19 95:13
96:6 97:22
98:6,16 99:19
100:14,20,23
101:1,4,12
102:20,25
103:8 105:23
106:6 107:21

109:13,17
113:23 115:20
117:25 119:2
119:16 121:2,5
121:15,24
122:10 123:4
123:12,20
136:8 138:25
139:14 141:11
141:20 142:8
142:20,24
143:9,24 144:8
144:15 145:3,6
145:22 147:11
147:13,15,20
148:4 149:16
154:9 155:19
156:9 157:1,16
159:4 160:1
161:1,11,12
162:7,11 164:6
**darnell** 28:1
30:15 85:22
88:20 92:1
93:4 94:1,11
99:24 100:12
101:22 111:13
114:15 117:17
118:14 119:23
120:23 124:8
124:23 125:8
143:22 144:7
144:13 145:21
166:23

**darnell's** 114:9 125:11

**data** 28:3,14 31:16,17 32:24 40:22,25 41:15 128:25 129:2 136:23

**date** 1:12 3:4 5:14 38:25 89:3 90:1 111:11,12 146:2 149:20 169:24 170:12

**dated** 45:24 54:13 61:2 64:4 66:15 68:11 70:16 72:19 74:14 75:13 77:4 80:11 81:13 83:3 87:22 89:2 95:19 110:2 126:17 126:25 137:10 150:4 152:25 157:21 164:23 165:1,4,6,9,11 165:15,18,20 165:23 166:1,4 166:7,10,13,16 166:19 167:1,4 167:9,11,14,16

**dates** 18:11 24:17

**day** 7:2 79:7 95:9 127:25 128:16,18 129:11 132:3 135:2 161:14 161:15 163:15 170:15

**days** 4:23 5:2,8 39:9 128:20 168:17

**deal** 104:13,16 141:22 142:1 144:16

**dealing** 113:16

**dealings** 103:19

**dealt** 103:23 148:25

**deceive** 109:12

**december** 1:12 3:4 159:18

**decipher** 7:24

**deck** 95:25

**declare** 170:4

**deem** 146:3

**deemed** 5:2 170:6

**defendant** 2:8 3:21 4:12

**defendants** 1:8

**definitely** 53:6

**definition** 41:12,20

**defoamer** 97:10 97:12,16,21,24 98:5,8 103:10

103:20 107:15 107:19,23 108:4,5,23

**defoaming** 96:21

**degree** 14:25 16:9,13

**degrees** 28:25

**delayed** 139:21

**deliver** 33:21 43:11

**delivered** 24:3 49:15 61:15 67:2 78:3

**deliveries** 38:17,19 42:4 44:18 49:25 75:6 127:14,19 127:21,25 128:12,14 129:12 131:25 132:2

**delivering** 49:16

**delivery** 32:8 32:12 34:3,16 35:8 38:25 39:18,19 40:1 49:19 53:23 59:22 62:19,24 67:11,16 68:5 73:22 78:23 79:7 84:2 127:23 128:1 138:2,18

158:20

**department** 21:17 128:10 138:19,21 147:3 160:7

**depending** 127:22

**depends** 127:25 130:3

**deponent** 168:13 170:3

**deposed** 6:19

**deposing** 168:13

**deposition** 1:10 3:5,10 6:23 7:6 12:19 135:10 147:23 148:15 148:19 162:17

**describe** 15:13 19:7 23:8 25:3 25:22 31:6 33:16 37:15 38:22 51:5,14 56:4 58:8 59:17

**described** 37:23 41:17 44:15

**description** 106:3 114:9 125:1,5,7,11,13 125:17

**descriptions** 124:22

**design** 17:1
**designed** 17:1,2
**detail** 51:15
**details** 61:20
  62:3,14 73:11
  73:23 82:8
**determined**
  36:22
**develop** 60:15
**development**
  97:15
**dgs** 14:12 22:14
  24:10 25:14,19
  25:23 27:6
  29:7,10,11,19
  30:10 42:2
  43:7,12,22
  46:18,22 47:3
  48:25 49:25
  52:17,24 54:7
  54:13 56:15
  58:23 59:25
  60:6,11 62:11
  68:10 69:23
  71:17 73:17,25
  75:23 76:3,14
  76:18 79:23
  80:24 81:23
  82:15 84:5,22
  84:23 85:4,14
  85:17,20 86:24
  87:13 91:9,11
  91:13 92:5,7
  92:10,14,16,19
  92:22 93:3,8

93:10,13,20,24
94:2,5,21 95:4
95:18 96:22
97:1,5,11,20
98:5,8,10,14
99:5,14,21,25
100:7,10 101:7
101:9,15,20
102:4,9,12,15
102:18,18,23
103:3,22 104:8
104:11,17,21
105:2,8,21
106:23 107:13
107:25 108:3
108:20 109:4
110:1 112:7,18
113:12,21
115:3,14,23
116:9,16,24
117:1,4,7,15
118:6,7,12,18
119:9 120:8,17
121:1,6,18,21
122:13,17,20
122:24 123:11
126:4 129:14
131:20 133:25
134:3,14 135:2
135:8 136:2
140:9,17
141:24 142:5
143:4,18,19
144:5 145:18
146:24 148:11

149:18 150:20
150:20 154:15
154:21,21
155:3,13,22
156:6,15,18,21
157:7,11,13
159:15,16,21
160:25 164:25
165:10 166:14
166:17
**dgs's** 30:6 65:4
  107:19 151:19
**died** 22:6
**differences**
  18:1
**different** 6:9
  19:25 33:22,23
  34:2,3 35:1,13
  35:13 36:5,8,8
  52:19 57:12
  58:9 61:14
  67:1,16 87:3
  87:18 139:22
**difficult** 9:2
  11:3
**digesters** 20:16
**digits** 81:25
**direct** 96:1
  127:9
**directly** 141:9
**disappeared**
  134:17
**disappointed**
  54:1,3

**discontinuing**
  73:8,20
**discuss** 12:9
  86:13 153:20
  161:20
**discussed** 12:18
  47:14 48:1
  50:9 56:24
  71:12 75:23
**discussion** 56:5
**discussions**
  48:24
**distracted**
  47:17,24
**distributed**
  136:14
**distribution**
  115:11,14,18
  115:23,25
  116:9,16 117:1
**district** 1:1,1
  3:8,9
**diversified**
  14:11 113:11
**diversity** 14:16
**dividends**
  134:19
**division** 1:2
  3:10 17:23,24
  17:25 19:19
**doctor's** 11:14
**document** 46:4
  46:14 54:11,17
  55:13 56:1
  60:24 61:9

63:19 64:8
66:23 68:8,16
68:22,23,25
69:5,13 70:24
71:9,12 72:15
74:12 75:9,10
75:21 77:12
80:4,15 83:2
86:6,18 88:5
89:2 96:16
111:8 124:18
133:18,22
**documents**
12:21,24 13:2
76:22 81:8
149:13,16
**doing** 29:22
30:25 39:10
40:13 42:10
64:13 71:1
126:20 135:1,2
158:5
**dollars** 141:22
142:2 144:17
**domestic** 93:1
**domestically**
104:3
**draft** 69:13
**drink** 11:7
**drive** 108:2,6
**driver** 21:2
39:7,25 74:23
74:25 82:7
**drivers** 82:11

**drop** 156:2
**drove** 22:22
**drugs** 11:2
**drunk** 21:2
**drywall** 23:11
**due** 14:1 43:17
49:22 63:6
76:9 126:12
151:12
**duly** 4:6
**duties** 62:11
71:17
**duty** 10:8
**dxi** 83:16

**e**

**e** 4:18 17:20
92:12 164:1,19
169:3,3,3
**e.g.** 154:21
**earlier** 9:23
10:1 13:10
18:13 26:21
44:15 46:18
47:14 48:2
52:7 57:24
58:17 59:4
75:23 78:8
87:2 88:7
99:14,24
101:15 102:23
103:3,21
107:13 108:9
114:14 117:13
134:6 139:7
144:19 147:25

148:24 152:17
**early** 19:14
**easier** 95:13
**eastern** 3:3
**easy** 5:25 6:8
31:11
**education**
14:22,24 16:8
26:18
**edwards** 80:10
166:3
**efficient** 7:4
**eight** 11:7
24:17 90:23
**eighty** 6:7
16:19 18:4
**either** 31:12
38:5 43:19
47:25 48:17
117:18,21
128:11 153:15
**eliminated**
21:17
**email** 35:25
41:24 45:23
47:5,9 53:25
61:1 62:7 64:3
64:10,15 65:1
66:14 70:15
72:1,18,24
73:4,6,24
74:13,16,20
75:3,12,18
76:2,6 77:3,18
77:21 78:6

79:13,16 80:8
80:10 81:11,12
82:3,8,19
87:21 89:7,9
89:14 91:5
101:18 126:16
126:24 127:8
132:9 136:5,15
137:9,19
138:11 149:16
150:3,12
152:24 153:9,9
153:15,24
154:3,8 157:20
158:2,6,12,18
159:1 164:22
165:2,5,7,13,16
165:19,21,24
166:2,5,11,24
167:2,7,10,12
167:15
**emailed** 153:24
**emails** 76:25
128:24 135:15
136:18,21
137:1
**employ** 93:8
**employee** 124:7
166:20
**employees**
25:20 44:16
109:5 120:17
**employment**
16:12

**enabled** 135:16
**encounter**
 43:10
**ended** 123:14
 128:7 152:1
**engage** 140:8
**engineer** 16:21
 19:5 24:1
 28:24 31:14
 32:16 50:24
**engineering**
 15:4,11,25
**engineers**
 136:14
**entailed** 16:23
**enter** 37:17
 41:14 93:14
**entered** 129:1
**entire** 42:6
 127:7
**entirely** 159:13
**entitled** 58:2
 59:1,10
**entity** 13:12
**entry** 28:3,14
**environmental**
 157:8,14
**envisioned**
 113:15 121:19
 121:22
**equipment**
 17:1,2,6 40:3
 45:1
**errata** 168:11
 168:13,17

**especially** 18:9
 18:21
**established**
 121:13,22
 122:2
**estate** 22:6
 134:14
**estimation**
 18:16
**estimations**
 18:24
**et** 3:8 168:4
 169:1 170:1
**events** 163:13
**exact** 18:11,23
**exactly** 18:1
 21:10,19 26:6
 41:11 85:6
 86:14 112:2
 148:14
**examination**
 4:7 84:11
 164:5,7
**example** 32:5
 75:5 76:3,13
 78:18,21 79:23
 89:24 148:21
 158:22
**excellent** 45:21
**except** 4:1
 120:21
**exception** 8:13
 41:8
**exclamation**
 76:10

**excuse** 157:12
**exhibit** 45:8,14
 45:23 46:5
 47:9,13 48:14
 48:17 54:11,13
 54:17 60:24
 61:1 64:2,3
 66:10,11,14
 68:9,10 70:15
 70:23,25 72:17
 72:18 74:12,13
 75:10,11,12
 76:24,24 77:3
 80:8,10 81:10
 81:12,18,22
 82:18,22,23,24
 82:25 83:3
 87:16,20,21
 88:1 95:12,15
 95:18,23 96:4
 96:7,7,8
 109:22 110:1,6
 110:6,19 124:7
 124:12 126:7
 126:16,20,22
 126:24 127:4
 131:24 133:9
 133:12,16
 135:13 137:7,9
 137:14 149:24
 150:3,8 152:24
 153:7 157:19
 157:20,24,25
 164:22,25
 165:2,5,7,10,13

