# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

---

INTERNATIONAL PAPER
COMPANY,

     Plaintiff,

v.                                                  Case No. 2:22-cv-02789-MSN-cgc
                                       JURY DEMAND

BEAZLEY INSURANCE COMPANY,

     Defendant.

---

## ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF INTERNATIONAL PAPER COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AND
## GRANTING IN PART AND DENYING IN PART DEFENDANT BEAZLEY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court are Plaintiff International Paper Company's ("Plaintiff") Motion for Partial Summary Judgment, ("Plaintiff's Motion," ECF No. 94), and Defendant Beazley Insurance Company's ("Defendant") Motion for Summary Judgment, ("Defendant's Motion," ECF No. 99). Defendant filed a response in opposition to Plaintiff's Motion on February 27, 2024, (ECF No. 118), and Plaintiff responded to Defendant's Motion the same day, (ECF No. 114). Parties filed Replies in further support of their Motions on March 12, 2024. (ECF Nos. 121 & 124). On April 19, 2024, Defendant filed a Notice of Supplementation concerning a case on which it relied in its Motion, (ECF No. 152), to which Plaintiff responded on April 22, 2024, (ECF No. 155). The Court also heard argument on both Motions at the Pre-trial Conference on April 19, 2024. For the reasons below, both Motions are **GRANTED IN PART AND DENIED IN PART**.

## FINDINGS OF FACT[1]

Plaintiff "is one of the world's leading producers of fiber-based packaging, pulp and paper." (ECF No. 1 at PageID 4.)  In 1987, Mr. Sitaraman Jagannath ("Mr. Jagannath") began working for Plaintiff and, from 2013 to 2019, "was the Sourcing Manager for [Plaintiff's] Specialty Chemicals Group . . . [which] provided chemicals to [Plaintiff's] mills to operate the mills and provide certain attributes to the products manufactured." (ECF No. 115 at PageID 7692.)  As part of his job duties, Mr. Jagannath implemented and supervised the purchase of these specialty chemicals.  (ECF No. 119 at PageID 8561.)

Relevant to these purchases, Plaintiff operated a "diverse supplier program" through which Plaintiff would do business with diversity or minority-owned businesses.  (ECF No. 96 at PageID 2836.)  The program involved two types of business arrangements with these businesses: Tier 1 and Tier 2.  (*Id.*)  Under a Tier 1 arrangement, the diversity supplier would obtain goods and services from a "majority supplier," mark up the price, and then supply those goods and services to Plaintiff directly.  (*Id.* at PageID 2836.)  Plaintiff, in turn, expected that the diversity supplier would "earn the mark-up by providing value-added services to [Plaintiff] . . . ."  (*Id.* at PageID 2836–37.)[2]  Under a Tier 2 arrangement, however, the majority supplier would provide goods and services to Plaintiff directly, but use a diversity supplier for a value-added service during their process.  (*Id.* at PageID 2837.)  The diversity supplier would receive a commission for its service

---

[1] Unless otherwise stated, the facts discussed are undisputed and are drawn from the Policy (available at ECF No. 102-1), parties' Statements of Undisputed Material Facts, (ECF Nos. 96, 100, 116, & 120), and the responses thereto, (ECF Nos. 115, 119, 122, & 126).  The same fact is often alleged in multiple of the foregoing documents, but for efficiency, the Court may cite only one document without parallel citations to others.

[2] Defendant takes issue with the quoted phrasing of this fact, suggesting that it should read that Plaintiff "expected that 'the Tier 1 diversity supplier markup will be *offset* by value-added services to [Plaintiff]."  (ECF No. 119 at PageID 8562.)  The Court does not consider this dispute material.

to the majority supplier. (*Id.*)

Pursuant to this process, Mr. Jagannath arranged for Plaintiff to purchase specialty chemicals from Diversified Global Sourcing, Inc. ("DGS") and Mid-South Diversity Group, Inc. ("Mid-South"). (*Id.*)[3] These companies were both Tier 1 and Tier 2 suppliers. (*Id.*) The problem with Mr. Jagannath's arrangements, of course, was that his half-brother—Shiv Kumar Seetharaman ("Mr. Seetharaman") owned and controlled both DGS and Mid-South. (*Id.* at PageID 2835–36.)[4] Indeed, Plaintiff had a conflict of interest policy in place that barred "an employee" from "award[ing] [Plaintiff] business to a firm owned or controlled by his or her family." (*Id.* at PageID 2835.)[5]

Meanwhile, Defendant issued an insurance policy ("Policy") to Plaintiff for the period of

---

[3] Defendant did not admit that Mr. Jagannath is the individual who arranged for Plaintiff's purchase of specialty chemicals from DGS and Mid-South. (ECF No. 119 at PageID 8562 ¶ 25.) Defendant did not support this dispute with a specific citation to the record or other showing, however. *See* Fed. R. Civ. P. 56(c)(1). Furthermore, Defendant stated in its denial letter that Mr. Jagannath "participated in contract negotiations with his half-brother, [Mr. Seetharaman], which led to the purchase of chemicals from two minority-owned companies (DGS and Mid-South) that participated in [Plaintiff's] diverse supplier program and were owned and/or controlled by [Mr. Seetharaman]." (ECF No. 117-1 at PageID 7709–10.) For these reasons, the Court does not consider this statement genuinely disputed for purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2).

[4] Defendant declined to admit that Mr. Jagannath and Mr. Seetharaman are half-brothers. (ECF No. 119 at PageID 8561 ¶ 17.) It argued that Plaintiff's support for this alleged fact—which included an Affidavit from Federal Bureau of Investigation ("FBI") Agent Marcus Vance indicating that Mr. Jagannath admitted that he and Mr. Seetharaman share the same mother—showed only that Agent Vance believed them to be half-brothers. (*Id.*) But Defendant did not challenge the Affidavit's admissibility in response to Plaintiff's Motion or Statement of Undisputed Facts. Nor did it cite to materials in the record to raise a genuine dispute as to this familial relationship. In fact, Defendant has acknowledged that its own investigation found that the two are half-brothers. (ECF No. 117-1 at PageID 7709–10.) The Court thus does not consider this alleged fact genuinely disputed for purposes of summary judgment.

[5] Defendant adds that these quotes come from an example in the Policy illustrating "a misuse of influence." (ECF No. 119 at PageID 8561.)

July 1, 2019 to July 1, 2020. (*Id.* at PageID 2833.)  Among its relevant provisions, it included a

$15,000,000 coverage limit for "Employee Dishonesty" to cover "direct financial loss" from

"Employee Theft," which the Policy defined as "the unlawful taking of Money, Securities or

Property to the deprivation of an Insured by an Employee, whether identified or not, acting alone

or in collusion with others to obtain financial benefit for the Employee." (*Id.* at PageID 2833–

34.)[6]  This $15,000,000 limit of liability was subject to a $1,000,000 deductible. (*Id.* at PageID

2833.)

In addition, the Policy contained a $500,000 coverage limit for "Expense Coverage" to

cover "Expenses incurred by the Insured and that results from any Loss covered hereunder." (*See*

ECF No. 102-1 at PageID 4490.)  The Policy defined "Expenses" as:

> [R]easonable expenses, other than an Insured's internal corporate costs (such as
> Employee remuneration or Employee expenses), incurred by an Insured with the
> Underwriters' prior written consent to . . . establish the existence and amount of a
> covered loss in excess of the Deductible; reproduce Data; or . . . repair or replace
> to a substantially similar standard any safe or vault damaged as a result of Robbery
> or Safe Burglary.

(ECF No. 102-1 at PageID 4492; ECF No. 119 at PageID 8560 ¶ 6.)

The Policy's subrogation provision provided:

> In the event of any payment under this Policy, [Defendant] shall be subrogated to
> the extent of such payment to the Insured's rights of recovery and the Insured shall
> execute all papers required and shall do everything necessary to secure and preserve
> such rights, including the execution of such documents necessary to enable
> [Defendant] effectively to bring suit in the name of the Insured."

(ECF No. 102-1 at PageID 4505; ECF No. 96 at PageID 2834.)

Its "Recoveries" provision stated as follows:

> Recoveries, whether effected by the Underwriters or by the Insured, less the cost
> of recovery, shall be distributed as follows:

---

[6] As Defendant notes, this language does not constitute the entire clause from which it is
drawn.  (ECF No. 119 at PageID 8559.)

    1.      first, to the Insured for the amount of Loss otherwise covered but in excess of the Limits of Liability;

    2.      second, to the Underwriters for the amount paid to the Insured for covered Loss;

    3.      third, to the Insured for the Deductible; and

    4.      fourth, to the Insured for Loss specifically excluded hereunder.

Recovery from reinsurance or indemnity of the Underwriters shall not be deemed a recovery hereunder.

(ECF No. 102-1 at PageID 4505.)

Regarding exclusions, the Policy contained several that are relevant to this matter:

**Indirect or Consequential**

The Underwriters shall not be liable for Loss or Expenses arising out of indirect or consequential loss of any kind except for covered Expenses under the Expense Coverage insuring agreement.

. . .

**Legal Fees, Costs or Expenses**

The Underwriters shall not be liable for Loss or Expenses incurred or paid by an Insured in defending or prosecuting any legal proceeding or claim, provided that this Exclusion shall not apply to the coverage provided under the Expense Coverage insuring agreement[.]

. . .

**Voluntary Exchange or Purchase**

The Underwriters shall not be liable for Loss or Expenses arising out of the Insured knowingly having given or surrendered Money, Securities or Property in any exchange or purchase with a Third Party, not in collusion with an Employee . . . .

. . .

**Affiliates and Prior Employees**

The Underwriters shall not be liable under the Employee Dishonesty, Client Property Coverage or Expense Coverage insuring agreements for loss or damage sustained by any Insured caused by:

    1.      any agent, broker, factor, commission merchant, consignee,

contractor, independent contractor, subcontractor, or similar person or entity; or

2.    any Employee acting alone or in collusion with any other employee more than 30 days following the termination of such Employee.

(ECF No. 102-1 at PageID 4495–97.)

On October 27, 2019, Plaintiff's personnel learned that Mr. Jagannath and Mr. Seetharaman might be related, (ECF No. 96 at PageID 2838,[7] and Mr. Jagannath stopped working for Plaintiff on November 20, 2019.[8]  The FBI arrested Mr. Jagannath and the U.S. Attorney's Office for the Western District of Tennessee filed a criminal complaint against him in December 2019. (*Id.*)  That same month, Plaintiff notified Defendant of a potential claim of "employee theft," alleging that Mr. Jagannath had received a financial benefit from his arrangements with DGS and Mid-South while acting as an employee of Plaintiff.  (ECF No. 100 at PageID 4454.)