 165:16,19,21
 165:24 166:2,5
 166:9,11,14,17
 166:20,24
 167:2,5,7,10,12
 167:15
**exhibits** 45:19
 87:19 152:23
**exist** 130:19,20
**existence** 51:13
 123:11
**exit** 110:17
**expect** 18:11
 142:13
**expedite** 139:8
**expediting**
 39:12 139:11
**expense** 45:3
**experience**
 56:21 105:16
 133:23
**expires** 163:24
**explain** 36:4
 53:8
**explaining**
 158:7
**exposure** 12:3
**extent** 34:20
 47:10 144:2
**eyewash** 31:10
**eyewashes**
 39:17

**f**

**face** 26:4,4
**facilitate** 33:6
**facilities** 33:24
35:13 36:9
139:19 140:2
**facility** 65:7
67:2 97:5
101:9 139:20
**factories** 91:9
**factory** 122:2,6
122:9
**fails** 168:19
**fair** 47:8
**fall** 48:18
**false** 103:16,16
**familiar** 13:12
29:7,8 32:24
32:25 43:22
58:5 60:15
72:16 110:11
111:2,5 114:22
**family** 125:25
131:19
**far** 6:24 25:20
29:9 30:7 37:6
119:3 123:16
123:21 133:21
**fast** 157:5
**faster** 139:13
**fbi** 146:8,16
149:2,12
159:18
**fear** 70:21

**feedback** 14:1
49:22 63:6
126:12 151:12
**feel** 53:5 140:12
153:13,16,21
153:22
**field** 16:15
113:17
**fighting** 11:11
**figure** 7:24
46:7
**file** 46:2 110:15
**filed** 3:8
**filling** 144:3
**find** 12:24
54:23 74:23,24
79:9 138:22
139:12,23
**fine** 18:8,17,24
45:19
**finish** 8:16 9:8
16:9
**finished** 85:4
**firm** 147:16
149:10
**first** 4:6 10:22
13:15 17:17
30:10 41:16
50:23 51:2,6
55:16,18,20
73:15 76:5
77:11,21 78:22
79:4 81:9
84:20,22,24
86:2,3,4 89:3

107:11 111:11
113:14 121:11
121:11 127:9
131:2,6 132:25
137:15 153:9
153:17,19,24
154:11 158:18
**five** 30:10
106:13 128:20
129:10 130:4
157:8,14
**flew** 108:18
**floor** 2:11
29:23
**flows** 15:17
**focus** 96:2
127:7
**focused** 97:15
153:17
**focusing** 51:4
**follow** 53:10,14
63:12
**follows** 4:6
**foot** 15:14
**foregoing**
163:6 170:5
**forest** 98:21
99:3
**forget** 25:11,13
**forgot** 42:22,25
82:21
**form** 4:1 34:5
34:13 39:20
40:16 65:5
71:19 72:9

78:13 80:1
83:3,6 166:9
**formal** 14:24
**formed** 93:10
113:22
**forward** 64:21
70:7
**forwarded** 89:7
**found** 79:10
**four** 5:25 17:8
20:20,21 21:4
56:20 57:2
76:22 81:24
87:9,10 106:21
106:22
**franklin** 90:5
132:13,14,16
132:19
**fraud** 160:7
**free** 34:20
140:12 153:13
153:22
**frequently** 13:6
67:7 74:4
**friday** 132:6,8
**frozen** 160:11
160:14
**full** 77:21 102:5
162:12
**function** 42:2
**further** 161:10
163:11
**future** 56:22

| g | getting 21:14 | 115:10 119:17 | 150:10,12 |
|---|---|---|---|
| **gac** 77:24 78:1 | 39:2 76:20 | 119:25 120:7 | 153:14,17 |
| **gained** 30:20 | 95:12 126:7 | 126:22 130:9 | 157:19 161:22 |
| **garbled** 53:12 | 145:1 | 132:25 136:10 | **good** 3:1,17 |
| 163:9 | **give** 4:22 8:21 | 146:4 150:1 | 5:10 8:22 |
| **gas** 113:18,25 | 8:22 9:18 10:2 | 157:11,19 | 15:19,20,21 |
| **gates** 2:3 3:18 | 10:19 18:16,20 | 160:4 | 32:20 44:3 |
| **general** 48:18 | 32:5 41:20 | **going** 6:21 7:6 | 45:20 54:4 |
| 148:20 | 45:5 54:11 | 7:25 10:11 | 74:6 145:1,18 |
| **generally** 38:9 | 63:20 69:3 | 11:12 13:19 | 150:2 162:4,13 |
| 43:7 44:16 | 80:4 128:5 | 14:15,20 16:11 | **goods** 154:15 |
| 48:12 55:19 | 143:3 145:16 | 18:10 26:20 | 155:23,24 |
| 58:15 72:3,7 | 148:12,21 | 32:22 38:5 | 156:7,16,23 |
| 74:8 81:5 | 149:21 | 42:23 44:1,5 | **grade** 157:17 |
| **generate** 9:13 | **given** 21:11 | 54:10 57:10 | **graduate** 15:5 |
| 134:20 | 170:9 | 60:23 62:17 | 16:1,16 |
| **generated** 41:8 | **giving** 10:1 | 63:19 65:18 | **graduated** |
| 41:17 69:9 | **glad** 42:21 | 66:9,12 68:7 | 16:12 |
| 134:18,24 | **gloating** 126:21 | 70:5,7,11 71:1 | **great** 4:4 8:6 |
| **generates** | **global** 14:11 | 72:14 75:8,10 | 18:21 77:9 |
| 134:13 | 50:21 113:11 | 76:10 77:24 | 162:10,12 |
| **generating** | **gmail.com** | 80:3 81:9,10 | **green** 59:1 |
| 134:16 | 168:2 | 81:17 82:17,21 | 116:18 |
| **generation** | **go** 6:21 9:6 | 86:13 87:16,17 | **greet** 123:16,22 |
| 110:16 | 15:22 16:15,16 | 87:20 90:9 | **gross** 141:25 |
| **georgetown** | 25:20 26:10 | 95:15,22,24 | 142:6 |
| 20:21 21:7 | 31:3,8,22 32:1 | 101:8 105:12 | **ground** 6:22,22 |
| 22:22 23:7 | 32:8,13 36:1 | 109:21,23 | 151:6 |
| 50:24 86:16 | 38:6 41:13 | 111:23 124:5 | **group** 14:16 |
| 89:24 90:7 | 44:2 45:18 | 126:7,22 127:7 | 17:1 20:7 |
| 94:9,24 95:1 | 46:2 54:18 | 132:8,22 133:3 | 31:13 56:6,9,9 |
| 158:19 159:13 | 57:10 61:5 | 133:8 136:16 | 56:14 |
| **georgia** 158:9 | 70:6,23 84:18 | 141:9 148:15 | **growing** 70:22 |
| 158:14,16,19 | 91:20 95:24 | 148:19 149:23 | **guess** 27:24 |
| 159:2,9 | 110:19 114:6 | 149:24,25 | 32:11 40:14 |

47:2 61:17
152:2
**guns** 150:25
**guy** 57:5,20
116:18
**guys** 30:1 57:5

**h**

**h** 17:20 164:19
169:3
**half** 146:7
**halfway** 76:5
**hamilton** 61:1
165:3
**hand** 89:17
96:10 137:14
163:14
**handle** 27:23
48:21 49:8
63:16 67:5
156:15,22
**handled** 27:7
34:25 49:2
142:15 156:18
**handling** 34:2
**happen** 5:6
9:16 39:13
**happened**
46:25 51:8
67:6
**happens** 9:24
**happy** 11:13
47:24 96:1
**harcros** 61:12
61:15 66:4

**hardware** 33:1
136:11
**harrison** 2:16
**hazel** 74:22
**head** 7:11
81:18 131:12
**headed** 79:19
**header** 56:23
**headquartered**
35:22
**headquarters**
36:2
**health** 85:19
**hear** 11:13
104:1 107:19
**heard** 6:24
25:21 26:21
32:19 98:14
102:11 103:17
122:8
**heather** 28:1
30:15 52:4,13
85:22 88:20
94:1,11 99:24
100:3,12
101:22 106:20
111:13 114:9
116:5 117:17
118:14 119:22
119:23 124:8
125:7 136:19
140:22 166:23
**heather's** 116:7
**heaviest** 132:4

**held** 16:24
17:18 19:4
22:3
**help** 9:12 13:3
23:2 33:6 34:1
43:18
**helped** 33:11
81:2
**helpful** 7:2
96:8
**helping** 75:6
**helps** 18:19
23:11
**hereto** 170:7
**hereunto**
163:14
**hey** 32:21 38:4
39:6 161:19
**higher** 85:13
**highest** 14:23
**hill** 149:10
**hired** 93:13
**history** 14:22
16:12 18:22
**hmm** 81:20
110:18 114:13
118:9
**hold** 16:3 20:18
24:14 95:16
**holiday** 73:18
74:1
**home** 88:18,20
88:22,24 116:2
116:4,7 119:14
120:19

**hop** 109:20
**hopefully** 8:21
109:22
**hoping** 23:1
**hour** 44:1
79:19 112:3
132:24
**hours** 11:7
118:5,10,22
128:17,18
130:4 135:2
**house** 135:4
**household**
131:15
**houston** 35:22
**hum** 7:11
**hurricane**
80:21
**hypo** 61:14
62:1 73:17,25
77:19,24,25
78:1,23 86:19
138:2,17
**hypochlorite**
136:25 154:22

**i**

**idea** 88:25
91:24 93:6
95:10 97:7
100:24 101:13
102:3,21
103:16 104:6
105:6,24
107:16 109:18
114:5 117:3,22

118:17 121:25
122:7,15
141:21 142:1,4
142:9,11
143:21 152:12
152:18 161:2
**identification**
45:25 54:14
61:2 64:5
66:16 68:12
70:17 72:20
74:14 75:14
77:5 80:12
81:14 83:4
87:23 95:20
110:3 124:9
126:18 127:1
133:13 137:11
150:5 153:1
157:22
**identify** 46:13
55:15 56:23
61:11 63:8
66:25 77:14,16
80:17 82:5
83:15
**ignore** 45:18
82:20
**illness** 11:15
**imagine** 126:13
**immediately**
54:8
**impact** 11:15
**impairment**
10:24

**implementati...**
20:7
**imply** 10:13,21
11:23
**import** 117:4,7
122:21 123:1
**improve** 17:2
**inbox** 135:17
**incidences**
119:13 120:9
120:18
**incident** 61:12
73:5 82:6,9
83:18 120:11
138:2
**incidents**
119:10,11
**include** 136:16
**included** 40:25
115:2
**includes** 116:1
**including** 163:8
**income** 131:16
131:21 134:7
134:20,24
**incorporated**
14:12
**incorrect**
103:15,15
118:3
**increase** 62:18
**increasing**
30:20,22
**incur** 120:17
136:2