A little under a year later, Plaintiff filed a civil suit against Mr. Jagannath, Mr. Seetharaman, DGS, Mid-South, "and other related companies" seeking over $30,000,000 in compensatory damages.   (ECF No. 96 at PageID 2839.)  Plaintiff notified Defendant of the potential settlement and invited Defendant to participate in it.  (ECF No. 116 at PageID 7704.)[9]  Defendant declined that offer, however, (*id.*), and Plaintiff ultimately settled the matter for $15,000,000 ("Plaintiff's Settlement").  (ECF No. 96 at PageID 2839.) Defendant advised Plaintiff multiple times that it reserved its rights, including its subrogation rights, under the Policy, but

---

[7] Defendant denied the portion of Plaintiff's fact relating to the alleged discovery of the employee theft scheme but did not deny the timing of Plaintiff's discovery that Mr. Jagannath and Mr. Seetharaman might be related.  (*See* ECF Nos. 96 at PageID 2838 ¶ 27 & ECF No. 119 at PageID 8562 ¶ 27.)  The Court thus deems this fact undisputed.

[8] Parties disagree about whether Mr. Jagannath was fired or resigned.  (*See* ECF No. 96 at PageID 2838; ECF No. 119 at PageID 8562.)  The Court does not find this fact material.

[9] For further reference, these discussions are available at ECF No. 126-4.

never objected to Plaintiff's Settlement.  (ECF No. 116 at PageID 7704; ECF No. 126 at PageID 8979.)  As part of Plaintiff's Settlement, Mr. Jagannath and Mr. Seetharaman "agree[d] that DGS and Mid-South received funds from [Plaintiff] pursuant to their contracts with [Plaintiff] and its suppliers and further agree[d] that some of those funds were transferred to accounts controlled by [Mr. Jagannath]."  (ECF No. 96 at PageID 2839.)[10]

After Plaintiff's Settlement, Plaintiff filed this suit against Defendant because Defendant had not provided coverage for Mr. Jagannath's conduct.  (*Id.*)  Plaintiff claims the following five categories of losses resulting from the alleged scheme:

(1) Tier 1 "Overpayments," for specialty chemicals in the amount of mark-ups collected by DGS and MidSouth ($26,843,769);

(2) Amounts of "Settlement Payments" that IP was required to make to majority suppliers that had not been paid by DGS and Mid-South for chemical products delivered to IP ($2,703,175);

(3) Tier 2 "Commissions" collected and retained by DGS and Mid-South ($1,938,966);

(4) "Legal Fees" incurred by IP in pursuing DGS and Mid-South for collection of stolen funds ($844,560); and

(5) "Expenses" incurred by IP to prepare its insurance claim ($958,599).

(*Id.* at PageID 2840.)[11]

Defendant filed an Answer to Plaintiff's Complaint on December 7, 2022 in which Defendant raised fifteen affirmative defenses.  (ECF No. 15 at PageID 78–81.)  On January 30,

---

[10] Defendant does not contest that this language appears in Plaintiff's Settlement.  (ECF No. 119 at PageID 8563.)  And while Defendant perhaps suggests it is not admissible, it does not specify the grounds for such inadmissibility.  (*See* ECF No. 101 at PageID 4473.)  The Court will therefore consider it for purposes of summary judgment.

[11] Defendant admits this statement "only to the extent that the sources cited list these five categories of alleged losses claimed by [Plaintiff]."  (ECF No. 119 at PageID 8563.)  Since it does not dispute that Plaintiff is claiming these categories of losses, the Court considers this statement undisputed.

2024, Plaintiff filed its Motion for Partial Summary Judgment with respect to twelve of them. (ECF No. 94 at PageID 2470.)  Defendant filed its Motion for Summary Judgment the same day, seeking summary judgment "either in whole or in part, on [Plaintiff's] claims because there are no genuine issues of material fact in dispute and [Defendant] is entitled to judgment as a matter of law."  (ECF No. 99 at PageID 4446.)

## JURISDICTION & CHOICE OF LAW

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff is a corporation incorporated in New York with its principal place of business in Memphis, Tennessee.  (ECF No. 1 at PageID 2.)  Defendant is an insurance company incorporated in Connecticut with its principal place of business in Connecticut.  (*Id.*)  Further, the amount in controversy exceeds $75,000.  (*Id.*)  The parties agree that Tennessee law governs their dispute, so the Court will not conduct a choice-of-law analysis *sue sponte*.  S*ee GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment — and the Court to grant summary judgment — "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all

inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56).  The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial.  *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010).  A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden"

applicable to the case. *Id.* at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252–53.

Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327.

## <u>DISCUSSION</u>

### I.     Subrogation, Made Whole Doctrine, and Defendant's Eleventh, Twelfth, Thirteenth, and Fourteenth Affirmative Defenses

Defendant moves for summary judgment because it contends that Plaintiff "materially breached" the subrogation provision when Plaintiff "executed a *complete release* of those alleged to be responsible for the loss that is the subject of this action" and thereby "wholly extinguished" Defendant's subrogation rights under the Policy. (ECF No. 101 at PageID 4461, 4469–70.) In Plaintiff's view, it could not have violated the Policy in this way because Defendant's subrogation rights had not arisen by the time of Plaintiff's Settlement and, in fact, have never arisen. (ECF No. 114 at PageID 7443.) Plaintiff argues in the alternative that Defendant waived any subrogation rights it might have had and further seeks summary judgment on Defendant's eleventh, twelfth, thirteenth, and fourteenth affirmative defenses based on its interpretation of the subrogation

provision's requirements and its invocation of Tennessee's made whole doctrine.  As stated in

Defendant's Answer to Plaintiff's Complaint, those defenses are as follows:

ELEVENTH AFFIRMATIVE DEFENSE

> Plaintiff's claims are barred in whole or in part under the Recoveries provision in the [] Policy . . . .

TWELFTH AFFIRMATIVE DEFENSE

> Plaintiff's claims are barred to the extent Plaintiff has breached any condition precedent to coverage under the [] Policy, including but not limited to taking any action which in any way increases the Underwriters' exposure under the [] Policy.

THIRTEENTH AFFIRMATIVE DEFENSE

> Plaintiff's claims are barred to the extent Plaintiff has failed to mitigate any damages.

FOURTEENTH AFFIRMATIVE DEFENSE

> Plaintiff's claims are barred in whole or in part by the equitable doctrines of waiver, estoppel, unclean hands and laches.

(ECF No. 15 at PageID 80–81.)

**A.      Subrogation and the Made Whole Doctrine**

In the insurance context, "subrogation allows the insurer to 'stand in the shoes' of the

insured and assert the rights the insured had *against a third party*." *York v. Sevier Cnty. Ambulance*

*Auth.*, 8 S.W.3d 616, 618–19 (Tenn. 1999) (quoting *Wimberly v. Am. Cas. Co.*, 584 S.W.2d 200,

203 (Tenn. 1979)).  As noted, Plaintiff contends that Defendant has no subrogation rights.  Its basis

for that argument is twofold: (1) under Tennessee's made whole doctrine, those rights do not arise

unless and until the insured has been "made whole," and (2) the language of the Policy's

subrogation provision requires that Defendant make payments under the Policy before it can claim

any right to subrogation.  (ECF No. 114 at PageID 7443 & 7444 n.25.)  Defendant maintains that

the made whole doctrine does not apply because Plaintiff breached the subrogation provision in

11

the Policy.  (ECF No. 101 at PageID 4472; ECF No. 124 at PageID 8969 n.5.)

The Court finds that the made whole doctrine applies regardless of any alleged violation of Defendant's subrogation rights under the Policy.  The Tennessee Supreme Court has directly addressed the interplay between the made whole doctrine and a subrogation provision in an insurance policy.  In *Abbott v. Blount Cnty.*, 207 S.W.3d 732 (Tenn. 2008), the Court surveyed its prior cases on this issue, beginning with its decision in *Wimberly*.  It summarized the conclusions in *Wimberly* as follows:

> Our modern made-whole doctrine jurisprudence began with our decision in Wimberly v. Am. Cas. Co., 584 S.W.2d 200 (Tenn. 1979). In that case, we concluded that subrogation is a doctrine that is generally governed by equitable principles rather than terms of the contract giving rise to the subrogation claim. Id. at 203. We noted that the primary purpose of subrogation is "to prevent either the unjust enrichment of the insured through a double recovery or a windfall benefit to the principal tortfeasor." Id. Because there is no threat of double recovery if the insured has not been made whole, we held that the insurer has no right to recover until the insured is made whole. Id. at 203-04.

*Abbott*, 207 S.W.3d 732, 734 (citing *Wimberly*, 584 S.W.2d 200).  The *Abbott* Court then addressed *Eastwood v. Glens Falls Ins. Co.*, 646 S.W.2d 156 (Tenn. 1983), which was the "next case addressing the made-whole doctrine."  *Id.*  In *Eastwood*, the Court took a different approach than the *Wimberly* Court, relying on the contractual subrogation provisions rather than the equitable nature of subrogation to hold that an insured could not settle a claim absent the insurer's consent where there was a subrogation agreement and the settlement and insurance proceeds did not make the insured whole.  *Id.*  But the *Abbott* Court was clear in finding that *Eastwood* "ha[d] been abrogated by subsequent opinions of [the Tennessee Supreme Court]," which had "returned to the equitable principles" set forth in *Wimberly*.  *Id.* at 735.  Those cases—*York v. Sevier Cnty. Amb. Auth.*, 8 S.W.3d 616 (Tenn. 1999) and *Health Cost Controls, Inc. v. Gifford*, 108 S.W.3d 227 (Tenn. 2003)—concluded that "an insurer is not entitled to reimbursement until an insured is made whole" and specified that *Wimberly*'s equitable principles "would control 'regardless of what

language is contained in the contract.'"  *Id.* (citing *York*, 8 S.W.3d at 619–21 and *Health Cost Controls*, 108 S.W.3d at 229–31).  The *Abbot* Court also emphasized that *York* had "stressed the importance of the made-whole doctrine by noting that 'a prerequisite to the right of subrogation is the full compensation of the insured. In effect, an attempt to contract away this prerequisite . . . would defeat the right itself.'"  *Id.* (quoting *York*, 8 S.W.3d at 619.)