**incurred**
135:24
**indecent** 12:3
**independent**
85:21,22,25
100:1,4
**index** 2:24
164:13
**india** 117:2,5
**indicating** 90:4
**industries**
113:18
**industry** 114:1
**information**
10:3 41:11,24
69:4,11,15
122:13 124:7
135:22 136:13
141:4 164:13
164:15 166:21
**infrequently**
120:2,6
**inherent** 163:9
**inherited** 135:5
**inhibit** 10:24
**initial** 26:4
31:21 33:17
35:24 37:2
39:15 44:18
51:2
**initiatives**
109:1 117:11
**injured** 120:15
**inspection** 31:9

**installation**
136:11
**installed** 19:8
135:19
**instance** 33:18
44:25 78:22
79:24 90:5
**instances** 43:9
43:21 46:21
81:1,5 90:23
**instrument**
41:22,23
**insurance** 1:6,6
2:9 3:7,22 4:12
85:19 147:7,8
148:10 168:4
169:1 170:1
**interacted**
56:14 61:22
62:1
**interacting**
7:14
**interactions**
26:1 44:13,15
**interest** 161:6
**interested**
163:13
**interfaced**
23:25
**intermittent**
90:7
**international**
1:3 2:2 3:6,19
6:15,17 13:16
17:24 19:16,20

20:2 30:7
31:16 60:5
84:14 86:11,15
86:25 87:4,12
87:19 92:23
93:17 94:17
95:5,9,19
99:11 103:24
104:4,10
105:16 108:10
111:14 117:5,8
122:14,22,24
123:2 135:18
135:19 136:20
137:24 138:23
141:1,5,8
143:5,7 145:1
145:19 146:1
146:25 148:10
151:2,4 159:21
160:24 166:15
168:4 169:1
170:1
**interpretation**
34:19
**interrupt**
110:23
**interrupted**
18:9
**interview** 22:19
26:5
**interviewed**
95:2,7
**introduce** 3:12
66:13 76:23

81:9 82:17
**introduced**
4:10 82:21
124:11 126:20
**introducing**
95:14 133:9
137:7 149:24
**inventory**
32:18 33:9
38:1 40:8
53:22 62:18
63:2,9 67:3,24
68:2 78:19
79:1 86:14
89:21 90:6,21
91:4 135:14
**investigation**
62:19 83:3,5
83:17 160:11
160:14 166:9
**investing**
134:10
**investment**
134:15 144:25
145:19
**investments**
131:22,22
134:7,17,18,20
134:22 135:3
144:20
**invisible** 32:17
**involved** 47:6
58:12 59:15
60:13,17,19
70:1 87:1

155:22 156:7
**involvement**
47:10 59:17
**ip** 13:16 19:23
21:17 30:4
36:6,14 37:21
39:4 40:21
44:13 47:16
48:4,7,19,21
50:10,15,17,21
52:21,24 53:17
56:10 57:12
59:25 60:6,12
64:17 65:4,7
69:20 72:3
75:24 76:13
77:19 79:24
81:6 82:11
83:21 84:1
158:19,23
159:13
**ip's** 65:20
**island** 60:15
**issue** 8:18 32:7
32:10,12 37:8
61:21 64:14
65:8,14,24
66:1,8 68:18
68:19 71:3
73:22 74:6
83:23
**issues** 39:3,5
54:20 61:6
63:24,24 64:17
65:3 71:2 74:9

82:10
**item** 60:14

**j**

**jag** 13:20,22,23
51:13,25 52:20
52:21 73:7
74:4,4,5,9 86:2
86:7 123:14
146:7 159:17
160:6,17,20
161:4
**jag's** 160:10
**jagannath**
13:20,20 72:19
165:17
**january** 55:19
130:21 163:15
168:3
**job** 7:7,19,20
14:22 18:22
19:25 40:12
78:9 106:3
120:15,16
124:22 125:1,7
125:11,13,17
129:15 131:23
134:5,14
144:17
**jobs** 129:17
**joe** 114:22
**jog** 9:20
**joined** 28:11
131:5
**joint** 113:17

**jump** 9:10
**justice** 147:4
  160:8
**justify** 51:12
  123:11
**jyotika** 22:24
  26:23,24,25
  27:1,3 52:18
  56:25 57:1
  69:2 85:25
  88:16,22 89:6
  91:25 93:4
  94:4,7 99:24
  100:5,17 102:2
  106:21 112:11
  112:14 117:20
  118:16 124:8
  124:23 125:14
  125:25 140:8
  140:19 143:8
  143:13 153:10
  153:11,24
  154:1,7,25
  155:17 156:6
  156:21 166:21
**jyotika's**
  124:20 125:20

**k**

**k** 1:15 4:18
  163:3,24
**k&l** 2:3 3:18
**keep** 7:2,4
  73:25 84:18
  110:17 128:9
  129:23

**kept** 73:17
**keyword** 151:5
**killed** 21:2
**kiln** 20:17
**kind** 6:10,22
  7:1 8:4 11:3
  14:21 18:22
  19:13 22:7
  27:13 28:15
  30:15 31:11
  33:12,25 36:10
  44:18 49:5
  91:13,16
  101:16 146:20
  148:4
**kinds** 10:15
  148:25
**klgates.com** 2:6
**klobucar** 75:13
  165:22
**knew** 28:24
  31:16 62:4,23
  123:16,21
**know** 4:9,11
  6:4 7:4,24,25
  8:3,5,7,12,13
  8:25 9:8,17,19
  9:21,25 10:2
  10:20 13:13
  16:8 18:10,11
  18:15,16,17,18
  18:23 22:25
  23:5,6 25:6,24
  26:11,15,18
  27:11,12,13,14

28:20,25 29:1
29:2,6,9,18
30:3,6,7 32:21
32:22 36:21
37:6 40:1 43:6
43:8 46:6,8
47:21,22 51:25
52:1 54:20,21
55:4,9 56:17
57:15 58:3
61:6,6 62:5,8
62:20,25 63:17
63:21,23,25
66:19,20 67:4
67:9 68:18,20
71:4,6 72:16
72:24 74:17
75:19 77:2,8
80:5,7 81:16
81:19 83:1,9
86:1 87:14
92:13,16 93:9
93:10 94:6,10
94:20,24 96:3
97:11,17,20
98:4,10 99:5
100:4,9,11
104:13,21,24
105:3,10
106:18,22,25
107:6 108:1,16
109:6,9 110:10
110:12 111:5
111:18 112:20
113:24 114:1

114:13 115:3,5
115:9,21
116:15 118:20
120:11 122:23
123:9 124:21
125:11,16,18
125:20 126:1
129:3 132:10
132:22,24
133:10 134:18
137:3 140:13
141:24 142:3
143:13,20,23
144:6,10 146:6
146:10 148:24
148:25 155:10
160:19 161:4
**knowledge**
  46:20 47:4
  88:10 91:18
  92:9 97:23
  98:2,7,12 99:7
  99:16,17,20
  101:17 103:1,5
  103:6,9 107:18
  117:9 118:15
  145:14
**kumar** 14:8
  22:23 25:22
  29:21 45:23
  53:15 57:11,13
  89:6 104:5
  105:4 112:25
  150:3,17,24
  152:24 164:23

167:10,13

**l**

**l** 4:18,18 17:20
**label** 155:3
**labeled** 81:20
102:18 105:15
**lading** 27:10
**laid** 84:16
**lake** 16:17
**language** 33:5
**large** 78:9
163:5
**largely** 26:12
30:11
**larger** 30:25
**largest** 101:19
122:25
**lasted** 148:1
**lastly** 11:18
125:13
**law** 10:8
147:16 149:10
**lawsuit** 148:9
**lead** 76:8 79:7
**learn** 22:15
142:5 146:11
**learned** 146:8
**learning** 126:9
**lease** 91:15
92:5,16 103:4
**leased** 91:17,18
91:20,22
116:11,13
**leave** 19:15
54:7

**leeway** 53:2
**left** 25:14 28:11
97:14 125:4,10
125:16 160:2
**legal** 18:1
168:23
**lesser** 144:2
**letters** 14:7
102:16
**letting** 38:6
67:4
**level** 14:23
31:17 37:18
38:3,6 41:9,23
41:25 62:14
67:3 77:23
78:10 136:18
136:21 137:1
**levels** 31:18
38:9 40:8,25
41:6 42:3
78:19 79:1
90:13 135:17
136:5 141:1
152:5,8,20
**life** 40:5 129:19
129:24 130:2
130:10,18,19
130:20 131:3
134:4
**likelihood**
83:11
**likely** 77:1
**likewise** 90:11

**lime** 20:17
**limited** 163:8
**line** 36:18
73:15 164:3,21
169:4,7,10,13
169:16,19
**link** 110:17
**linkedin** 46:3
133:12,20
134:1,3 167:5
**list** 58:19 76:21
87:20 91:5
133:25 156:17
**listed** 86:17
117:11
**little** 6:1 7:3
9:19 15:14
16:22 17:12
19:7,9 25:4,19
40:7 51:15
53:12 85:11
109:24 152:15
**live** 5:16,23
135:7
**lived** 5:19 6:9
**living** 131:19
**llp** 2:3,10
**load** 67:20
74:21 78:2,2
79:6 109:24
158:20
**loaded** 72:25
**loading** 96:11
110:8 153:5

**loads** 64:17
67:9,10,19
158:20
**local** 107:8
**locally** 23:2,3
**locate** 124:12
**location** 1:14
36:22 37:7
39:12 139:24
**locations** 6:10
67:1
**lod** 67:11,12,15
67:21,24
**log** 91:7
**logistical** 39:18
**logistics** 34:2
36:11,14 49:4
105:15 107:8
**long** 5:23 7:1
12:15 20:18
21:15 22:8
24:10 28:5
54:6 55:3 62:4
73:17,25
111:25 127:20
128:13,23
129:4
**longer** 120:16
161:13
**look** 23:4 39:10
46:7 54:21
55:3,10 61:7
63:23 64:21
66:20 68:19
71:6 72:23

75:18 80:6
81:19 83:9
111:4 139:17
139:19 140:4
146:13
**looked** 22:21
23:1,5 37:16
38:23 47:2
55:11 131:23
153:18
**looking** 46:10
56:19,21 58:19
76:9 82:19
112:18 134:5
**looks** 90:19
106:13,15,19
110:13 133:20
**lost** 77:25
120:8,11,18
159:21
**lot** 76:25
134:14 142:15
144:20
**lots** 56:5
**louisiana** 5:22
6:1,5,10 16:18
21:1 116:17
**low** 67:3,3,24
**lsu** 15:2 17:15
**lucky** 11:11

**m**

**m** 4:18
**ma** 2:12
**ma'am** 162:2

**machine** 20:16
29:23
**made** 35:4
46:22 49:5,7
49:24 69:6
153:8 170:5
**magnitude**
30:23,24
**mail** 91:22
**major** 15:24
**majority** 134:9
**make** 4:22,24
5:9 7:3,13,15
7:16,17 8:9,18
9:2,11,14 10:3
10:18 11:3
13:6,9,17,21
14:9,13,17
15:17 20:9
39:15 64:16
70:7 84:21
144:23
**makes** 43:1
**making** 31:10
39:23 40:2
48:25 64:18
85:5 90:9
110:23 125:23
142:6 145:20
**manage** 37:25
86:15
**managed** 61:24
90:6
**management**
86:14 136:14