Based on these cases, the *Abbott* Court held that the made whole doctrine does not depend on the language in an insurance contract and reiterated that an insured cannot contract away its right to be made whole.  *Id.*  In further explanation, the Court noted that to hold otherwise "would allow the insurer to withhold consent from any settlement that does not make the insured whole and thereby compel the insured to seek a larger award at trial."  *Id.*

Defendant in this case challenges the aforementioned precedent by referencing *Hayes Fam. P'ship v. Tenn. Farmers Mut. Ins. Co.*, 683 S.W.3d 754 (Tenn. Ct. App. 2023).[12]  In *Hayes*, the plaintiff owned a commercial building that was covered by an insurance policy issued by the defendant.  683 S.W.3d at 755.  One day, an individual drove into the plaintiff's building, leading

---

[12] *Hayes* was an unreported decision until after briefing had closed on parties' summary judgment motions.  Following its publication, parties submitted their joint proposed pretrial order and cited *Hayes* as a reported decision after all.  They subsequently advised the Court of their positions on the significance of that publication.  (ECF No. 152 & 155.)  Having considered parties' briefs and the cases cited therein, the Court concludes that, as it applies to the made whole doctrine, *Hayes* is persuasive authority, but not binding on the Court for several reasons.  It is distinguishable on its facts, and there has been no showing of prejudice.  Furthermore, while the Tennessee Supreme Court denied appeal in *Hayes*, *see Hayes Fam. P'ship v. Tenn. Farmers Mut. Ins. Co.*, No. W2022-01209-SC-R11-CV, 2023 Tenn. LEXIS 398 (Tenn. Dec. 19, 2023), generally, "'only the law as expressed by the highest court of a State is binding on [the] Court in a diversity action.'"  *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 362 (6th Cir. 2014) (quoting *Ruth v. Bituminous Cas. Corp.*, 427 F.2d 290, 292 (6th Cir. 1979)).  To be sure, the Court may rely on published decisions of a state intermediate court.  *Ruth*, 427 F.2d at 292 (citing *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940)).  But it need not do so if it is "convinced that the highest state court would decide differently."  *Id.*  For the reasons discussed, (*see* discussion *infra* Sec. I.A), the Court is convinced that the Tennessee Supreme Court would reach a different decision from the one in *Hayes* insofar as it found the made whole doctrine not to apply in that case.

the plaintiff to report the damage to the defendant.  *Id.*  After that report, the plaintiff hired a firm to repair the building and, in doing so, assigned the defendant's rights, benefits, and causes of action under the policy to the firm.  *Id.*  Upon receipt of $25,000 from the driver's insurance company, the plaintiff released all claims against the driver and his insurer.  *Id.* at 755–56.  The defendant was unaware of any of these actions by the plaintiff.  *Id.* at 756.  When the plaintiff subsequently went to the defendant to claim $207,928.70 in damages, the defendant advised that there was no coverage because the plaintiff had forfeited it by assigning the defendant's rights to the firm and by releasing the driver, since such release cut off the defendant's subrogation rights under the policy.  *Id.*

A lawsuit followed, and the defendant ultimately moved for judgment on the pleadings given the plaintiff's aforementioned actions.  *Id.* at 757.  The plaintiff responded that the defendant did not have any subrogation rights because the plaintiff had not been "made whole" as a result of the settlement.  *Id.*  The trial court agreed with the plaintiff and held that, under the made whole doctrine, the release of the driver did not bar the plaintiff from pursuing recovery under the policy. *Id.*  On appeal, the Tennessee Court of Appeals reversed.  Citing three cases[13] that Defendant also cites in this matter, the Tennessee Court of Appeals held that the trial court erred in finding that the made whole doctrine applied because the plaintiff forfeited any rights he had under the policy as a result of his material breach.  *Id.* at 762–63.

This Court is unwilling to give *Hayes* the weight Defendant wants because it finds that the Tennessee Supreme Court would find differently than *Hayes* on this issue.  For one, *Hayes* does

---

[13] Those cases are *Kentucky Nat'l Ins. Co. v. Gardner*, 6 S.W.3d 493 (Tenn. Ct. App. 1999); *Aetna Cas. & Surety Co. v. Tenn. Farmers Mut. Ins. Co.*, 867 S.W.2d 321 (Tenn. Ct. App. 1993), and *Doss v. Tenn. Farmers Mut. Ins. Co.*, No. M2000-01971-COA-R3-CV, 2001 Tenn. App. LEXIS 906, 2001 WL 1565883 (Tenn. Ct. App. Dec. 10, 2001).

not reference *Abbott*.  In fact, in reaching its decision on the made whole doctrine, the *Hayes* Court relied on three cases that predate *Abbott*, one of which explicitly relied on *Eastwood*.  *See id.* at 763.  Additionally, the Court rejects Defendant's suggestion that *Abbott* does not apply here because Plaintiff did not obtain written consent to settle.  (*See* ECF No. 118 at PageID 8555.)  Defendant relies on *Thorpe v. Allstate Ins. Co.*, CA NO. 1258, 1989 Tenn. App. LEXIS 438 (Tenn. Ct. App. June 9, 1989), to support this argument because the Court in that case adopted the narrow view of *Wimberly* as only standing for the proposition that an insurer cannot enforce its subrogation rights when it has consented to a settlement amount that, when added to the sums paid under the policy, do not make the insured whole.  1989 Tenn. App. LEXIS 438, at *5.  But in reaching that conclusion, the *Thorpe* Court relied on *Eastwood* which, as discussed, the *Abbott* Court criticized for its narrow approach and determined had been abrogated by subsequent decisions.  Plaintiff is not foreclosed from invoking the made whole doctrine.[14]

### B.   Eleventh Affirmative Defense

Defendant's eleventh affirmative defense invokes the Recoveries provision, which governs the order of distribution following a recovery.  It provides:

> Recoveries, whether effected by the Underwriters or by the Insured, less the cost of recovery, shall be distributed as follows:
>
> 1.   first, to the Insured for the amount of Loss otherwise covered but in excess of the Limits of Liability;
>
> 2.   second, to the Underwriters for the amount paid to the Insured for covered Loss;
>
> 3.   third, to the Insured for the Deductible; and

---

[14] *Hayes* also stated that the made whole doctrine was "inapplicable because [the insurer] ha[d] not remitted any payments to or for the benefit of [the insured] and is not seeking to recover any damages from [the tortfeasor] or his insurer."  683 S.W.3d at 763.  This Court does not necessarily disagree, but notes that the made whole doctrine could still apply in this case if a jury finds there is coverage and assess damages which make Plaintiff whole.

4.      fourth, to the Insured for Loss specifically excluded hereunder.

Recovery from reinsurance or indemnity of the Underwriters shall not be deemed a recovery hereunder.

(ECF No. 102-1 at PageID 4505.)

Plaintiff maintains that Defendant cannot invoke this provision to claim entitlement to any of the $15 million from Plaintiff's Settlement because of the made whole doctrine.  (ECF No. 95 at PageID 2485.)[15]  More specifically, Plaintiff argues that it can recoup all of its losses from the settlement amount because the total loss it has incurred exceeds $15 million.  (ECF No. 121 at PageID 8737.)  Defendant reiterates its position that the made whole doctrine does not apply because Plaintiff destroyed its subrogation rights.  (ECF No. 118 at PageID 8556.)

The Court has agreed with Plaintiff that the made whole doctrine applies if Plaintiff is ultimately made whole in fact.  But because there are genuine disputes of material fact as to the amount of loss Plaintiff sustained and thus whether Plaintiff has been or will be made whole, the Court **DENIES** Plaintiff's request for summary judgment on that defense.

### C.      Waiver of Defendant's Right of Subrogation

Plaintiff "has a right to be fully compensated before subrogation or reimbursement is allowed" no matter the contractual language.  *Abbott*, 207 S.W.3d at 736.  But that does not absolve the Court from resolving parties' disagreements over Defendant's subrogation rights or the alleged waiver of them.  *See id.* (finding that a genuine dispute of material fact remained as to whether the

---

[15] Plaintiff also points to deposition testimony from Defendant's corporate-designee witness that could be read as a concession that Defendant is not entitled to any of Plaintiff's Settlement funds.  (ECF No. 95 at PageID 2484.)  The Court agrees with Defendant that this deposition testimony could be read to mean that Defendant could not obtain those funds *presently* but might be able to access them should Plaintiff be found to have a covered claim.  (*See* ECF No. 118 at PageID 8556.)  For this reason, the Court does not consider this testimony dispositive of Plaintiff's request for summary judgment on this affirmative defense.

defendant had waived its subrogation and reimbursement rights even though the made whole doctrine applied).  For example, a jury could find that Plaintiff incurred less than $15 million in loss, which would revive parties' arguments over subrogation if damages were awarded and Plaintiff made whole.  Moreover, if Defendant is correct that Plaintiff has forfeited coverage under the Policy by entering into Plaintiff's Settlement, then the jury need not decide any questions of fact related to parties' disagreements at summary judgment concerning coverage.

In Tennessee, "*any* contractual provision of a policy of insurance, whether part of an insuring, exclusionary, or forfeiture clause, may be waived by the acts, representations, or knowledge of the insurer's agent."  *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003) (quoting *Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 13 (Tenn. 1991)).  The insured bears the burden of proving waiver, *id.*, which "is a voluntary relinquishment or renunciation of a known right . . . [and] may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct; or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive."  *Baird v. Fidelity-Phenix Fire Ins. Co.*, 178 Tenn. 653, 665 (Tenn. 1942).  "Whether there was such a waiver or course of conduct depends, in the last analysis, upon all of the facts and circumstances of each case."  *Rutherford v. Tennessee Farmers Mut. Ins. Co.*, 608 S.W.2d 843, 846 (Tenn. 1980) (reinstating the trial court's determination that the undisputed facts established that the insurer waived provisions requiring written consent to settle with a third party).

The Court notes at the outset that parties agreed during oral argument that the issue of waiver—in light of the undisputed facts relevant to waiver in this case[16]—should be determined

---

[16] As discussed with parties at oral argument, these facts are primarily those relating to Plaintiff's notice to Defendant of the potential for Plaintiff's Settlement and Defendant's response

by the Court at summary judgment.  Having considered those undisputed facts, the Court finds

that they cannot support a finding of Defendant's waiver of its right to subrogation.  Those facts

establish that Plaintiff notified Defendant of its intent to settle with Mr. Jagannath and Mr.

Seetharaman.  (ECF No. 126-4 at PageID 9090–91; ECF No. 126 at PageID 8979.)  Plaintiff also

invited Defendant to participate in its mediation with Mr. Jagannath and Mr. Seetharaman in

pursuit of its subrogation rights should Defendant make payment under the Policy.  (ECF No. 126-

4 at PageID 9090–91.)  Defendant declined, explaining that it had yet to make a coverage

determination but stating that it "continue[d] to reserve all of [its] rights and defenses in this

matter."  (*Id.* at PageID 9090.)  Following Defendant's subsequent inquiry into Plaintiff's

Settlement, Plaintiff informed Defendant that mediation had taken place and that a tentative

settlement had been reached.  (*Id.* at PageID 9083.)  Plaintiff also sent Defendant a draft of the

settlement agreement and invited Defendant to comment on it.  (*Id.*)  Defendant ultimately

reviewed the draft and reiterated to Plaintiff that it "continue[d] to reserve all of [its] rights and

defenses under [its] policies and otherwise, specifically in light of the agreement that apparently

has been reached, including the right to maintain that [Plaintiff] has improperly prejudiced any

potential subrogation rights, if any, that the Insurers would have once a coverage decision is made."

(*Id.* at PageID 9082.)  Defendant commented, however, that it had concerns that the settlement

amount ($15 million) was too low.  (*Id.*)  At no time did Defendant object to Plaintiff's Settlement.

These undisputed facts do not support a finding of Defendant's waiver of subrogation.