**manager** 19:10
22:25 32:16
42:21 46:16
**managers**
118:18 119:7
**managing** 22:6
40:8 134:22
**mandatory**
109:4,15
**manipulate**
15:16
**mansfield**
59:13,24 90:11
**manual** 40:14
41:13
**manually**
110:17
**manufacture**
155:13
**manufacturing**
115:12,15,19
115:24 116:10
116:17 117:2
155:14
**map** 106:9
**marcus** 146:18
**margin** 142:16
142:17,23
**marginally**
59:16
**mark** 1:10 3:6
4:5,18 45:7,17
76:7,10 82:21
124:8 133:12
164:4 166:22

167:6 168:1,5
169:2,24 170:2
170:4,12
**marked** 45:24
46:5 54:14
61:2 64:1,4
66:15 68:11
70:16,25 72:17
72:19 74:14
75:11,13 77:4
80:8,11 81:13
83:4 87:22
95:20 96:7,10
110:2 124:9
126:17,25
133:13 137:10
150:4 152:25
157:21
**markwallen56**
168:2
**master's** 14:25
15:1,3 17:11
17:15
**material**
156:15,22
**matt** 147:9
**matter** 3:6 4:12
84:15 160:17
160:22
**max** 4:3,11
84:10,16 96:9
161:19
**maxwell** 2:10
**mcintosh** 64:18
65:2,6,15,19

**mean** 6:7 8:4
11:23 13:8
27:18 29:1
33:8 36:8
45:17 52:24
55:8 69:23
73:3 79:9
139:12 143:16
**meant** 32:19
42:25 67:10,20
131:14,18
134:25 135:9
139:16
**measures** 41:23
**medical** 10:23
**medications**
11:2
**meet** 33:13
35:20 36:2
37:9 38:11
42:12 43:23
76:18 115:6
123:16,22
**meeting** 30:2,2
30:4 51:7,11
51:20,24 53:11
53:14 55:17,20
55:23 56:2,4
56:11,13 64:21
75:24 76:3
79:24 86:3,5
86:18 95:5,6
111:21,21
112:1,24 115:7
123:8,19 124:1

149:1 160:3,4
**meetings** 50:15
50:17 51:5
**members** 151:1
**memory** 9:21
59:23 62:4
**memphis** 26:5
30:2,2 50:21
51:5,11 55:16
86:3,4 91:17
92:2,3 106:20
111:13 116:10
160:2
**mention** 122:8
**mentioned**
19:18 32:23
37:12 40:13,20
48:13 49:9
106:4 134:6
144:19
**met** 22:22
35:23,23 50:22
50:23 84:13
86:2,7 88:8
95:8 98:25
102:8 146:21
**mid** 14:15,16
19:14
**middle** 8:14
73:6
**mill** 20:13,15
20:24 21:1,1
21:20,21 23:7
25:12 26:10
31:7,8,13,22

32:1,8,13 33:4
33:21 38:17,20
39:15 40:2,2
41:2,5,9,10
44:25 47:4
49:17,24 50:22
50:24 61:13,16
61:18 62:8,17
62:20,20,24
63:13,17 64:12
67:16 69:7,8
71:13 73:8,13
73:17,21,25
76:3 77:15,19
78:6,10,19,22
79:14 80:18
82:7 89:18,22
89:25,25 90:8
90:15,16,24
93:15,16 94:9
108:13 120:21
127:20,22
129:10 132:13
132:14,16
135:22 136:6
136:10 138:24
149:19 150:20
151:7 158:19
159:8
**mill's** 35:4
**million** 142:6
144:14 145:2
145:20
**mills** 20:23
21:22,24 22:1

24:25 25:6,7
29:22 30:20
31:2,3,22
32:25 33:18
37:13,22 38:10
40:9,23 41:5
42:9,12,16
43:2,9 44:16
44:22 51:1,17
53:20 58:11,13
58:16,19 59:19
64:20 65:2,8
65:17,20 75:6
75:24 79:25
81:2,6 82:11
89:15 90:3,19
91:3 93:14
94:8,12,23
108:10 112:8
112:19 114:20
119:18,25
120:7 127:22
127:23 128:1,6
128:15 140:16
158:23
**millview**
135:23
**mind** 7:2 84:18
161:19
**minter** 114:25
**minute** 110:9
**minutes** 12:17
129:5,9,10
148:2

**misdelivery**
63:1,9
**misinterpreted**
35:11
**mississippi**
5:22,25 6:6,11
19:17
**mistake** 153:8
**moment** 150:15
**monday** 74:22
127:13,15
132:1,3,4
**money** 27:7
49:3 84:21
**monitor** 3:3
31:18 38:2
44:5,10 70:11
70:19 89:18,21
90:13 133:3,7
135:15 140:25
161:22
**monitored**
89:22 90:2
91:4
**monitoring**
38:9 40:8 42:3
42:9 63:2,9
68:2 78:9,19
78:25 90:1,20
91:1,5 136:5
152:4,7,16,19
**month** 84:25
85:5
**monthly** 84:21

**months** 50:25
**morning** 3:2,17
128:17
**move** 21:11
73:20 138:23
**moved** 6:10,11
16:17 21:13
68:5 79:18
**moves** 131:12
**moving** 66:12
129:23
**msn** 1:5
**multiple** 21:21
35:7 139:18
**multitude** 19:6
**mutual** 13:7

**n**

**n** 4:18 92:12
164:1
**nalco** 61:23,24
62:16 63:14,15
159:12
**name** 4:16
35:21 59:3
84:14 102:11
106:1,5 114:22
146:17,19
154:21 158:11
**name's** 4:11
**names** 5:12
29:13 57:2,2
156:18
**nanjing** 97:3,6
98:20,21,25
99:3,6 101:7

101:10,24
102:4 117:8
121:1,6 122:18
**nate** 3:15,25
6:23 8:25 34:8
34:8 45:7,22
70:4 84:9
95:13 96:6
101:4 109:17
121:3 145:6
**nathan** 2:4
3:18 84:14
**nathan.towns...**
2:6
**national** 99:10
**natural** 9:9
**near** 132:16,18
138:2
**nearly** 25:7
128:11
**necessary**
146:3 170:6
**need** 7:9,10
8:11,15,17
37:19 38:4,10
38:11 39:9
43:23 44:1
47:20 55:3
75:24 76:3,9
76:15,18 79:6
79:24 88:4
95:24 105:10
110:13 129:3
139:7 153:16
153:21 157:11

157:13
**needed** 31:19
36:24 53:21
60:7 62:25
90:14,16
**needs** 42:13
43:10 158:19
**neither** 59:22
163:11
**never** 47:20
98:14 103:17
106:4 122:8
124:20 150:25
**new** 19:24 26:9
31:21 109:5
122:2,6,8
123:5
**news** 32:20
**nine** 153:9
**nod** 7:11
**non** 140:9
**nope** 108:8
**north** 132:18
**northwest**
25:11
**notary** 163:4
170:13,19
**note** 145:25
168:10
**noted** 170:7
**notes** 154:2
**noticed** 62:13
62:17 77:23
**notified** 63:14

**november**
  51:21 111:11
  112:24 115:6
  123:8 127:8
**number** 24:25
  69:18,19 121:2
  128:5 142:12
  166:8
**numbers** 56:19
  81:23 102:16
  112:17 113:10
**ny** 168:15

**o**

**o** 17:20
**oath** 3:23 10:6
  10:7 84:16
**object** 34:8
**objecting** 34:13
  34:15,17,19
**objection** 34:5
  34:10 39:20
  40:16 65:5
  71:19 72:9
  78:13 80:1
  93:5 94:19
  97:22 98:6,16
  99:19 100:14
  100:20,23
  101:12 102:20
  102:25 103:8
  105:23 106:6
  107:21 109:13
  109:17 113:23
  115:20 117:25
  119:2,16

121:15,24
122:10 123:4
123:12,20
136:8 138:25
139:14 141:11
141:20 142:8
142:20,24
143:9,24 144:8
144:15 145:3,6
145:22 154:9
155:19 156:9
157:1,16 159:4
160:1 161:1
**objections** 4:1
  101:2
**obtain** 92:22
**occasion** 38:3
  139:8
**occasional**
  120:21
**occasionally**
  31:24 40:5
**occasions** 43:14
  88:8 89:12
**occurred** 55:21
**october** 51:21
  153:10,11
**offend** 135:9
**offense** 131:14
  131:18 134:25
**offer** 140:12,15
  140:19 141:12
  141:15 143:6
  143:10,20,22
  145:10

**offered** 142:14
**offering** 143:4
  144:5
**offhand** 32:6
  45:4 81:3
**office** 22:24
  33:20 91:17,20
  91:23 92:2,4
  115:17 116:2,4
  116:7,12,13
  132:15
**official** 19:12
  23:20 163:15
**oh** 6:4 34:12
  35:12 51:21
  82:1 89:6
  106:16 132:19
  137:17 158:12
  158:24 162:9
**oil** 57:16
  113:17,25
**ok** 73:7,20
**okay** 4:4 5:6,10
  6:13,13,18
  10:11 13:14
  14:19 15:7,18
  17:14 18:3,25
  19:2,14 20:5
  21:3,20 22:8
  22:12 27:5
  29:3 34:23
  38:8 39:8,14
  41:16 43:1
  44:12 45:12,12
  45:15,21 47:1

47:8 51:4,10
51:14 54:16
55:1,8,11,11,13
56:9,20 58:4
59:2,11 61:8
62:5,14,16
64:6 66:9,12
66:22 67:23
68:8,21,21
70:21 71:5,8,9
71:11,15 72:5
72:25 73:1
74:11,19,20
75:20 76:20
77:10,10,18
80:13,13 82:1
82:2,3,23 83:5
83:12 85:8
87:25 88:3,6
89:8 90:15
95:4,14,16
96:12,13,18
97:2,4 102:17
105:17,20
106:17 107:10
109:3 111:1,6
113:13 114:8
115:13 117:12
121:10 122:19
124:4,11,13
126:6,19 127:3
127:5,11
128:13 132:14
132:21 133:15
133:17 137:17

137:17,22,23
140:3 142:18
145:25 150:7,9
150:18 152:22
153:3,6,11,12
153:18,20
154:1,14
157:18,24
158:1 161:17
162:4,13
**old** 21:14 77:25
**olin** 16:18,20
19:4 33:19
35:19 65:6,18
**once** 26:4 35:23
36:21 37:2,2
38:15 44:18
55:2,9 61:6
75:19 80:7
138:20 140:10
158:25 159:8
**one's** 36:9
124:6
**ones** 4:13 37:23
94:13 106:21
106:22 146:22
**onetime** 59:21
**ongoing** 36:16
37:1,6
**oops** 38:7 42:24
58:10
**open** 46:5,6,9
54:19,19,21
55:2 63:23
68:17 75:17