Indeed, while Defendant did not object to Plaintiff's Settlement, it explicitly warned Plaintiff

multiple times that it was reserving its rights under the Policy, to include its rights under the

subrogation provision.  These statements simply cannot be viewed as "a voluntary relinquishment

---

to that notice, both in word and conduct.  Parties' communications were, in large part,
memorialized in an email exchange lasting from May–September 2022.  (ECF No. 126-4.)

or renunciation of a known right."  At oral argument, Plaintiff additionally suggested that, even if Defendant did not waive its rights through express declaration, it did so through its course of conduct with Plaintiff when Defendant repeatedly declined to protect its subrogation rights by participating in Plaintiff's Settlement.  Given Defendant's simultaneous statements to the contrary throughout its course of conduct, however, the Court does not find that Defendant's conduct was such "to induce a belief that it was [Defendant's] intention and purpose to waive."  Defendant did not waive its rights to subrogation, but it may have waived its right to allege breach.

### D.    Breach

As noted, Defendant seeks summary judgment on all of Plaintiff's claims because it contends Plaintiff "materially breached" the Policy when it "executed a *complete release* of those alleged to be responsible for the loss that is the subject of this action" and thereby "wholly extinguished" Defendant's subrogation rights under the Policy.  (ECF No. 101 at PageID 4461, 4469–70.)  Plaintiff says Defendant has no subrogation rights because the Policy language conditions them on Defendant first paying Plaintiff, which it still has not done.  (ECF No. 114 at PageID 7443.)  It became clear at oral argument on these Motions that both parties consider the Policy language dispositive on this issue.

The subrogation provision in the Policy states:

> In the event of any payment under this Policy, the Underwriters shall be subrogated to the extent of such payment to the Insured's rights of recovery and the Insured shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable [Defendant] effectively to bring suit in the name of the Insured.

(ECF No. 114 at PageID 7443.)  The Court finds that, in the absence of sufficient objection by Defendant as to Plaintiffs' Settlement, Plaintiff did not breach this provision of the Policy when it entered into Plaintiff's Settlement.  Defendant points the finger at Plaintiff for its inability to pursue its subrogation rights against Mr. Jagannath and others, since Plaintiff entered into Plaintiff's

Settlement despite Defendant's warnings that doing so could potentially give rise to the claim that it violated the Policy.  But the Court finds that the undisputed facts tell a slightly different story.

The language of the provision indicates that Defendant's subrogation rights arise only upon payment under the Policy.  Evidently, Defendant shares this understanding, as evidenced by its reservation of the right "to maintain that [Plaintiff] [] improperly prejudiced any potential subrogation rights, if any, that the Insurers would have once a coverage decision is made." (*See* ECF No. 126-4 at PageID 9082.)  The provision also indicates that Plaintiff had an obligation to "do everything necessary to secure and preserve" those rights.  But there is nothing in the provision to foreclose Defendant from also acting to protect its "potential subrogation rights."  Beyond expressing its concerns about the amount of Plaintiff's Settlement and its provisions related to invocations of the Fifth Amendment, though, Defendant elected not to do so.  It did not, for example, make a coverage determination and pay under the Policy, which would have given rise to its subrogation rights.  Nor did it discuss other avenues for intervention in the negotiations it knew Plaintiff was having with Mr. Jagannath, or even take an affirmative position on the significance Plaintiff's Settlement would have on coverage under the Policy.  Instead, it opted for the bare minimum, merely reserving its rights and occasionally checking in on Plaintiff's progress in reaching a settlement.

Given these facts, the Court does not agree with Defendant that Plaintiff's Settlement constituted a breach of the Policy.  Even if it did, Defendant arguably waived any right it may have had to assert breach by Plaintiff.  Rather, Plaintiff was required to "do everything necessary to secure and preserve" Defendant's subrogation rights and it fulfilled that obligation by keeping Defendant informed of the potential for settlement and providing Defendant with every opportunity to protect its subrogation interests.  The Court does not read the Policy to make it

"necessary" for the insured to forego all opportunities to mitigate its damages when, as here, the insured repeatedly puts the insurer on notice of a potential settlement and the insurer repeatedly declines to act.  While this conclusion stems from the Policy language, the Court further notes that the opposite outcome would encourage insurers to delay coverage determinations and thus force insureds to choose between pursuing some recovery from the tortfeasor at the expense of coverage and potentially forfeiting the ability to recover from the tortfeasor at all in the hopes of getting coverage (which the insurer may ultimately deny).

Defendant challenges this conclusion, again relying on *Hayes* to argue that Plaintiff's Settlement constituted a breach of Plaintiff's obligation to secure and preserve Defendant's subrogation rights.  The subrogation provision at issue in *Hayes* stated, in relevant part:

> I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO U.S.
>
> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. **That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them . . . .**

*Id.* at 759 (alteration in original).

In addition to the *Hayes* Court's findings on the made whole doctrine, it concluded that the trial court had erred in concluding that the policy's provision obligating the plaintiff to do everything necessary to secure the defendant's subrogation rights did not allow the defendant to avoid coverage despite the release.  *Id.* at 758–59.  The *Hayes* Court thus reversed, holding instead that the plaintiff materially breached the policy when he released the driver and his insurer.  *Id.* at 759.  And while it acknowledged that prior cases only involved the destruction of subrogation rights after payment by the insurer, the Court in *Hayes* ruled that "the same legal consequence"—forfeiture of any right of recovery against the insurer—"occurs if the insured destroys the insurer's subrogation rights before payment . . . ."  *Id.* at 762.  It did not elaborate on the reasoning for this

21

finding, however.

Defendant also cites *Aetna Cas. & Surety Co. v. Tenn. Farmers Mut. Ins. Co.*, 867 S.W.2d 321 (Tenn. Ct. App. 1993). There, an insured had primary uninsured motorist coverage with Tennessee Farmers Mutual Insurance Company ("Tennessee Farmers") and excess coverage with Aetna Casualty and Surety Company ("Aetna"). 867 S.W.2d at 322. Without obtaining Tennessee Farmers's consent, the insured and Aetna executed a full release of the tortfeasor. *Id.* In light of this release, Tennessee Farmers refused to pay under its policy with the insured, and Aetna subsequently sued Tennessee Farmers seeking contribution for the payments Aetna paid to the insured. *Id.* The trial court dismissed the complaint because Aetna and the insured destroyed Tennessee Farmers's subrogation rights. *Id.*

The Tennessee Court of Appeals affirmed. It first found that, based on statute and the relevant policy, an insured who destroys his insurer's subrogation rights forfeits any recovery. *Id.* at 323. As for the timing of payment, the Court found that it did not matter. It was at least "clear that if an insured destroys the insurer's subrogation rights after payment, the insured is liable to the insurer for payments made by the insurer." *Id.* (citing *Motors Ins. Corp. v. Blakemore*, 584 S.W.2d 204 (Tenn. Ct. App. 1978)). And while Tennessee Farmers had not yet made any payments to its insured, that fact did not affect the ultimate outcome in the case:

> [Based on *Blakemore*], assuming arguendo that Tennessee Farmers had paid their insured, they would now be entitled to a judgment against their insured for all amounts paid because of the extinguishment of Tennessee Farmers' rights of subrogation by the release. To require Tennessee Farmers to pay after a release has been given and the right of subrogation extinguished is neither justifiable in equity nor warrantable under the clear intent expressed by statute (T.C.A. § 56-7-1204) or the terms of the policy. Further, the insured has clearly breached that provision of the insurance contract which provides that the insured shall do nothing after loss to prejudice the rights of the insurer.

*Id.*

The Court does not consider these cases dispositive here because both are distinguishable. Like here, the insureds did not receive the insurer's consent before releasing their claims in *Hayes* and *Aetna*. But there is nothing in those cases to suggest that the insurer received the amount of notice that Defendant received here; the insured gave the insurer no notice in *Hayes*, and all *Aetna* tells us is that the insured did not receive consent to settle. In the Court's view, this fact matters in determining whether the insured has fulfilled its obligations under the Policy. Given the equitable principles underlying subrogation in Tennessee, the Court does not consider it justifiable to allow an insurer to benefit from intentionally withholding its consent or its objection to a potential settlement. Plaintiff did not breach the Policy, and Defendant's request for summary judgment on all of Plaintiff's claims on that basis is denied.

### E.        Affirmative Defenses 12, 13, and 14

Plaintiff contends that Defendant has no standing to challenge Plaintiff's Settlement because it had no subrogation rights at the time it was entered into and thus moves for summary judgment on Defendant's twelfth, thirteenth, and fourteenth affirmative defenses, which Plaintiff contends "blend together to make the single argument, in essence, that [Plaintiff] should have obtained more than $15 million from [Mr. Jagannath] and [Mr. Seetharaman] in its settlement with them." (ECF No. 95 at PageID 2487.)[17] Defendant does not address the affirmative defenses specifically, but argues generally that Plaintiff's breach forfeited, or waived, any coverage under the Policy and that the low amount of Plaintiff's Settlement demonstrates a failure to mitigate damages.

---

[17] It reaches this conclusion based on statements Defendant's corporate-designee witness made in elaborating on why it raised these defenses, all of which, as Plaintiff represents, relay Defendant's position that there were assets Plaintiff did not pursue and which can no longer be pursued given Plaintiff's release. (*See* ECF No. 95 at PageID 2487.)

Given the Court's ruling that Plaintiff did not breach the Policy, Plaintiff's Motion for summary judgment on Defendant's Twelfth and Fourteenth affirmative defenses is granted and those defenses are dismissed.  Given the material questions of fact surrounding Plaintiff's alleged damages, the Court finds it premature to consider Defendant's Thirteenth affirmative defense concerning the mitigation of damages and thus denies summary judgment on that defense.

## II.  "Employee Theft"

Defendant also contends that it is entitled to summary judgment because Plaintiff "cannot show that funds went to [Mr.] Jagannath; and overpayments to vendors are not 'employee theft.'"[18] (ECF No. 101 at PageID 4472.)  These arguments invoke the Employee Dishonesty provision of the Policy, which covers "Loss resulting directly from Employee Theft."  (ECF No. 102-1 at PageID 4488.)  The Policy further defines "Employee Theft" as "the unlawful taking of Money, Securities or Property to the deprivation of an Insured by an Employee, whether identified or not, acting alone or in collision with others to obtain financial benefit for the Employee[.]"  (*Id.* at PageID 4492.)