77:8 80:6
81:18
**opened** 68:21
**opening** 55:1,6
**operations**
140:6
**operator** 38:4
41:12
**opinion** 145:10
145:16
**opinions**
148:12
**opportunity**
5:3
**opposed** 24:20
**opposing** 6:23
**oral** 7:16
**orally** 7:10
**orange** 80:18
82:6 90:11
154:4
**order** 7:9 9:5
27:16,21 33:12
35:4 38:15,24
64:16 68:10
69:9,18,19,24
77:19 90:4,10
90:24,25
139:21 158:23
162:1 165:10
**ordered** 27:9
**ordering** 33:7,9
151:20
**orders** 37:5,13
37:22 38:9,10

44:17 87:3,7
90:20 91:4
141:5 151:22
**ordinary** 35:16
73:12
**oregon** 25:10
69:8 107:12
108:14
**organic** 29:15
29:17 57:23
59:3
**orientation**
109:5,16
117:14 118:2
**originally** 6:16
**osha** 118:5,10
118:22
**outage** 32:21
36:23 38:6
42:23
**outdoor** 129:20
**outside** 35:16
56:11 92:23
**outsource**
155:14
**overlap** 43:17
163:10
**overmodulati...**
163:10
**overnight**
130:12,17,22
131:2,8
**oversee** 136:11
**overview**
113:12

**own** 29:20 91:9
91:11,13 92:7
92:10,11 99:15
101:9,16
102:18,24
107:14 116:22
**owned** 101:20
108:3 135:16
**owner** 25:24
94:21
**owns** 99:10,21

**p**

**p** 41:10 92:12
**pa** 2:5
**pacific** 158:9
158:14,16,19
159:2,9
**packages** 143:4
**page** 13:9
54:24 55:18
56:16,19 58:1
58:25 59:9
72:24 75:18
76:5 77:22
79:4,17 80:8
81:10 83:2
96:24 101:7
110:17 112:17
113:9 127:9
137:15 153:9
157:5 164:3,21
169:4,7,10,13
169:16,19
**pages** 153:17
153:19 154:11

**panned** 59:22
**paper** 1:3 2:2
  3:7,19 6:16,17
  13:16 17:24
  19:16,20 20:3
  20:11,16 23:10
  23:12 29:22
  30:7 31:16
  33:4 60:5
  61:16,18 62:17
  62:24 84:15
  86:11,15,25
  87:12,20 92:23
  93:17 94:18
  95:6,9,19
  103:24 104:10
  108:10 111:14
  117:5,8 122:14
  122:22,24
  123:2 135:18
  135:19 136:20
  137:24 138:24
  141:5,8 143:5
  143:7 145:1,19
  146:1,25
  148:10 151:2,4
  159:21 160:24
  166:16 168:4
  169:1 170:1
**paper's** 87:4
  141:1
**pardon** 34:6
  147:12
**parents** 21:14
  22:6 135:5

**part** 10:1 19:22
  20:6 31:4,20
  38:13 39:15
  61:16 71:16
  78:2 87:2
  104:10 111:4
  129:11,14
  134:7 146:14
  160:11,14
**particular**
  31:25
**partnership**
  110:2 166:18
**parts** 111:9
**party** 155:14
  163:12
**pass** 21:25
**patent** 99:11
  102:18 103:17
**patents** 92:10
  92:12,14,16
  99:10,15,21
  102:24 103:4
**paula** 158:9,24
**pay** 93:3
  157:17
**payable** 27:19
  143:17
**paycheck** 54:9
**pdf** 56:17
  162:12
**pending** 163:13
**people** 29:10,11
  33:5 52:1
  53:19 56:6

  104:21 126:3
  136:20 151:6
  153:23
**percent** 142:17
  142:23
**perform** 93:23
  100:12,17,22
  120:16 126:15
**performed**
  97:20 98:5,10
  98:15
**period** 30:19
  118:11 151:22
**periodically**
  108:10
**periods** 6:2,4
  18:14
**person** 52:21
  88:8 158:13
**personally**
  145:9
**personnel**
  19:12 29:8
  44:14 93:17
  95:6 139:23
  147:7
**perusing** 55:11
  68:21 71:8
  73:1 74:19
  75:20 77:10
  80:13 82:1
  83:12 88:6
  96:12 110:21
  127:5 137:17
  137:21 150:18

  150:18 153:18
  158:1
**phd** 113:16
**phillips** 66:14
  81:21 126:17
  165:8 166:25
**phone** 53:24
  149:3,14
**pi** 41:10,15,24
  41:24 128:24
  135:15
**picked** 25:5
  69:7 101:3
**picking** 26:9
**picture** 97:9
**piece** 8:2,5 10:3
  27:24
**pieces** 39:19
**pipelines**
  113:17
**pittsburgh** 2:5
**place** 2:11 4:16
  18:19 36:24
  38:24 44:19
  52:19 54:17
  66:9 87:3,7
**placed** 38:15
  91:4
**places** 89:21,21
**placing** 27:21
  38:10 44:17
  90:20,24,25
  158:22
**plaintiff** 1:4 2:2

**plan** 37:2,2
70:7 132:2,15
138:1,8
**planning** 65:1
65:12 81:2
**plans** 80:19,20
**plant** 17:22
19:5,6,21
61:19 64:18
65:15,19
**plants** 17:22
**plasmine** 68:11
151:6,15,17
165:11
**platform** 163:8
**please** 3:12
7:23 51:5
57:10 59:18
78:16 81:17,19
82:5 83:15
88:5 96:24
102:15 105:13
107:7 109:2
122:17 127:10
140:12 153:15
**pleased** 126:8
**pm** 70:11,19
79:20 133:3,7
161:22 162:18
**point** 8:11
15:14 18:19,21
22:5 39:24
40:1 67:11
71:2 90:12
110:7 113:14

117:23 118:25
121:11 122:3
128:25 152:11
157:25
**points** 34:3,16
35:8 39:18
67:16
**polite** 47:23
**polymer** 60:15
**portfolio**
134:12
**portland**
107:12 108:17
108:20
**position** 16:25
17:17 19:3,24
20:19 21:9,10
21:12,16,20,21
22:3,12,16
23:14,18,24
25:15
**positions** 16:24
24:14
**possible** 140:24
141:3 161:10
**possibly** 112:7
112:8 115:8
124:16 161:7
**potentially**
123:3
**pounds** 142:15
**powerpoint**
54:13 86:18
87:10 95:18
101:11 110:1

111:16 112:5,6
112:22 113:3,6
124:5 164:25
166:14,17
**prepare** 12:21
12:25 68:25
**preparing** 12:8
**presence** 112:7
112:18 115:11
**present** 2:15
55:23 56:6
111:3,13
**presentation**
95:19 96:20
111:17 166:15
**presented**
101:10 111:4
111:19,19
**presenter**
111:3
**presenting**
122:13
**preston** 57:4,17
59:6
**presume**
118:19 119:6
153:14
**pretty** 8:13
15:21 30:19
153:3
**preventative**
138:1,8
**preview** 110:15
110:18

**previous** 24:2
121:18
**previously** 46:3
63:22 118:22
122:20 123:10
125:19
**price** 141:17
**primarily**
40:12 120:18
**primary** 42:1
131:16 139:25
140:4
**probably** 8:15
13:22 18:12
70:22 112:11
112:12,14
118:9 129:10
130:5 131:5,13
140:11
**problem** 26:9
32:2,4,13,14
47:20 84:2
110:10 149:23
**problems** 139:4
139:4
**procedure**
39:25
**proceed** 45:13
**process** 7:3
15:12 16:21,25
17:3,5 20:6,10
20:12 22:19
25:6 31:13
33:7 37:16
38:23 40:14

41:16 70:2,22
72:16 151:20
151:22
**processes** 20:14
**processing**
27:17
**procured**
156:16
**procures**
156:23
**producing**
23:11
**product** 15:17
33:10,21 43:11
49:16 60:2,7
60:12 61:23
65:19 90:7
142:15 155:4
156:2
**production**
17:5 19:10
20:11 23:25
31:14 32:16
33:24 36:9
50:24 97:16
101:19 122:25
140:1
**products** 36:5,8
58:20 62:1
98:22 112:10
154:20 155:13
**professional**
16:3 163:4
**profile** 46:3
133:12,20

134:3 167:5
**profit** 141:25
142:6
**program**
129:21
**programmed**
20:9
**programs**
15:16
**progress**
110:16
**project** 37:18
129:2
**projecting**
38:10
**projects** 17:3
19:8 21:24
**promise** 76:21
**promises**
109:23
**promote** 134:4
**prompt** 32:1
**pronouncing**
29:4
**pronunciation**
26:21
**proposing**
21:24
**protection**
113:16,17
**provide** 69:22
69:23 136:5
143:8 151:9
**provided** 51:16
60:12 143:6,11

143:14 144:13
144:13 146:25
148:11
**providing** 81:5
144:10
**public** 163:4
170:19
**pull** 54:10 61:5
66:18 71:1
72:14,23 74:17
82:25 88:1
126:7
**pulling** 124:5
**pumps** 76:10
**purchase** 45:1
46:19 47:1,6
47:10 68:10
69:9,18,19,23
165:10
**purchased**
17:21 19:22
47:4 154:16
**purchases**
46:22
**purchasing**
46:16 128:10
**purpose** 109:19
123:7,18,25
124:2 134:2
**purposes** 69:12
**pursuant**
145:11
**put** 29:21 37:5
45:11,17 60:23
60:23 63:19