### A.  Receipt of Funds by Mr. Jagannath

Defendant asserts Plaintiff "has put forth **no** evidence showing that [Mr.] Jagannath received any funds from the alleged employee theft," meaning Plaintiff cannot meet its burden to show that Mr. Jagannath financially benefited from the alleged scheme and thus cannot establish loss under the Employee Dishonesty provision.  (ECF No. 101 at PageID 4472.)  Plaintiff

---

[18] Defendant's Motion could be read to challenge the alleged overpayments on two grounds: (1) that they do not constitute "Employee Theft" as that term is defined in the Policy because they were not "unlawful taking[s]" and (2) they do not constitute "Loss" as that term is defined in the Policy, presumably because they were not sufficiently "direct."  (*See* ECF No. 101 at PageID 4472 & 4474.)  Based on the organization of the Motion, however, and the fact that Defendant explicitly challenges other claims as not being sufficiently "direct" to constitute "Loss" under the Policy, the Court addresses only whether the alleged overpayments qualify as "Employee Theft."

disagrees, arguing that proof that Mr. Jagannath received funds is not necessary to establish "Employee Theft." (ECF No. 114 at PageID 7448–49.)  In any event, Plaintiff points to language in Plaintiff's Settlement indicating Mr. Jagannath did receive funds from the alleged scheme. (*Id.* at PageID 7447–48.)

The Court agrees with Plaintiff that the Employee Dishonesty provision in the Policy does not make coverage contingent on the allegedly dishonest employee's receipt of funds. The Policy does not directly define "financial benefit" for purposes of an "Employee Theft," saying only that the term "does not include any employee benefits earned in the normal course of employment, including salaries, commission, fees, bonuses, promotions, awards, profit sharing or pensions." (ECF No. 102-1 at PageID 4492.)  And Defendant does not explain why "financial benefit" under the Employee Theft provision requires "receipt" of funds rather than some other form of financial benefit.  Nor does Defendant support its suggestion that Plaintiff needs to show that money was deposited into an account under Mr. Jagannath's name—a curious suggestion given that the Employee Dishonesty provision permits coverage even if the identity of the employee is unknown. (*See* ECF No. 101 at PageID 4473.)  Defendant's request for summary judgment based on the general argument that there is no evidence Mr. Jagannath received any funds at all is denied.[19]

_____

[19] Because the Court rejects Defendant's argument that the Policy requires proof of actual receipt of funds, it denies Defendant's request for summary judgment on grounds that "[Plaintiff] fail[ed] to adduce any admissible evidence as to whether [Mr.] Jagannath received any funds . . . ." (*See* ECF No. 101 at PageID 4473.)  The Court further notes, however, that Plaintiff has pointed to evidence that supports its allegation that Mr. Jagannath financially benefited from his alleged scheme.  Most significant, it cites Mr. Jagannath's and Mr. Seetharaman's agreement within Plaintiff's Settlement "that DGS and Mid-South received funds from [Plaintiff] pursuant to their contracts with [Plaintiff] and its suppliers and further agree[d] that some of those funds were transferred to accounts controlled by [Mr. Jagannath]." (ECF No. 96 at PageID 2839.)  In addition, Plaintiff references Mr. Jagannath's deposition in this case in which, when asked for additional information about what the phrase "some of those funds were transferred to accounts controlled by [Mr. Jagannath]" meant, Mr. Jagannath invoked his Fifth Amendment right against self-incrimination.  (ECF No. 117-12 at PageID 8515.)  The admissibility of both Mr. Jagannath's statement and his invocation of his Fifth Amendment rights are subjects of pending motions in

## B.      Overpayments to Vendors

Defendant's other argument concerning "Employee Theft" involves Plaintiff's claim that Defendant should cover the $26,843,769 in overpayments Plaintiff alleges it paid to DGS and Mid-South.  (ECF No. 101 at PageID 4473.)  Plaintiff's reasoning for this claim is that it overpaid Mid-South and DGS because, as part of Mr. Jagannath's scheme, these entities sold specialty chemicals to Plaintiff without providing the value-added services Plaintiff expects from its Tier 1 diversity suppliers.  Defendant denies that the Policy covers these "overpayments"—which Defendant disputes are "overpayments" at all—because it does not consider them to constitute "Employee Theft" as courts have interpreted this phrase in other cases.  (*Id.* at PageID 4475.)  Plaintiff challenges the applicability of Defendant's cases and otherwise asserts that these overpayments fall under "Employee Theft."  (ECF No. 114 at PageID 7451–53.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has established a genuine issue of material fact to preclude summary judgment.  Insurance policies are contracts, and courts thus interpret their language as they would any other contract.  *Garrison v. Bickford*, 377 S.W.3d 659, 883 (Tenn. 2012) (citing *Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000)).  Accordingly, "the terms of an insurance policy 'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'"  *Id.* (citing *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012)).  Insurance policies, however, "are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls."  *Id.* (quoting *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn.

---

limine.  Defendant did not sufficiently raise these challenges at the summary judgment stage, however.  (*See also* discussion *supra* n.10.)  Thus, even were the Court to find that the Policy required the specific proof Defendant suggests, the Court would determine that Plaintiff has raised a genuine dispute of material fact concerning "Employee Theft."

1993)).  That being said, a court may not place a "strained construction" on the policy's language to create ambiguity if none exists.  *Id.* (citing *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

As noted, the Policy defines "Employee Theft" as "the unlawful taking of Money, Securities or Property to the deprivation of an Insured by an Employee, whether identified or not, acting alone or in collusion with others to obtain financial benefit for the Employee . . . ."  (ECF No. 96 at PageID 2833–34.)  It is clear from parties' disputes over the applicability of Defendant's cases that the central question here is whether Mr. Jagannath's alleged activity constituted an "unlawful taking."  The Policy does not further define this phrase or the words therein, nor does either party provide authority from Tennessee doing so.  The word "unlawful," however, "points the Court toward the definition of theft in [Tennessee's] criminal code for assistance in construing the [] Policy as to the meaning of 'unlawful' in the definition of theft."  *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, No. 5:10 CV 823, 2013 U.S. Dist. LEXIS 46297, at *60–61 (N.D. Ohio Mar. 28, 2013).  And "[o]ther courts have turned to the applicable criminal code for help in interpreting the meaning of 'theft' in policy language."  *Id.* (citing *Hartford Fire Ins. Co. v. Mitchell Co., Inc.*, 2010 U.S. Dist. LEXIS 132887, at n.6 (S.D. Ala.)).

The Tennessee Supreme Court closely examined Tennessee's theft statute in a case requiring it to determine whether it included theft of real property.  *State v. Gentry*, 538 S.W.3d 413 (Tenn. 2017).  As part of that analysis, it explained that, "[p]rior to 1989, Tennessee did not have a single, generic definition of theft."  *Id.* at 421.  Like other states, it had a number of statutes derived from English common law, which arose from the British Parliament's "somewhat ad-hoc process" of creating new statutory offenses for theft-like crimes.  *Id.*  Since the differences between these statutes were difficult to discern and challenging to apply, the American Law Institute

included a consolidated theft statute in its Model Penal Code ("MPC") to help streamline their application. *Id.* at 421. In 1989, Tennessee enacted a generic theft statute based on the MPC. *Id.* at 422 (citing Tenn. Code Ann. § 39-14-101 (2021) ("Conduct denominated as theft in this part constitutes a single offense embracing the separate offenses referenced before 1989 as embezzlement, false pretense, fraudulent conversion, larceny, receiving or concealing stolen property, and other similar offenses")). Concerning the offense of "theft," the statute provided: "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2021).

As this history indicates, "theft" in Tennessee covers a wide variety of conduct. For example, to "obtain" for purposes of the statute:

> includes, *but is not limited to*, the taking, carrying away or the sale, conveyance or transfer of title to or interest in or possession of property, and includes, *but is not limited to*, conduct known as larceny, larceny by trick, larceny by conversion, embezzlement, extortion or obtaining property by false pretenses . . . .

*Id.* at 423. The *Gentry* Court also cited in its discussion of the scope of this statute the following words of one of the principal drafters of the MPC language: "[T]here are a lot of ways of stealing. The basic conception of this draft [of the consolidated theft statute] is that it does not make any difference which way you choose to steal. If you are stealing, you are a thief." *Id.* at 423–24. Pertaining to Tennessee's theft statute in particular, the *Gentry* Court suggested[20] that "'the critical inquiry is [] twofold: whether the actor had control of the property, no matter how he got it, and whether the actor's acquisition or use of the property was authorized.'" *Id.* at 423 (quoting MPC

---

[20] The *Gentry* Court referenced the MPC Commentaries several times in its discussion of Tennessee's theft statute in particular. It also directed the defendant to those Commentaries in response to one of her arguments. *See Gentry*, 538 S.W.3d at 426. This Court thus interprets *Gentry* to find instructive, if not formally adopt, the referenced portions of the MPC Commentary when analyzing Tennessee's theft statute.

Commentaries, Part II §§ 220.1–230.5, 166 (Official Draft and Revised Comments 1980)).

Considering the term "unlawful" in the Policy, the Policy's definition of "Employee Theft," and the history and text of Tennessee's consolidated theft statute, and resolving any ambiguity in the Policy against Defendant, Mr. Jagannath's alleged role in ensuring Plaintiff made the "overpayments" could support a finding of "Employee Theft."  Rather than focus on Mr. Jagannath's alleged conduct, Defendant frames the "overpayments" as "a less favorable deal from a deceitful contractor" rather than theft by Mr. Jagannath.[21]  (ECF No. 101 at PageID 4474 (quoting *Frazier Indus. Co. v. Navigators Ins. Co.*, 149 F. Supp.3d 512, 518 (D. N.J. 2015).)  But there are facts to support a finding that Mr. Jagannath's level of control over the purchase of chemicals is enough to constitute "Employee Theft."  Indeed, as other courts have explained in denying similar requests for summary judgment, an "unlawful taking" can include the exertion of control and need not be confined to physical removal or other, more narrow definitions of "taking."  *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Cargill, Inc.*, 61 F.4th 615, 620–21 (8th Cir. 2023) (finding "employee theft" when an employee "took implicit control over" and "exercised her authority to direct the transfer and sale" of her employer's grain as part of her embezzlement scheme); *Sherwin-Williams Co. v. Beazley Ins. Co.*, No. 18-02964 (DWF/DTS), 2020 U.S. Dist. LEXIS 130389, at *9–11 (D.C. Minn. July 23, 2020) (finding "employee theft" even though the employee did not exercise control over the relevant payments because the employee controlled the approval of invoices).  The breadth of Tennessee's theft statute further counsels in support of this broader approach towards the question of what action can constitute an "unlawful taking."