68:7 75:8,10
80:4 155:3
**putting** 34:10
74:11

**q**

**quantity** 38:25
**question** 7:16
8:1,5,8,9,14 9:9
9:17,20 11:22
11:24 34:14,21
34:22 40:18
47:22 80:19
84:20 98:3,4
123:24 146:2
149:4 154:14
155:12,21
156:14 157:5
**questioning**
161:10
**questions** 7:7,8
7:10,20,21,21
7:23 8:21,22
10:12,14,15,22
11:4,20 34:9
70:5 83:10
84:17 132:23
135:11 145:13
146:4,20 148:4
148:6,23 154:7
154:12 161:9
**quick** 70:6
**quite** 53:25
103:12
**quote** 137:25
151:21

| r | | | |
|---|---|---|---|
| **r** 4:18 17:20 169:3,3 | **realized** 126:21 | **receive** 37:20 | 162:6 |
| **raised** 72:2 | **really** 21:22,25 26:9,17 33:8 36:7 51:7 56:7 126:14 | 42:8 85:16,19 87:12 94:1,4 101:18 117:14 118:5,8,22 135:15,17 136:21,25 | **recorded** 3:5 7:8 119:10 |
| **range** 18:17 24:22 | **rear** 2:24 | | **reed** 74:13 165:19 |
| **rarely** 43:13 | **reason** 7:23 8:12 11:18 21:11 62:23 131:23 168:11 169:6,9,12,15 169:18,21 | **received** 100:6 100:10 136:17 | **refer** 13:16,23 14:9,12 25:21 36:11 41:18 139:11 |
| **rc.com** 2:13 | | **receptive** 53:5 53:6 | **reference** 18:20 |
| **rdr** 1:15 163:24 | | **recess** 44:7 70:13 133:4 | **referenced** 59:4 168:6 |
| **reach** 31:21 37:22 39:4,6 43:12,22 82:11 140:3 | **reassure** 64:20 | **recognize** 55:13 57:3,4,5 61:9 64:8 66:23 68:22 71:9 73:2,3 75:21 77:11 80:15 82:3 83:13 87:18 96:15 97:8 133:18 153:23 | **referred** 14:2 25:20 |
| | **rebrand** 154:15 | | **referring** 104:8 112:15 119:20 |
| **reached** 80:18 83:22,22 84:1 137:24 | **rebranded** 154:21 | | **refers** 86:5 |
| | **recall** 6:2 12:15 12:18 22:16,21 28:5 29:14 46:21 48:4,24 50:20 51:6,20 51:23 52:23 60:11 63:12 64:10 65:23,25 66:1 71:11 72:2 73:10 75:25 78:10 81:1,5 112:6 124:1 128:2 130:25 131:4 146:20 158:3 | | **refill** 44:1 |
| **reaching** 62:7 76:14 78:22 | | | **reflected** 47:5,9 47:13 58:5 |
| **read** 64:15,23 73:1 75:1 76:11,25 78:4 79:11,21 97:17 97:19 98:23 102:5 121:18 137:21 153:22 162:15 168:9 170:5 | | **recognized** 52:21 57:17 | **refresh** 54:24 56:1 68:16 70:24 87:25 110:5 |
| | | **recollection** 56:2 67:19 152:21 | **refusing** 145:18 |
| | | **record** 3:2 4:10 4:16 9:4 34:11 44:2,6,10 70:6 70:12,19 101:3 111:7 120:8 133:1,3,7 161:22,24 | **regarding** 138:1 |
| **reading** 41:13 113:19 154:2 | | | **registered** 163:3 |
| **reads** 156:1 157:6 | **receipt** 168:18 | | **regular** 50:16 |
| **real** 134:14 136:22 157:5 | **receivable** 27:18 143:16 | | **regularity** 44:22,23 48:8 |
| **realize** 8:15 161:13 | | | **regularly** 32:17 50:23 |

**reichhold**
17:19,20
**reintroduce**
82:22
**related** 43:19
80:20 125:25
163:12
**relates** 64:10
65:14,16
**relating** 77:19
**relation** 36:16
65:19 140:16
**relationship**
59:20
**relatively** 23:3
**remained** 159:2
**remember** 6:9
9:21 12:14
21:19 26:6,22
29:13 35:21
41:11 43:24
46:12,24 51:7
51:8,8 52:12
56:8 61:20,22
62:2,14 63:18
64:12,13,13,14
65:8 66:3,7,8
67:5,14 71:13
72:4,5 73:4,23
77:15 81:4
82:7 85:6 89:9
94:13,14 95:8
111:3 112:2
113:1,2,5
123:7 128:6

131:7 132:20
137:19,22
139:9 146:17
146:19 148:14
149:18,20
152:10,14,19
**remembered**
9:25
**remembering**
114:15
**remind** 58:20
84:15
**remote** 41:18
41:21 42:9,13
42:17
**remotely** 3:11
**renovating**
135:4
**rent** 116:11
**rep** 22:14 23:19
**repack** 154:15
**repackaging**
154:20 155:1
**repeat** 47:24
53:12 57:9
120:5 124:25
**rephrase** 36:17
52:20
**replaced**
135:22
**replacement**
139:21
**report** 41:5
83:19

**reported** 1:15
**reporter** 3:13
3:24 4:25 5:7,7
7:8 9:1 13:25
14:6 43:16
49:21 63:5
126:11 151:11
161:25 162:4
162:13 163:1,4
164:9
**represent** 4:11
82:18 84:14
106:18 107:5
129:22
**representing**
3:18
**request** 27:11
49:2,19,25
50:1,3 90:4
**requested**
74:21 164:13
164:15
**requesting**
137:25
**requests** 48:21
49:1,17 50:5
**require** 127:23
127:24,24
145:15
**required** 33:23
93:12 128:1
135:20 145:12
170:13
**requirements**
35:2

**research** 97:15
97:21 98:5,11
98:15,21
100:12,17,22
**reserved** 4:1
**reserves** 146:1
**resolution**
83:23
**resolve** 65:14
**resolved** 64:17
64:21 65:9
66:2
**resources**
74:24
**respect** 37:10
55:20 58:16
65:3 75:24
83:23
**respond** 155:17
**responding**
154:7,11
**response** 76:17
138:10 156:1
**responsibilities**
30:18 31:4
48:3 58:15,20
**responsibility**
21:23 53:22
62:13 138:22
139:5 159:1,7
159:9,11
**responsible**
20:23,25 27:21
138:14

**rest** 35:24
124:6 159:1
**restate** 71:21
72:11 78:15
102:1 156:12
157:12
**result** 53:25
66:3
**retired** 25:16
25:17
**retirement**
85:16
**retiring** 51:13
123:14
**retrying** 110:17
**return** 5:1,9
110:18 144:23
145:1 146:1
168:13,17
**review** 4:21 5:4
5:8 12:21 88:5
95:17 96:2
99:23 128:23
150:15 153:16
168:7
**reviewing** 56:1
63:25 127:6
**revisiting** 64:19
**rice** 64:3 165:5
**richmond**
108:3,7 132:16
**riegelwood**
59:13,23
**right** 3:1 6:7,14
7:12 8:2 9:1,8

10:14 13:10
16:11,16 17:9
18:5 19:20
21:3,5 23:19
26:13,20 27:2
27:4,17 28:16
30:12,16,19
32:9,23 35:5
35:14 37:13
38:8,11,17
39:19 40:9,15
40:23 41:2,6
42:2,6 43:1,25
44:19 45:9,10
46:19 47:5,22
48:4,9,14
49:10 50:18
51:2 52:3,7
55:19,24 57:18
57:21 58:17
59:7 60:4
61:24 62:11
63:3 64:23
65:15,21,24
67:21,22,24
68:2,5,7,14
69:24 70:6
72:7 74:1 75:8
76:11 78:4
79:1,10,21
80:3,21 82:1
83:21 84:7,8
85:2,10 87:15
88:18 89:4,17
90:1,17,21

93:21 96:10
97:17 99:12,15
100:2,7 103:15
103:22 104:22
106:24 107:14
109:23 110:24
111:15 114:4
114:17 115:19
115:24 116:7
117:18,21
118:23 119:14
121:14,19
125:2,20
127:16 132:6
133:10 134:8
136:2,6 137:14
137:18 138:8
140:6 141:6,16
143:18 144:3,7
144:20 146:1
149:15 151:15
154:4,17,23
155:15 156:4
156:19 157:9
159:3,9,15
162:15
**riles** 157:20
158:15 167:16
**rings** 158:11
**riverdale** 60:19
64:20 65:2,7
65:16,20 74:21
**road** 9:19
**robert** 29:3

**robinson** 2:10
3:21 147:17
**role** 20:8 25:23
26:13 27:5
30:9,15 33:3
33:14 34:1
42:2 87:3
151:19
**roosevelt** 2:16
**rosin** 59:12
**rough** 18:24
162:8
**roughly** 6:2
12:16 17:6,8
18:6,7,8 19:1
24:6,13 28:5
28:11,13 50:20
**route** 6:14
**rules** 6:22
84:16
**run** 13:8 60:6,9
90:9
**rush** 46:11

**s**

**s** 164:19 169:3
**safety** 31:8,10
39:17 40:2
71:15 72:2
93:13,15,16,23
94:1,5 109:1,4
109:15 117:11
117:14 118:2
157:8,14
**sake** 149:25

**salaries** 124:20
**salary** 85:13
  124:21 125:20
**sale** 122:21
  123:1
**sales** 97:16
  138:19,20
  139:22
**salesperson**
  140:25
**sanders** 81:12
  137:10,24
  138:3 166:6
  167:8
**sanders's**
  138:11
**sandra** 1:15
  163:3,24
**sandy** 162:7
**satisfactory**
  39:16
**satisfy** 48:23,25
**saves** 14:5
**saving** 149:4
**saw** 68:24 79:9
  96:12
**saying** 9:4
  13:11 47:23
  53:20 121:21
  138:5
**says** 55:5,18
  59:12 60:14,18
  64:15 73:7,16
  73:24 74:20,22
  76:6 77:22

79:4,17 89:5
89:17 90:15
96:4,7 97:14
98:19 99:9,13
101:7 102:4,7
102:15 105:18
107:11 110:8
112:18 113:11
113:14 114:7
121:1,11,12,16
122:2,5 154:1
154:2 155:12
155:21 156:21
**sc** 1:14
**scale** 31:1
**scenario** 71:11
**scenic** 6:14
**schedule** 31:19
  37:20 78:2
  79:7 90:10
  127:14,21
  128:14 131:25
  139:19
**scheduled** 24:2
  62:18
**scheduling**
  19:12 24:1
  27:11 39:1
  42:4 127:19
  132:3,4,5,7
  161:20
**school** 16:16
  17:11
**scientific**
  156:17

**scientist** 102:8
  102:12
**scientists** 93:8
  102:5
**scope** 30:22
**scott** 114:25
**screen** 58:6
**scroll** 56:16
  58:1,25 59:9
  79:3 96:24
  101:6 102:14
  105:13 107:7
  109:1 113:10
  117:10 120:25
  122:16 157:4
**seal** 163:15
**season** 80:21
**sec** 54:12 80:5
**second** 4:15
  13:19 45:5
  51:10 55:3
  63:20 77:22
  79:10,16 95:15
  122:3 150:23
  154:3,8 157:5
  161:20
**section** 98:19
  99:9
**see** 4:21 25:21
  46:3 49:5
  59:12 61:17
  64:12 72:25
  73:7 78:23
  79:8 89:7,18
  92:14 102:5

105:18 106:9
110:15 112:25
114:10 137:13
137:16,21
154:2 158:12
158:12,24
**seeing** 137:16
**seem** 55:19
**seems** 158:13
**seen** 111:8,9
  124:14,20
  150:12 153:14
  158:2
**seetharaman**
  14:8
**segments** 58:2
**self** 26:12 30:11
**sell** 86:24 117:5
  117:8
**selling** 36:5
  140:17 149:19
**sells** 156:16,23
**semiretired**
  22:5
**semiretirement**
  22:9
**send** 31:17
**sending** 67:21
**sends** 41:24
**sense** 7:13,17
  8:9,18 9:14
  10:4 13:17,21
  14:9,13,17
  43:1 70:8

**sent** 21:22 27:9 27:10 42:24 91:22 158:25 168:14
**sentence** 150:23
**separate** 36:7
**series** 81:24
**serve** 114:15 131:15
**served** 4:13 145:12
**service** 22:14 23:19,21,21,22 24:15 54:5 64:22 140:16 140:20 141:13 141:15 150:21 151:3,5,8
**serviced** 116:24
**services** 51:16 52:25 65:4 141:9 142:14 145:21,21 148:11
**servicing** 58:11 58:12 89:16 128:7 159:7
**set** 73:19 90:12 134:12 135:25 161:12
**setup** 35:24
**seven** 106:14 106:17