Here, Mr. Jagannath was an employee during the alleged scheme and, as part of his duties,

---

[21] Defendant also frames the issue as whether or not the *overpayments* constitute "employee theft."  But whether a theft has occurred depends on the actions of the alleged wrongdoer—not the item said to have been stolen.  The better question is thus whether Mr. Jagannath's alleged conduct as to the alleged overpayments could support a finding of "Employee Theft."

implemented and supervised the purchase of specialty chemicals DGS and Mid-South ultimately procured for Plaintiff.  Plaintiff alleges that Mr. Jagannath used those duties to accomplish his scheme.  For example, Plaintiff posits that "after [Plaintiff] had awarded business to a Majority Supplier for an agreed upon price, [Mr. Jagannath] would contact the Majority Supplier and offer to extend the award of business for an additional year if the Majority Supplier would enter into a Tier 1 or 2 relationship with DGS or Mid-South."  (ECF No. 114 at PageID 7441.)  In one email from a majority supplier to Mr. Seetharaman, the majority supplier advises that it "ha[d] spoken with [Mr. Jagannath] about adding a 4th year to [its] existing contract extension proposal, and he has asked that [it] work with you to supply one of our products at this location through DGS." (ECF No. 97-15 at PageID 4180.)  Plaintiff also alleges that Mr. Jagannath financially benefited from the purchases he arranged with DGS and Mid-South, citing Mr. Jagannath's and Mr. Seetharaman's statement in Plaintiff's Settlement "that DGS and Mid-South received funds from [Plaintiff] pursuant to their contracts with [Plaintiff] and its suppliers and further agree[d] that some of those funds were transferred to accounts controlled by [Mr. Jagannath]."  (ECF No. 96 at PageID 2839.)  Plaintiff additionally notes that Defendant conceded in its coverage determination letter that "the facts generally demonstrate an Employee Theft" and that, save for the inability to quantify the money lost, Defendant "acknowledges that the claim otherwise falls within the Employee Dishonesty coverage."  (ECF No. 114 at PageID 7449; ECF No. 117-1 at PageID 7709.) A reasonable juror could find "Employee Theft" from the facts alleged and evidence cited.

Defendant cites *Frazier*, an out-of-circuit case from the New Jersey District Court, for its argument that these payments are not "Employee Theft."  149 F. Supp.3d 512.  But that case does not go as far as Defendant needs.  In *Frazier*, the insured was a manufacturer of steel storage systems who sometimes employed independent contractors to install the systems.  *Id.* at 515.

30

Eventually, the insured learned that the employee who was responsible for setting the insured's budget for installation costs was executing a scheme with one of its contractors.  *Id.*  Through that scheme, the employee would receive the contractor's bid and, if it was below budget, tell the contractor how much it could increase its bid while still winning the contract.  *Id.*  In turn, the employee would split the padded amount with the contractor.  *Id.*  The padded sums were alleged to amount to nearly $2 million.  *Id.*

The insured sought coverage for its loss under the Employee Theft provision of its Crime Policy, which stated that the insurer "will pay for loss of or damage to 'money,' 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee', whether identified or not, acting alone or in collusion with other persons."  *Id.* at 514.  The insurer denied coverage on grounds that the alleged loss was not a result of "theft," and so was not covered by the Policy.  *Id.* at 515.  The *Frazier* Court agreed with the insurer insofar as payments to the independent contractor were concerned, explaining that "the padded amounts [the plaintiff] paid its independent contractor were not an 'unlawful taking' by [the plaintiff's] employee."  *Id.* at 517.  It went on:

> [The plaintiff] bought insurance from [the defendant] to protect it from employee theft, not against a less favorable deal from a deceitful contractor. Unlike the plaintiff in [*Hartford Fire Ins. Co. v. Clark*, 562 F.3d 943, 945 (8th Cir. 2009)], [the plaintiff] does not assert that the underlying transaction was fraudulent and that the independent contractor did not perform its work. *Cf. Clark*, 562 F.3d at 945 (stating that insurance company voluntarily paid out for employee theft where the employer was charged for services that were not provided and the employee approved unreasonable rates). In addition, [the plaintiff] has not argued nor demonstrated that [the contractor's] bids were either unreasonably priced or not the lowest for a particular job—the latter likely to be the case otherwise [the employee's] choice of [the contractor] would have raised suspicions. *Cf. id.* Rather, [the plaintiff] set an internal budget and expected that any independent contractor it chose would make a profit on their service. As such, [the plaintiff] was not "unknowingly deprived of money." *See [Hartford Fire Ins. Co. v. Mitchell Co.*, 440 F. App'x 759, 760 (11th Cir. 2011)]. Consequently, the "loss" that [the plaintiff] claims here is—at its core—an inability to obtain the lowest price, and that is not a basis to raise a claim under the Crime Policy. *See [Hartford Fire Ins. Co. v. Mitchell Co.*, No. 08-00623-KD-N, 2010 U.S. Dist. LEXIS 132887, at *5].

*Id.* at 518. The *Frazier* Court considered the *employee's* share of the padded amount, however, an "unlawful taking" because those amounts "were not strictly payments to a third-party, and [the plaintiff] had not consented to such payments." *Id.* It did not matter to the *Frazier* Court that the money had first passed through the independent contractor before reaching the employee. *Id.*

Thus, even *Frazier* does not necessarily counsel in support of summary judgment. First, the *Frazier* Court's finding that the amounts paid to the independent contractor did not constitute an "unlawful taking" is not particularly applicable to the facts of this case because it rested in part on the fact that the plaintiff was not claiming the contractor was not performing its work. *See id.* But Plaintiff here does assert that the underlying contractors (DGS and Mid-South) were not performing their work; in fact, that is the foundation of Plaintiff's claim for overpayments. Second, the *Frazier* Court ruled that the employee's share of funds did count as an "unlawful taking." *Id.* Defendant's Motion for Summary Judgment on this basis is denied.[22]

## III.    $4.6 Million in Payments to Third Parties

Defendant moves for partial summary judgment on two other categories of Plaintiff's claimed losses—(1) the "$1.9 million purportedly paid in markup *to majority suppliers*" and (2) "the roughly $2.7 million in payments made by [Plaintiff] *to its majority suppliers* after terminating its relationship with DGS and Mid-South." (ECF No. 101 at PageID 4462.) The $1.9 million amount is, specifically, $1,938,966 and it comes from Plaintiff's damages expert ("Mr. Glasser"), who calculated that DGS and Mid-South had received $1,938,966 in "commissions" from the majority suppliers with whom they were in Tier 2 arrangements. (ECF No. 95 at PageID 2476.)

---

[22] Defendant includes a footnote arguing that the "Affiliates and Prior Employers Exclusion" reinforces the fact that overpayments are not "Employee Theft." (ECF No. 101 at PageID 4474 n.4.) The Court addresses this argument in its discussion of that exclusion. (*See* discussion *infra* Sec. VI.)

Plaintiff considers itself entitled to this amount because it believes the prices it paid to the majority suppliers were inflated by this much, assuming the majority suppliers passed along the costs of its commissions to DGS and Mid-South to Plaintiff.  The $2.7 million—or $2,703,175—also comes from Mr. Glasser, who calculated that Plaintiff made $2,703,175 in payments to majority suppliers DGS and Mid-South had not paid for the product Plaintiff received.  (ECF No. 95 at PageID 2476.) Defendant contends that neither of these claims are covered by the Policy because they are barred by exclusions and do not constitute "direct 'loss.'"

### A.      Voluntary Exchange or Purchase Exclusion (Fourth Affirmative Defense)

Both parties move for summary judgment on Defendant's affirmative defense that the Voluntary Exchange or Purchase Exclusion bars recovery of these two categories[23] of claimed loss.  "'An insurance company has the burden of proving that an exclusion in its policy applies to a claim.'"  *Johnson & Assocs., LLC*, 572 S.W.3d 636, 644 (Tenn. Ct. App. 2018) (quoting *Patterson v. Shelter Mut. Ins. Co.*, No. M2014-01675-COA-R9-CV, 2015 Tenn. App. LEXIS 734, at *8 (Tenn. Ct. App. Sept. 11, 2015)).  Once it has done so, "the burden shifts to the insured to demonstrate that its claim fits within an exception to the exclusion."  *Standard Fire Ins. Co. v. Chester-O'Donley & Assocs.*, 972 S.W.2s 1, 8 (Tenn. Ct. App. 1998) (citing *Just v. Land Reclamation, Ltd.*, 445 N.W.2d 683, 688 (Wis. Ct. App. 1989), *rev'd on other grounds*, 456 N.W.2d 570 (Wis. 1990)).

Here, the Voluntary Exchange or Purchase Exclusion provides, in relevant part: "The Underwriters shall not be liable for Loss or Expenses arising out of the Insured knowingly having given or surrendered Money, Securities or Property in any exchange or purchase with a Third

---

[23] Plaintiff suggests that Defendant argues that this Exclusion also applies to the Tier 1 overpayments.  (ECF No. 121 at PageID 8736.)  The Court cannot find sufficient argument from either party about its application to this category of claimed loss, however, and thus will not consider it.

Party, not in collusion with an Employee . . . ."  (ECF No. 102-1 at PageID 4496.)  Defendant considers both categories of claimed loss unavailable under this Exclusion because it argues that Plaintiff voluntarily made the relevant payments to the majority suppliers.  (ECF No. 101 at PageID 4478.)  Plaintiff denies that these payments were made voluntarily, contending instead that they were made under duress or without sufficient knowledge.  (ECF No. 114 at PageID 7458.) Plaintiff further contends that it is entitled to summary judgment on this affirmative defense because Defendant bears the burden to establish it and cannot show that Mr. Jagannath was *not* in collusion with DGS or Mid-South.  (ECF No. 95 at PageID 2482.)  Defendant retorts that there could not have been collusion with Mr. Jagannath on the settlement payments because Plaintiff made them after his termination and that there was no collusion with Mr. Jagannath on the commission payments because Plaintiff has not established that he was involved in Plaintiff's payments to the majority suppliers.  (ECF No. 118 at PageID 8552.)

Before considering the merits of parties' arguments, the Court must first resolve a threshold issue that parties have not directly addressed: the type(s) of purchases (or exchanges) to which this Exclusion applies.  The Exclusion's title includes the word "voluntary," indicating that it governs purchases made "voluntarily."  But its text speaks to whether the insured's payments were made "knowingly."   Defendant appears to treat "knowing" and "voluntary" as synonyms,[24] but the

---

[24] Defendant implies that these terms are interchangeable when it cites to Michigan's "voluntary payment doctrine," under which a payor may not recover payments made with full knowledge of the relevant facts absent artifice, fraud, deception, or duress.  (ECF No. 101 at PageID 4478 (citing *Nationwide Mut. Fire Ins. Co. v. McDermott*, No. 12-11863, 2013 U.S. Dist. LEXIS 128764, at *11 (E.D. Mich. Sept. 10, 2013)).)  Tennessee has similarly blessed the voluntary payment doctrine.  *See Love v. Clark*, No. E2017-01138-COA-R3-CV, 2018 Tenn. App. LEXIS 274, at *7 (Tenn. Ct. App. May 17, 2018) (quoting *Newman v. Aluminum Co. of Am.*, 643 S.W.2d 109, 112 (Tenn. Ct. App. 1982)) (stating that the voluntary payment doctrine holds that "where a person with full knowledge of the facts voluntarily pays money under a mistake of law on a demand not legally enforceable against him, he cannot recover it in the absence of unjust enrichment, fraud, duress, or improper conduct by the payee.").  But Defendant not only fails to cite it, but also does not explain whether, why, or how it should apply here other than to say this

Policy does not define either term and they generally are not synonymous.  *See, e.g.*, *State v. McKinney*, 669 S.W.3d 753, 770 (Tenn. 2023) (considering the "knowing" and "voluntary" prongs of a defendant's *Miranda* waiver separately).  Plaintiff seems to appreciate that there is a difference between the terms but does not elaborate on what that might be.  In any event, it is clear that the Policy at least excludes coverage for payments made "knowingly" to a third party.