**several** 17:22 52:1 89:12 130:4
**share** 54:11,17 70:23 75:10 76:24 81:18 87:16 110:6 157:25
**sharp** 126:14
**sheet** 168:11
**shipments** 53:16,24
**shipped** 156:2
**shipping** 36:10 139:8,11
**shiv** 14:8,9 22:24 25:21 52:14 56:24 88:8,11,24 89:14,20 91:25 92:3 94:17,23 100:22 106:4 113:3 122:8 123:18,25 125:25 143:20 146:6 155:9 159:20 160:16 160:19 161:4
**shiv's** 26:15 160:13
**short** 20:25 74:16
**shortage** 43:10
**shortcomings** 163:9

**shortly** 111:6
**show** 112:17 149:12
**shower** 31:11
**showers** 39:17
**shut** 25:12
**sic** 76:7
**sick** 11:9
**sign** 162:15 168:12
**signature** 163:23
**signed** 5:2 168:20
**similar** 11:22 19:3 21:9,12 46:21 48:17 49:13 146:22
**single** 95:25 127:19,20
**sir** 44:4 110:20
**sit** 109:24
**sitaraman** 13:19
**situation** 62:22 76:14
**six** 19:1,2 90:19 106:15
**sixth** 2:5
**size** 25:9 59:12 59:22 76:8 86:19 108:24 151:8,9,14,17 151:18 152:20

**sketchy** 62:3
**skids** 46:16 47:2,4
**slide** 102:15 105:13 107:7 108:25 109:8 109:11 111:11 112:7,9,11,13 112:15,16 113:11 114:6 115:2,10,10 117:10,23,24 120:25 121:18 121:22,23 122:16
**slides** 95:25 112:4
**slow** 100:25
**slowly** 77:24
**slupski** 29:3,4
**small** 142:16
**smaller** 124:6
**smoother** 7:4
**smoothly** 73:20
**sodium** 86:19 136:25 154:21
**software** 135:16 136:12
**sold** 87:13 92:23 128:8
**solutions** 168:23
**somebody** 93:18 128:8 137:5

**someplace** 26:10 52:16
**son** 131:5
**sonny** 67:4
**soo** 114:10,12
**soon** 78:3 129:1 137:8 153:4
**sorry** 6:6 18:8 32:3 34:8 47:17 69:4 71:21 75:9 82:23 102:1 104:15 109:17 110:23 112:12 121:2 124:25 145:6 147:10 150:11 161:23
**sort** 66:24 93:12 136:11 139:3 140:8,15
**sound** 67:21 114:4
**sounds** 5:10 27:4 31:20 44:2 45:20 67:22 111:15
**source** 36:21 37:7
**sourced** 35:13 36:24
**sources** 139:17
**sourcing** 14:12 50:22 56:7 113:11

**south** 5:16 6:12 14:15,16 15:23 20:21 21:7,13 52:16,19 57:7 57:13 89:25 92:1 104:5 105:1,8 115:24 135:6 163:5,16
**space** 91:18 116:12,14
**speak** 7:9,14 8:24 9:10 26:7 57:8 149:9
**speakerphone** 52:15,18 113:1
**speaking** 8:23 113:4
**special** 15:10 43:10 49:16,19 49:24 62:23
**specialized** 16:6
**specific** 8:5 65:23 72:4,6 81:4
**specifically** 30:9 89:11
**specification** 15:17 35:2
**specifications** 33:22 34:16,24 34:25
**specify** 8:3 118:1

**specs** 34:3 35:14 61:14,21 62:24
**speech** 163:9
**speed** 132:12
**spell** 4:16
**spend** 130:1 134:10,22
**spent** 145:2
**spoke** 12:15 78:8 112:24 113:1 149:7
**spoken** 40:7
**spot** 88:1
**spreadsheet** 37:17 129:1,2 129:11
**spreadsheets** 129:4
**springfield** 25:9 69:8 108:13,16 149:19 150:20 152:8
**stabilized** 73:19
**stamp** 45:8 66:12
**stamped** 45:19
**standard** 3:3 11:24 162:2,11
**stars** 106:9,11 106:18 107:4
**start** 9:10,12 136:4 152:7

**started** 17:19 17:23 24:4,19 57:8 152:16
**state** 10:19 163:5
**stated** 7:20
**statement** 7:16 99:18 103:7
**states** 1:1 3:8 5:19 92:24 104:12 106:12 106:24 107:2 107:14 160:7
**station** 31:10
**stay** 110:16
**staying** 161:19
**steep** 126:9
**stick** 135:11
**sticker** 82:24 82:25
**sticking** 161:15
**stipulation** 3:25
**stock** 134:19
**stop** 108:20
**stopped** 45:11
**storage** 43:3 48:21 49:10,11 49:12 50:4
**streamline** 36:14
**street** 10:16
**strength** 23:6,9 77:25 86:16 89:25 90:1

**strike** 50:13
92:20 130:15
**string** 73:4
158:12
**strokes** 148:15
**strong** 23:12
**stuff** 19:13 22:7
27:13 29:23
31:11 33:12,25
36:10 152:5
**subcontractor**
57:24 116:20
**subcontractors**
29:11,12,24
52:5
**subject** 48:13
146:3 161:10
**subpoena** 4:14
145:12
**subscribed**
170:14
**subsidiary**
17:25 19:19
**substance**
48:20
**success** 110:2
166:19
**sufficient** 26:12
30:11
**suggested**
53:22
**suggests** 132:9
**supervisor**
19:11 31:14

**supplemental**
131:21
**supplied** 54:4
58:10 59:21
60:2 61:16,18
61:18 65:20
69:16 140:5
151:14,15
155:4
**supplier** 24:2
36:19 37:3
38:25 39:6
43:11 60:3
61:13,15 65:12
69:24 83:17,22
138:12,13,19
138:21 139:5
139:12,18
140:1 141:10
155:4
**supplier's** 36:1
**suppliers** 33:13
35:20 37:10
49:4,18 53:24
87:3 93:1
129:12 136:24
139:23 140:25
141:12
**supplies** 41:1
**supply** 59:13
60:18 104:11
105:15 107:8,8
139:24
**supplying** 23:6
66:5 104:10

151:17 159:1
**support** 81:6
**supporting**
17:6
**supposed**
123:16
**sure** 3:17 5:5
6:5 7:15,18
8:10 9:6,11
10:18 13:6,9
14:10,18 18:1
18:15 31:10
36:25 39:15,23
40:2 47:7
50:22,25 59:24
64:16 68:24
70:9 110:23
111:9 150:11
159:14
**surprise** 142:5
142:12,19
**surprised** 54:1
146:11
**surprising**
125:22
**suspect** 81:16
**swear** 3:13
**switch** 67:8,10
67:11,19
**sworn** 4:6
170:14
**syllables** 14:6
**system** 41:10
41:14,17
128:24 135:16

135:22,25
**systemic** 32:13
**systems** 19:9
20:7 31:16
73:19

**t**

**t** 92:12,12
164:19 169:3,3
**take** 3:15 4:15
6:14,25 7:11
8:16 9:11,11
10:8,17 22:12
22:18 25:15
30:10 39:1
41:13 46:7,10
50:18 54:21
55:2,3,5,8
63:23 66:20
68:19 70:4
71:6 72:23
75:18 80:6
81:18 83:9
88:4 95:15,23
109:23 110:8
127:20 128:13
128:23 129:5
141:4 150:15
151:21 153:15
162:8
**taken** 10:7
**talk** 14:21
25:19 33:4
42:20,22 70:6
**talked** 22:25
33:20 46:24

52:7 58:16
**talking** 9:3
18:22 57:24
**tank** 31:17,18
37:18 38:3,6,9
41:9,22,23
42:3 62:13
77:24 90:13
135:17 136:5
136:18,21,25
141:1 152:5,7
152:19
**tape** 23:11
**task** 126:15
**team** 56:20
64:22 113:15
114:7 115:2
**technical** 23:20
23:21 24:15
140:15,19
**technology**
20:7 56:6,9
59:21 68:11
135:20 163:7
165:11
**tedious** 101:8
**telemetry** 41:18
41:21 42:13,17
**telephone** 26:3
32:15 35:25
**tell** 16:22 38:5
42:19,23,25
53:1 90:8,14
90:16 95:24
96:19 105:9,11

106:11 120:14
123:18,25
124:17 129:19
133:21 145:18
148:18 149:25
150:16 151:4
153:16 158:5
159:20
**telling** 89:20
122:24 150:17
158:18
**temporary**
48:21 49:11,12
50:4
**ten** 129:10
130:4,25
**tennessee** 1:1
3:9 90:5
**term** 36:20
**terminate**
160:25
**terminated**
53:18 54:7
**terms** 13:5,8
148:20
**testified** 4:6
46:18 87:2
88:7 99:14,23
101:15 103:3
103:21 106:23
107:13,17
108:9 114:14
117:13,17,20
118:21 122:20
125:19 134:6

139:7 147:25
**testify** 4:14
10:9,12,25
11:16 102:23
123:10 160:17
160:20
**testifying** 10:9
**testimony**
10:20 12:8
13:3 139:9
168:9,18 170:8
**texarkana** 67:2
67:6,7 127:24
128:7
**text** 154:4
**tf** 64:3 165:5
**thank** 4:19
15:18 56:16
57:1 72:14
84:8,10 91:7
112:20 121:5
135:13 137:6
156:14 157:4
161:8,13,16,18
162:4,13
**thanks** 4:3
45:21 96:9
98:1 101:4
102:1 111:1
**theirs** 140:2
**thereof** 163:13
**thing** 49:3,4
61:5 63:22
66:11 68:14
74:7 127:7

162:11
**things** 7:2,11
14:22 19:6
43:3 48:22
49:13 51:17
56:7 73:19
79:18 129:23
132:12 148:25
**think** 6:1 11:19
13:2 19:11
26:3 29:2,15
29:25 34:14
35:12 38:14,16
39:14 40:20
41:4,8 43:14
44:24 45:3,5
48:16 49:9,13
50:6,11,25
51:2,22 52:13
54:8,24 59:24
66:3,6 67:7,13
85:7 87:1 88:7
88:23 109:10
109:11 129:8
132:18 140:10
141:18 144:14
144:25 145:9
145:18 147:25
159:12 160:24
161:5
**third** 113:10
155:14
**thought** 6:8
**thousand** 21:18

**thread** 47:9
76:2 77:18
81:11 82:8
**three** 6:9 28:7
30:14 56:20
76:21 100:6
104:20 107:4
125:23 127:25
128:14,16,18
129:8 131:9
135:2 150:1
**thursday** 74:23
**tick** 9:12
**tight** 109:25
**time** 1:13 3:2,3
6:2,4 8:12,17
18:14,18,20
20:1,3,25 24:3
24:8,24 26:5
28:22 30:19
34:9,9 40:21
42:6 44:4,9
46:10 55:9
56:13 58:11
60:12 70:10,18
72:4 76:8 79:6
79:7 84:19
86:2 88:4
95:23 102:5
109:23 110:18
110:22 118:11
120:8,11,18
126:4 129:14
130:1 131:20
133:2,6 134:10