Courts in Tennessee have interpreted "knowingly" in the criminal context to mean "that state of mind wherein the person charged was in possession of facts under which he was aware he could not lawfully do the act charged."  *State v. Summers*, 692 S.W.2s 439, 446 (Tenn. Ct. App. 1985) (citing *State v. Smith*, 105 S.W. 68, 69 (Tenn. 1907)).  Tennessee's criminal code states that "a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist."  Tenn. Code Ann. § 39-11-106(a)(22) (2021).  While the definitions differ somewhat, they all require an actual awareness of the circumstances surrounding a particular action.  The Court will thus consider the applicability of the Voluntary Exchange or Purchase Exclusion with this definition in mind.

### 1.    $1,938,966 in Alleged Commission Payments

Neither party is entitled to summary judgment on the applicability of the Voluntary Exchange or Purchase Exclusion to Plaintiff's claim for the alleged commission payments.  Defendant contends that the majority suppliers did not pass these costs along, meaning Plaintiff has not shown it incurred these costs at all, and accordingly cannot show that Mr. Jagannath "colluded" to impose them on Plaintiff for purposes of the Exclusion.  (ECF No. 118 at PageID 8552.)  Most notably, it points to evidence that Nalco—a majority supplier—was "adamant" in telling Plaintiff that it did not pass these costs along.  (ECF No. 122 at PageID 8743.)  But Plaintiff

---

doctrine is "related" to the exclusion.

has pointed to evidence in the record indicating that at least one majority supplier may have passed along those costs, referencing an email from Solenis—one of the majority suppliers—to Mid-South following a shift from a Tier 1 to a Tier 2 relationship.  (ECF No. 122 at PageID 8744; ECF No. 115 at PageID 7697.)  In that email, Solenis suggested increasing the price at which it sold chemicals to Plaintiff to account for the services it (Solenis) would now be performing rather than Mid-South and, by implication, for the commission payment to Mid-South.  (*See* ECF No. 117-11 at PageID 8492.)  There is thus a genuine dispute of material fact as to whether Plaintiff incurred these costs and, if so, to what extent.

Summary judgment is also inappropriate on the grounds Plaintiff suggests.  Plaintiff argues that the Exclusion does not apply because the payments were not made "knowingly," since Mr. Jagannath was the only one who knew that Plaintiff was covering commission payments despite receiving nothing in return for them.  (ECF No. 114 at PageID 7458.)  Relatedly, Plaintiff contends that the Exclusion is inapplicable because the payments were not made "in an exchange or purchase," since it was not receiving any services in return for its alleged commission payments.  (*Id.*)  In support, Plaintiff cites an email from the President of one of its majority suppliers to Mr. Jagannath asking that it "move to the Tier 2 type" because DGS was not providing any services.  (ECF No. 116 at PageID 7703; ECF No. 114-6 at PageID 7588.)  But Defendant cites to Plaintiff's contracts with Mid-South and DGS that provided for the provision of services including inventory management, the evaluation of new products, and tank monitoring.  (ECF No. 123-2 at PageID 8855.)

Because parties have raised these genuine disputes of material fact, both Motions for summary judgment on the Fourth affirmative defense are denied.

## 2.     $2,703,175 in Settlement Payments to Majority Suppliers

The Court finds that summary judgment is appropriate on Plaintiff's claim for the roughly $2.7 million in settlement payments to majority suppliers, however.  First, Defendant has established that the Voluntary Exchange or Purchase Exclusion excludes Plaintiff's settlement payments to the majority suppliers.  Even viewing the facts in Plaintiff's favor, they establish that Plaintiff knowingly paid third parties for purchases and that such payments were not made in collusion with an employee.  It is undisputed that Plaintiff made these payments to third parties (the majority suppliers).  (ECF No. 115 at PageID 7696.)  The undisputed facts also show that Plaintiff's reason for making these payments stemmed from its knowledge of the relevant facts and circumstances; it wanted to avoid lawsuits from the majority suppliers over certain specialty chemicals that were in Plaintiff's possession but had not been paid for (since DGS and Mid-South had stopped paying the majority suppliers after Plaintiff discovered the alleged scheme).  (*Id.*) Additionally, the record establishes that these payments were purchases—specifically, purchases for specialty chemicals.  (*See* ECF No. 115 at PageID 7696 (Plaintiff's response to Defendant's Statement of Undisputed Material Facts) ("Thus, in some situations, [Plaintiff] was forced to pay twice for certain specialty chemicals because of the employee theft scheme.").)  Because Mr. Jagannath was no longer working for Plaintiff at the time of these payments, Defendant has also shown that the settlement payments were not issued in collusion with an Employee.  (*Id.*)

Second, Plaintiff has not established that its claim for the settlement payments falls into an exception to this Exclusion.  In fact, the Court can find no argument about whether an exception to the Exclusion applies.  Rather, Plaintiff's main response to Defendant's arguments was that the settlements were not voluntary because they were made under duress; according to Plaintiff, their choices were to either settle with the suppliers DGS and Mid-South never paid or else face an

unjust enrichment lawsuit, since Plaintiff had already received the chemicals from the majority suppliers. (ECF No. 114 at PageID 7458.) But as discussed, the Voluntary Exchange or Purchase Exclusion bars coverage of payments to third parties that were made "knowingly," and Plaintiff's arguments do not implicate this requirement. Without more, and based on the aforementioned undisputed facts, the Court finds that a reasonable juror could not return a verdict for the Plaintiff on this issue and thus grants Defendant's motion for summary judgment on Plaintiff's claim for the $2,703,175 in settlement payments to majority suppliers.

### B.    "Direct Loss"

#### 1.    "Direct Loss" Under Tennessee Law

The Policy defines "Loss" under the "Employee Dishonesty" provision as "direct financial loss," but does not further define "direct" or "loss." (ECF No. 102-1 at PageID 4493.) There are two main approaches to determining what "direct" means in an insurance contract": the "direct is direct" approach and the "proximate cause" approach. *Transtar Elec., Inc. v. Charter Oak Fire Ins. Co.*, No. 3:13CV1837, 2014 U.S. Dist. LEXIS 8000, at *9 (N.D. Ohio Jan. 22, 2014). The "direct is direct" approach defines "direct" as "immediate," with courts often considering "'whether the employer suffered actual depletion of funds as a direct (immediate) result of the employee's conduct.'" *Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 674 (6th Cir. 2012) (quoting *Direct Mortg. Corp. v. Nat'l Union Fire Ins. Co.*, 625 F.Supp.2d 1171, 1174–76 (D. Utah 2008)). *See also, e.g., Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*, 249 F.Supp.2d 19, 27 (D. Mass. 2003) ("Courts interpreting fidelity policies similar to those at issue in this litigation have consistently concluded that the insured does not suffer a direct loss unless the insured's assets, and not those of a third party, are reduced because of the offending employee's wrongful conduct."). In contrast, the "proximate cause" approach "uses the traditional

'reasonably foreseeable' analysis . . . ." *Transtar*, 2014 U.S. Dist. LEXIS 8000, at *9.  *See, e.g.*, *Scirex Corp. v. Fed. Ins. Co.*, 313 F.3d 841, 850 (3rd Cir. 2002) (finding direct loss when an employer's losses were tied to studies that nurses had rendered useless through their violation of protocol and deceptive recordkeeping).

Defendant does not provide any authority indicating which approach Tennessee prefers. Considering the cases Defendant cites in support of its argument, however, it clearly wants the Court to adopt the "direct is direct" approach.  (ECF No. 101 at PageID 4476.)  Plaintiff, meanwhile, asserts that Tennessee follows the "proximate cause" approach, as suggested in *Farmers Mut. Fire Ins. Co. v. McMillan*, 395 S.W.2d 798, 799 (Tenn. 1965).  (ECF No. 114 at PageID 7455.)

This Court has not found Tennessee authority on which way to go in determining "direct loss" in a commercial crime policy such as the one here.  But there are cases that address "direct loss" for other types of insurance coverage pointing to the "proximate cause" approach as the one that reigns in Tennessee.  *See Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, 691 F.3d 821, 831–32 (6th Cir. 2012) (finding that Ohio would apply the proximate cause standard to determine "direct loss" under a commercial crime policy based in part on Ohio courts' application of that standard to other forms of insurance coverage).  In *McMillan*, the Tennessee Supreme Court stated that "subject to contract language to the contrary, the phrase 'direct loss by fire' in a fire insurance policy would generally be synonymous with proximate cause."  *McMillan*, 395 S.W.2d at 799. The *McMillan* Court further cited American Jurisprudence in support of that conclusion:

> Generally speaking a policy insuring against losses by fire covers every loss, damage, or injury to the insured property of which fire is the proximate cause. It includes every loss necessarily following from the occurrence of a fire, if it arises directly and immediately from the peril, or necessarily from the surrounding circumstances, the operation and influence of which could not be avoided. Moreover, it is not essential, to bring a loss within a fire insurance policy, that the

> property insured be ignited or consumed by fire, for in a proper case, a fire policy may, for example, cover damage from heat from a hostile fire; damage from breakage, theft, water, etc., in an attempt to save the property; damage from an explosion caused by a fire or to stop a conflagration; damage produced by a short circuit of electricity caused by fire . . . .

*Id.* (quoting 29A Am. Jur. <u>Insurance</u> § 1289 (1964).)  Based on the foregoing, the *McMillan* Court found that the policy's coverage for "all direct loss by fire, lightning and extended coverage" did not extend to the fee that the insured incurred by calling a private fire department to extinguish the fire to the insured property.  *Id.* at 798–800.  Indeed, that expense was not "'a natural and continuous sequence' resulting from the fire as these words are understood in the law of proximate case [sic]."  *Id.* at 800.

Tennessee courts have also reached the same conclusion when approaching the issue from a slightly different angle: namely, whether a covered event directly *caused* a particular loss.  The Court finds these cases persuasive.  After all, whether a loss resulted directly from a covered event and whether a covered event directly caused a loss are two sides of the same coin.  And while these cases involve different types of insurance coverage than the coverage at issue in this matter, the language in these policies often tracks that in the Policy here.  Two of these cases involved policy language that provided coverage for death if it resulted "directly" from accidental bodily injury and "independently of all other cause."  *See Reserve Life Ins. Co. v. Whittemore*, 442 S.W.2d 266 (Tenn. Ct. App. 1969); *Hughes v. Kentucky Cent. Life Ins. Co.*, 500 S.W.2d 442 (Tenn. Ct. App. 1973).  And in both, the Court found that proximate cause governed the analysis.  *See Hughes*, 500 S.W.2d at 445 (citing *Maness v. Life & Cas. Ins. Co. of Tenn.*, 28 S.W.2d 339 (Tenn. 1930)) ("the 'immediate cause' of death is not necessarily the cause of death in the matter of policies of insurance. If an accident be the efficient and predominating cause of death, the accident is regarded as the proximate cause even though the result was brought about by a chain of events, and the accident need not be the nearest cause in point of time or place"); *Whittemore*, 442 S.W.2d at 273

40

(citing *Maness*, 28 S.W.2d).  *See also Parker v. Provident Life & Accident Ins. Co.*, 582 S.W.2d 380, 384 (Tenn. 1979) (quoting 44 Am. Jur. 2d Insurance § 1215 (1969)) ("In accident insurance the question whether the insurer is liable for an injury depends on the proximate cause of the loss. The term 'proximate cause,' as here used, means the same as in other insurance cases, and a provision requiring loss to be caused by accident 'independent of all other causes' is equivalent to a provision requiring it to be the proximate cause.'").