134:13,21
135:1 136:22
145:25 149:5
153:15 156:16
156:22 161:9
161:21 162:3
168:19
**timeframe**
168:8
**times** 6:24
37:21 46:23
53:23 72:2,6
125:23
**title** 23:20 96:6
96:12 102:15
**titled** 96:25
97:1 108:25
112:7 115:11
**today** 4:14 7:14
7:19,20,23
8:12,17 9:6,13
9:16,24 10:7
10:13,19,25
11:4,9,12,16,20
12:9,22,25
13:3,6 18:15
67:9 70:5
75:23 78:8
83:11 146:23
161:14
**today's** 3:3
**told** 26:22
52:24 61:13
105:7 124:2
148:17,22

155:7,8,10
**took** 27:16
32:18 129:4,8
131:3,8,8
140:1
**top** 56:23 73:6
79:16 81:23
97:14
**total** 119:9
**tote** 49:14,20
49:25 50:5
**totes** 75:24
76:3,8
**touch** 37:4
**tower** 67:12,15
67:20,25
**town** 132:8
**townsend** 2:4
3:17,18 4:2
34:5 39:20
40:16 45:10,15
45:20 65:5
70:9 71:19
72:9 78:13
80:1 84:10,12
84:14 87:15,24
92:20,21 93:7
94:22 95:11,14
95:21 96:9,14
97:25 98:9,18
99:22 100:16
100:21,25
101:5,14
102:22 103:2
103:11 105:25

106:8 107:24
109:14,20
110:4 114:3
115:22 118:4
119:5,19 121:4
121:8,17 122:1
122:12 123:6
123:17,23
124:4,10 126:6
126:19 127:2
130:15,16
132:21 133:8
133:14 136:9
137:12 139:2
139:15 141:14
141:23 142:10
142:22 143:2
143:12 144:1
144:11,18
145:4,8,24
150:6 151:13
152:22 153:2
154:13 155:20
156:11 157:3
157:18,23
159:6 160:5
161:3,8,18,25
162:2,9 164:8
**track** 119:9,12
**trader** 134:19
**trail** 129:19,24
130:2,10,18,19
130:20 131:3
134:4

**trained** 94:6
**training** 16:6
  93:13,15,16,23
  94:2,4,5
  117:14 118:6
  118:11,22
**transcribed**
  163:6
**transcript** 2:24
  4:21,23 5:1,4
  9:2,13 162:1
  162:16 163:6
  168:6,20 170:5
  170:8
**transfer** 19:24
  20:1
**transpired** 44:7
  70:13 133:4
**transport**
  139:13
**transportation**
  138:14,22
  139:3 155:22
  156:7
**transported**
  155:24
**travel** 127:13
**traveling** 28:4
  114:16,19
**treating** 62:16
**treatment**
  61:25 66:4
**trial** 4:1 10:9
  60:4,6,9

**trials** 59:13,19
  59:25 60:1,2
  60:11
**tried** 112:25
**trip** 108:22
  131:3
**trips** 130:9,12
  130:18,23
  131:7,8
**troop** 131:6
**truck** 27:10
  37:20,20 38:2
  38:4 39:1,7,23
  39:25 42:24
  67:9 79:19
  158:7
**trucks** 24:2
  31:9,19
**true** 103:16
  118:24 170:8
**trusts** 134:15
**truthfully**
  10:13,25
  145:13
**try** 7:14,23,24
  8:8,24 12:24
  26:22 46:5
  54:19 56:22
  62:14 63:22
  68:17 75:17
  87:17 100:25
  110:18 128:4
**trying** 10:13,18
  10:21 51:12
  67:5 79:5

89:13 101:1
  109:10,11
  127:18
**tuesday** 132:5
  132:7
**turn** 14:20
  16:11 84:9
**turning** 30:9
**twice** 26:4
**two** 5:22 21:18
  33:22,23 35:12
  39:8 50:21
  51:4 56:19
  61:14 67:1,16
  75:18 81:8,10
  83:2 88:8
  112:3 127:24
  128:12,14,16
  128:18 129:8
  135:2 150:1
  152:22 153:17
  153:19 154:11
**type** 81:6
**types** 34:3
  47:13,15 48:2
  48:12 50:5
**typical** 49:15
  62:12,13
  128:16
**typically** 33:17
  36:3,22 49:6
  50:2 68:23
  69:1 84:1
  127:21

**u**

**ultimately**
  23:13 138:23
**um** 7:11
**umbrella** 104:9
  104:17,25
**under** 11:14
  84:16 105:2
  106:16 122:9
  154:21
**undergo** 93:12
  118:10 157:12
  157:13
**undergone**
  157:7
**undergrad**
  15:22 16:13
**underscore**
  81:24
**understand**
  7:22,22 8:1,3,8
  9:18 10:6,18
  11:4 13:11
  33:11 34:21
  35:9 38:18
  40:17 77:17
  98:1 113:9
  129:23 142:11
  144:22
**understandable**
  15:9
**understanding**
  13:7 33:10
  40:22 113:21
  127:18 138:3

145:17 150:19
154:7
**understood**
33:11 34:24
137:6
**undertake**
130:23
**unemployed**
17:12
**unhappy** 24:1
**unique** 35:5
**united** 1:1 3:8
92:24 104:12
106:12,24
107:2,14 160:7
**units** 19:11
**universe** 126:3
**university**
15:23 98:20,21
99:1,3,6
**unloaded** 158:8
**unloading** 31:9
39:24
**unlocking**
39:25
**unusual** 62:22
**updated** 134:3
**uploaded**
126:22 150:7
**uploading**
109:22
**usa** 129:19,24
130:2,10,18,19
130:20 131:3

**usage** 37:19
**use** 13:6 46:17
87:16,18 90:8
113:3,6 141:9
**used** 33:10
111:16 166:8
168:20
**using** 15:16
78:1 163:7
**usually** 31:24
35:23 42:22
**utilized** 20:15

**v**

**v** 168:4 169:1
170:1
**vacation**
114:21
**vaguely** 73:11
111:2 137:22
**value** 143:4,6,8
143:11,20,22
144:5,9,12,13
146:24
**vance** 146:18
**vanished**
134:15
**variables** 43:4
**various** 16:24
20:14,17 140:1
**vehicles** 92:5,7
**vein** 11:22
49:13
**vendors** 154:16
155:23,24
156:8,16,23

**verify** 103:14
168:9
**veritext** 168:14
168:23
**veritext.com.**
168:15
**versus** 3:7
**vicinity** 25:8
146:9
**vicksburg**
19:16 20:20,22
20:24 37:25
**video** 3:5
**videographer**
2:16 3:1 44:3,4
44:9 70:10,18
133:2,6 161:21
**videotaped**
1:10
**view** 15:15
**violette** 150:4
150:17 151:21
151:25 167:11
**violette's**
150:23
**virginia** 108:3
108:7 132:17
132:19
**visit** 39:15 51:2
64:18 65:1,12
65:18 94:7,11
94:23 108:10
108:13
**visited** 51:1,17
94:24 95:1

**visiting** 65:11
92:2 132:9
**visits** 120:21
**voice** 43:17
163:10
**volunteer**
129:24 130:7
**volunteering**
130:2
**vs** 1:5

**w**

**w** 1:10 3:6 4:5
4:18,18 164:4
168:1,5 169:2
169:24 170:2,4
170:12
**wait** 39:8 90:8
**waived** 162:16
**want** 3:15 4:22
9:1,10 13:6
25:19 37:25
45:17 69:10
77:16 96:2,3
101:2 109:21
132:24 162:1
**wanted** 26:10
38:2 45:1
160:25
**wanting** 32:21
**wants** 4:20
**warehouse**
107:20 108:2,6
108:21
**warehouses**
91:11 107:1,14

**warehousing**
107:9,12
**warn** 95:22
**washington**
25:10
**waste** 110:22
**wastewater**
61:25
**water** 61:19
62:16 66:4
**way** 8:4 10:17
35:5 40:13
47:25 49:15
79:19 139:13
141:1
**ways** 18:10
139:19
**wdaley** 2:13
**we've** 40:7
43:25 50:9
63:22 68:14
71:1 132:22
**weather** 43:3
43:19
**website** 70:23
**wednesday**
64:18
**week** 127:14,20
127:23 128:2
128:12,14,19
128:20 130:3,4
132:1 134:23
**weekend** 73:18
74:1 128:22

**weekly** 130:2
134:11,21
**weeks** 12:14
147:22
**went** 8:20
17:10,14 19:23
21:6 33:20
93:14 111:12
140:11 150:25
**western** 1:1,2
3:9,10
**wet** 23:6,8,12
86:16 89:25
90:1
**whatever's**
45:18
**white** 106:21
106:22 158:9
158:24
**william** 2:10
3:20
**willing** 160:19
**wilmington**
132:18
**window** 68:15
**wire** 160:7
**witness** 1:14
3:24 4:20 14:2
34:6 40:17
43:18 64:6
65:6 80:2,13
83:5 93:6
94:20 96:11
97:23 98:7,17
99:20 100:15

100:24 101:13
102:21 103:1,9
105:24 106:7
107:22 109:18
113:24 115:21
118:1 119:3,17
121:6,16,25
122:11 123:5
123:13,21
126:9,13 139:1
141:12,21
142:9,21,25
143:10,25
144:9,16 145:7
145:23 154:10
156:10 157:2
157:17 159:5
160:2 161:2,17
163:14 168:8
168:10,12,19
**work** 8:6 19:23
21:25 27:8
30:25 32:13
36:14 86:13
88:11,13,16,20
88:22,24 93:3
95:4 101:24
127:19 129:14
130:7 133:23
144:6,6
**worked** 6:15
16:18 17:3
24:25 28:22
33:19 57:11,14
88:18 93:24

99:25 100:3
102:9,12 106:5
120:18 126:4
131:20
**working** 84:22
84:22 85:4,14
85:17,20 86:8
86:10 99:5
101:19 110:14
118:12 119:14
129:11 133:9
**works** 6:13
162:3
**world** 89:1
146:15
**worth** 15:21
144:14
**wow** 150:18
**write** 109:7
**writing** 89:9
**wrong** 10:17
24:17 29:4
34:18

| x |
|---|
| **x** 10:2 164:1,19 |

| y |
|---|

**y** 10:2
**y'all** 78:1
**yeah** 6:4,15
15:8 19:2
23:17 24:22,23
26:25 32:11
35:10 40:20
45:10 47:7

55:8 61:24
62:15 68:8
82:23 83:8
85:3 93:19
106:10 119:24
129:13 162:9
**year** 15:5 18:18
79:6 85:1
94:14 114:4
131:19,22
142:7 144:14
145:20 146:9
149:21
**years** 12:5 17:8
17:13 18:17
19:1,3 20:20
20:21 21:4
24:13,16,17
28:7 30:10,14
50:23 142:3
152:14 157:8
157:15
**yep** 121:20

**z**

**zeros** 81:24
**zoom** 1:11,16
2:4,11,16 3:11
163:7
**zurich** 1:6

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by him unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 30 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion
to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign
require rejection of the deposition in whole or in
part.


DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.


Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.