Based on these cases, and in the absence of any competing authority offered by Defendant, the Court thus finds that the remaining category of loss challenged by Defendant—the over $1.9 million in alleged commission payments—should be assessed through the lens of proximate cause.

### 2. $1,938,966 in Mark-Ups

The Court finds that Defendant's request for summary judgment on the alleged commission payments must be denied.  It bears mentioning again that the Employment Dishonesty provision covers "direct financial loss" "resulting directly from Employee Theft."  Thus, to qualify as a covered loss under this provision, (1) there must be a loss, (2) that is financial in nature and (3) direct (*i.e.*, a proximate cause of an employee theft).  Defendant argues that these "losses" are not sufficiently "direct" because *the majority suppliers* passed these costs along to Plaintiff—not DGS or Mid-South.  (ECF No. 101 at PageID 4476.)  Otherwise, Defendant merely asserts that the losses are not direct under certain case law.  (*Id.* at PageID 4477.)  Plaintiff responds that these payments do qualify as "Loss" under the Policy in that "[Mr. Jagannath] induced the Majority Suppliers to pay a Tier 2 commission to DGS or Mid-South, and the Majority Suppliers passed along the commission costs to [Plaintiff] in the form of higher prices."  (ECF No. 114 at PageID 7456.)  Thus, Plaintiff sees a "'loss necessarily following from" [Mr. Jagannath's] inducement." (*Id.* (quoting *McMillan*, 395 S.W.2d at 799).)

Questions of fact pervade the question of coverage under the Policy for these commission payments.  As previously discussed, there are genuine disputes about whether majority suppliers passed commission payments to Plaintiff in the first place and whether DGS and Mid-South provided any value-added services.  (*See* discussion *supra* Section III.A.1.)  Even assuming Plaintiff did pay commissions, whether Mr. Jagannath's alleged conduct proximately caused Plaintiff to do so is also a question of fact for a jury to decide.  Summary judgment on the alleged commission payments is thus denied.

### C.       Indirect or Consequential Exclusion

Defendant maintains that both the $2.7 million in settlement payments and $1.9 million in commission payments must be excluded under the Indirect or Consequential Exclusion, which states that "[t]he Underwriters shall not be liable for Loss or Expenses arising out of indirect or consequential loss of any kind except for covered Expenses under the Expense Coverage insuring agreement."  (ECF No. 102-1 at PageID 4496.)  Specifically, Defendant maintains that this Exclusion applies because these payments were made to entities other than the alleged tortfeasor. (ECF No. 101 at PageID 4479.)  Plaintiff counters that nothing in the Exclusion's language suggests that it always applies to payments made to third parties and that these payments were direct losses under the Policy.  (ECF No. 114 at PageID 7457.)

As explained above, the settlement payments to majority suppliers are foreclosed by the Voluntary Expense or Purchase Exclusion.  And while the Court agrees with Plaintiff that the language of the Exclusion does not automatically bar payments to third parties, there are genuine disputes of material fact surrounding the "direct" nature of the commission payments.  Summary judgment on the basis of the Indirect or Consequential Exclusion is thus inappropriate.

## IV.     Affirmative Defenses 1, 6, 9, 10, and 15[25]

Plaintiff moves for summary judgment on these affirmative defenses because it contends Defendant is no longer pursuing them.  (ECF No. 95 at PageID 2477.)  Defendant confirmed Plaintiff's representation and further noted that it does not object to summary judgment as to these affirmative defenses.  (ECF No. 118 at PageID 8538.)  Accordingly, Plaintiff's Motion is granted insofar is it requests summary judgment on Defendant's first, sixth, ninth, tenth, and fifteenth affirmative defenses.

## V.     Seventh Affirmative Defense

This affirmative defense applies to Plaintiff's claim for the $958,599 Plaintiff incurred to prepare its insurance claim.  (ECF No. 95 at PageID 2486.)  Defendant generally maintains that this claim is barred by the Legal Fees, Costs or Expenses Exclusion in the Policy, which provides that "[t]he Underwriters shall not be liable for Loss or Expenses incurred or paid by an Insured in defending or prosecuting any legal proceeding or claim, provided that this Exclusion shall not apply to the coverage provided under the Expense Coverage insuring agreement[.]"  (ECF No. 102-1 at PageID 4496.)  Specifically, Defendant asserts that this Exclusion prevents recovery by Plaintiff on this claim because the relevant "Expense"—the costs of preparing the insurance claim—does not constitute an "Expense" under the Policy because it was neither reasonable nor incurred with Defendant's prior written consent. (ECF No. 118 at PageID 8553–54.)  In any event, Defendant contends that summary judgment is inappropriate because there is at least a genuine dispute of material fact concerning the reasonableness of the expenses incurred.  The Court agrees that the question of reasonableness is appropriately one for the trier of fact, especially since neither party moves for summary judgment on the basis of reasonableness.   Plaintiff's request for

---

[25] These affirmative defenses can be found at ECF No. 97-8.

summary judgment on this affirmative defense is thus denied.

## VI.    Eighth Affirmative Defense

Next, Plaintiff moves for summary judgment on Defendant's affirmative defense that the Affiliates and Prior Employees Exclusion precludes Plaintiff from recovering on its claims.  (ECF No. 95 at PageID 2483.)  This Exclusion provides as follows:

> The Underwriters shall not be liable under the Employee Dishonesty, Client Property Coverage or Expense Coverage insuring agreements for loss or damage sustained by any Insured caused by:
>
> 1.    any agent, broker, factor, commission merchant, consignee, contractor, independent contractor, subcontractor, or similar person or entity; or
>
> 2.    any Employee acting alone or in collusion with any other employee more than 30 days following the termination of such Employee.

(ECF No. 102-1 at PageID 4497.)  Plaintiff interprets this Exclusion to bar coverage only when the third party *alone* causes the loss—"i.e., when not colluding with an 'Employee.'"  (ECF No. 95 at PageID 2484.)  If it were otherwise, Plaintiff argues, then it would conflict with the Employee Dishonesty provision.  (*Id.* at PageID 2483.)  Defendant responds that interpreting this Exclusion to apply only when a third party acts alone "would render the exclusion meaningless and never capable of being applied."[26]  (*Id.*)

The Court finds that the Affiliates and Prior Employees Exclusion is ambiguous as it relates to the requisite third party conduct.  "Contractual language is ambiguous when it is susceptible to more   than   one   interpretation   and   reasonably   intelligent   persons   could   come   to   different

---

[26] Defendant also argues that analyzing this Exclusion is inappropriate before Plaintiff has established that an Employee Theft occurred.  (ECF No. 118 at PageID 8551.)  The Court has found that a reasonable juror could conclude that Mr. Jagannath's alleged conduct constitutes Employee Theft for which the Employee Dishonesty provision provides coverage.  (*See* discussion *supra* Section II.)

conclusions as to the meaning of the contract." *Fisher v. Revell*, 343 S.W.3d 776, 780 (Tenn. Ct. App. 2009) (quoting 77 C.J.S. Contracts § 304). In determining whether an ambiguity exists, "the whole instrument must be considered, and not in isolated part, such as a single sentence or paragraph. *Id.* "When an ambiguity is found in an insurance policy, it 'must be construed strongly against the insurer and in favor of the insured.'" *Id.* (quoting *Phillips v. United Servs. Auto. Ass'n*, 146 S.W.3d 629, 633 (Tenn. Ct. App. 2004)). "However, 'there must be two reasonable constructions of the language before the Court can find ambiguity and construe the policy toward the insured.'" *Id.* (quoting *Paul v. Ins. Co. of N. Am.*, 675 S.W.2d 481, 484 (Tenn. Ct. App. 1984)).

Here, the Exclusion could reasonably be read in the two ways parties suggest—as applying only to third parties acting alone or as applying to third parties acting in concert with an employee. Indeed, Plaintiff's interpretation is reasonable because the Exclusion would otherwise clash with the Employee Dishonesty provision. The main reason it would do so is that the Employee Dishonesty provision indicates that there is coverage no matter who Plaintiff colluded with to effectuate the unlawful taking. That is because the definition of "Employee Theft"—which the Employee Dishonesty provision incorporates—does not care who Plaintiff colluded with to effectuate the unlawful taking. Indeed, it merely requires the employee collude with an "other" to fall within its scope. ("Employee Theft means the unlawful taking of Money . . . to the deprivation of an Insured by an Employee . . . acting alone or in collusion with others . . . .")

But Defendant may have a point that interpreting the Exclusion to limit liability only when third parties act alone renders that portion of the Exclusion meaningless. The Exclusion limits liability for Defendant under three provisions: the Employee Dishonesty provision, the Client Property provision, and the Expense Coverage provision. Since the first two require Theft by an Employee, Plaintiff's interpretation restricts Defendant's ability to avoid liability for losses caused

by third parties under this Exclusion to the Expense Coverage provision, which states that "[t]he Underwriters shall indemnify the Insured for Expenses incurred by the Insured and that results from any Loss covered hereunder."  (ECF No. 102-1 at PageID 4490.)  The Court does not know if a third party acting alone could hypothetically cause a "Loss" covered under the Policy.  Nor will it parse the Policy to find out, since parties did not meaningfully address the issue.  But the possibility that a third party acting alone could not cause a covered "Loss" so as to permit invocation of the Expense Coverage provision is enough in the Court's view to support Defendant's contention that the Exclusion would lose its effect if interpreted in the way Plaintiff suggests.

Thus, while the Court finds the Exclusion ambiguous, it must construe it in Plaintiff's favor as the insured.  Accordingly, the Court finds that the Affiliates and Prior Employees Exclusion bars coverage only when a third party acts alone.  Because material questions of fact remain concerning the alleged scheme and the roles of DGS, Mid-South, and Mr. Jagannath in that scheme, however, Plaintiff's request for summary judgment on this affirmative defense is denied.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to Defendant's First, Sixth, Ninth, Tenth, Twelfth, Fourteenth, and Fifteenth affirmative defenses and **DENIED** as to Defendant's Fourth, Seventh, Eighth, Eleventh, and Thirteenth affirmative defenses.  Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**, this 25th day of April, 2024.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE